1              U. S.  DISTRICT COURT
            SOUTHERN DISTRICT OF ILLINOIS
2

DELIVERMED HOLDINGS, LLC, an        )
3    Illinois Limited Liability Company, )
     MARK SWIFT, LINDA DEETER, and       )
4    WILLIAM R. DEETER ASSOCIATES, INC.  )
                                         )
5                  Plaintiffs,           )
                                         )
6    v.                                  )   Case 3:10-cv-684-JPG
                                         )
7    MICHAEL L. SCHALTENBRAND,           )
     MEDICATE PHARMACY, INC, and,        )
8    JOEY D. SIDDLE,                     )
                                         )
9                  Defendants.           )
     _____   CONSOLIDATED WITH:
10
     MARK A. SWIFT,                      )
11                                       )
                   Plaintiff,            )
12                                       )
     v.                                  )   Case 3:10-cv-685-JPG
13                                       )
     MEDICATE PHARMACY, INC, and         )
14   MICHAEL L. SCHALTENBRAND,           )
                                         )
15                 Defendants.           )

16

17        TRANSCRIPT OF BENCH TRIAL PROCEEDINGS

18       BEFORE THE HONORABLE J. PHIL GILBERT
             UNITED STATES DISTRICT JUDGE
19
                   April 25, 2012
20

21
     COURT REPORTER:     Christine A. Simpson, CRR, RPR, CSR
22                       UNITED STATES DISTRICT COURT
                         301 W. Main Street
23                       Benton, IL  62812
                         (618) 439-7725
24
     Proceedings recorded by mechanical stenography, produced
25   by computer-aided transcription.

```
 1
         APPEARANCES:
 2
         FOR THE PLAINTIFFS: A. Courtney Cox, Esq.
 3                           SANDBERG, PHOENIX & VON GONTARD
                             2015 West Main Street, Suite 111
 4                           Carbondale, IL  62901
                             (618) 351-7200
 5
                             Russell K. Scott, Esq.
 6                           GREENSFELDER, HEMKER & GALE PC
                             12 Wolf Creek Drive, Suite 100
 7                           Swansea, IL  62226
                             (618) 257-7308
 8
                             James A. McGurk, Esq.
 9                           LAW OFFICES OF JAMES A. McGURK, PC
                             10 South LaSalle Street, Suite 3300
10                           Chicago, IL  60603
                             (312) 236-8900
11
         FOR THE DEFENDANT:  Kevin J. Stine, Esq.
12                           Laura E. Craft-Schrick, Esq.
                             Mark S. Schuver, Esq.
13                           MATHIS, MARIFIAN & RICHTER, LTD.
                             23 Public Square, Suite 300
14                           PO Box 307
                             Belleville, IL 62222
15                           (618) 234-9800

16                           Ned W. Randle, Esq.
                             POLSTER, LIEDER, et al.
17                           12412 Powerscourt Drive, Suite 200
                             St. Louis, MO  63131
18                           (314) 238-2400

19

20

21

22

23

24

25
```

1                          I N D E X

2                         WITNESSES

3     ALL WITNESSES:                                    PAGE:

4     For Plaintiff:

5        JOEY D. SIDDLE:
            Direct Examination by Mr. Cox              480:20
6           Cross-Examination by Mr. Schuver           517:6

7        ALLAN KOVIN:
            Direct Examination by Mr. McGurk           500:11
8           Examination by The Court                   572:14
            Recross-Examination by Mr. Schuver         573:14
9           Redirect Examination by Mr. McGurk         574:10

10       LINDA DEETER:
            Direct Examination by Mr. McGurk           577:11
11          Cross-Examination by Mr. Schuver           603:1
            Redirect Examination by Mr. McGurk         665:14
12
         CRAIG L. GREENE:
13          Direct Examination by Mr. McGurk           670:17
            Cross-Examination by Mr. Stine             704:17
14          Redirect Examination by Mr. McGurk         733:3

15

16

17

18

19

20

21

22

23

24

25

```
 1              (Proceedings began at 8:25 a.m. in open court.)

 2              THE COURT:  Okay, we are back on the record.

 3    Parties are present with their representative counsel.  We

 4    are still in the direct cross-examination so to speak of

 5    Mr. Siddle.  Mr. Cox, are you ready to proceed?

 6              MR. COX:  I am, Your Honor.  With the exception

 7    that I have just received this morning a copy of that

 8    document Mr. Siddle was talking about yesterday and I have

 9    just marked it as an exhibit, but I haven't had a chance

10    to make copies of it.

11              MS. SCHRICK:  We have a copy.

12              THE COURT:  Do you want Tracy to make a copy real

13    quick?

14              MR. COX:  That way, I'd like for you to have it as

15    well.

16              (Off the record.)

17              THE COURT:  Okay.  Copies have been made and we're

18    ready to roll.

19                   DIRECT EXAMINATION (continued)

20    BY MR. COX:

21    Q.    Mr. Siddle, yesterday you told us that you had

22    received a document, you said a handwritten document from

23    Schaltenbrand and Schaltenbrand regarding some numbers

24    that you then plugged into your tax return.  Do you recall

25    that?
```

1  A.        I said that, yes, sir.

2  Q.        And you said you didn't recall who it came from

3  but you were sure it was from Schaltenbrand and

4  Schaltenbrand; is that right?

5  A.        Yes.

6            THE COURT:  You have to answer yes or no.

7            THE WITNESS:  Yes, sir.  I said yes, sir.

8  Q.        (BY MR. COX)  Be sure to answer out loud because

9  the reporter is going to write down what you say.  Okay?

10  A.        (Nonverbal response.)

11  Q.        Now then, this morning we have been provided by

12  your attorneys with a document which we have marked

13  Exhibit 97, and which we have given you a copy of.  Do you

14  have it in front of you?

15  A.        Yes, sir, I do.

16  Q.        Is this the document that was sent to you by

17  Schaltenbrand and Schaltenbrand?

18  A.        Yes, they faxed this to me on April the 12th,

19  2006.

20  Q.        Did you ask for it or was it just sent to you?

21  A.        I just asked for all my documents that I needed

22  from working for Medicate Central Pharmacy.

23  Q.        Who did you ask?

24  A.        I do not remember, sir.

25  Q.        And do you know who faxed this to you?

1    A.        I do not know.

2    Q.        I see in the upper right-hand corner it says page

3    two of three.   Do you know where page one is?

4    A.        I do not know.  It was -- I checked my files,

5    there was nothing, I noticed that too, it must have been a

6    cover sheet or something.

7    Q.        Can you recall what was on the cover sheet?

8    A.        No, sir, I do not.

9    Q.        When you got this, did you review it?

10    A.        At the time?

11    Q.        Yes.

12    A.        No.

13    Q.        Well, when it came in, the fax, did you look at it

14    and see what was on it?

15    A.        Yeah, I looked at the name and everything and I

16    just put it with my other papers.  I didn't like go

17    through it, you know, until I plugged it into the

18    computer.

19    Q.        Okay.  So then when you plugged it into the

20    computer, you took these exact numbers and put them into

21    the return that you filed?

22    A.        Yes, sir.

23    Q.        And did you take any steps to determine what,

24    whether what you were putting in your return, the numbers,

25    were accurate or not?

1   A.       I just, I just took it for granted that Medicate

2   Pharmacy -- I mean Schaltenbrands knew the numbers were

3   correct.  I just took them as an accountant.

4   Q.       Now then, can you tell me what you understood

5   these numbers to mean?  For example, the $128,057 of gross

6   receipts, part one, line one, what did you understand that

7   to be?

8   A.       At the time I took that as being probably 10

9   percent of the, the revenue that came in for the mail

10  order side.

11  Q.       And would you say it was probably the 10 percent

12  of the net profit?

13  A.       No, sir.

14  Q.       Okay.  So this would be the 10 percent of the

15  sales?

16  A.       Yes, sir.

17  Q.       So what you were putting down was the, all of the

18  sales of the business?

19  A.       That's what I took that as when I, when I, when I

20  put it into the tax.

21  Q.       Now you told us yesterday that you weren't

22  supposed to get 10 percent until the business sold, but

23  this looks like you're getting your 10 percent as you go.

24  Is that a fair statement?

25  A.       That's a fair statement, yes.

1    Q.      Okay.  And then we see a subtraction here for cost

2    of goods sold and then the gross profit would be, what?

3    What would that represent?

4    A.      Gross profit is what you have after you take out

5    of the cost of goods it's called, I think that's called a

6    profit margin but I'm not sure.

7    Q.      So then we go on and we start deducting some

8    expenses from that gross income; is that correct?

9    A.      Yes, sir.

10   Q.      And do you know whether these numbers are accurate

11   or not in terms of expenses?

12   A.      Sir, I didn't figure these numbers, they gave them

13   to me.

14   Q.      Okay.  So you just relied on what they gave you?

15   A.      The accountants, yes, I think it's 10 percent of

16   whatever the real number was, that's what I'm thinking.

17   Q.      Okay.  In other words, you take this DeliverMed

18   mail order business and 10 percent of the gross sales for

19   2005 would have been 128, so that's about, what, 1.2

20   million?

21   A.      No.

22   Q.      And then you subtract the cost of goods, which

23   would be about 900,000 total?  Is that right?

24   A.      That's what I'm thinking.  I'm guessing.

25   Q.      So the gross profit for the business for 2005 the

1    DeliverMed mail order was about $378,000?  According to
2    this?
3    A.      Yeah, and then you start taking overall the
4    expenses over that, yeah.
5    Q.      Okay.  Then we see what expenses are being
6    deducted.  Let's take a look at those.  The first expense
7    that's deducted is advertising.  So, it looks like about
8    $5,600 of advertising would be the total; correct?
9    A.      That's what I'm thinking, yes, sir.
10   Q.      And then we have interest that's being paid of
11   about 4,900.  I'm using the 100 percent figures, you
12   understand?
13   A.      Yes, sir.
14   Q.      And then legal and professional services, about
15   $580.  And then a pension and profit sharing, looks like
16   about maybe $660, that cost total.  Did you have a pension
17   or profit sharing plan in this business?
18   A.      No, not in DeliverMed, no, uh-uh.
19   Q.      So when you looked at it and read it did you
20   wonder what's that for or we don't have one of those?
21   A.      Sir, Schaltenbrand said go ahead and file this,
22   Joe.  I said okay.
23   Q.      My question is:  Did you wonder since you don't
24   have a pension or profit sharing plan why there's a number
25   there?

1    A.        No.   I was not looking at -- no, sir, I did not.

2    Q.        Okay.   And again supplies looks like $5,210; taxes

3    and licenses about $9,000; wages about, looks like about

4    $95,000 of wages in this business.   Who were the employees

5    of the business at that time?

6    A.        At that time I don't totally recall exactly who.

7    Q.        You don't recall having any employees at that

8    time?

9    A.        That's not what I said.

10   Q.        I'm sorry.

11   A.        I said I don't recall who they were at that time.

12   Q.        Don't recall.   Who -- do you know how many there

13   were?

14   A.        At that time, I want to guess, I would think that

15   was probably just doing, you know, we're within a pharmacy

16   and there was staff that just did the mail order side.

17   And I'm in my head counting right now.   I would think

18   probably about, I want to say maybe six?

19   Q.        Okay.   And those six made about $95,000 then?

20   A.        Sir, I'm guessing.   I don't know.

21   Q.        Well, let's go to the line that says other

22   expenses.   To find out what those are, we have to turn to

23   page two at the bottom.   And it looks like we have here

24   bank service charge, I would take that to mean, of about

25   $180, and delivery.   What's that?

1    A.        $660 delivery.  I do not know.

2    Q.        Because the mail order business which we're

3    talking about here didn't make deliveries, did it?

4    They --

5    A.        No, sir.

6    Q.        -- shipped things.  So then we have miscellaneous

7    of, it looks like about $18,000.  Do you know what that's

8    for?

9    A.        No, sir.

10   Q.        And then telemarketing, that was to pay DeliverMed

11   Holdings for marketing?

12   A.        Yes, sir.

13   Q.        And that was, looks like it's close to $400,000.

14   A.        Yes, sir.

15   Q.        And what we don't see is an expense or deduction

16   here is the $7 per prescription, do we?

17   A.        No, sir, wouldn't be there.

18   Q.        All right.  Because that's not a deduction from

19   net profit, is it?

20   A.        Sir, the $7 had to do within the pharmacy.  I

21   explained that yesterday.  It had nothing to do -- the $7

22   has to be taken before your net profit when you're dealing

23   with three guys out with a mail order service within a

24   pharmacy.

25   Q.        That's my point.  When you talk about the $7, it's

1    already out before you even get to the net profit numbers;

2    correct?

3    A.      No, we probably have to add up all these numbers

4    here below the 37,000 to figure out if that comes out to

5    $7, if I had the number of how many prescriptions were

6    sent out the same time.

7    Q.      I'm sorry, I didn't follow that.

8    A.      Your $7, sir, we're guessing that that's the

9    number that we're deducting off the $37,000 here that that

10   has the profit margin in it.

11   Q.      Well, show me where in the expenses here you are

12   deducting off the $37,000 the $7.   Where is it?

13   A.      You just asked me, the $7 is not in there.

14   Q.      Right.

15   A.      Okay?  $7 is overhead that, we're thinking it's $7

16   a prescription.   That has to calculate how much that

17   department within the pharmacy is.   Okay?

18   Q.      So you're not deducting it off the gross profit in

19   this?

20   A.      If I knew how many prescriptions that this

21   represented and totalled up all the overhead, divided by

22   that, that would give me a real clear to see if our $7 is

23   correct.

24   Q.      Well, we see advertising, we see legal services,

25   we see interest, we see all the things we have looked at

1     but we don't see that overhead here being deducted, do we?

2     A.      Well, no, it's broken out a different way.

3     Q.      Where?  Where is it -- point to where it is in

4     here where that's being deducted.

5     A.      There's no $7 on there because I don't have a

6     total of how many RXs that that $128,000 represents.  Then

7     I could turn around and figure if my $7 is correct.  The

8     $7 is a guess of this whole operation cost because you

9     have all these different numbers to see if that's what it

10    is, we had to average out what that was.  It wouldn't be

11    on this document.

12    Q.      Okay.  It's not here, is it?

13    A.      No, it's broken out a different way.

14    Q.      Well, where is it broken out?  That's what I'm

15    asking you.  Where would I look to find the $7 in these

16    various expenses.  That's all I'm asking.

17    A.      If I had how many RXs that this represented, then

18    I could divide what the cost of the overhead was against

19    that, and that could tell me what, what that is, if it's

20    $7 or $8 or $6.  That was numbers we were just trying to

21    figure out what the overhead would cost.

22    Q.      Well --

23    A.      This actually breaks it out a different way.

24    Q.      Well can you tell me -- let's go through them.

25    I'm sorry, we'll have to go through them now.  Under

1    advertising, would the $7 be included in the advertising

2    expense?

3    A.        It would be in that -- it would not be in the

4    $39,000 though in the telemarketing page two because we

5    never -- the $7 had to do with the overhead of the cost,

6    what it cost that mail order business being inside a

7    pharmacy.  It cost a pharmacist, it cost a staff, it cost

8    advertising, the cost of the mortgage cost, the cost of

9    the legal -- everything --

10   Q.        Mr. Siddle?

11   A.        -- power, utilities.

12   Q.        Mr. Siddle?  Just a moment.

13   A.        I'm just trying -- I'm just trying to get you to

14   understand.

15   Q.        I understand.  So you're saying that the $7 would

16   not be included in the marketing expense?

17   A.        That's correct.

18   Q.        Okay.  Is, is -- it wouldn't be included in the

19   advertising expense, would it?

20   A.        If that's something that the pharmacy has to pay

21   for, it is.  We're just trying to figure out what that,

22   that piece of business within a pharmacy would cost.

23   Q.        And would it be included in the interest, the

24   $4,900 interest, is the $7 included there?

25   A.        If that's some sort of expense a pharmacy has,

1    then it would because I have to figure out what that piece

2    would cost within a pharmacy.

3    Q.       All right.  How about the legal services?

4    A.       Sure, if that's an expense a pharmacy has, then I

5    have to make sure that within a pharmacy I have to pay my

6    portion of what that whole cost of operating expense is in

7    a pharmacy.

8    Q.       Let me ask this, that isn't it true that what we

9    are talking about here are expenses just for the mail

10   order; right?

11   A.       They just kind of sliced out what they think the

12   mail order would be.

13   Q.       Okay.  So, in other words, the mail order part of

14   the business spent $580 on legal services; correct?

15   A.       No, what they said was the pharmacy in a whole --

16   you know, I'm not real sure.  I'm not sure what they're

17   saying.

18   Q.       Okay.  You just put them in the return?

19   A.       I just had No. 8.  And I took No. 8 and put it in

20   No. 8.  I took No. 19, put it in No. 19.

21   Q.       Isn't it true that the $7 is just a calculation

22   for management to keep track of, of things, not for

23   financial reporting, isn't that true?

24   A.       Yes, sir.

25   Q.       Okay.  Now, you said Schaltenbrands told you,

1    Schaltenbrand said, go ahead and file this, Joe.  Which

2    Schaltenbrand, Larry Senior or Larry Junior, told you to

3    go ahead and file this information with the --

4    A.      I don't remember.

5    Q.      One of the two, though; right?

6    A.      Somebody from there, I don't remember.  They

7    talked to me or a secretary sent it to me.  I'm sure all I

8    did was requested my documents and they faxed them to me.

9    Q.      You said Schaltenbrand said to go ahead and file

10   this, Joe.  And I'm just asking, it had to be either Larry

11   Junior or Larry Senior because they're the only

12   Schaltenbrands there.

13   A.      I meant Schaltenbrand and Schaltenbrand the

14   company.

15   Q.      So you relied on them and you did what they told

16   you and you filed this information.

17   A.      Yes, sir.

18   Q.      Very good.  Let's take a look at Exhibit 8,

19   Plaintiff's Exhibit 8, and if you would turn please to

20   page 34.  So what was the sales, total sales for the

21   period ending December 31, 2005?

22   A.      1 million 755,302.

23   Q.      And what would 10 percent of that be?

24   A.      It would be 1,755,000.

25   Q.      No, 10 percent of that.

1   A.      Well, it would be 175,000 and some change.

2   Q.      Right.  Now go back to Exhibit 97.  How much did

3   the Schaltenbrands tell you was your 10 percent of the

4   sales?

5   A.      128,000.

6   Q.      So that's not correct, is it?

7   A.      No, sir, it's not.

8   Q.      Yeah.  They shorted you a little bit, didn't they?

9   A.      I, I guess I should have had a bigger -- I don't

10  know, I guess, yeah.

11  Q.      I mean, you know that 175,000 is more than

12  128,000.

13  A.      Yeah.

14  Q.      By about 50,000, roughly.  So you were shorted,

15  weren't you?

16  A.      It was a wrong number, yeah, or they're two

17  different numbers.

18  Q.      Yeah, and the one they told you is less than the

19  one we see over here; right?

20  A.      You'll have to ask them.  I don't know.

21  Q.      Right.  Okay.  Well then the cost of goods, how

22  much was that?

23  A.      $1,204,793.

24  Q.      It looks like the number over here is 90,000.  It

25  looks like they kind of give you a break on that number

1    but it's definitely different, about 900 instead of --

2    A.        Yeah, that's correct.

3    Q.        -- these numbers, what they're showing you on this

4    paper, 97, aren't matching up, are they, to what's

5    actually on the financial statements, are they?

6    A.        No, sir, they're not.

7    Q.        Gross profit.  They showed about 370,000 gross

8    profit.  But when we look over here, we see actually the

9    gross profit should have been about, for you, about

10   $55,000.

11   A.        Sure, if they would have showed the 1.75 over

12   here, too, yeah, absolutely.

13   Q.        Right.  Right.  So these numbers that they have

14   given you aren't, aren't accurate, are they?

15   A.        Not according to these two documents.

16           MS. SCHRICK:  We object to foundation.  There's

17   been no foundation that witness prepared or submitted the

18   financial statements and can comment on their accuracy.

19           THE COURT:  Overruled.

20   Q.        (BY MR. COX)  Well let's take a look at some of

21   these expenses while we're here.  First of all, do you see

22   an expense for a pension and profit sharing plan over here

23   on page 34 of Exhibit 8?

24   A.        No, sir, I do not.

25   Q.        So, can you explain why it's showing up here on

1    Exhibit 97?

2    A.       I do not have a clue.  I'm sorry.

3    Q.       Well, let's see about legal services.  Do you see

4    any legal services over here on page 34?

5    A.       No, sir, I do not.

6    Q.       Bank charges.

7    A.       No, sir, I do not.

8    Q.       Actually, there are bank charges on page 34.

9    A.       Oh, I'm -- I --

10   Q.       All right.  I didn't want you to miss --

11   A.       Sorry about that.

12   Q.       That's all right.  And so those bank charges, it

13   looks like 10 percent would be about $18, so that figure

14   looks right.  But we don't see the $7 on either one of

15   these, page 34 of 97, do we?

16   A.       No, not without the RX number.

17   Q.       Okay.  Now then, let me take a look, I just got

18   this document, if you can just bear with me for just one

19   moment.  I wanted to ask you about, it says delivery

20   expense over here.  Actually, that number looks right.

21   A.       I'm sorry, which page are we talking about?

22   Q.       On page 34.

23   A.       Okay.

24   Q.       It says delivery expense, $657.  And that's

25   showing up as $66.  That looks right on the, this sheet

1    they gave you.  But you don't recall any delivery that had

2    to be made for the mail order business?

3    A.        No, sir.  On page 34, if you look like where it

4    says cost of goods and right underneath there, freight and

5    all that?  That's shipping costs?  That's where your

6    shipping cost is, it's considered a different name.

7    Q.        So you think that's the cost of shipping all the

8    stuff?

9    A.        Yes, sir.

10   Q.        All right.  One of the things I wanted to ask you

11   about is, you were given this and when you look at it,

12   this appears to make you sole proprietor.  Do you know

13   what a sole proprietor is?

14   A.        Yes, sir.

15   Q.        What is a sole proprietor?

16   A.        That I own this DeliverMed.  It's not DeliverMed,

17   it's been spelled wrong, but that I own this company.

18   Q.        Right.  But you didn't own the company, you own 10

19   percent of the company; right?

20   A.        No, I just, I just fill out -- I just filled this

21   out.  Because if you look at this, they fill it out this

22   way, so they even put my address in there and they

23   misspelled DeliverMed.  I just, I thought that was

24   supposed to be right.  They even put my Social Security

25   number in there.  I just moved it over to my tax return.

1    Q.      Well, they were showing what -- what they're

2    showing here is that you owned a business --

3    A.      Yeah.

4    Q.      -- by yourself using your Social Security number,

5    your address, with the name DeleverMed.  And that this is

6    your income and expenses and so on; right?

7    A.      At that time I thought I was supposed to do it

8    this way.  I thought that I guess Mark got one and Mike

9    got one.  I didn't ask, I just filled it in.

10   Q.      As you look at it now, does it appear that they

11   were wrong in what they sent you?

12   A.      At the time I thought that was supposed to be what

13   was supposed to be done.  Obviously they didn't do this

14   again on 2006, so apparently they stopped doing it,

15   whatever it was.

16   Q.      My question is:  As you sit here today do you

17   realize this is wrong?  You weren't a sole proprietor --

18   A.      I -- yes, sir.

19   Q.      And these aren't the right numbers?

20   A.      I don't -- the numbers don't add up.

21   Q.      Right.  Right.  Now was Schaltenbrand and

22   Schaltenbrand the accounting firm you used?

23   A.      No, sir.

24   Q.      So do you know why they sent this to you?  Did you

25   ask for it or what happened exactly?

1    A.        They give me my W-2 and they give me a 1099 at the

2    time for Medicate Respiratory Pharmacy, gave me the K-1

3    and they gave me this, too.  They said, here's all your

4    stuff, file it, so I did it.

5    Q.        A K-1 is for a partnership?

6    A.        Yes, sir.

7    Q.        And at this time in 2005 DeliverMed, what you were

8    calling DeliverMed was a partnership between you and Mark

9    and Mike, so they should have given you a K-1 instead of

10   this; right?

11   A.        There was never a business, as far as I know.  I

12   never got any shares of any company.

13   Q.        No I'm not saying --

14   A.        Medicate Respiratory, they gave me shares, okay?

15   Q.        You told us yesterday you were in a partnership

16   with Mike and Mark in this mail order business so you

17   should have gotten a K-1, not this; correct?

18   A.        If it was a business.  It wasn't -- when I say the

19   word partner, Mike and Mark and I came together and Mark

20   had an idea.  He had a DeliverMed, Mike had a pharmacy,

21   and I had the knowledge of putting together this thing.

22   And together we used the pharmacy to have this partnership

23   of having these patients.

24   Q.        Sure.

25   A.        I'm not talking, there was no corporate shares

1    given out and the big corporation.  It wasn't like that.

2    It was just a partnership between three guys.

3    Q.      Sure.  And if you have a partnership, your

4    partnership income, which is you're talking about here

5    would show on a K-1; correct?  That's what a

6    partnership --

7              MS. SCHRICK:  Objection, Your Honor, calls for

8    legal and accounting conclusion.

9              THE COURT:  Sustained.

10             MR. COX:  Very good.  Thank you, sir.

11             THE COURT:  Why don't we take a break now and

12   we're going to, I think at 9:00 have some video.  Who's

13   going to be at 9:00?

14             You may step down.

15             THE WITNESS:  Oh, thank you.

16             MR. McGURK:  Your Honor, it will be Mr. Allan

17   Kovin, K-O-V-I-N.

18             THE COURT:  Mr. Siddle, other than your attorneys

19   you are still on the stand because --

20             MS. SCHRICK:  We'll have a few questions.

21             THE COURT:  You'll have a few questions.  So

22   again, don't talk to anybody other than your attorneys.

23   Okay?

24             THE WITNESS:  Yes, sir.

25             (Court recessed from 8:54 a.m. to 8:56 a.m.)

1              (Witness sworn by clerk.)

2              THE WITNESS:  It's Allan Kovin, last name is

3    spelled K-O-V-I-N.

4              THE COURT:  Is Allan -- spell Allan.  There's two

5    different ways to spell Allan.

6              THE WITNESS:  I'm sorry.  A-L-L-A-N.

7                        ALLAN KOVIN,

8    having been first duly sworn, was examined and testifies

9    as follows:

10                      DIRECT EXAMINATION

11   BY MR. McGURK:

12   Q.      Mr. Kovin, where do you reside?

13   A.      I reside, do you want my home address or town?

14   Q.      Home address is fine.

15   A.      Okay.  I reside 5208 Lilac Court, Lansdale

16   Pennsylvania 19446, and that's in Montgomery County.

17   Q.      Is that also your, the location of your studio?

18   A.      Yes.

19   Q.      What is your business?  What is the business name

20   you function under?

21   A.      Kovin Design.

22   Q.      Spelled the same way?

23   A.      Yes, my last name and Design, which is what I do.

24   I'm a designer, graphic designer.

25   Q.      Can you describe your educational experience

1    starting with high school?

2    A.        I graduated Northeast Philadelphia High School,

3    art curriculum.  Went on to post-grad at Dobbins Tech in

4    Philadelphia where I also received a two-year degree in

5    commercial art.  And attended evening school at

6    Philadelphia College of Art for a few semesters.

7    Q.        Did you also serve in the military?

8    A.        Yes, I did.  I was in the National Guard.

9    Q.        Can you describe --

10   A.        Honorable discharge.

11   Q.        I'm sorry.

12   A.        Served in the National Guard, served my full term

13   and was granted an honorable discharge after my term of

14   duty.

15   Q.        Mr. Kovin, as you know we are on a video

16   connection so I will try and speak slowly and I want to

17   make sure I don't talk over you.  And if I am going too

18   fast I want people to slow me down.

19            Can you describe your work experience after you

20   completed your studies at the Philadelphia College of Art?

21            THE COURT:  I'm going to interrupt here.  Is there

22   any dispute, we don't have a jury here, that Mr. Kovin is

23   a graphic designer that has a lot of experience and so we

24   can just jump right into the issues in this case?

25            MR. SCHUVER:  We'll stipulate to that, Judge.

1          THE COURT:  So stipulated.

2          MR. McGURK:  Very well.

3    Q.     (BY MR. McGURK)  Mr. Kovin, do you have experience

4    in the pharmaceutical area --

5    A.     Yes.

6    Q.     -- in terms of design work?

7    A.     About 20 years.

8    Q.     Approximately 20 years of work in the

9    pharmaceutical area?

10   A.     Yes.

11   Q.     Do you know Linda Deeter?

12   A.     Yes.

13   Q.     And what is the name of her firm?

14   A.     Deeter Marketing and Advertising.

15   Q.     And is that where you are located physically right

16   at the moment?

17   A.     Yes.

18   Q.     And what town is that located?  In what town is

19   that located?

20   A.     Doylestown, Pennsylvania.

21   Q.     That's in Bucks County, Pennsylvania?

22   A.     Yes, Bucks County, yes.

23   Q.     And have you worked for Linda Deeter for a period

24   of time on various projects?

25   A.     Yes, I have worked with her on other projects.

1  Q.      Directing your attention to 2008, did you and

2  Linda Deeter work together on a project involving a

3  company called DeliverMed?

4  A.      Yes.

5  Q.      Can you describe how that started?

6  A.      I received a call from Linda about a new project,

7  and I met with her at her offices where we are now and she

8  gave me a briefing of the project, and it happened to be

9  the DeliverMed logo design, and that was our initial

10  meeting.

11  Q.      Mr. Kovin, I want to make sure you keep your voice

12  up so we all can hear.  Do you recall where the meeting

13  took place?

14  A.      Yes.  The meeting took place in Deeter's offices.

15  Q.      In Doylestown?

16  A.      In Doylestown, correct.

17  Q.      What did you do next?

18  A.      Well, after given the assignment I, since I'm a

19  contractor, freelance artist, I took it back to my studio,

20  worked on it, developed creatives to present to Linda.  In

21  this particular case Linda was playing, planning to have

22  the role of art director and has me as graphic designer.

23  And normally in the chain of command I report back to her,

24  and that's exactly what I did with my creatives.  We met

25  again at her offices again in Doylestown and reviewed what

1    I had came up with for the new DeliverMed logo.

2    Q.      What do you mean when you use the term art

3    director?  What do you mean in the industry?

4    A.      Well, okay, usually there's a chain of command and

5    the, in a creative environment, a creative department

6    usually the person in charge is the art -- is titled the

7    art director.  There's senior art directors and junior art

8    directors.  And underneath the art director usually you'll

9    have the graphic designer, also senior graphic designer

10   and junior graphic designer.  So Linda was in this

11   particular case and going forward, you know, this is the

12   way we usually work on all projects, Linda assumes the

13   role of the art director and I assume the role of the

14   graphic designer.  So I answer to Linda.  You know, Linda

15   gives me input and I, you know, do what I, you know,

16   whatever the project is and report back to her.  And then

17   we review everything and, you know, it's a, it's a

18   cooperative with, you know, we cooperate together,

19   coordinate things.

20   Q.      Did you -- I'm sorry.  Have you completed your

21   answer?

22   A.      Yeah.  We both interact giving input to each other

23   as far as whatever the project may be.

24   Q.      Did you come -- did you prepare a number of

25   different proposed idea -- design ideas for review by

1    Linda Deeter on the DeliverMed project?

2    A.      Yes, there were, you know, several designs for the

3    logo that were presented.

4    Q.      Who -- so how did the process work once the, the

5    proposed designs were, were presented?

6    A.      As I said, I would report back to Linda and

7    present all the different variations of the, what the logo

8    could look like, you know, back to her.  I presented those

9    to her when I, when we met again.  And we reviewed them,

10   kind of like pasting them up on the board, looking at them

11   side by side and deciding which popped, which didn't, you

12   know, because logos have personalities like people and we

13   were trying to match the look of a particular logo to that

14   particular client.  And that's part of the process, you

15   know.

16   Q.      Unfortunately, we don't have a way of, of

17   displaying on your screen and on our screen the same

18   document, so I'm going to ask you to pull up or to get a

19   document that is Plaintiff's Exhibit 36.

20   A.      Okay.

21   Q.      It has in the lower right-hand corner Exhibit 36.

22   A.      Yes.

23   Q.      And I'm going to put it on the document camera.

24   (Pause.)  Is Plaintiff's Exhibit 36 the logo that you and

25   Linda Deeter ultimately decided to present?

1    A.        Yes, this was the final selection.

2              THE REPORTER:    Could you ask him to repeat that?

3    Q.        (BY MR. McGURK) Could you repeat that?

4    A.        This was the final logo that we all agreed on.

5    Q.        When you say, we all agreed on, who are you

6    referring to?

7    A.        Well, I'm referring to myself, Linda, and her

8    client, I believe Mr. Swift, in which I didn't have any

9    interaction with.  I just, you know, Linda would take the

10   logo and present it to the client and, you know, she would

11   come back to me with feedback and we would sort all of

12   that feedback out.  So when I say all, that's what I mean,

13   myself, Linda and her client.

14   Q.        All right.  Now, referring to Plaintiff's Exhibit

15   36, we have up on the monitor, this is just in black and

16   white but in color it, there are two different colors on

17   here; is that correct?  Or on the logo in real life, if

18   you will?

19   A.        I think there were three colors.

20   Q.        Three colors?

21   A.        You see black and white, but if I recall there

22   were three colors.

23   Q.        Who selected the colors for that final logo?

24   A.        Well, again it was an operation between Linda and

25   myself basically.

1          MR. McGURK:   Your Honor, I would move the

2     admission of Plaintiff's Exhibit 36.

3          THE COURT:   Any objection?

4          MR. SCHUVER:   No objection.

5          THE COURT:   Be admitted.

6     Q.     (BY MR. McGURK) Now after you completed your work

7     with Linda did you submit a bill?

8     A.     Yes, I did.

9     Q.     And were you paid?

10    A.     Yes.

11    Q.     Who did you intend the logo to be owned by?  That

12    is to say, who did you intend was to have ownership of the

13    logo at the end of the process?

14    A.     Linda's client, DeliverMed.

15    Q.     Turning to 2012, this year, did there come an

16    occasion when you received a telephone call from a Mr. Ned

17    Randle?

18    A.     Yes.

19    Q.     Can you describe what occurred?

20    A.     I received several phone calls from Mr. Randle.

21    Q.     How many?

22    A.     It occurred I guess within a two-, possibly

23    three-day period, and each day around two calls or so.

24    Q.     So over a two- or three-day period he called twice

25    a day?

1    A.        I believe so.

2            THE COURT:   Can he pinpoint when this was in 2012?

3    Q.        (BY MR. McGURK) Do you recall whether this was

4    during the month of February of 2012?

5    A.        I, you know, I don't know the exact day or month

6    but February, around February would sound about, about

7    right.

8    Q.        Was there is a message left as to why Mr. Randle

9    was trying to reach you?

10   A.        Yes.  It was vague and I don't recall exactly what

11   it was, but I was hesitant to return it for that reason.

12   I don't return unknown phone calls.

13   Q.        Ultimately did you talk to Mr. Randle?

14   A.        Yes, I did.

15   Q.        What did he want?

16   A.        What it boiled down to after talking with him for

17   a little bit, he was interested in purchasing the logo,

18   the DeliverMed logo from me.

19   Q.        Did he make a monetary offer?

20   A.        Yes, he did, on the first conversation, a thousand

21   dollars.

22   Q.        That was his first offer, was a thousand dollars?

23   A.        Yes.

24   Q.        And did he state who he, or whose behalf he was

25   calling?

1    A.        He told me that there was a dispute going on and

2    that, you know, I don't know who his client was.  I was

3    not familiar.  I mean, I, at that particular time I was

4    only familiar with DeliverMed.  I was not aware of any

5    other, you know, anyone else being involved.  I mean, this

6    was all new to me.  It was more or less a shock, a

7    surprise so, no, he, he may have mentioned his client but

8    there's no reason that I would have remembered the name at

9    that time.

10   Q.        Well, let me ask this question:  Have you ever

11   been an employee of Medicate Pharmacy Inc. of East St.

12   Louis and Washington Park, Illinois?

13   A.        No.

14   Q.        Have you ever met Mr. Michael L. Schaltenbrand?

15   A.        No.

16   Q.        Have you ever been an employee of Mr. Michael L.

17   Schaltenbrand?

18   A.        No.

19   Q.        Have you ever entered into a written contract with

20   Mr. Michael L. Schaltenbrand to design a logo?

21   A.        No.

22   Q.        Have you ever entered into a contract with

23   Medicate Pharmacy Inc. to design a logo?

24   A.        No.

25   Q.        All right.  So Mr. Randle contacted you, he made

1    this offer.  Did he, did he increase the offer at any

2    time?

3    A.      Yes.

4    Q.      What did he get up to?

5    A.      I was told 3,000, that he, you know, wasn't

6    directly to me, the offer.  My attorney had been in touch

7    with him.

8    Q.      Your --

9    A.      He made the offer to my attorney.

10   Q.      And for the clarity of the record, I am not your

11   attorney in this matter; is that correct?

12   A.      Correct.

13   Q.      Why did you not accept his offer?

14   A.      I -- to me it seemed very obvious that it wasn't

15   the right thing to do.  It seemed unethical.

16   Q.      Mr. Kovin, I'm going to ask you to turn to

17   Plaintiff's Exhibit 77.

18   A.      Okay.

19   Q.      The document is, that is, Plaintiff's Exhibit 77

20   is captioned copyrights assignment.  Do you see that?

21   A.      Yes.

22   Q.      And is that your signature at the bottom?

23   A.      Yes.

24   Q.      And what is the date?

25   A.      20th of March, 2012.

1          MR. McGURK:  Your Honor, I would move the

2    admission of Plaintiff's Exhibit 77.

3          MR. SCHUVER:  No objection, Your Honor.

4          THE COURT:  It will be admitted.

5    Q.    (BY MR. McGURK) Mr. Kovin, you prepared a

6    declaration in this case; is that correct?

7    A.    Yes.

8          MR. McGURK:  For clarity, Your Honor, we'd like to

9    introduce the document to clarify one small point.  All

10   right?

11         THE COURT:  Okay.  It's been admitted.

12         MR. McGURK:  Plaintiff's Exhibit 76, Your Honor.

13         THE COURT:  This is a different exhibit, then?

14         MR. McGURK:  Yes, this is the declaration of Mr.

15   Allan Kovin.

16         THE COURT:  Any objection, Mr. Schuver?

17         MR. SCHUVER:  Subject to cross-examination, no

18   objection.

19         THE COURT:  Be admitted.

20   Q.    (BY MR. McGURK) Mr. Kovin, this is your

21   declaration that you signed in this matter under oath?

22   A.    Exhibit 76 you are referring to?

23   Q.    Yes, sir.

24   A.    Okay.  Yes.

25   Q.    I should say subject to the penalty of perjury,

1    referring to paragraph two, it says you have worked with

2    Linda Deeter and her company on various projects for a

3    number of years.  Do you see that?

4    A.      Yes.  That's, that's right.

5    Q.      But in fact for clarity, was this the first

6    project that you and Linda Deeter worked on together?

7    A.      Yes.

8    Q.      That is to say, the DeliverMed project?

9    A.      Right.

10    Q.      So there's no misunderstanding, it's not as if you

11    had worked prior to the DeliverMed project on this case?

12    A.      Correct.

13          MR. McGURK:  Your Honor, I would move Plaintiff's

14    Exhibit 76 just for clarity into the record.

15          THE COURT:  It's been admitted.

16          MR. McGURK:  Thank you.

17    Q.      (BY MR. McGURK) Now, Mr. Kovin, the design was

18    used, the logo design was used on various pieces and I'm

19    going to show you some of those.  First one I'd like to go

20    to is Plaintiff's Exhibit 39.

21    A.      Okay.

22          MR. SCHUVER:  I'm sorry, what was the number?

23          MR. McGURK:  Plaintiff's Exhibit 39.

24    Q.      (BY MR. McGURK)  It is a card captioned "thank you

25    for using Medicate Pharmacy DeliverMed."  Do you see that?

1    A.        Yes.

2    Q.        Mr. Kovin, what was your role in terms of setting

3    up such matters as the cards, literature, letterhead and

4    so forth?

5    A.        After the logo was established, finalized,

6    approved, we move on to do the letterheads for, the

7    letterhead set for the DeliverMed stationery and also a

8    magnet, what I recall, and some, a few small ads of which

9    this is one of.

10             MR. McGURK:  Your Honor, I would move the

11   admission of Plaintiff's Exhibit 39.

12             THE COURT:  Any objection?

13             MR. SCHUVER:  No objection.

14             THE COURT:  Be admitted.

15   Q.        (BY MR. McGURK) Mr. Kovin, I'd like you to take

16   look at Plaintiff's Exhibit 40, which is a business card.

17   A.        Right, I have it.

18   Q.        What is Plaintiff's Exhibit 40?  Or I should say,

19   in whose name is -- who is the business card for?

20   A.        Joe D. Siddle.

21   Q.        That's S-I-D-D-L-E?

22   A.        Yes.

23   Q.        This is one of the items that was designed and

24   prepared by you and Deeter for DeliverMed?

25   A.        Yes.

```
 1              MR. McGURK:  Your Honor, I'd move the admission of
 2   Plaintiff's Exhibit 40.
 3              THE COURT:  Any objection?
 4              MR. SCHUVER:  No objection.
 5              THE COURT:  Be admitted.
 6   Q.        (BY MR. McGURK) Plaintiff's Exhibit 41, ask you to
 7   take a look at that.  Now, Mr. Kovin, this is a
 8   reproduction of a website page and I'm simply going to
 9   ask, is the logo in the upper left-hand corner the same
10   logo that you designed with Linda Deeter?
11   A.        Which exhibit?
12   Q.        I'm sorry, we're looking at Plaintiff's Exhibit
13   41.
14   A.        Okay.  And the question, again?
15   Q.        The question is, is the logo in the upper
16   left-hand corner the same logo that was designed for
17   DeliverMed?
18   A.        Yes.
19              MR. McGURK:  Your Honor, I'd move the admission of
20   Exhibit 41.
21              THE COURT:  Any objection?
22              MR. SCHUVER:  No objection.
23              THE COURT:  Be admitted.
24   Q.        (BY MR. McGURK) Mr. Kovin, could you please look
25   at Plaintiff's Exhibit 42.
```

1    A.      Okay.

2    Q.      What is Plaintiff's Exhibit 42?  (Pause.)  I'm

3    sorry, Mr. Kovin, what is Plaintiff's Exhibit 42?

4    A.      Yeah, I'm looking at it.  Do you have a question?

5    Q.      Yes.   What is Plaintiff's Exhibit 42?  Is that one

6    of the magnets that was designed with the logo?

7    A.      That's not -- I did a logo magnet.  This doesn't

8    look like it, the one that I worked on.

9    Q.      All right.  Did you understand that there was a,

10   refrigerator magnets that were created with the logo on

11   it?

12   A.      Yes, and I did work on that.  But it wasn't this

13   one.  It doesn't -- this is not --

14   Q.      Well, referring to the --

15   A.      This has another logo on there.

16   Q.      Referring to the logo --

17   A.      -- if you look at it --

18   Q.      -- on the left --

19   A.      -- I don't know what that is and I have nothing to

20   do with that.

21   Q.      So the logo on the left at the bottom is the logo

22   that you worked on, the one on the right which I believe

23   says Midwest Operating Engineers you had nothing to do

24   with?

25   A.      Right.  And I had, the one that I worked on was

1    similar to this but more squattier.  This isn't the same

2    one I worked on but, yes, it has my logo on it.

3            MR. McGURK:  Your Honor, I would move the

4    admission of 42 to the extent it refers to the logo?

5            THE COURT:  Any objection?

6            MR. SCHUVER:  I don't believe there's been any

7    foundation for the admission of it.  He doesn't know what

8    this is or where it came from.

9            THE COURT:  I'm going to admit it and it will go

10    to the weight, not the admissibility of it.

11    Q.      (BY MR. McGURK) Finally, I'll say the materials

12    subpoenaed, that was included in that.

13    Q.      Very well.  That is to say you received a

14    subpoena --

15    A.      Yeah, the correct version was submitted and it's

16    in that subpoena, subpoena that I had sent, one of the

17    pages in there.

18    Q.      We, I'm sure we will be getting to additional

19    documents.

20            Mr. Kovin, who did you intend should have the logo

21    when you signed the assignment in this case?

22    A.      Well, it was my understanding that I was designing

23    alongside, you know, with Linda, and we were doing it for

24    a company called DeliverMed which is, was one of Linda's

25    clients.  So DeliverMed.

1       MR. McGURK:  Thank you, Your Honor.  I have no

2  further questions.  I'll tender for cross-examination.

3       THE COURT:  Mr. Schuver?

4       MR. SCHUVER:  Yes, Your Honor.

5                    CROSS-EXAMINATION

6  BY MR. SCHUVER:

7  Q.      Mr. Kovin, my name is Mark Schuver.  We haven't

8  met before; is that correct?

9  A.      That's correct.

10 Q.      Okay.  Can you hear me okay?

11 A.      Yes.

12 Q.      All right.  Mr. Kovin, you have a company called

13 Kovin Design, and that's a commercial art and graphic

14 design firm; is that correct?

15 A.      Correct.

16 Q.      And you have told us that you are what's called a

17 graphic designer?

18 A.      That's right.

19 Q.      And a graphic designer is someone who creates

20 visual concepts either by hand or using some computer or

21 computer software.  Is that a fair description?

22 A.      Yes.

23 Q.      Okay.  So essentially you're the one who actually

24 puts pen to paper so to speak, you may use a computer to

25 do it but you're the one who does the drawings?

1    A.        Yes.

2    Q.        Okay.   Now you told us you are familiar with Linda

3    Deeter; correct?

4    A.        Correct.

5    Q.        But this assignment to create this logo, this was

6    the first time you had ever worked with her; correct?

7    A.        Yes.

8    Q.        Was this also the first time you had worked with

9    her company?

10   A.        Yes.

11   Q.        Okay.   You mentioned her company's name as being

12   Deeter Marketing and Advertising.   Is that her company, is

13   that your understanding of her company name?

14   A.        They're a marketing and advertising company, is my

15   understanding of their function.   And they're called

16   Deeter and Associates.   I mean, to be specific, their

17   specific title, maybe the wording may be, may be

18   advertising comes before marketing or marketing before

19   advertising.

20   Q.        Okay.

21   A.        Basically it's Deeter Associates Marketing and

22   Advertising,

23   Q.        Okay.   You aren't familiar enough with them or

24   haven't worked with them enough to know their official

25   corporate name?

1    A.        No.

2    Q.        And Linda Deeter, she's not a graphic designer;

3    is that correct?

4    A.        I, I don't know, you know, her background.

5    Q.        Okay.  William R. Deeter Associates Inc., have you

6    ever heard of that company?

7    A.        I'm not familiar with her, I guess that's their

8    corporate name.  I'm not familiar with that.

9    Q.        Are you aware if anybody with Linda Deeter's

10   company, if they have, even have any graphic designers?

11   A.        I'm a freelancer so I don't, you know, I don't

12   ask.  I know they have employees.  What their job

13   positions are, I, I'm not familiar with.

14   Q.        And you have never been an employee of William R.

15   Deeter Associates Inc.; is that correct?

16   A.        Only on a freelance basis.

17   Q.        But you have never been an employee of William R.

18   Deeter Associates Inc.; is that correct?

19   A.        Not a full time.

20   Q.        You have never been an employee -- have you

21   received a W-2 from them?

22   A.        At the end of the year I receive a W-2, yes.

23   Q.        From William R. Deeter Associates Inc.?

24   A.        Yes.

25   Q.        Are you an employee?  Do you consider yourself an

1    employee of William R. Deeter Associates Inc. or are you

2    the owner and employee of your own company Kovin Design?

3    A.        I am the owner and, of my own company Kovin

4    Design, which is a freelance company, you know.  I

5    contract, I do freelance work for other companies.  I do,

6    through my 40 years experience I have worked with many of

7    the advertising agencies and marketing agencies.  I work

8    directly with corporations like Merck Pharmaceutical as

9    well as work for small -- so my work is done at any

10   capacity as far -- but it is design work, is what I do.

11           So what I'm saying is that I work for whatever

12   company that requests my services, whether they be, you

13   know, a full corporation, I work with them directly, or I

14   can work indirectly for an advertising or marketing

15   company, large or small, such as, you know, the Deeter

16   Associates.  And in this particular case, I was called as

17   a freelance designer to help with this particular project

18   and whenever they call me in, that's how it's usually

19   done.

20           The charge -- because it's their client, which is

21   rightfully so, it's not my client, and I meet with her and

22   collaborate with her on whatever the project may be and,

23   you know, I take the role of graphic designer and she's

24   the, you know, art director --

25   Q.        Okay.  But Mr. Kovin, when you were doing work,

1    when you did work on this particular logo you were doing

2    it freelance through your company Kovin Design; correct?

3    A.        Correct.

4    Q.        Okay.  You weren't an employee, they didn't

5    actually hire you, saying, we're putting you on our

6    payroll and we're paying you as an employee of William R.

7    Deeter Associates Inc.; is that correct?

8    A.        I was not -- that's what I said, I was not -- I'm

9    not on their payroll.

10    Q.        But what you said is --

11    A.        I did work for them as freelance.

12    Q.        As freelance.  And you do that work for various

13    other companies you told us; correct?

14    A.        That's, well, correct.

15    Q.        On the same basis; correct?

16    A.        Correct.

17    Q.        All right.  And you're not an employee of all

18    those companies, are you?

19    A.        No.  I'm either a freelance artist or a

20    contractor.

21    Q.        Okay.

22    A.        I'll have a contract with them or else I'll be

23    called in for a project.

24    Q.        All right.  So I just want to make it clear, that

25    was the same arrangement that you had when you did this

1    particular project with Linda Deeter.

2    A.        Right.  I was a freelance designer.

3    Q.        Okay.  So you told us that you were contacted by

4    Linda Deeter to work on this logo.  And all of your

5    communications regarding the logo were with Linda Deeter;

6    correct?

7    A.        Yes.

8    Q.        You never had any direct contact or communications

9    with a man by name of Mark Swift; is that correct?

10    A.        I never spoke with him directly.  I made a

11    business card up for him.  I saw -- you know, I used his

12    name on one of the business cards for, as DeliverMed --

13    Q.        You made up one for Joe Siddle also; is that

14    correct?

15    A.        Yes, that's the one that we looked at earlier.

16    Q.        And I'm sure you have heard the name John

17    Tollefson, T-O-L-L-E-F-S-O-N, is that fair?

18    A.        I don't -- I don't remember every, you know, this

19    is 2008.  Or actually this is 2012, that was 2008.  I

20    don't remember every name --

21    Q.        Okay.  You were never an employee of Mark Swift;

22    is that correct?

23    A.        Correct.

24    Q.        You were never an employee of a company by the

25    name of DeliverMed Holdings LLC; is that correct?

1    A.        Yes.

2              THE REPORTER:  Could you have him repeat his

3    answer?

4    Q.        (BY MR. SCHUVER) Mr. Kovin, I may have run over

5    you and I didn't mean to.  Can you finish your response

6    again so we can get it down?

7    A.        I'm not sure where we cut off, so.

8    Q.        Why don't you go ahead and just repeat your

9    response.

10   A.        Repeat what?

11   Q.        Repeat the response.  I think I asked you if you

12   were ever an employee of DeliverMed Holdings LLC.

13   A.        Right.  Okay.  No, I was never an employee of

14   DeliverMed.

15   Q.        And you never had any written agreement, to this

16   day you have never had any written agreement with Mark

17   Swift or the company DeliverMed Holdings LLC?

18   A.        Correct.

19             MR. McGURK:  Your Honor, I guess I'm going to

20   object because obviously we have just introduced an

21   assignment that refers to transfer of a logo to DeliverMed

22   Holdings from Linda -- I mean the assignment goes from Mr.

23   Kovin to Linda Deeter with the intention that it goes to

24   DeliverMed Holdings.  So I, I -- to the extent --

25             THE COURT:  What's your objection?

1      MR. McGURK:   My objection is, he says there's no,

2  no agreement directly between the two.

3      THE COURT:   Well, that's for me to decide, isn't

4  it?

5      MR. McGURK:   All right, Your Honor.   Thank you.

6      MR. SCHUVER:   Okay.

7  Q.    (BY MR. SCHUVER)  And you told us you had no

8  interaction whatsoever with, with Mark Swift in any of

9  this?

10  A.    Yes, I never had any interaction.

11  Q.    You understood, though, that Linda Deeter was the

12  person communicating with the client; correct?

13  A.    That's correct.

14  Q.    And the people she was communicating with were

15  Mark Swift and John Tollefson; is that correct?

16  A.    Tollefson, I'm not familiar with.   I have heard

17  the name Swift but I, I mean, I just -- that was not my,

18  you know, none of my business, my business was with Linda.

19  Q.    Okay.

20  A.    Whoever she spoke with, that was her client and I

21  had no interaction with them.

22  Q.    You understood that all of the work that you were

23  performing with respect to this logo and then the

24  application of the logo on various items, that that was

25  all being done with the approval and consent and

1    authorization of whoever the client was, Mark Swift, John

2    Tollefson, whoever it was that Linda Deeter was

3    communicating with?

4              MR. McGURK:   Your Honor, I guess I'm going to

5    object --

6    A.        That's correct.

7              MR. McGURK:   -- Mr. Schuver is suggesting Mr.

8    Tollefson was -- the testimony --

9              MR. SCHUVER:   Whoever the client was, Judge, I

10   think that's --

11             MR. McGURK:   Whoever the client was is fine, but

12   when he says, I'm going to throw in Mr. Tollefson, I think

13   that's improper, Your Honor.

14             THE COURT:   Why don't you repeat your question.

15             MR. SCHUVER:   Sure.

16   Q.        (BY MR. SCHUVER)  You understood, Mr. Kovin, that

17   the work you were performing, the creation of this logo

18   and then the application of the logo on various items, the

19   magnets, the cards and various things that we'll go

20   through in a minute, that that was all being done with the

21   consent and approval of the client, whoever it was that

22   Ms. Deeter was communicating with?

23   A.        Correct.

24   Q.        Okay.  Sir, I understand that you have a number of

25   exhibits in front of you marked Defendant's Exhibits.  I'd

1    like to start off with Defendant's Exhibit 200, if you can

2    please pull that?

3    A.      I don't have that.

4    Q.      What's that?

5    A.      I just have plaintiff's.

6    Q.      You don't have the defendant's exhibits?

7    A.      No.

8           MR. McGURK:  I sent those yesterday to Linda

9    Deeter, so she has them.

10          MR. SCHUVER:  I told you that these were for both

11   their depositions.

12          THE COURT:  I don't have 200.  Does the witness

13   have 200?

14          MR. McGURK:  Your Honor, if it makes things

15   simpler, Defendant's Exhibit 200 and Plaintiff's Exhibit

16   76, which you marked, are identical.

17          THE COURT:  Let's use 76 then.

18          MR. SCHUVER:  We'll use 76 but, Judge, I, they

19   told us we provided them with all the --

20          THE COURT:  Speak into the mike.

21          MR. SCHUVER:  Judge, we provided -- counsel

22   initially told us that Mr. Kovin and Ms. Deeter were going

23   to be testifying live.  We found out on Monday that they

24   were going to presented by video now.  So we gave them a

25   list and we e-mailed them in PDF form all of the exhibits

1    that we wanted to use with these two witnesses.  And we

2    were assured that they would be provided to these

3    witnesses.

4          Now they're telling us that apparently Mr. Kovin

5    doesn't have any of our exhibits.  I can't conduct a

6    cross-examination of them without our exhibits.  And we

7    were assured that this was going to happen.

8          MR. McGURK:  Your Honor, I will attempt to contact

9    the Deeter offices where Mr. Kovin is right now to make

10   sure that they bring to him whatever documents, if we can

11   have just a moment I can try and do that.

12         THE COURT:  We'll take a 5- to 10-minute recess

13   right now.

14         MR. McGURK:  Thank you very much, Your Honor.

15         THE CLERK:  All rise.

16         (Court recessed from 9:43 a.m. to 9:55 a.m.).

17         THE COURT:  Do we have the document situation

18   corrected?

19         MR. SCHUVER:  Yes, Your Honor.

20         THE COURT:  Mr. Schuver.

21   Q.    (BY MR. SCHUVER)  Okay, Mr. Kovin, first of all,

22   is there anybody else in the room with you?  The

23   videographer?

24   A.    Yes.

25   Q.    Is Linda Deeter or anybody from their firm,

1    they're not in the room with you?

2    A.        No, all the doors are shut.

3    Q.        All right.  So let's turn back to Plaintiff's

4    Exhibit 76, which is your title declaration of Allan Kovin

5    subject to penalties of perjury pursuant to 28 USC Section

6    1746.  Do you have that in front of you?  (Pause.)  And

7    that's a two -- oh, I'm sorry, I'll wait for you to get

8    that.

9    A.        Okay.

10    Q.        Have that?

11    A.        Yes.

12    Q.        Okay.  That's a two-page document; correct?

13    A.        Correct.

14    Q.        With your signature on the last page?

15    A.        Right.

16    Q.        And you have told us it's dated March 16, 2012, so

17    just about, what, five, six weeks ago?

18    A.        Right.

19    Q.        And you didn't prepare this document; correct?

20    A.        Myself, no.

21    Q.        This was prepared by or was sent to you at least

22    by James McGurk, the attorney that was just

23    cross-examining or just examining you a few minutes ago?

24    A.        That's right.

25    Q.        And he's not your attorney; correct?

1    A.        No, he's not.

2    Q.        Okay.  Let's start with paragraph four.  It

3    states, "In 2008, I was contacted by Linda Deeter, who

4    asked that I work with her on the design of a logo and the

5    design of other written and promotional materials for a

6    client of Deeter by the name of DeliverMed Holdings LLC."

7              Did I read that correctly?

8    A.        Right.

9    Q.        And the time frame that you were contacted by Ms.

10   Deeter, does March, early March of 2008 sound right to

11   you?

12   A.        I know it was 2008.  I don't know the month.

13   Q.        Okay.

14   A.        But if you say it's March, that's, I guess that's

15   fine.

16   Q.        Okay.  So you say here that you were contacted

17   about the design of a logo and design of other written and

18   promotional materials for a client of Deeter by the name

19   of DeliverMed Holdings LLC.  But you were also told about

20   the name of Deliver -- Medicate Pharmacy; is that correct?

21   A.        No.

22   Q.        That's not correct?  You were never told anything

23   about the name Medicate Pharmacy?

24   A.        The -- that's going back four years to a specific

25   time, place and time.

1    Q.      Okay.  Let's refresh your recollection.  Do you

2    have Defendant's Exhibit No. 4 in front of you?

3    A.      Okay.

4    Q.      You have that?

5    A.      Yes.

6    Q.      Now told us earlier that one of the things you did

7    was you designed some magnets as part of this project;

8    correct?

9    A.      Yes.

10    Q.      This is a graphic file for one of the magnets you

11    designed; correct?

12    A.      Correct.

13    Q.      In fact, this is something you produced to us in a

14    subpoena, in response to a subpoena; correct?

15    A.      Yes, this is one that I worked on.

16    Q.      Okay.  And if you read that, it says "thank you

17    for using Medicate Pharmacy DeliverMed"; correct?

18    A.      Yes, it does.

19    Q.      So in fact you were told the name Medicate

20    Pharmacy in addition to DeliverMed.

21    A.      Well, I was presented copy.  That's what the copy

22    stated.  I wouldn't, you know, remember that.  And again,

23    it's going back four years.

24    Q.      Okay.  You were presented copy and it was your

25    understanding that that copy was something that the client

1   wanted; correct?

2   A.      Yes.

3   Q.      What you did, you prepared something with the

4   approval and consent of the client; correct?

5   A.      My understanding is that, yes.

6   Q.      You didn't just come up with, out of thin air to

7   add the name Medicate Pharmacy in front of DeliverMed; is

8   that correct?

9   A.      Yes, I did not.

10  Q.      You put Medicate Pharmacy on that magnet because

11  you were told that that's what the client wanted on that

12  magnet.

13  A.      Correct.

14  Q.      And of course we see the logo below that; is that

15  correct?

16  A.      Yes.

17  Q.      Let's turn to Defendant's Exhibit No. 5.

18  A.      Okay.

19  Q.      Defendant's Exhibit 5 are two graphic files for

20  two magnets; correct?

21  A.      Yes.

22  Q.      Again, these are magnets that you redesigned and

23  you created; correct?

24  A.      It looks like it, yes.

25  Q.      And these state, "thank you for using Medicate

1    Pharmacy DeliverMed"; correct?

2    A.       Yes.

3    Q.       And of course you were told to put Medicate

4    Pharmacy on these magnets; correct?

5    A.       That was the copy supplied.

6    Q.       And that was authorized and approved by the

7    client; correct?

8    A.       Yes.

9    Q.       As was the use of the logo in conjunction with the

10   name Medicate Pharmacy; correct?

11   A.       Yes.

12   Q.       Let's turn to Defendant's Exhibit 6, please.   This

13   is another magnet design; correct?

14   A.       Yes.

15   Q.       One of yours that you designed; correct?

16   A.       I think so.

17   Q.       And it says "Medicate Pharmacy offers the right at

18   home pharmacy delivery service";  is that correct?

19   A.       Yes.

20   Q.       And of course that language, those words were

21   words that you, that you understood were approved and

22   authorized to be put on those magnets by the client;

23   correct?

24   A.       Correct.

25   Q.       And we see of course the logo on there; correct?

1    A.        Yes.

2    Q.        And again, the use of the logo in conjunction with

3    the statement "Medicate Pharmacy offers the right at home

4    pharmacy delivery service," that was all approved by the

5    client; correct?

6    A.        Yes.

7    Q.        At the bottom you put on there, quote, proudly

8    serving Illinois for more than 23 years, close quote.  Is

9    that correct?

10   A.        That's on there.

11   Q.        Do you know how long DeliverMed Holdings LLC had

12   been in existence in 2008 when you created this magnet?

13   A.        No.

14   Q.        Do you know how long Medicate Pharmacy Inc. had

15   been in existence in 2008 when you created this magnet?

16   A.        No.

17   Q.        Assuming that Medicate Pharmacy had been in

18   existence for 23 years at this point in time, would it be

19   fair to say that when you prepared this magnet with the

20   house and pestle logo on it, referring to "proudly serving

21   Illinois for more than 23 years" referred to Medicate

22   Pharmacy?

23            MR. McGURK:  Your Honor, I'm going to say that

24   calls for speculation.

25            THE COURT:  Sustained.

1           You do not have to answer that.

2           THE WITNESS:  Yeah, it didn't make sense to me.

3           THE COURT:   That is why I sustained the objection.

4   You want my job.

5   Q.      (BY MR. SCHUVER)  Let's turn to Plaintiff's

6   Exhibit 40.   You already looked at this.   This is the

7   business card for Joe Siddle; correct?

8   A.      Okay.

9   Q.      All right.   So we have the business card for Joe

10  Siddle.   And this is something that you created; is that

11  correct?

12  A.      Yes.

13  Q.      And it says Joe D. Siddle, Chief Operating

14  Officer, it has the name DeliverMed Holdings LLC and it

15  also has the name Medicate Pharmacy; is that correct?

16  A.      It breaking up -- yeah, I see it.   Okay.

17  Q.      You do see all that language there?

18  A.      I do.

19  Q.      And of course that was all language that was

20  approved and authorized by the client; is that your

21  understanding?

22  A.      Yes.

23  Q.      Okay.   And we know the client was at least Mark

24  Swift; is that correct?

25  A.      You know, no, that's not totally correct.

1    Q.      Actually it would be correct that you didn't know

2    who the client was when you were doing this work, you were

3    just doing the work at the direction of Linda Deeter?

4    A.      Correct.

5    Q.      Okay.  And you don't know what relationship Joe

6    Siddle had to DeliverMed Holdings LLC or to Medicate

7    Pharmacy; is that correct?

8    A.      I have no --

9    Q.      You don't know whether or not Joe Siddle was an

10   employee of either one of those companies?

11   A.      I have no clue.

12   Q.      Let's look at Defendant's Exhibit No. 207.

13   A.      Okay.

14   Q.      And just, this is a housekeeping matter.  Let me

15   just do this right here.

16           MR. SCHUVER:  Judge, we would move for admissions

17   of Defendant's Exhibits 4, 5, 6, and I think those are the

18   only ones that I have gone through that were defendant's

19   exhibits so far.

20           THE COURT:  Any objection?

21           MR. McGURK:  No objection, Your Honor.

22           THE COURT:  They will be admitted.

23   Q.      (BY MR. SCHUVER)  Okay, you have Defendant's

24   Exhibit 207 in front of you?

25   A.      Yes.

1    Q.        And you told us that in addition to the magnets

2    and business cards you also created some advertisements;

3    correct?

4    A.        Yes.

5    Q.        And of course this is one of them that we

6    obtained, Exhibit 207 is one of them that we obtained from

7    you pursuant to the subpoena; is that correct?

8    A.        Yes, this is one.

9    Q.        So you created this advertisement; correct?

10   A.        Yes.

11   Q.        And it says at the top "DeliverMed Medicate

12   Pharmacy offers the right at home pharmacy delivery

13   service"; correct?

14   A.        Correct.

15   Q.        And again we see the logo in the bottom right-hand

16   corner; correct?

17   A.        Yes.

18   Q.        And at the very bottom on the left-hand side it

19   says, "proudly serving Illinois for more than 23 years";

20   correct?

21   A.        Yes.

22   Q.        And this was all done with the authority and

23   approval and direction of the client; is that correct?

24   A.        Of Linda.

25   Q.        Of Linda?

1    A.       Yeah, Linda Deeter.

2    Q.       Okay.  But you understood or at least she

3    indicated to you that she was getting this from the

4    client?

5    A.       Right.

6    Q.       Turn to Defendant's Exhibit 208.  Do you have that

7    in front of you?

8    A.       Yes.

9    Q.       This again is another advertisement that you

10   prepared; correct?

11   A.       It looks like it, yes.

12   Q.       And at the top it says "DeliverMed Medicate

13   Pharmacy"; correct?

14   A.       Yes.

15   Q.       And we see in the middle the, the house and pestle

16   logo; correct?

17   A.       Right.

18   Q.       And at the bottom it says, "proudly serving

19   Illinois for more than 23 years"; correct?

20   A.       Right.

21   Q.       And again, this was done with the direction and

22   approval of the client; correct?

23   A.       Linda Deeter, yes.

24   Q.       Well, Linda Deeter getting approval from, you

25   understood Linda Deeter was getting approval from Mark

1    Swift?

2    A.      If that's the chain of command.

3    Q.      Okay.

4    A.      I don't know who she was getting her direction

5    from, but I know I was getting mine from her.

6    Q.      Then if you'll turn back to Plaintiff's Exhibit

7    39.

8    A.      Okay.

9    Q.      This is that card that you, that you said that you

10   prepared and you created; correct?

11   A.      Yes.

12   Q.      And at the very top it says, "thank you for using

13   Medicate Pharmacy DeliverMed"; correct?

14   A.      Yes.

15   Q.      And in the middle we see of course the house and

16   pestle logo; correct?

17   A.      Yes.

18   Q.      Again, this is something that was done to your

19   understanding all with the approval and consent of the

20   client?

21   A.      Yes.

22   Q.      Okay.  I'd like to turn back then to Plaintiff's

23   Exhibit 76, which is your declaration.

24           THE COURT:  Which is your 200?

25           MR. SCHUVER:  My 200 and their 76.

1    A.        Okay.   You said 77?

2    Q.        (BY MR. SCHUVER) 76.   This would be your

3    declaration under penalties of perjury.

4    A.        Okay.  I have it.

5    Q.        So, when it states in paragraph four that in 2008

6    you were contacted by Linda Deeter who asked that you work

7    with her on the design of a logo and the design of other

8    written and promotional materials for a client by Deeter

9    by the name of DeliverMed Holdings LLC, it would be fair

10   to say that you also were doing this for Medicate

11   Pharmacy?

12   A.        The job was always referred to as DeliverMed.

13   Q.        Just DeliverMed, just that name?

14   A.        Yes.

15   Q.        And then what you put on all the documents was one

16   of two names, either DeliverMed Medicate Pharmacy or more

17   commonly Medicate Pharmacy DeliverMed; correct?

18   A.        If you could repeat that again, I would appreciate

19   it.

20   Q.        Sure.   The various exhibits that we have just gone

21   through had the name DeliverMed Medicate Pharmacy or

22   Medicate Pharmacy DeliverMed; is that correct?   And

23   whether they were separate names or one long name, you

24   don't know?

25             MR. McGURK:   Your Honor, I guess I'm going to

1    object, there's confusion.

2          THE COURT:  I didn't really understand the

3    question.  It's not a good question.

4          MR. SCHUVER:  I'll just move on, Judge.  That's

5    fine.

6    Q.    (BY MR. SCHUVER)  You certainly understood in 2008

7    when you were creating all of this work that you were to

8    put the name Medicate Pharmacy on the various materials

9    that we have identified.

10   A.    It was in the copy.  The, the job that I worked on

11   was, the project was DeliverMed.  Now -- and the logo that

12   started, kicked everything off was the DeliverMed logo.

13   Q.    Okay.

14   A.    DeliverMed is what I was doing it for as far as

15   my, as far as my knowledge goes, but what happened with

16   the copy is an afterthought.  I, you know, how they chose

17   to word things are, you know, the client's decision.  I

18   just follow whatever they request through the line of

19   chain of command, client to Linda to me.  So whatever the

20   composition of the graphic was, whether it be a logo, an

21   ad, a magnet, I was following direction.  And if it, so be

22   it, had two names in it or one name in it, that's how it

23   was handled.  But as far as the project overall, it was

24   DeliverMed.  It was being done for DeliverMed, that's my

25   understanding.

1    Q.    I'm sorry.  I didn't mean to cut you off.  Are you

2    finished?

3    A.    Finished.

4    Q.    Okay.  And you didn't know who Mark Swift was

5    working for or being paid by at that time in March of

6    2008?

7    A.    It was not my, any of my concern.  I -- he was not

8    part of the project.  It was not a graphic.

9    Q.    Not, not your concern.  Fair enough?

10   A.    No.

11   Q.    Let's talk about how you came to receive this

12   declaration that's been marked Plaintiff's Exhibit 76.  Do

13   you have, can you pull up Defendant's Exhibit 203?

14   A.    Okay.

15   Q.    Do you have that in front of you?

16   A.    Yes, I do.

17   Q.    This is an e-mail dated March 7, 2012, just about

18   six weeks ago; correct?

19   A.    Yes.

20   Q.    It's about nine days before you signed your

21   declaration on March 16; correct?

22   A.    Nine days before the declaration?

23   Q.    Yes.

24   A.    Okay.

25   Q.    All right.  And this e-mail is from Linda Deeter

1    and it's addressed to you.

2    A.      Okay.

3    Q.      It starts out saying, quote, "Hi, Alan, seems when

4    we made the DeliverMed logo there were two partners.  We

5    worked only with one of them, Mark Swift, and didn't

6    realize there was a second."

7            Do you see that?  So do you understand now there

8    were actually two partners at the time you were creating

9    these materials?

10   A.      I had no idea of how many partners there were, you

11   know.  Again, it was out of my jurisdiction.  I just -- I

12   answered to Linda and so, you know, beyond that client

13   contact is her jurisdiction so I had no idea that there

14   were --

15   Q.      So, but we know that on March 7, 2012, when you

16   received this e-mail from Linda Deeter, she is informing

17   you that, oh, by the way, there were two partners, we just

18   didn't realize it; correct?

19   A.      Yeah, right.  I see, I see that.

20   Q.      You see that.  And so you understood that.  Did

21   you, did you disagree with Linda?

22   A.      I, I had no knowledge of the partnership and how

23   it was comprised so there was nothing to disagree about.

24   Q.      Sure.  You had no knowledge back when you were

25   doing the work back in 2008 and other than what Linda

1    Deeter told you in this e-mail on March 7, 2012, you

2    didn't have any other knowledge; correct?

3    A.      Not, not that I -- no.  No.  Not that I could

4    think of.  I mean --

5    Q.      Why, Mr. Kovin, did you sign the declaration under

6    penalties of perjury nine days after you get this e-mail

7    dated March 7, 2012, advising you that there really were

8    two partners?  Why did you sign that declaration?

9    A.      The declaration for -- I have to go back and look

10    at the declaration to see what that pertains to.  And are

11    you referring to No. 4 in the declaration again?  Is that

12    what you are trying to --

13    Q.      Let me see which paragraph.  (Pause.)  Yes, No. 4.

14    A.      I'm not sure what you're -- the point you are

15    trying to make is.

16    Q.      Well in paragraph No. 4, you signed this, it

17    states that the client was DeliverMed Holdings LLC.  But

18    Ms. Deeter in her March 7, 2012, e-mail, nine days before

19    you signed this declaration, is telling you that there

20    were actually two partners, a man by the name of Mark

21    Swift and someone else who she does not identify in the

22    e-mail.

23            THE COURT:  Hold on a second.  Mr. McGurk?

24            MR. McGURK:  Yes, Your Honor, I'd like to

25    interpose an objection.  This is unbelievably

1    argumentative, and I would ask the Court sustain the

2    objection on the basis it's not the appropriate question

3    to ask of this witness.

4            THE COURT:  I'm going to -- it's cross-examination

5    so I'll allow the question.

6    Q.      (BY MR. SCHUVER)  Go ahead, Mr.  Kovin.

7    A.      Okay, so I mean, I -- DeliverMed is the

8    corporation and as I said I, I don't know how it's made

9    up, comprised of.  Whether it's a partnership or -- I

10   don't, I don't see how that's relevant to, to what you are

11   asking me.  I mean, I -- it doesn't matter if it's made up

12   of nine people.  To me, it doesn't really -- it's

13   DeliverMed that I work for and it was through Linda

14   Deeter.  So I, I don't see how I'm perjurying myself here.

15   Q.      Well, sir, you knew that there were two partners

16   but she didn't tell you that those were two partners in

17   the same company DeliverMed Holding LLC?

18   A.      You're asking me about DeliverMed.  No. 9 -- No.  4

19   is, you know, I work with Deeter and her client by the

20   name of DeliverMed.  It doesn't really matter how, what

21   they were made up of.

22           THE COURT:  Move on.

23           MR. SCHUVER:  We'll move on.

24   A.      The name is DeliverMed.  That's what I've been

25   trying to say to you, DeliverMed.  That's who I worked for

1    and I did it through Linda Deeter.  So how they were

2    comprised of -- that e-mail you were referring to?  That,

3    to me it's irrelevant.

4    Q.      (BY MR. SCHUVER)  You didn't know who the clients

5    were when you were doing this work back in 2008?

6              MR. McGURK:  I'll object Your Honor, it's --

7              THE COURT:  It's been asked and answered many

8    times.  Next question?

9    A.      I don't know why you're pressing me, asking me --

10             THE COURT:  Hold on a second.  There's no question

11   on the table now.

12             Next question, Mr. Schuver.

13   Q.      (BY MR. SCHUVER)  Mr. Kovin, referring back to

14   Exhibit 203, defendant's exhibit, third paragraph down,

15   second sentence says, because you are the person who

16   actually put pen to paper.  And that's true, isn't that

17   correct?  When Linda Deeter said that in her e-mail of

18   March 7, 2012, you're the person who actually put pen to

19   paper?

20   A.      Are we looking at the declaration?

21   Q.      No, we're looking at Defendant's Exhibit 203, the

22   third paragraph down, second sentence, starts off, quote,

23   because you are the person who actually put, and then she

24   has in quotations, pen to paper, close quote.

25   A.      You know, it was a collaboration, you know, with

1    the logo and everything else.  And she was the director,

2    the art director, and I was the graphic designer.

3    Q.      Linda Deeter -- I'm sorry.

4    A.      I put pen to paper but I did it in, you know, with

5    Linda and we worked the logo design together.

6    Q.      Linda Deeter didn't do any of the drawings; is

7    that correct?

8    A.      Linda is not skilled to work a computer as far as

9    graphics.  That's why she hires me.  But Linda's input is

10   just as important as far as determining color, you know,

11   typeface, and if I'm going in the right direction as far

12   as the graphic.  So it was a, you know, a team effort, you

13   know, we worked together on so I, you know, I may have put

14   pen to paper but her input was just as important as far as

15   the creative.  And that's what it is, it was a creative,

16   you know, process.

17   Q.      But Linda Deeter did not do any of the drawings;

18   correct?  Simple question, did she use a pen, any type of

19   a device to actually make one of the drawings?

20   A.      Well, beginning in the process of discussing what

21   this thing could look like we maybe sketched a few things

22   out so, yes, maybe she did use a pen.  I don't recall.

23   Q.      I'm not asking you maybe.  Do you recall Linda

24   Deeter actually making one of the drawings that actually

25   resulted in the logo that we have already identified as

1    Plaintiff's Exhibit 36?

2    A.    No, she didn't do the actual drawings, but we

3    marked up --

4    Q.    It's a simple question, Mr. Kovin.  Did she do one

5    of the drawings or not?

6            MR. McGURK:  Your Honor, I would just ask --

7            THE COURT:  Hold.  Hold.  Hold a second.  It --

8    Mr. McGurk and -- Mr. Kovin, it is a simple question.  Can

9    it be answered yes or no?  Did, you know, did Miss Deeter

10   put pen to paper on this logo?

11           THE WITNESS:  No, she didn't.

12           MR. SCHUVER:  Thank you.

13   Q.    (BY MR. SCHUVER)  Turn to Plaintiff's Exhibit 36

14   again.

15   A.    Okay.

16   Q.    Do you have that in front of you?

17   A.    Yes, I do.

18   Q.    It consists of four pages.

19   A.    Yes.

20   Q.    Now, there's no question that you created this

21   logo in the year 2008; correct?

22   A.    Yes.

23   Q.    Turn to page two of Plaintiff's Exhibit 36.  Have

24   that in front of you?

25   A.    Yes.

1    Q.        It says, date of first use, January 1, 2006.

2    That's not possible, is it, Mr. Kovin?

3    A.        No.

4    Q.        That would be a false statement, wouldn't it, Mr.

5    Kovin?

6    A.        Correct.

7    Q.        Below that it says date --

8    A.        You're, you're referring to the logo?

9    Q.        That's what this is referring to.

10    A.        Okay.

11    Q.        Below that it says "date of first use in commerce"

12    and it says January 1, 2006.  Again, that's a false

13    statement, isn't it, Mr. Kovin?

14    A.        Yes.

15    Q.        Turn to page three.  It repeats the first thing,

16    date of first use and date of first use in commerce,

17    January 1, 2006; correct?

18    A.        Correct.

19    Q.        Those are false statements;  is that correct?

20    A.        Well, assuming the logo was designed in 2008 which

21    is when it was, yes, that would be wrong.

22    Q.        You didn't copy this from somebody else, did you?

23    This logo?

24    A.        Absolutely.

25    Q.        Absolutely not.  You're the one who created it and

1    you created it in 2008; correct?

2    A.       Yes.

3    Q.       And anybody who says it was created and used back

4    in January of 2006 would not be telling the truth.

5    A.       Right.

6    Q.       Same thing on page four of Plaintiff's Exhibit 36;

7    correct?  Same thing, they indicate that first use and

8    first use in commerce were January 1, 2006.

9    A.       Right.  For this logo, I don't see it, I mean, not

10   possible.

11   Q.       And those are false statements; is that correct?

12   A.       I don't see it would be possible to be correct.

13            MR. SCHUVER:  We'd like the Court to take judicial

14   notice that Plaintiff's Exhibit 36 is a document that was

15   attached to plaintiff's complaint, Document 145.

16            THE COURT:  The Court takes judicial notice.

17   Q.       (BY MR. SCHUVER)  Let's go back again to your

18   declaration, Plaintiff's Exhibit 76.

19   A.       Okay.

20   Q.       Paragraph seven says -- hold on, let me get it up

21   on the screen for us over here.  (Pause.)  Paragraph seven

22   says, pursuant to those discussions, I -- and I means you,

23   correct?  Allan Kovin?

24   A.       Correct.

25   Q.       Pursuant to those discussions, I prepared a series

1    of draft corporate logos.

2          So you are the one who prepared the series of

3    draft corporate logos; correct?

4    A.      Right.

5    Q.      Turn to Defendant's Exhibit 215.

6    A.      I don't have 215 here.  It doesn't look like I

7    have 215.  I see going up to 201 is my highest number.

8    (Pause.)  I don't have 215.

9          THE COURT:  I take it these are the series of

10   drafts?

11         MR. SCHUVER:  It is.

12   A.      I only go up to 202.

13   Q.      (BY MR. SCHUVER)  I'll see if I can muddle

14   forward, Judge.  I don't know if taking a break would help

15   or --

16         THE COURT:  We'll take a 5-minute recess, see if

17   we can't get that.

18         215 apparently, Mr. Kovin, is a series of drafts

19   that you prepared.

20         MR. SCHUVER:  But there will probably be others --

21   what was the max -- what was the highest number that you

22   said you had, Mr. Kovin?

23         THE WITNESS:  202.

24         THE COURT:  What number are you going to?

25         MR. SCHUVER:  Let me get my list here that I -- I

1    gave you my list yesterday.

2         THE COURT:  We'll take a recess.

3         (Court recessed from 10:34 a.m. to 10:45 a.m.)

4         THE COURT:  All right.  Let's move on.  We're on

5    document, Defendant's 215.

6    Q.      (BY MR. SCHUVER)  Okay.  Mr. Kovin, you have

7    Defendant's Exhibit 215 in front of you; is that correct?

8    A.      Yes.

9    Q.      And these are the drafts that you prepared of the

10   logo; correct?  Of different logos?

11   A.      Right.  This, this is the, all the different

12   drafts of the DeliverMed logo.

13   Q.      And then the last page has kind of a summary of

14   all of the logos all on one page, just kind of some

15   thumbnails?

16   A.      Yeah, right.

17   Q.      And if you look at the last page, my understanding

18   is the one that the client selected was the one in the

19   upper left-hand corner; correct?

20   A.      It looks that way.

21   Q.      Okay.  Let's go back to your declaration,

22   Plaintiff's Exhibit 76.

23   A.      Okay.

24   Q.      It says, paragraph nine says, "Linda Deeter chose

25   the colors to be used with the house and pestle logo after

1    consultation with Mark Swift and chose the type font for

2    the promotional material created for the logo"; correct?

3    A.      Yes.

4    Q.      You didn't know who Mark Swift was up until more

5    recently; correct?

6    A.      Yes.

7    Q.      So you didn't know who she was in consultation

8    with, whether it was Mark Swift or someone else?

9    A.      Um -- yes.

10   Q.      Okay.  Let's turn to Defendant's Exhibit 24.

11   A.      Okay.

12   Q.      This is a series of e-mails.  I'm looking at the

13   one that starts in the middle of the page, it's dated

14   April 1, 2008, at 4:18 p.m., from Linda Deeter.

15           Do you see that?

16   A.      4:18, yes.

17   Q.      And it starts off, "Hi Allan," so this is directed

18   to you; correct?

19   A.      Looks that way.

20   Q.      And she states in here that they like the concept

21   in the top left of the page with many possibilities on it.

22   The top left of the page, that's what we were just

23   referring to on that composite thumbnail on Defendant's

24   Exhibit 215; correct?

25   A.      Yeah, I assume.

1    Q.       And "they" means the client; correct?

2    A.       I assume, yes.

3    Q.       Linda Deeter does not refer to herself as "they,"

4    she was referring to the client is, that what you

5    understood when you received this e-mail?

6    A.       Yes, that's what it sounds like to me.

7    Q.       Okay.  So they, the client, selected the top left

8    logo; correct?

9    A.       Yes.

10    Q.       Then she goes on to state, that said, they'd like

11    -- I think it's a typo -- it says to, T-O, I suspect it

12    should have been "the", but that said they'd like two

13    colors to be more like the blue and green on the logo with

14    the black bar across the top.

15             Do you see that?

16    A.       Right.  Mm-hmm.

17    Q.       So "they" again is the client; correct?

18    A.       Right.

19    Q.       And it says they like the colors to be more like

20    the blue and green on the logo, on another logo on your

21    composite sheet; correct?

22    A.       Correct.

23    Q.       And in fact if you go back to the last page of

24    Exhibit 215 in the area where she indicates in the, like

25    the colors more like the blue and green on the logo with

1    the black bar across the top, that would be the one in the

2    upper right-hand corner?

3    A.        I'm looking at it.

4    Q.        Okay.  So they, the client, selected those colors

5    for the, for the logo.

6    A.        Right.  There was a lot to choose from, isn't

7    there?

8    Q.        You're right.  You're the one who put together all

9    of these; correct?

10   A.        Yes.

11   Q.        As far as putting together, drawing the logos and

12   all these samples that we see in Exhibit 215.  Correct?

13             THE COURT:  Can you answer that?

14             THE WITNESS:  Oh, yes, I did.

15   Q.        (BY MR. SCHUVER)  Okay.  Thank you.  Sorry about

16   that.  It's a little difficult to communicate so we

17   understand.

18   A.        Sure.

19   Q.        So, going back to Plaintiff's Exhibit 76,

20   paragraph nine, where you say Linda Deeter chose the

21   colors, you also say that Linda Deeter chose the type

22   font; is that correct?

23   A.        Right.  There's a lot, you can see there's a lot

24   of different type fonts here to mix and match.

25   Q.        And if we look at Plaintiff's Exhibit 36, you will

1    agree with me that there is no type font on that logo.

2    A.      Well, I don't know why there's not.

3    Q.      Okay.  The one in Plaintiff's Exhibit 36 has no

4    type font?

5    A.      But there should be.  I guess -- incorporates the

6    name of the company --

7    Q.      Do you know which logo, which logo was the subject

8    of any copyright or trademark, whether it's the one that

9    you have in front of you as Plaintiff's Exhibit 36 or some

10   other version?

11   A.      I'm not sure if I'm understanding.

12   Q.      Do you know if -- well, first of all, do you have

13   any knowledge as to whether anyone obtained a, either a

14   copyright registration or a trademark registration on the

15   house and pestle logo?  And if you have no knowledge, just

16   tell us.

17   A.      None.  Nobody contacted me and told me.

18   Q.      Fair enough.

19   A.      I wouldn't know.

20   Q.      All right.  Let's turn back to Plaintiff's Exhibit

21   76, your declaration again.

22   A.      Okay.

23   Q.      And actually we need to turn to the second page, I

24   want to look at paragraph 11.  Paragraph 11 states, quote,

25   "I always intended and believed that the client,

1    DeliverMed and Mark Swift would own all rights in the

2    final logo design."

3          Is that correct?

4    A.        That would be correct.

5    Q.        But you already told us, you already told us back

6    in 2008 when you were working on this that you didn't

7    really know who Mark Swift was, all you knew is a name

8    DeliverMed.

9    A.        Pretty much, until business cards had to be put

10   together, then I saw the name Mark Swift.

11   Q.        And you saw the name Joe Siddle; correct?

12   A.        I'm sorry?

13   Q.        And you saw the name Joe Siddle?

14   A.        Right.  But that was in the passing.  I mean, that

15   was just putting, putting cards together.  There was no

16   other attachment as far as knowing who they are or, you

17   know, other than their title, I guess that would be on

18   their card but I wouldn't remember that.  I -- maybe the

19   Mark Swift name had come up but there was no reason for me

20   to place special emphasis on remembering it.  If that's

21   Linda's client, assuming DeliverMed and, you know, if Mark

22   Swift is her client who she was doing it through, I mean,

23   that's, that's okay, you know, with me.

24   Q.        What I'm asking you, sir, is what you knew back in

25   2008 when you worked on this project.  Did you actually

1    intend and believe that the client was Mark Swift?  Not

2    what you know now but what you knew then.

3    A.        Right.  You know, again it's going back four

4    years, I don't remember conversations then.  Maybe in

5    conversation, and most likely, not just maybe but most

6    likely Linda did mention his name but there's not any

7    reason, you know, since then, and now with all the work

8    that I have done and other clients that I have associated

9    with and all their details and specifics as far as their

10   jobs go that I would remember that in particular.

11   Q.        So would it be fair to say that back in 2008 you

12   have no -- you have no recollection of, back in 2008,

13   having any intention with regard to Mark Swift?

14   A.        You know, my memory's not that good.  I'm sorry.

15   Q.        So the answer would be no.

16   A.        I don't -- it wouldn't be a general no, it would

17   be a maybe.

18   Q.        Nothing you can recall as you are sitting here

19   today testifying under oath?

20   A.        Again, Linda had talked about, had spoken to me

21   about the client back then a little bit, giving me a

22   little background, but, you know, having the name pop out,

23   I don't know.

24            THE COURT:  He can't remember.  Move on.

25   A.        I can't give you a definite yes or no on that,

```
 1    that's what I'm saying.  I can't.
 2    Q.      (BY MR. SCHUVER)  And Mr. McGurk is the one who
 3    actually prepared this for your signature, to your
 4    knowledge?
 5    A.      Right.
 6    Q.      Okay.
 7    A.      Well, and -- right.
 8    Q.      So let's look, let's talk about the house and
 9    pestle logo itself.  You're familiar with the, the symbol
10    of, of the letter C being in a circle; is that fair?
11    A.      Yes.
12    Q.      Okay.
13    A.      Copyright, yes.
14    Q.      That's putting people on notice of a copyright;
15    correct?
16    A.      Correct.
17    Q.      And at no time did you ever draft this house and
18    pestle logo with that C in a circle symbol?
19    A.      No.  Never would.
20    Q.      And you never put the words copyright or COPR or
21    anything like that --
22    A.      No.  No.  No.  Or R in a circle even.
23    Q.      Okay.  None of those things.
24    A.      No.
25    Q.      Turning pack to Plaintiff's Exhibit 76, your
```

1    declaration, let's look at paragraph 12.  Have that in

2    front of you?

3    A.      Yes.

4    Q.      It says, quote, to the extent that I had any legal

5    right to the house and pestle design, I have tran -- I

6    have transferred all my rights in the house and pestle

7    logo design to Linda Deeter who has transferred those

8    rights to the client DeliverMed, since that was always my

9    intention and understanding.

10          Did I read that correctly?

11   A.      Yes, you did.

12   Q.      So you -- this is dated March 16, 2012.  And you

13   are saying, I have transferred all of my rights in the

14   house and pestle logo to Linda Deeter.  Past tense.

15   Correct?

16   A.      Right.  Correct.

17   Q.      Let's look at Plaintiff's Exhibit 77.  That's the

18   document titled copyright rights assignment; correct?

19   A.      Right.

20   Q.      And your signature at the bottom; correct?

21   A.      Yes.

22   Q.      But that's dated March 20, 2012; correct?

23   A.      That's right.

24   Q.      So when you executed this declaration, Plaintiff's

25   Exhibit 76, on March 16, 2012, you had not yet prepared a

1    written document signed by you transferring any rights to

2    Linda Deeter.

3    A.        As far as the, all of that goes, I mean, it really

4    goes back to 2008 when I was called in for the project.

5    And it was an understanding at that time, I wasn't under

6    contract, it was verbal, that when I came in to do the

7    project I was doing it for Linda.  And what Linda chose to

8    do with the logo after that was up to her.  But she was,

9    you know, I assume that she was as honorable as I was as

10   far as our arrangement was, as far as her -- our

11   arrangement and her to her client.

12         So that, you know, I just, I assume that she was

13   going to do the right thing and I was, thought I was doing

14   the right thing and I, you know, I was to design the logo,

15   I was paid by Linda and that was the end of our, you know,

16   relationship as far as the logo went.  I was paid for it

17   and when I, the moment I was paid for it, it belonged to

18   Linda as far as I was concerned.

19         Now I thought I did the right thing there, you

20   know, and I assume that Linda was going to carry the baton

21   and do the right thing by her client and not take

22   ownership of, of the logo for herself.  And apparently

23   that's what, you know, this is why it was all done

24   verbally and under good faith.  I mean, I -- so you know

25   as far as these two papers in front of me, especially the

1    copyright one, even though it was made up later, we had a

2    verbal understanding in 2008 that I design the logo and

3    was paid for it and it was then her logo.  What she did

4    with it afterwards was, you know, up to Linda and Deeter

5    Associates.  And that's how that came to be.  That's --

6    Q.      Mr. Kovin, I'd like to you answer my questions, if

7    you wouldn't mind.  My question was much simpler.  Prior

8    to March 20, 2012 --

9    A.      Right.

10   Q.      -- did you ever have a written and signed

11   document, written and signed by you transferring any legal

12   rights in the logo?

13   A.      No.

14   Q.      Okay.

15   A.      It was a verbal agreement.

16   Q.      Thank you.  So nothing written and signed;

17   correct?

18   A.      Verbal.  Like a handshake.  Remember that?  The

19   handshake?

20   Q.      Are you generally familiar, being a graphic

21   designer, with any copyright laws?

22   A.      Yes.

23   Q.      You are aware are you not that in order to

24   transfer rights, copyrights, it must be in a written and

25   signed document?

1    A.       When, when it's -- yeah, right, okay.

2    Q.       Thank you.  So let's look at Plaintiff's Exhibit

3    77, which is your copyright assignment.  (Pause.)  Hold on

4    a second, I need to grab my copy here.  Okay.  Do you have

5    that in front of you?

6    A.       Yes, I do.

7    Q.       All right.  Third paragraph down says, "I intended

8    that all copyright ownership rights in the house and

9    pestle logo were to be transferred by myself and Linda

10   Deeter to the client, DeliverMed Holdings, LLC";  is that

11   correct?

12   A.       Wait a minute.  Which document are we on?

13   Q.       It's Plaintiff's Exhibit 77, which is titled

14   copyright rights assignment.

15   A.       Right.  And on which paragraph are we on?

16   Q.       It is -- they're not numbered, but it's the third

17   paragraph from the top.  And I'll read it to you one more

18   time.  It says, "Whereas, I intended that all copyright

19   ownership rights in the, quote, house and pestle, close

20   quote, logo were to be transferred by myself and Linda

21   Deeter to the client, DeliverMed Holdings, LLC";  is that

22   correct?

23   A.       That sounds correct.

24   Q.       All right.  Now in your declaration, paragraph 11,

25   you said you intended it to be transferred to DeliverMed

1    and Mark Swift; is that correct?

2    A.      That's what it says.

3    Q.      Okay.  You don't mention anything about Mark Swift

4    in copyright rights assignment document, Plaintiff's

5    Exhibit 77.

6    A.      It's not -- I don't see anyone else's name in

7    there, no.  Wouldn't that be -- and Linda Deeter to the

8    client, and that would be Mark Swift then, wouldn't that

9    be correct?

10    Q.      I'm just asking you, sir, if the name Mark

11    Swift --

12    A.      Mark Swift -- well then that's my understanding,

13    her client, if her client being Mark Swift then Mark Swift

14    would be there.

15    Q.      So let's look to see -- I'm sorry.

16           MR. SCHUVER:  I didn't mean to cut him off.

17    Q.      (BY MR. SCHUVER) Are you done, Mr. Kovin?

18    A.      Yes.

19    Q.      Okay.  Let's look to see who you in fact

20    transferred this to.  Let's look at this large paragraph

21    under "therefore."  Do you see that?  It starts off, "I,

22    Allan Kovin"?

23    A.      Yes.

24    Q.      It says, "I, Allan Kovin, for good and valuable

25    consideration, receipt of which is hereby acknowledged, do

1    hereby assign, transfer and grant to Linda Deeter of

2    William R. Deeter Associates Inc. all of my rights of

3    copyright, to the extent that they exist, in and to a

4    two-dimensional design known as the house and pestle

5    logo."

6         And I'll kind of stop right there for right now.

7    So this is transferring to Linda Deeter of William R.

8    Deeter Associates Inc.; correct?

9    A.    Yes.

10   Q.    Okay.  Going back to Plaintiff's Exhibit 76, your

11   declaration, paragraph 12.

12   A.    Okay.

13   Q.    Got it?

14   A.    Yes.

15   Q.    You state, "to the extent I had any legal right to

16   the house and pestle design, I have transferred all my

17   rights in the house and pestle design to Linda Deeter who

18   has transferred those rights to the client DeliverMed

19   since that was always my intention and understanding."

20        Mr.  Kovin, when did Linda Deeter transfer those

21   rights to the client DeliverMed?

22   A.    I, I don't know.

23   Q.    How do you know that Linda Deeter transferred

24   those rights to the client DeliverMed?

25   A.    Well, how do I know?

1    Q.       Yes.

2    A.       I'm sorry.  Ask me that last question again.

3    Q.       How do you know that Linda Deeter transferred

4    those rights to the client DeliverMed?

5    A.       I, I don't know personally, so I -- I mean, I, I

6    guess the attorneys handle that aspect.  But I, I wouldn't

7    know.

8    Q.       So you just signed this without having such

9    knowledge?

10   A.       Well, let me review this again before I commit.

11   (Pause.)  Well, I -- I mean, I don't know for sure that

12   she, you know, transferred those rights to DeliverMed.

13   Q.       Did you say that she will or that she did?

14   A.       Well, since you drafted this, as you mentioned

15   earlier, was McGurk, Attorney McGurk, which is the

16   attorney for DeliverMed, I, I don't think he would put

17   this together unless it were so.  Wouldn't you think?

18   Q.       Good question, Mr. Kovin.  Mr. Kovin, you have

19   never seen a written and signed document from Linda Deeter

20   transferring any rights to DeliverMed; is that fair to

21   say?

22   A.       That's fair.

23   Q.       Okay.  And you don't know when Linda Deeter

24   transferred or purportedly attempted to transfer any

25   rights to DeliverMed?

1    A.        I mean, the only thing I can think of is looking

2    at the date here, March 16, which wasn't really all that

3    long ago.  Doesn't it take a little time to do, do that?

4    That's the only thing I can think of.  But otherwise I

5    don't, I don't know.

6    Q.        Okay.

7    A.        Maybe it hasn't been done yet, that's the only

8    thing I can think of, or maybe it has and I haven't seen

9    it.  I really don't know.

10   Q.        And just so you know, Mr. Kovin, no one here is

11   asking you to guess, we just want to know what you know

12   and what you don't know.  Okay?

13   A.        I don't know.  I don't know because I, no one's

14   ever shown me anything so I -- and since McGurk is, James

15   McGurk is the attorney for DeliverMed, I, I would imagine

16   that has been taken care of.

17   Q.        Okay.  Let's go back to Plaintiff's Exhibit 77,

18   the document copyright rights assignment.  And that same

19   sentence goes on to state you are transferring and

20   granting to Linda Deeter of William R. Deeter Associates

21   Inc. all of my rights of copyright to the extent that they

22   exist in and to a two-dimensional design known as the

23   house and pestle logo; correct?

24   A.        Yes.

25   Q.        And the two-dimensional design, that's the design

1    that you drew; correct?

2    A.      Yes.

3    Q.      Linda Deeter did not draw it; correct?

4    A.      No, she collaborated with me on the graphic of it.

5    Q.      That's not my question.  I didn't ask if she

6    collaborated.  I wanted to know, did Linda Deeter draw it?

7    A.      No.

8    Q.      Thank you.  It says that you received good and

9    valuable consideration for this copyright rights

10   assignment.  What did you receive, Mr. Kovin?

11   A.      Well, the project was completed and I was paid.  I

12   received my compensation.  I billed Linda and I, you know,

13   she received an invoice, she paid it, and as I mentioned

14   earlier at that time in 2008 is my understanding that it

15   was hers.

16   Q.      So the compensation you received was for doing the

17   work on the project; correct?

18   A.      Yes.

19   Q.      You completed all of that work back by, I think

20   your last billing was statement of August of 2008.  Does

21   that sound about right to you?

22   A.      Sounds about right, yes.

23   Q.      And you were paid some time in 2008; is that

24   correct?

25   A.      I believe so.

1    Q.        So you received no compensation for signing this

2    copyright rights assignment in March of 2012?

3    A.        I answered that earlier.

4    Q.        Did you receive, since March 20, 2012, have you

5    received any compensation from Linda Deeter or anyone else

6    in exchange for signing this copyright rights assignment?

7    A.        I received my -- going back to answer you, your

8    question and what I have stated earlier, when I took the

9    project it was a verbal agreement that when I, when the

10   project was completed that I was paid for it, the logo was

11   hers.  And she -- you know, and that was my compensation.

12   I was compensated before -- you know, before I was

13   challenged.  You are challenging me now and this is why

14   we're going through all of this.  But really, this was all

15   accomplished back in 2008 when I did work for the project

16   and I was paid for it, I was compensated back then.  And

17   the agreement was that I was designing it for her client

18   DeliverMed and she, and she was, you know, it was hers.

19   It was her logo at that time to do as she pleased with it

20   and that's it.

21   Q.        Mr. Kovin, my question was much simpler.  And

22   again, it would be much easier if you'd answer my

23   question.  I wanted to know, since March of 2012 have you

24   received any compensation in exchange for this copyright

25   rights assignment?

1    A.      We keep going in circles, aren't we?

2    Q.      No, we aren't, sir.  I'm asking you since March of

3    2012 --

4    A.      My answer to you is, I was compensated before

5    March of 2012 or whatever that recent date was.

6    Q.      So the answer to my question would be no.  Would

7    the answer to my question be no, Mr. Kovin?

8    A.      You're making it very difficult for me because I

9    was, I did the project and I was compensated for it and

10   she had the rights back in 2008, you know.  There would no

11   reason --

12          THE COURT:  The Court understands that he has not

13   received any compensation --

14          MR. SCHUVER:  Thank you, Judge.

15          THE COURT:  -- for the copyright assignment.  The

16   compensation he received was back in 2008.

17          MR. SCHUVER:  Thank you.

18          THE COURT:  And that will be the finding, one of

19   the findings of this Court.

20          MR. SCHUVER:  I appreciate that, Judge.  Thank

21   you.

22          THE COURT:  Okay?

23          MR. SCHUVER:  Thank you.

24   Q.      (BY MR. SCHUVER)  Mr. Kovin, you talked a little

25   bit earlier about some telephone calls that you received

1    from Ned Randle; is that correct?

2    A.       That's correct.

3    Q.       And as I understand it, some time in late February

4    of 2012 Mr. Randle attempted to contact you, he left you

5    several voicemail messages asking you to give him a call;

6    correct?

7    A.       That's right.

8    Q.       And then he called and you picked up the phone on

9    one of his calls finally and, and you did talk to him;

10   correct?

11   A.       Correct.

12   Q.       Now, earlier when you were asked on direct

13   examination, you couldn't recall whether or not he had

14   told you who he represented.  He, in fact, told you that

15   he represented Medicate Pharmacy Inc.; is that correct?

16   A.       He probably did.  I, you know.

17   Q.       Well, let's look at Plaintiff's Exhibit 76, your

18   declaration.

19   A.       Okay.

20   Q.       Paragraph 13.

21   A.       Okay.

22   Q.       This discusses your conversation with attorney Ned

23   W. Randle; correct?

24   A.       Right.

25   Q.       And you state, under penalty of perjury, quote,

1    when I spoke to Mr. Randle, he advised me that he

2    represented Medicate Pharmacy Inc., close quote.

3            Does that refresh your recollection?

4    A.     Okay.

5    Q.     Okay.  And Mr. Randle, he wasn't rude to you, was

6    he?

7    A.     Not, not by any means.

8    Q.     Not by any means.  And, and he, he told you that

9    he was interested on behalf of Medicate Pharmacy Inc. in

10   purchasing the logo; correct?

11   A.     Yes.

12   Q.     And he was offering you compensation,

13   consideration for doing so; correct?

14   A.     Yes.

15   Q.     It was your understanding that he initially

16   offered you a thousand dollars; correct?

17   A.     Correct.

18   Q.     And then he offered $3,000; correct?

19   A.     Yes.

20   Q.     And then you politely told him that you aren't

21   interested and you declined the offer; correct?

22   A.     Yes.

23   Q.     And that was the end of it; is that right?

24   A.     That's right.

25   Q.     He didn't harass you, call you in the middle of

1    the night, threaten you or anything like that?

2    A.      No.

3    Q.      And he even told that you there was a dispute

4    going on about the logo and the ownership; correct?

5    A.      He explained that to me, yes.

6    Q.      Yes.

7            MR. SCHUVER:  Judge, just some housekeeping.  I

8    think Miss Schrick is keeping track of which exhibits have

9    been admitted.  Can she read off --

10           THE COURT:  I do have one question --

11           MR. SCHUVER:  Oh, yeah.

12           THE COURT:  -- for you, Mr. Kovin.

13                          EXAMINATION

14   BY THE COURT:

15   Q.      Who -- and I think with respect to your

16   declaration which is Defendant's Exhibit 200.

17           THE COURT:  What's the corresponding plaintiff's

18   exhibit?

19           MR. McGURK:  76, Your Honor.

20           THE COURT:  Yeah, 76.

21   Q.      (BY THE COURT)  That you indicated that Mr. McGurk

22   prepared that; is that correct?

23   A.      Yes.

24   Q.      What about Plaintiff's Exhibit 77, the copyright

25   assignment?  Did you prepare that or did someone prepare

1    that for you?

2    A.        Mr. McGurk.  Now, but please understand that this

3    was done, I had an attorney that was overwriting with Mr.

4    McGurk, was writing here, so you, my attorney reviewed it

5    before I signed.

6    Q.        All right.  But Mr. McGurk prepared it; is that

7    correct?

8    A.        Yes, he prepared it.  Prepared it, yes.

9    Q.        Okay.

10            MR. SCHUVER:  May I have just a minute?  Were you

11   finished?  I have one more question.

12            THE COURT:  I'm through.

13                      RECROSS-EXAMINATION

14   BY MR. SCHUVER:

15   Q.        The written document that you did sign on March

16   20, 2012, that was in your name, Allan Kovin, not in the

17   name of Kovin Design; is that correct?

18   A.        The copyright?

19   Q.        The copyright assignment?

20   A.        Exhibit 77; right?

21   Q.        Yes.

22   A.        And you're asking was that Allan Kovin of Kovin

23   Design?

24   Q.        You signed at the bottom where your signature is

25   located, you signed as Allan Kovin?

1    A.        Right.

2    Q.        Not in the name of Kovin Design.

3    A.        Well, I take it where I ,Allan Kovin, of Kovin

4    Design have worked with Linda Deeter.  So I think it says

5    it on the top and I'm signing it on the bottom.

6              MR. SCHUVER:  That's all I have, Judge.

7              THE COURT:  Redirect examination.

8              MR. McGURK:  Thank you, Your Honor.

9                         REDIRECT EXAMINATION

10   BY MR. McGURK:

11   Q.        Mr. Kovin, did Mr. Randle explain to you why you

12   had these rights?

13   A.        I'm sorry?  To whom am I speaking now?

14   Q.        I'm sorry.  This is James McGurk speaking on

15   redirect examination, Mr. Kovin.  Can you see me?

16   A.        Okay, yes.

17   Q.        Do you recall when speaking to Mr. Ned Randle if

18   he discussed with you why he believed you had these rights

19   to the logo, to the house and pestle logo?

20   A.        I'm starting to feel very worn down here.

21   Q.        I'm sorry, Mr. Kovin.  I'll try and be very brief.

22   Do you dispute whether Linda Deeter has any right to

23   copyright the logo?

24             MR. SCHUVER:  Objection, calls for a legal

25   conclusion.

1    A.        No.

2              THE COURT:   Overruled.

3    Q.        (BY MR. McGURK) Do you dispute whether DeliverMed

4    has any right to copyright the logo based on an assignment

5    from Linda Deeter?

6              MR. SCHUVER:  Objection, he's --

7              THE COURT:  I'm going -- hold on a second, Mr.

8    Kovin.  This is the judge.  I'm going to sustain that

9    objection.

10             MR. McGURK:  All right.

11   Q.        (BY MR. McGURK) Now, you became aware there was

12   this pending litigation between the parties?

13   A.        Yes, I'm aware of it, yes.

14   Q.        Did you give permission to Mr. Michael

15   Schaltenbrand to copyright the house and pestle logo in

16   October of 2009?

17   A.        I'm not even familiar with that name.

18             MR. McGURK:  Can we accept that, Your Honor, as a

19   no?

20             THE COURT:  Accept it as a no.

21             MR. McGURK:  That's all the questions I have.

22   Thank you very much.

23             MR. SCHUVER:  No questions.

24             MS. SCHRICK:  If we could quickly move to the

25   admission of our exhibits.  We'd like to tender to the

1    Court --

2         THE COURT:  Hold on a second.  We can -- Mr.

3    Kovin, you are through.  You can go to lunch.  Okay?

4         THE WITNESS:  Thank you, sir.

5         THE COURT:  All right.  Okay.  Move the admissions

6    of --

7         MS. SCHRICK:  We'd like to tender to the Court

8    Exhibits 4, 5 and 6, which were previously admitted, and

9    we would move for the admission of Defendant's 24, 203,

10   207, 208 and 215.

11        THE COURT:  Any objection?

12        MR. McGURK:  No objection.

13        THE COURT:  They will be admitted.

14        THE CLERK:  I also have 47.

15        THE COURT:  47?

16        THE CLERK:  The fax.

17        MR. SCHUVER:  I didn't refer to that.

18        MS. SCHRICK:  I think that's it.

19        THE CLERK:  Okay.  You didn't want 200?

20        MR. SCHUVER:  200 is admitted.

21        MS. SCHRICK:  200 is previously admitted and we

22   would be tendering the original to the court file but I

23   think that was previously admitted.

24        THE COURT:  200 is a previous exhibit.

25        THE CLERK:  I realize that, but I didn't know they

1    admitted theirs.

2             (Off the record.)

3             (Witness sworn by clerk.)

4             THE WITNESS:  Linda Deeter, D, as in David,

5    double-E, T, as in Tom, E-R.

6             THE CLERK:  Thank you.

7                          LINDA DEETER,

8    having been first duly sworn, was examined and testifies

9    as follows:

10                       DIRECT EXAMINATION

11   BY MR. McGURK:

12   Q.       Mrs. Deeter, what is the name of your company?

13   A.       William R. Deeter Associates Inc.

14   Q.       What is the working title used by the company?

15   What is the company known as day to day?

16   A.       We are known as Deeter.

17   Q.       Just Deeter.

18   A.       Just Deeter.

19   Q.       What is your position with William R. Deeter

20   Associates Inc.?

21   A.       I'm an executive vice president.

22   Q.       And who is Mr. William R. Deeter?

23   A.       My husband.

24   Q.       Can you briefly describe your educational

25   background?

1    A.        Yes.   I have a Bachelor of Science degree in

2    Education from Kutztown University here in Pennsylvania.

3    Q.        Can you briefly describe your work experience?

4    A.        My work experience.   I have been working here at

5    Deeter since 1990.   Prior to that I sold advertising and I

6    was a teacher and a business owner.

7    Q.        In terms of employment, have you ever been an

8    employee of Medicate Pharmacy Inc. of East St. Louis and

9    Washington Park, Illinois?

10   A.        No.

11   Q.        Have you ever met Mr. Michael L. Schaltenbrand?

12   A.        No.

13   Q.        Have you ever been an employee of Mr. Michael L.

14   Schaltenbrand?

15   A.        No.

16   Q.        Can you describe for us the work of Deeter?

17   A.        We are a strategic public relations and

18   advertising firm, sometimes called marketing

19   communications.

20   Q.        And where is Deeter located?

21   A.        We are located in Doylestown, Pennsylvania.

22   Q.        And that is where you are currently located for

23   this testimony; is that correct?

24   A.        Yes, that is correct.

25   Q.        Do you know Mr. Mark Swift?

1    A.        Yes.

2    Q.        How do you know Mr. Swift?

3    A.        I know Mr. Swift through my son Kirk.

4    Q.        What does your son Kirk do?

5    A.        Kirk is a writer and editor of magazines.

6    Q.        What magazine?

7    A.        Well, right now he just got another great job,

8    he's Editor At Large of Field and Stream magazine, and

9    he's also the Editor of Trout, which is the national

10   magazine for Trout Unlimited.

11   Q.        When did your son introduce you to Mr. Mark Swift,

12   if you recall?

13   A.        I believe that was in 2007.

14   Q.        Do you recall working with Mr. Mark Swift in a

15   professional manner?

16   A.        Yes.

17   Q.        When did you first start working with Mr. Swift?

18   A.        In 2007.

19   Q.        Can you describe the project?

20   A.        We worked on a brochure for him.

21   Q.        What was the name of his company?

22   A.        I believe it was Express Meds.

23   Q.        Did you, when you say, we worked on a brochure,

24   can you describe what you did?

25   A.        We did the graphic design work for a brochure for

1    his company.

2    Q.      Turning your attention to 2008, were you contacted

3    by Mr. Mark Swift for a project?

4    A.      I was contacted by John Tollefson on behalf of

5    Mark Swift for, to design a logo.

6    Q.      For what entity?

7    A.      For a company named DeliverMed.

8    Q.      Can you describe what you understood the project

9    to be?

10    A.      I understood that they needed a new, a logo, a

11    look, for a company named DeliverMed, and that we were

12    going to give them several options on what that could be

13    and to get it designed for them.

14    Q.      Did this also include marketing material and

15    letterhead, business cards?

16    A.      It included what we call an identity.  And when

17    you are doing branding or an identity for a company you

18    start out with the logo and then you apply that to various

19    materials, including business cards, letterhead, that type

20    of thing.

21    Q.      What did you do after you received this

22    assignment?

23    A.      When I received the assignment, I thought about

24    which designer I would work with on this.  We work with

25    several different designers in our company and I chose the

1    one to work with, called that person in and went over what

2    we were doing and began to work.

3    Q.    Who was the designer that you contacted?

4    A.    We contacted a man named Allan Kovin of Kovin

5    Design.

6    Q.    Can you describe the meeting with Mr. Kovin?

7    A.    I had him come to our office, explained what we

8    were attempting to do, what our assignment was, and asked

9    -- and gave him information that I knew about the company

10   and what they did.  I understood it to be a pharmaceutical

11   company that delivered prescription medication to people's

12   homes, and I told him what we knew about it and asked him

13   to give us some design options to, to start work on

14   developing this logo.

15   Q.    Did you ever sketch out any ideas on paper,

16   thumbnails, any, anything in writing at all?

17   A.    I'm not the designer.  I'm more of the director

18   than the designer.  No, I --

19   Q.    How would you describe, how would you describe

20   your position as an art director?

21   A.    If we were a large agency, I would be called an

22   art director.  But because we are a small agency, I do

23   several things, including directing art.  And as the art

24   director, I'm the one that makes the assignments to the

25   graphics designers and work, I'm the direct contact with

1    the client and communicate and help develop the logo that

2    they need.  So I direct the project.

3    Q.      What did Mr. Kovin do after your meeting?

4    A.      He took the information that we had, that I had

5    given him, and came back and gave us several options for a

6    possible design.

7    Q.      A possible -- several options for a possible

8    design of a logo; is that correct?

9    A.      That's correct.

10   Q.      And by the way, in terms of the process, you, you

11   indicated that, that there was a identity for a whole

12   series of different things but the first thing you start

13   with is the logo; is that correct?

14   A.      Yes.

15   Q.      Who selected the design, the final design to use

16   for the logo for DeliverMed?

17   A.      As far as I know, it was Mark Swift and John

18   Tollefson.

19   Q.      Did you present various alternatives to them?

20   A.      Yes, I did.

21   Q.      Did you make recommendations to them?

22   A.      Yes, I did.

23   Q.      Let me ask the question this way:  How many

24   different potential designs did you present?

25   A.      Can I look at the exhibit for exact number?

1    Q.    Best you can recall at this point.

2    A.    15 to 20?

3    Q.    Now, who selected the colors for the logo?

4    A.    It's always a collaborative effort.  When we

5    presented the options, there were several different

6    designs in several different colors.  And when they

7    decided upon the house, I believe originally the house

8    wasn't in the colors that it ended up with, but we liked

9    colors from another one.  And we massaged the colors and

10   came up with the ones that we felt would work best.

11   Q.    Who selected the type font for the name?

12   A.    That was very much like colors --

13         THE COURT:  Hold on.  There's an objection.

14         MR. SCHUVER:  Objection.  What type font?

15         MR. McGURK:  Back up.

16   Q.    (BY MR. McGURK) Was there a type font selected for

17   the logo?

18   A.    Yes, there was.

19   Q.    And who selected the type font for the logo?

20   A.    Again, it was a collaborative effort.  They were

21   given several fonts to choose from on the original sheet.

22   They're called boards.  And we presented them separately

23   so that they could see different designs and different

24   logo, different type font, and then we worked with the

25   ones they liked and put them together.  It's always

1    something that we work with someone, so it's hard to say

2    exactly who chose, chose what. It's a team effort.

3    Q.      I'm going to ask you if you can pull out

4    Plaintiff's Exhibit 36 in the stack of materials.

5    A.      Yes, I have it.

6    Q.      Plaintiff's Exhibit 36 has previously been

7    introduced into evidence. Is this the house and pestle

8    logo without any text?

9    A.      Yes, it is.

10    Q.      When the house and pestle logo was designed, did

11    it include text?

12    A.      Yes.

13    Q.      I'm going to place it on the overhead and ask you

14    to look at Exhibit 47. Plaintiff's Exhibit 47.

15    A.      Okay.

16    Q.      That's a series of materials. Are those, do those

17    materials all reflect the house and pestle logo that was

18    ultimately selected?

19    A.      (Pause.) Yes, they do.

20    Q.      I note on the first page of the Exhibit 47, the

21    house and pestle logo, there at the very, very bottom you

22    see a tiny little emblem? Do you know what that is?

23    A.      On the business card?

24    Q.      That's correct.

25    A.      Beneath, beneath the Medicate Pharmacy there's a

1    little bitty logo?

2    Q.      Yes.

3    A.      Is that what you referring to?

4    Q.      Yes, ma'am.   What is that?

5    A.      That's -- I -- I recognize that as the union logo

6    that a union printer would put on a card that they print.

7    Q.      Do you know whether that was one of the

8    requirements on this project for business cards and

9    materials?  That is to say, to use a union printer?

10   A.      Did it require -- excuse me?

11   Q.      Did you understand that one of the requirements

12   was to use a union printer, have a union bug logo on the

13   cards?

14   A.      We were requested to print, actually print cards,

15   and to find a union printer who could put that, what we

16   call a bug, on the cards, yes.

17   Q.      I'm going to put on the screen Plaintiff's Exhibit

18   47.

19           MR. SCHUVER:  That's just another page --

20           MR. McGURK:  I'm sorry, Plaintiff's Exhibit 46.  I

21   apologize.  Plaintiff's Exhibit 46.

22   A.      Yes.

23   Q.      (BY MR. McGURK) Is this an example of some of the

24   advertising material that was prepared?

25   A.      No.  We did not prepare this.

1    Q.       You did not prepare this?

2    A.       We did not.

3    Q.       All right.  In 2000 -- 2011, did you sign an

4    agreement for assignment of copyright?

5    A.       Yes.

6    Q.       I'm going to ask you to turn to Plaintiff's

7    Exhibit 44.  This is an agreement for assignment of

8    copyright.

9    A.       Okay.  I have it.

10   Q.       All right.  And turning to the second page of

11   that.

12            MR. SCHUVER:  Objection --

13   Q.       (BY MR. McGURK) Whose signature is that?

14            THE COURT:  Hold on a second.

15            MR. SCHUVER:  Counsel, this has never been

16   produced to us.

17            MR. McGURK:  Plaintiff's Exhibit 44.

18            MR. SCHUVER:  Judge, this was produced to us

19   without a signature.  And we have asked multiple times,

20   including in Miss Deeter's deposition.  And now suddenly

21   one is mysteriously appearing here in court with a

22   signature on it.  We asked for this multiple times, in

23   e-mails and in the deposition itself.

24            MR. McGURK:  Your Honor, all of these documents

25   that bear the plaintiff's exhibit numbers were produced by

1  my co-counsel Mr. Courtney Cox to the Mathis Marifian firm

2  in advance of the trial.  We can get the specific date of

3  that, if the Court would like to take the time.

4         MR. SCHUVER:  Judge, they had bate stamp numbers

5  on their production.  This document has no bate stamp

6  numbers.  We have asked for this several time.  We know --

7         THE COURT:  Do you have an unsigned copy of this?

8         MR. SCHUVER:  Yes.  It's always been unsigned,

9  Judge.  Well, I haven't read to see if this is the exact

10 one, but what we do have is a document that's titled the

11 same but it's unsigned.  We cross-examined Miss Deeter in

12 January on this issue and she said she couldn't locate it.

13        THE COURT:  Couldn't locate what?

14        MR. SCHUVER:  A signed copy.  She says she has a

15 copy but not, she never found a signed one.

16        THE COURT:  Okay.  Well the Court will --

17        MR. SCHUVER:  We'd move to strike it, Judge.

18        MR. McGURK:  Your Honor, a moment, please?

19        (Off the record.)

20        MR. COX:  Your Honor, I would have to get on my

21 computer and check the e-mails I sent to Miss Schrick with

22 all the exhibits that we sent to verify that.

23        THE COURT:  When did you send the exhibits?  How

24 long have you been in this case?  When did you come into

25 this case, Mr. Cox?

1          MR. McGURK:   October --

2          MR. COX:  I don't recall the date.  It's been some

3     time.

4          THE COURT:  Well, let's talk about what year.

5          MR. COX:  Well, what we did recently, Judge --

6          THE COURT:  You're not answering my question.

7          MR. COX:  I don't know.

8          THE COURT:  Was it 2012?  2011?

9          MR. COX:  2011.

10          THE COURT:  Was it winter, spring, summer or fall?

11          MR. COX:  I don't know, Judge.  I'm sorry.  I can

12     look at my entry of appearance on the docket sheet.

13          THE COURT:  Okay.

14          MR. COX:  But I can tell you what I was doing was

15     transferring exhibits to Ms. Schrick as we went along,

16     providing her documents.  I did that by e-mail.  She and I

17     were the ones transferring documents back.  To answer a

18     question about whether I produced something, I can go back

19     and look at those exhibits and see where I sent that

20     exhibit.

21          MR. SCHUVER:  Judge, we took Ms. Deeter's

22     deposition on January 16 and January 19 of this year.  Mr.

23     Cox and Mr. McGurk were both present.  They -- Ms. Deeter

24     was asked to produce all of the documents relative to this

25     case.  She produced an unsigned copy of an agreement for

1    assignment of copyright.  I cross-examined her extensively

2    on whether she could find or locate a signed copy.  We

3    completed on April 16th.  We took a couple of days off and

4    then we took, when she came back on April 19 and her

5    deposition was completed and she told us she could not

6    find one.

7          We asked repeatedly both Mr. McGurk and Mr. Cox,

8    we told them, look, if you have a signed one, get it to

9    us.  It has never to our knowledge been produced.  If it

10   had been, they should have brought it to our attention.

11         I don't know where this came from, Judge.  But we,

12   we have been prepared for our case to the effect there is

13   no signed copy.

14         THE COURT:  Okay.  Well, the Court will reserve

15   ruling on your motion to strike this document, go ahead

16   and allow Mr. McGurk to question on it.  In the meantime,

17   Mr. Cox, I want you to find out at what point in time you

18   transferred and what you transferred Plaintiff's Exhibit

19   44.

20         MR. COX:  I will check, Judge.

21         THE COURT:  And the form it was in.  Okay?

22         MR. COX:  I'll do that right now.

23         THE COURT:  All right.

24         MR. COX:  And if you don't mind, I'm going to step

25   out with my computer --

1          THE COURT:   That's fine.

2          MR. COX:   -- and, and do that.

3          THE COURT:   That's fine.

4          THE COURT:   Mr. McGurk, you can go ahead and

5     examine.

6          MR. McGURK:   Thank you very much, Your Honor.

7          Your Honor, I'm simply going to ask the witness to

8     acknowledge Mr. Swift's signature on the last page of this

9     exhibit.   And I don't believe that there's been any

10    concern because I know this has been produced, was part of

11    the package, so --

12         MR. SCHUVER:   I don't recall Mr. Swift's signature

13    being on it either.

14         MR. McGURK:   Well then, Your Honor, I guess we'll

15    come back --

16         THE COURT:   Hold on a second.   Do you have a copy

17    of what was produced to you?

18         MR. SCHUVER:   Absolutely.

19         THE COURT:   Let me see what was produced to you.

20         MR. McGURK:   I would ask if the defendants could

21    bring up their copy of Plaintiff's Exhibit 44.

22         THE COURT:   That's what I'm asking for right now.

23         MR. SCHUVER:   Give me a minute here, Judge.

24         THE COURT:   I'm kind of puzzled why this isn't

25    handy if you knew Miss Deeter was testifying, Mr. Schuver.

```
 1    I'm puzzled why you can't put your hands on it right away.
 2            MR. SCHUVER:  Judge, I've got a box of exhibits so
 3    I'm just trying to find my list of all of my exhibits.
 4    It's on a notepad.
 5            THE COURT:  Appreciate your patience, Miss Deeter.
 6            THE WITNESS:  Okay.
 7            (Pause.)
 8            MR. SCHUVER:  It's not even the same document,
 9    Judge.
10            THE COURT:  Hold on a second.  Hold a second.  Put
11    it back in there.
12            MR. SCHUVER:  Okay.
13            THE COURT:  Is that marked as a defendant's
14    exhibit?
15            MR. SCHUVER:  Yes, Judge.
16            THE COURT:  Is that the entire document?
17            MR. SCHUVER:  Yes.
18            MR. McGURK:  I'm sorry, Your Honor, defendant's
19    exhibit or plaintiff's exhibit.
20            THE COURT:  Well, they have there -- what do you
21    have there, Mr. Schuver?  And first of all, before you
22    show it to me, show it to Mr. McGurk.
23            MR. SCHUVER:  Sure.
24            MR. McGURK:  I agree that Plaintiff's Exhibit 44
25    and Defendant's Exhibit 9 are not the same document.  That
```

1    I will agree to, Your Honor.

2            MR. SCHUVER:   May I present this, Judge?

3            MR. McGURK:   Can I ask if you could please get the

4    copy of Plaintiff's Exhibit 44 that we provided to you,

5    that you have.

6            THE COURT:   Yeah, look for Plaintiff's Exhibit 44.

7            MS. SCHRICK:   This is what we received from the

8    box that I received from Diane on Monday.

9            MR. SCHUVER:   This is this Monday?

10           MS. SCHRICK:   I don't know if it came by e-mail

11   but this was in the box.

12           MR. SCHUVER:   This was this Monday.

13           MS. SCHRICK:   It may have come by e-mail, I don't

14   know --

15           THE COURT:   Do you have Plaintiff's Exhibit 44?

16   That's my question.   That -- supposedly, you were supposed

17   to provide all of your exhibits to the plaintiff, the

18   plaintiffs are supposed to provide all of their exhibits

19   to the defendant.   Do you have Plaintiff's Exhibit 44 that

20   was supposedly transferred to you?

21           MR. SCHUVER:   As of this Monday, Judge, we do.

22           THE COURT:   Okay.   Where is it?

23           MS. SCHRICK:   Right here.

24           MR. SCHUVER:   She has a copy of it, Judge.

25           THE COURT:   Okay.   Let me look and see what that

1    is.  Is that a signed copy?  Let me see.  (Pause.)  Yes,

2    it is.  So you received a copy of this on --

3              MR. SCHUVER:  Monday, Judge, by e-mail.

4    Unfortunately we were here so --

5              THE COURT:  Now, during discovery what did you

6    receive?

7              MR. SCHUVER:  May I hand it to the Court?

8              THE COURT:  Yes.

9              MR. SCHUVER:  I have, during discovery we received

10   what's been marked as Defendant's Exhibit No. 9.

11             MR. STINE:  And, Mark, we may have received that

12   earlier than Monday via e-mail but not in discovery.  I

13   mean, it was right before trial.  I don't know that.

14             MS. SCHRICK:  We do know it was in the box --

15             THE COURT:  Okay, now, was this in response to a

16   request for production?

17             MR. SCHUVER:  It -- when we took Miss Deeter's

18   deposition, we did it as a Rule 30(b)6 as the corporate

19   representative for William R. Deeter Associates.  And we

20   also attached to there a request for documents and we

21   requested all written agreements and assignments.  And

22   this is what was produced, is Defendant's Exhibit No. 9.

23             THE COURT:  And this is what you questioned her on

24   during the deposition?

25             MR. SCHUVER:  Exactly.

1          THE COURT:  Had you, up until the day before this,

2    or the day this trial started or the weekend before, had

3    you ever seen Plaintiff's Exhibit 44?

4          MR. SCHUVER:  I had not seen it, Judge.

5          THE COURT:  Okay.  I'm -- I will take your motion

6    to strike under advisement and going to continue to allow

7    Mr. McGurk to examine on it.

8    Q.     (BY MR. McGURK) Ms. Deeter -- Mrs. Deeter, could

9    you please turn to page, the second page of the document

10   marked Plaintiff's Exhibit 44?

11   A.     Okay.

12   Q.     Is that your signature?

13   A.     It is.

14   Q.     And what is the date?

15   A.     April 8th, 2011.

16   Q.     And turning to the last page of the document,

17   whose signature is that?

18         MR. SCHUVER:  Objection, foundation.

19   Q.     (BY MR. McGURK) If you know.

20         THE COURT:  If she knows.

21   A.     Mark Swift.

22   Q.     (BY MR. McGURK) Do you recognize Mark Swift's

23   signature?

24         MR. McGURK:  Wait.  Your Honor, we'll cover this

25   with Mr. Swift.

```
 1              THE COURT:  Okay.

 2              MR. McGURK:  All right?

 3    Q.      (BY MR. McGURK) Now, were you -- are you aware

 4    that a copyright application, certificate for registration

 5    was filed on behalf of DeliverMed for the house and pestle

 6    logo, based on that assignment?

 7    A.      Would you repeat the question?

 8    Q.      I'm sorry, Mrs. Deeter.  Were you aware that based

 9    upon the assignment that DeliverMed Holdings filed for a

10    certificate of registration, copyright registration for

11    the house and pestle logo?

12    A.      I don't think I really understand the, the

13    question.

14    Q.      Yes, ma'am.  You understand that there was an

15    agreement for the transfer, assignment of the copyrights

16    rights to DeliverMed Holdings?

17    A.      To Mark Swift.

18    Q.      And Mark Swift?

19    A.      Yes.  Yes.

20    Q.      And that as a part of that, a copyright

21    application was filed by DeliverMed Holdings.

22    A.      Yes.

23    Q.      I'm going to ask the Court and ask the parties to

24    turn to Plaintiff's Exhibit 38, which is a certificate of

25    registration for the house and pestle logo.  If you would
```

1    turn to page one of that document.  That --

2    A.      What exhibit is this, please?

3    Q.      Plaintiff's Exhibit 38.

4    A.      All right.

5    Q.      Do you see the listing author?

6    A.      Linda Deeter.

7    Q.      And do you see the date of first publication?

8    A.      [Inaudible.]

9            THE REPORTER:  Ask her to repeat that, please.

10   Q.      (BY MR. McGURK) Could you repeat that?

11   A.      June 1st, 2008.

12           MR. McGURK:  Your Honor, I would move the

13   admission of Plaintiff's Exhibit 38, certificate of

14   registration.  This is obviously public record document

15   and this is the issue and dispute in the case.

16           MR. SCHUVER:  No objection.

17           THE COURT:  Be admitted.

18   Q.      (BY MR. McGURK) Now turning to March of 2010, do

19   you recall receiving a telephone call from Mr. Michael

20   Schaltenbrand at your offices in Pennsylvania?

21   A.      Yes.

22   Q.      What did he say to you and what did you say to

23   him?

24   A.      Well, it regarded the logo and he wanted to know

25   if I would, would tell him the logo was his.

1    Q.        Did he have anyone with him on the telephone call?

2    A.        I do not know.

3    Q.        What did you do?

4    A.        Well, I didn't know who he was.

5    Q.        You did not know who he was?

6    A.        I did not know who he was.  The call was a

7    surprise to me.  And I spoke with him and then, then I

8    hung up from talking with him.  I talked to my husband and

9    I told him what had happened, and then I called John

10   Tollefson and Mark Swift.

11   Q.        In 2008 when the logo was first created, who did

12   you intend the ownership of the logo to go to?

13   A.        To Mark Swift.

14   Q.        Did you regard Mark Swift and DeliverMed to be the

15   same thing?

16   A.        I do, yes.

17   Q.        Did you submit a bill to DeliverMed Holdings for

18   your work in 2008?

19   A.        Yes.

20   Q.        All right.  I'm going to ask you to turn to

21   Plaintiff's Exhibit 45.  I'll put that on the document

22   camera.

23   A.        I have it.

24             THE COURT:  I thought I've seen that bill before,

25   though?

1          MR. McGURK:  It has been attached to numerous
2     pleadings.
3          THE COURT:  Okay.
4     Q.     (BY MR. McGURK) Mrs. Deeter, what is the date of
5     Plaintiff's Exhibit 45?
6     A.     It's dated October 17th, 2008.
7     Q.     And to whom is the bill addressed?
8     A.     It's addressed to Mr. Mark Swift, DeliverMed
9     Holdings LLC.
10    Q.     What is the address?
11    A.     John Hancock Center, Suite 3100, 875 North
12    Michigan Avenue, Chicago, Illinois, 60611.
13    Q.     Reading the first line -- there's a line across
14    the bill and then there's a description.  Can you tell us
15    what that description is, or read to us what the
16    description is?
17    A.     That first line item is a logo/mark, and the fee
18    is $4,025.
19    Q.     And can you read the line of text above that?
20    A.     Design and production work from January through
21    September 2008.
22    Q.     So this covers the, the project for DeliverMed
23    concerning the logo?
24    A.     Yes, it does.
25    Q.     Can you tell us what the charges are below that?

1    The next entry I believe, update brochures.  Can you tell

2    us what that refers to?

3    A.     Yes.  It says update brochures, and that was where

4    we took older brochures and put the new logo on them.

5    Business cards, design, production, printing and ship

6    something; new look business cards that we mailed

7    overnight; No. 9 envelopes; ads for publication; business

8    cards with union logo, design, print, ship; business card;

9    magnet art; and the logo in black and white.  Black white

10   logo.

11   Q.     You see the entry that says update brochures?  Do

12   you see that entry?

13   A.     Yes.

14   Q.     Does this have anything to do with the brochures

15   you did for Express Meds earlier in 2007 that you had

16   mentioned to us earlier?

17   A.     Yes.

18   Q.     So essentially you took that work and basically

19   put the new logo on to use for this project?

20   A.     Yes.

21   Q.     In terms of the logo, I'm going to ask you to turn

22   to Plaintiff's Exhibit 41.

23   A.     I have it.

24          MR. McGURK:  Can I simply move for the admission

25   of Exhibit 45?

1          THE COURT:   Sure.   Be admitted.

2          MR. SCHUVER:   No objection.

3    Q.       (BY MR. McGURK) All right.   I'm turning to

4    Plaintiff's Exhibit 41.   This is a website page.   What is

5    the logo in the left-hand corner?   What is that?

6    A.       The logo in the top left is the DeliverMed logo.

7    Q.       Now you see below that the, the word Medicate

8    Pharmacy?   Do you see that?

9    A.       I do.

10   Q.       Was Medicate Pharmacy the entity that you sent the

11   bill to?

12   A.       No.

13   Q.       Was, in your view, was the client Medicate

14   Pharmacy or was the client DeliverMed Holdings LLC and

15   Mark Swift?

16   A.       The client was DeliverMed Holdings and Mark Swift.

17   Q.       Are you aware that in October 2009 Mr. Michael L.

18   Schaltenbrand filed a copyright identifying himself as the

19   author of the house and pestle logo?

20   A.       I was made aware of that when I was asked to get

21   involved, when, when I did my deposition and the

22   discovery.   I did not know that before.

23   Q.       Had you ever authorized Mr. Michael L.

24   Schaltenbrand to own the copyright on the house and pestle

25   logo in October 2009 or any other time?

1    A.        No.

2    Q.        Did you have a written agreement with Mr. Michael

3    L. Schaltenbrand to --

4    A.        No.

5    Q.        -- copyright the logo?

6    A.        No.

7    Q.        And I think we have already confirmed that you

8    were never an employee of Mr. Michael L. Schaltenbrand.

9    A.        No.    That's correct, I was not.

10        MR. McGURK:    Your Honor, those are all the

11    questions I have.    I'd submit the witness for cross.

12        THE COURT:    How long is cross going to take?

13    Going to take awhile?

14        MR. SCHUVER:    Yes.

15        THE COURT:    We're going to take -- the court

16    reporter needs to rest her fingers.    We're going to take

17    about a 20-minute recess and then we're going to continue,

18    begin the cross, because I think we have another video

19    conference at 1:30.

20        MR. McGURK:    That's correct.

21        THE COURT:    So we're going to try to get through,

22    but we do need to take a break for the court reporter.

23        (Court recessed from 12:09 p.m. to 12:34 p.m.)

24        THE COURT:    Okay.    Mr. Schuver.

25        MR. SCHUVER:    Thank you, Judge.

1          THE COURT:  May I make a statement on the record.

2          THE COURT:  Yes.

3          MR. SCHUVER:  I'm going to fall on my sword,

4     Judge.  We have reviewed our e-mails and apparently on

5     March 28 of this year Mr. Cox's office did e-mail that

6     signed document that has been marked Plaintiff's Exhibit

7     44 to our office, so we had it on March 28.  We did not

8     have it when we took Ms. Deeter's deposition and she

9     couldn't find it at that point in time.  But apparently in

10    the deluge of all the exhibits that have been going, I'm

11    apologizing to the Court and to counsel that we did

12    receive it on March 28 of this year.

13         THE COURT:  Okay.

14         MR. COX:  And that's the day I received it from

15    Miss Deeter's attorney and we had sent it on immediately

16    so that -- and I got in the case in October of 2011.

17         MR. SCHUVER:  I got in it in January, Judge, of

18    2012.

19         THE COURT:  Okay.  Miss Deeter, can you hear us?

20         THE WITNESS:  Yes, I can.

21         THE COURT:  Okay.

22         MR. SCHUVER:  Ready, Judge?

23         THE COURT:  Ready.

24         MR. SCHUVER:  Okay.

25                    CROSS-EXAMINATION

BY MR. SCHUVER:

Q.      Good afternoon, Miss Deeter.  I'm Mark Schuver.
We met at your first deposition in January of this year;
correct?

A.      Yes.

Q.      Okay.  The name of the company you are employed by
you told us is William R. Deeter Associates Inc.; correct?

A.      Yes.

Q.      And it goes by the name, short name of Deeter?

A.      Yes.

Q.      And what Deeter is, it's an advertising and public
relations company; correct?

A.      Yes.

Q.      And for the last three, four, five years you have
had a total of six employees, including yourself and your
husband?

A.      Right now we have six.  It just varied.  When the
economy was better, we had ten.

Q.      Okay.  And back in 2008 you had roughly about six
employees, give or take maybe one or two, fair enough?

A.      That's right.

Q.      Okay.  And your title with the company is
executive vice president.

A.      Yes.

Q.      And as executive vice president you are

1    responsible for account management, production and

2    operations; correct?

3    A.        Yes.

4    Q.        And you told us that your degree is in the field

5    of education; correct?

6    A.        That's right.

7    Q.        You have no degrees or certifications as a graphic

8    designer, artist, anything like that?

9    A.        No.

10   Q.        And so you don't hold yourself out to be a graphic

11   designer; correct?

12   A.        Correct.

13   Q.        You are not the person on the computer doing the

14   computer drawings or doing the sketch or drawings by hand;

15   correct?

16   A.        Correct.

17   Q.        And your company, William R. Deeter Associates

18   Inc., they do not have any in-house designers; correct?

19   A.        Correct.

20   Q.        So anytime you need any graphic design work, you

21   go to an outside company and work with them; correct?

22   A.         I would go to a graphic designer, not necessarily

23   a company.

24   Q.        Okay.  A graphic design company, that would be

25   correct, okay.  Now you told us that Mark Swift was a

1    friend of your son Kirk; correct?

2    A.    Yes.

3    Q.    And Kirk is not an employee of, of your company

4    Deeter?

5    A.    No.

6    Q.    And you have never met Mark Swift; correct?

7    A.    Correct.

8    Q.    In fact, as far as communications with Mr. Swift,

9    you rarely communicated directly with Mr. Swift about any

10   of the work that you did on this project.

11   A.    Correct.

12   Q.    And you don't know Mr. Swift's wife, Ann Sickon,

13   S-I-C-K-O-N?  Correct?

14   A.    I -- correct.

15   Q.    And you have never had any contact or

16   communication with Miss Sickon?

17   A.    Correct.

18   Q.    Now, you have never been in an employee of Mark

19   Swift's; correct?

20   A.    Correct.

21   Q.    And you have never been an employee of DeliverMed

22   Holdings LLC; correct?

23   A.    Correct.

24   Q.    You told us that in 2012 you had worked on a

25   project in creating brochures for a company called Express

1    Meds; correct?

2    A.        Yes.

3    Q.        Then in 2008 you told us that you were contacted

4    by a gentleman by the name of John Tollefson and then you

5    were doing work for a company named DeliverMed; correct?

6    A.        Well, it was the same company, it was -- John

7    Tollefson was my contact continually.

8    Q.        Continually.  So throughout this project when you

9    are working on what's called the house and pestle and the

10   various advertisements and magnets that you put the house

11   and pestle logo on, you were primarily or almost

12   exclusively working with a gentleman by the name of John

13   Tollefson?

14   A.        Primarily, yes.

15   Q.        This project started some time or you first became

16   aware of the need to create this new or this brand and the

17   new logo for this company DeliverMed some time after

18   February 27, 2008; is that correct?

19   A.        Yes.

20   Q.        Prior to that, to your knowledge this company that

21   you were creating this brand and this logo for did not

22   have a logo in place prior to February of 2008.

23   A.        I don't know.

24   Q.        Do you recall -- you recall giving us your

25   deposition on January 16, 2012; correct?

1    A.        I do.

2    Q.        You probably have a copy of it there, Defendant's

3    Exhibit No. 193?

4    A.        I have my deposition but I don't have Defendant's

5    Exhibit 193.

6    Q.        Okay.  But you have your a copy of your deposition

7    there; correct?

8    A.        Not, not here in front of me, no.

9    Q.        You don't.  Well, let me read from your

10   deposition, page 36, beginning at line 24, and this is in

11   reference to when you were first brought in to work on

12   this project.

13            And you were asked this question.  Question:

14   Always through John Tollefson, to your knowledge did

15   DeliverMed have a logo in place prior to you being asked

16   about this?

17            Answer:  I don't know.

18            MR. McGURK:  Your Honor, I thought that's the

19   identical answer she just gave.

20            THE COURT:  I thought it was, too.

21            MR. McGURK:  I don't understand how that can be

22   impeachment, Your Honor?

23            THE COURT:  It's not impeachment.  Move on.

24   Q.        (BY MR. SCHUVER)  Now, when you talked to Mr.

25   Tollefson, he told you he wanted a logo for a

1    pharmaceutical company that delivers prescriptions to your

2    home.

3    A.      Yes.

4    Q.      Then you told us you selected Allan Kovin to be

5    the graphic designer to draw these, the logos and do the

6    graphic work; correct?

7    A.      I selected Allan Kovin to be the graphics

8    designer.

9    Q.      Yes.  And that's because you -- he had some

10   experience in pharmaceutical product, in dealing with

11   pharmaceutical products; correct?

12   A.      He does.

13   Q.      And Mr. Kovin works for or owns a company called

14   Kovin Design.

15   A.      Yes.

16   Q.      Allan Kovin has never been an employee of your

17   company, William R. Deeter Associates Inc.?

18   A.      He has not.

19   Q.      You have no written contractual agreement with Mr.

20   Kovin?

21   A.      I do not.

22   Q.      And you understood when you were dealing with Mr.

23   Kovin in 2008 that he does graphic design work for other

24   companies in addition to yours?

25   A.      Yes.

1    Q.        And when he did work for your company, he would

2    send you bills; correct?

3    A.        Yes.

4    Q.        And when you paid the invoices for his work you

5    would make the check payable in the name of Kovin Design;

6    correct?

7    A.        I think so.

8    Q.        So after you selected Mr. Kovin, you told us you

9    met with him and you gave him some parameters on what the

10   project involved; correct?

11   A.        Yes.

12   Q.        Let's talk about that.  The parameters that you

13   gave to him were that this was a pharmaceutical delivery

14   company; correct?

15   A.        Yes.

16   Q.        And that you wanted a logo that was fresh,

17   current, up to date and professional; correct?

18   A.        Yes.

19   Q.        At no point in time did you, did you describe for

20   him anything about what specifically the logo should look

21   like or any specific details of the logo.

22   A.        No, I did not.

23   Q.        You always let the designer show you that.

24   A.        I always select a designer who is highly capable

25   and I like to see a variety of designs come back.

1    Q.      So you let the designer show you that?

2    A.      Yes.

3    Q.      You, yourself, did not sit down and put any idea

4    for a logo for DeliverMed in a tangible form?

5    A.      I did not.

6    Q.      You didn't draw a logo, whether it was on a

7    computer, a piece of paper or anything like that?

8    A.      I did not.

9    Q.      And the reason you didn't do that is because you

10   don't draw?

11   A.      Correct.

12   Q.      Now, Mr. Kovin came up with various different

13   designs or concepts for this logo; is that correct?

14   A.      Yes, it is.

15   Q.      And you sent those various different designs to a

16   man by the name of John Tollefson; is that correct?

17   A.      Yes.

18   Q.      And you considered Mr. Tollefson to be the client;

19   correct?

20   A.      No.  Everything that I sent, I sent to John and

21   Mark Swift, always.  And I considered Mark Swift to be my

22   client.

23   Q.      Let's talk about the selection of the colors for

24   the logo.  It's your testimony that you are the one who

25   selected the colors for the logo?

1    A.       In collaboration.  I believe in my deposition I

2    explained that we presented several different logos.  This

3    is in Defendant's Exhibit 215.  And the original

4    DeliverMed logo was not in the colors that it ended up in,

5    and I did, once we landed on the logo, we presented it in

6    a variety of shades of blues and greens and, yes, I did

7    recommend some to the one that was chosen.

8    Q.       My question to you, Ms. Deeter, did you choose the

9    colors or did somebody else choose those particular

10   colors?

11   A.       That's, that's hard to say.  I would say, I, I

12   pretty much chose the colors with help from everyone.  We

13   all agreed.

14   Q.       You chose the colors, that's your testimony?

15   A.       With help from others.  So, so in collaboration

16   with others.

17   Q.       Well, do you recall at page 201 of your deposition

18   beginning at line 6 testifying --

19   A.       Would you like me --

20   Q.       -- as follow --

21   A.       Excuse me.  Would you like me to go get the copy

22   of my deposition though I don't have it in front of me?

23           THE COURT:  Is it handy?

24           THE WITNESS:  Yes.

25           THE COURT:  Go get it.

1          (Off the record.)

2          THE WITNESS:  Okay, I have it.

3     Q.     (BY MR. SCHUVER)  Okay.  If you would turn to page

4     201.

5     A.     (Pause.)  Okay.

6     Q.     Beginning at line 6, question:  And did you choose

7     the colors or did somebody else choose those particular

8     colors?

9          Answer:  I chose the colors.

10    A.     Right.

11    Q.     Okay.  So let's turn to Defendant's Exhibit 24.

12    Do you have that?

13    A.     Yes.

14    Q.     This is -- this is a series of e-mails, let's just

15    start off at the very top, it starts off, "Hi, John, this

16    may be helpful, it's from the actual designer to me."

17         That's an a e-mail from you to John Tollefson; is

18    that correct?

19    A.     Yes.

20    Q.     And the actual designer you are referring to is

21    Allan Kovin; correct?

22    A.     Yes.

23    Q.     And then below that we see an e-mail from you to

24    Mr. Kovin dated April 1, 2008 at 4:18 p.m.  It starts kind

25    of in the middle of the page; is that correct?

1    A.        Yes.

2    Q.        And you tell Mr. Kovin that, quote, they like the

3    concept in the top left of the page with many

4    possibilities on it.  This is the two rectangles with the

5    mortar and pestle.

6              "They" refers to who?

7    A.        To John Tollefson and Mark Swift.

8    Q.        So both of them together; correct?

9    A.        Yes.

10   Q.        And the various options you are talking about,

11   there were, it was a, Mr. Kovin had prepared a sheet,

12   Exhibit, Defendant's Exhibit 215.  Let's refer to that.

13   A.        All right.

14   Q.        The last page, there are some thumbnails of

15   various logo designs that Mr. Kovin had created and

16   authored; correct?

17   A.        Yes.

18   Q.        And they were picking the one in the top left-hand

19   corner; correct?

20   A.        That was the one they liked.

21   Q.        And they, again, would be Mark Swift and John

22   Tollefson; correct?

23   A.        Yes.

24   Q.        Then you also state that they'd like to -- colors

25   to be more like the blue and green on the logo with the

1    black bar across the top.  And again, the "they" is

2    referring to Mark Swift and John Tollefson; correct?

3    A.      Yes.

4    Q.      And they were referring to another logo up in the

5    upper right-hand corner of the last page of Defendant's

6    Exhibit 215, which had the colors that they wanted?

7    A.      No, they were colors -- they were a blue and a

8    green.  And if you read on in this, I got, and I directed

9    that they saw some options of blues and greens.

10   Q.      And you directed Mr. Kovin to come up with those

11   options?

12   A.      Yes, I did.

13   Q.      Okay.  So by April 1, 2008, the logo was locked in

14   or chosen; correct?

15   A.      I believe so.

16   Q.      And then the next step was to apply the logo to

17   letterhead, business cards, magnets and other materials;

18   correct?

19   A.      Yes.

20   Q.      So between April 1, 2008, and some time in August

21   of 2008 you are applying the logo to the letterheads, the

22   business cards, the magnets and other materials; correct?

23   A.      Yes.

24   Q.      Now, Ms. Deeter, this may sound like a stupid

25   question but clearly this logo was not in existence in

1    2006; correct?

2    A.        As far as I know, it sure wasn't.

3    Q.        And this logo was not in existence in 2007; is

4    that correct?

5    A.        Correct.

6    Q.        It didn't come into existence until Allan Kovin

7    drew it some time in March of 2008; correct?

8    A.        Correct.

9    Q.        And any statement that this logo was in use or in

10   use in commerce in either 2006 or 2007 would be a false

11   statement; would that be correct?

12   A.        Yes.

13   Q.        The business cards, Allan Kovin designed the

14   business cards with the house and pestle logo on it?

15   A.        Yes.

16   Q.        And John Tollefson is the one who told you exactly

17   how the business cards should read, he provided you the

18   language to put on them; correct?

19   A.        Yes.

20   Q.        So, do you have Defendant's Exhibit No. 21 there

21   in front of you?

22   A.        Yes.

23   Q.        This is one of the business cards that Mr. Kovin

24   designed and authored?

25   A.        He designed it.  He didn't author it..

1    Q.      Designed, okay.  And we see the house and pestle

2    logo on it; correct?

3    A.      Yes.

4    Q.      And we see the name of Joe D. Siddle; correct?

5    A.      Yes.

6    Q.      And we see his job title, his address in

7    Washington Park, Illinois; correct?

8    A.      Yes.

9    Q.      And then we also see DeliverMed Holdings LLC;

10    correct?

11    A.      Yes.

12    Q.      And immediately below that the name Medicate

13    Pharmacy; correct?

14    A.      Yes.

15    Q.      And John Tollefson told you to put the Medicate

16    Pharmacy name on the business cards; correct?

17    A.      He did.

18    Q.      And that was all approved by Mark Swift; correct?

19    A.      I don't know.

20    Q.      You didn't object in any way to Medicate Pharmacy

21    being on the same card with the house and pestle logo; is

22    that correct?

23    A.      I would not object.

24    Q.      That's because you do what the client directs you

25    to do; correct?

1    A.      Yes.

2    Q.      And the client that directed you to do that in

3    this case was John Tollefson; correct?

4    A.      Yes.

5    Q.      And of course you anticipated that that business

6    card would be used; correct?

7    A.      Yes.

8    Q.      Okay.  Let's look at a couple of others real

9    quick.  You also applied this house and pestle logo to

10   some magnets, I guess kitchen magnets that you'd put on

11   your refrigerators or whatever; correct?

12   A.      Yes.

13   Q.      Okay.  You can pull Defendant's Exhibits 4, 5 and

14   6.

15   A.      Okay.

16   Q.      We'll look at Defendant's Exhibit 4 very quickly.

17   It has the house and pestle logo; correct?

18   A.      Yes, it does.

19   Q.      And it says, "thank you for using Medicate

20   Pharmacy DeliverMed"; correct?

21   A.      Yes.

22   Q.      And the client told you to put that language,

23   Medicate Pharmacy DeliverMed, on the magnet; correct?

24   A.      Yes.

25   Q.      And at the bottom it says, quote, right at home,

1    close quote; correct?

2    A.      There are no quotes.

3    Q.      No quote, I was doing the quote but it just says

4    "right at home"?

5    A.      It does.

6    Q.      And again, the client told you to put that phrase

7    on the magnet also; correct?

8    A.      Yes.

9    Q.      In fact, your company Deeter did not do any of the

10   writing or copy for this magnet; correct?

11   A.      Correct.

12   Q.      It was all done as far as the writing and copy at

13   the direction of the client; correct?

14   A.      Yes.

15   Q.      Similarly, same thing with Defendant's Exhibit 5,

16   we see the house and pestle logo and "thank you for using

17   Medicate Pharmacy DeliverMed"; correct?

18   A.      Yes.

19   Q.      And again, that was all done at the request and

20   authorization of the client; correct?

21   A.      Yes.

22   Q.      Exhibit 6, do you have that?

23   A.      I do.

24   Q.      That says "Medicate Pharmacy offers right at home

25   pharmacy delivery service"; correct?

1    A.        Yes.

2    Q.        And at the very bottom it says, "proudly serving

3    Illinois for more than 23 years"; correct?

4    A.        Yes.

5    Q.        And do you know how long Medicate Pharmacy had

6    been in existence in 2008 when you were applying the house

7    and pestle logo to these magnets and using that phrase?

8    A.        I do not.

9    Q.        How about DeliverMed?

10   A.        I do not.

11   Q.        And all of that was put on the magnet at the

12   request and approval of the client; correct?

13   A.        Yes.

14   Q.        We'll turn to Defendant's Exhibit 33.

15             MR. SCHUVER:  I think that's a new one, Judge.

16   A.        Okay.

17   Q.        (BY MR. SCHUVER)  And these are a series of

18   e-mailed invoices from Kovin Design for the work performed

19   relating to this project; correct?

20   A.        Yes.

21   Q.        And in fact if you look at, there are some bate

22   stamp numbers at the bottom right-hand corner that

23   identify each page.  DET 02623, this is an e-mail from Mr.

24   Kovin to you dated April 17, 2008; correct?

25   A.        Yes.

1    Q.      And it is for developing the logo/mark for

2    DeliverMed, implementation of logo/mark to business

3    stationary set, card, letterhead, envelope; correct?

4    A.      Yes.

5    Q.      So what we see in Defendant's Exhibit 33, it

6    represents all the work that Allan Kovin or Kovin Design

7    did in creating these logos, magnets and everything else

8    that we have kind of gone through?

9    A.      It covers what he states it covers in these, yes.

10   Q.      And of course you paid that invoice, those

11   invoice; correct?

12   A.      Yes.

13   Q.      And when you made the payment, you made them out

14   to Kovin Design?

15   A.      Yes.

16   Q.      Let's look at Defendant's Exhibit No. 3.

17   A.      3?

18   Q.      Yes.

19   A.      Okay.

20           MR. SCHUVER:  And, Judge, this may also be the

21   Plaintiff's Exhibit and I don't remember which number.  I

22   apologize.

23   Q.      (BY MR. SCHUVER)  This is a copy of your invoice

24   dated October 17, 2008; correct?

25   A.      Yes.

1    Q.        And it's addressed to Mr. Mark Swift, as you told

2    us; correct?

3    A.        Yes.

4    Q.        So, clearly assuming he got it in the mail, he

5    knew about the work that you were doing and all of the

6    items that were listed on here, the logo, the business

7    cards, the business cards with the union logo, the

8    magnets, everything else, when he received this invoice;

9    correct?

10   A.        As far as I know, yes.

11   Q.        Then Mr. Swift turned around and sent it to

12   Michael Schaltenbrand and asked him to pay for it.  Is

13   that your understanding?

14   A.        I don't know that.

15   Q.        The invoice was paid; is that correct?

16   A.        Yes, it was.

17   Q.        And the payment was made by Medicate Pharmacy Inc;

18   is that correct?

19   A.        That's what he told me at the deposition and what

20   is on the check, but I did not know that.

21   Q.        That's what was on the check that you received for

22   payment; correct?

23   A.        Yes.

24   Q.        Okay.  And the amount of the payment made by

25   Medicate Pharmacy Inc. was $8,350; correct?

1    A.        Yes.

2    Q.        And that's the full amount of your invoice for the

3    work on this project; correct?

4    A.        It's the amount of the invoice number, Exhibit

5    No. 3.

6    Q.        Okay.  Mark Swift never paid you a penny for this

7    logo.

8    A.        I don't know that.

9    Q.        Have you seen a check from Mr. Swift paying you a

10   penny for this logo?

11   A.        I have not.

12   Q.        DeliverMed Holdings LLC never paid you a penny for

13   this logo, is that correct, ma'am?

14   A.        The check that we have was issued from Medicate

15   Pharmacy.  I don't know where the money came from for the

16   check.  I have no idea.

17   Q.        Okay.  So you send out this invoice to Mr. Swift

18   dated October 17, 2008.  You receive the payment from

19   Medicate Pharmacy on March 6, 2009, a little less than

20   about five months later; is that correct?

21   A.        Yes.

22   Q.        Between October 17, 2008, and March 6, 2009, you

23   contacted John Tollefson by phone to ask him about the

24   payment; correct?

25   A.        Was that in my deposition?

1    Q.       I can read it to you if it will help refresh your

2    recollection.  Does that sound correct?

3    A.       Then I would say if that's what I said then, then

4    that's what it is.

5    Q.       If you testified to that in your deposition,

6    Defendant's Exhibit 193 at pages 70 to 71, you would have

7    no reason to disagree with that; correct?

8    A.       Okay.

9    Q.       Okay.  And Mr. Tollefson told you that you would

10   get paid; correct?

11   A.       Yes.

12   Q.       And of course we know that Medicate Pharmacy Inc.

13   paid for all that work; correct?  Yes?  You need to answer

14   out loud, Ms. Deeter.

15   A.       That's what you're telling me.

16   Q.       That's who you received the check from; correct?

17   A.       Yes.

18   Q.       All right.

19   A.       Mm-hmm.  Yes.

20   Q.       Now, in addition to the phone call with Mr.

21   Tollefson, you also had a phone call with Michael

22   Schaltenbrand; correct?

23   A.       Michael Schaltenbrand called me.

24   Q.       Exactly.  Michael Schaltenbrand called you at your

25   office; correct?

1    A.        Yes.

2    Q.        And he called you and indicated to you that he

3    owned the logo; correct?

4    A.        I don't believe he indicated that he owned the

5    logo.

6    Q.        Okay.  He did not.  He actually called you because

7    he wanted to talk about the bill from Deeter, your

8    company.

9    A.        No.

10   Q.        No.  Do you recall, I think earlier you testified

11   that the date of this conversation was March of 2010?

12   A.        I, I think that's what you testified.

13   Q.        You initially testified in your deposition that

14   you thought it happened in the spring of 2011; correct?

15   A.        I initially -- um -- it would be whenever I talked

16   with Jim McGurk for the first time.

17   Q.        When did you talk to Jim McGurk the first time?

18   A.        I think that was in March of 2011.

19   Q.        2011.  So in your deposition you initially told us

20   it happened in 2011; correct?

21   A.        Right.

22   Q.        Then in your answers to interrogatories,

23   Interrogatory No. 12, you stated that it was in March of

24   2010; correct?

25   A.        Yes.  I think -- and then I think I went on to say

```
 1    I thought I had made a mistake.
 2    Q.      The bottom line is, you can't remember exactly
 3    when Mr. Schaltenbrand called you.
 4    A.      No, I can remember because it was when I first
 5    talked to Mr. McGurk.
 6    Q.      Which would be in 2011?
 7    A.      Yes, I think so.
 8    Q.      Okay.  You are familiar with Kathi, K-A-T-H-I,
 9    Schrader, S-C-H-R-A-D-E-R?
10    A.      Yes.  She was a bookkeeper for us.
11    Q.      She's no longer with you?
12    A.      No, she hasn't been here for a few years.
13    Q.      She was with your company in March of 2009; is
14    that correct?
15    A.      Yes.  I believe her name is on one of these
16    invoices.
17    Q.      Okay.  And she was a bookkeeper for your company;
18    correct?
19    A.      Yes.
20    Q.      And I'll show you -- do you have Defendant's
21    Exhibit 47 in front of you?
22    A.      Yes.
23    Q.      The first page of Defendant's Exhibit 47 is a fax
24    cover sheet with your company's name and information on
25    it; correct?
```

1    A.        Yes.

2    Q.        And that's your logo and the name Deeter; correct?

3    A.        Yes.

4    Q.        And this fax is dated March 6, 2009; correct?

5    A.        Yes, it is.

6    Q.        And it's from Kathi Schrader, bookkeeper for

7    Deeter; correct?

8    A.        Yes.

9    Q.        And written above her name and title she's written

10   a message, it says, quote, Mike, here are your outstanding

11   invoices, we would appreciate your help in getting them as

12   soon as possible, close quote.  Did I read that correctly?

13   A.        That's right.

14   Q.        Now, Kathi Schrader, if the testimony from Mr.

15   Schaltenbrand is that he received this fax from Miss

16   Schrader shortly after speaking to you, does that help

17   refresh your recollection that your conversation with Mr.

18   Schaltenbrand actually occurred in March of 2009?

19   A.        No.  It definitely does not.

20   Q.        Do you know why Kathi Schrader chose on March 6,

21   2009, to fax a copy of the Deeter invoice, which is the

22   second page of Defendant's Exhibit 47, to Mr.

23   Schaltenbrand?

24   A.        I have no idea.

25   Q.        You don't allow your bookkeeper to fax out

1    invoices for anyone other than the client, just if someone

2    calls and requests it, do you?

3    A.      Excuse me?

4    Q.      Was Kathi Schrader, was she free to fax out an

5    invoice to whoever may call to ask for one even if they

6    weren't the client?

7    A.      Yes, she was.

8    Q.      She was.  Okay.  You allow your bookkeeper to do

9    that.

10   A.      Well, we're a small business and I didn't even

11   know that she had done this.  She could have easily just

12   put Mike instead of Mark for all I know.

13   Q.      You don't know how this is that this fax ended up

14   going to Mike Schaltenbrand on March 6, 2009?

15   A.      I do not.

16   Q.      So you have told us when you were doing this work

17   on the logo and the other various materials that you

18   usually worked with John Tollefson; correct?

19   A.      Yes.

20   Q.      And you simply assumed that Mr. Tollefson worked

21   for DeliverMed; correct?

22   A.      That's correct.

23   Q.      You considered Mr. Tollefson to be the client or a

24   representative of the client; correct?

25   A.      I considered him to be a representative of the

1     client.

2     Q.      And you knew that Mr. Tollefson was working with

3     Mark Swift; correct?

4     A.      Yes.

5     Q.      Ms. Deeter, neither you nor your company, William

6     R. Deeter Associates Inc., neither of you are licensed or

7     authorized to operate a pharmacy; is that correct?

8     A.      We are not.

9     Q.      And you and your company never used this house and

10    pestle logo for your own purposes; correct?

11    A.      We did not.

12    Q.      You never applied for a trademark on the logo;

13    correct?

14    A.      Um -- we applied for the copyright that was

15    transferred.

16    Q.      Do you understand the difference between a

17    trademark and a copyright?

18    A.      Not legally, no.

19    Q.      Okay.  You were referring to what Mr. McGurk had

20    referred you to in your direct examination, the

21    certificate relating to the copyright in April of 2011;

22    direct?

23    A.      Yes.  The assignment for copyright, yes.

24    Q.      Obviously your company, you and your company, did

25    not lose any profits because of any alleged use by others

1    or any infringement from use of this logo?

2    A.      We did not.

3            MR. McGURK:  Your Honor, I guess an interpose an

4    objection in terms of legal conclusions but --

5            THE COURT:  Overruled.  She may answer.  Well she

6    answered, we did not.

7            MR. SCHUVER:  Is that okay, Judge?

8            THE COURT:  That's fine.

9    Q.      (BY MR. SCHUVER)  So therefore you were not

10   seeking any financial damages in this litigation; correct?

11   A.      Correct.

12   Q.      And when I say "you" that means neither for you

13   personally or for your company William R. Deeter

14   Associates Inc.; correct?

15   A.      Yes, correct.

16   Q.      On the logo itself, the house and pestle logo,

17   there's nothing on that logo that would give anyone notice

18   that the logo had been copy written; correct?

19   A.      Correct.

20   Q.      You are familiar with the letter C in a circle

21   which puts people on notice of the existence of a

22   copyright?

23   A.      Yes, I am.

24   Q.      And there was no letter C in a circle put on this

25   logo?

1    A.       No.

2    Q.       And the words copyright or COPR were not put on

3    the logo?

4    A.       Correct.

5    Q.       Neither you nor your company ever provided

6    Medicate Pharmacy Inc. or Michael Schaltenbrand or Joe

7    Siddle with any notice that they were infringing on any

8    copyright; correct?

9    A.       We did not.

10   Q.       At no time did you or anyone from your company,

11   William R. Deeter Associates Inc. ever notify anyone that

12   the house and pestle logo should not be used in

13   conjunction with the Medicate Pharmacy name?

14   A.       We did not.

15   Q.       Ms. Deeter, let's talk about the copyright

16   certificate of registration.  First of all, we know that

17   this logo came in existence some time in March or April of

18   2008.  Is that a fair statement?

19   A.       Yes.

20   Q.       Then if we look at Plaintiff's Exhibit 38.

21   A.       Okay.

22   Q.       It indicates that you submitted an application for

23   a copyright on a house and pestle logo on April 1, 2011;

24   correct?

25   A.       I believe --

1          MR. McGURK:   Your Honor --

2          THE COURT:   Hold a second.   Mr. McGurk?

3          MR. McGURK:   Yes, Your Honor.   This is the

4    certificate of copyright for DeliverMed Holdings based

5    upon the assignment from Linda Deeter to DeliverMed

6    Holdings.

7          THE COURT:   Doesn't say anything --

8          MR. McGURK:   This is not an application.

9          THE COURT:   Nothing in here says that she applied

10   for anything.

11         MR. SCHUVER:   That may be correct, Your Honor.

12   Apologize.

13         THE COURT:   Okay.

14   Q.    (BY MR. SCHUVER)  During or prior to April of 2011

15   -- well in fact, strike that.

16         At no time have either you or your company ever

17   applied for a certificate of registration with the U.S.

18   copyright office for this logo;  is that correct?

19   A.    That's correct.

20   Q.    Let's look at Plaintiff's Exhibit 38, and it says

21   that year of completion was 2008.   And that's correct, is

22   that right?  That this house and pestle logo was completed

23   in 2008?

24   A.    Yes.

25   Q.    And it says, date of first publication was June 1,

1    2008.   Does that sound about right to you that that's when

2    you started implementing these things on the various items

3    that we have talked about?

4    A.       Yes.

5    Q.       Then it says, author, and it identifies you, Linda

6    Deeter; correct?

7    A.       Yes, that's correct.

8    Q.       And below that it says author created, and it says

9    you created the 2-D artwork; correct?

10   A.       That's what it says.

11   Q.       You didn't create the artwork here, Allan Kovin

12   did; is that correct?

13   A.       Allan Kovin was the graphic designer and I was the

14   art director and he just did what I asked him to do.

15   Q.       You didn't create the 2-D artwork, Allan Kovin

16   did; correct?

17   A.       Not exactly, no.

18   Q.       You, yourself, did not sit down and put any idea

19   for this logo in a tangible form; correct?

20   A.       I directed how it should be.

21   Q.       I'm asking you, did you, yourself, sit down and

22   put any idea for this logo in a tangible form?

23   A.       I did not.

24   Q.       You didn't draw this logo, whether it was on a

25   computer, a piece of paper, or anything else like that?

1    A.       I did not.

2    Q.       And no one at your company William R. Deeter

3    Associates Inc. is a graphic designer; correct?

4    A.       That's right.

5    Q.       And no one at your company did that work, sat down

6    and drew on a computer or a piece of paper or anything

7    like that this logo?

8    A.       That's right.

9    Q.       On Plaintiff's Exhibit 38, next section below

10   identifies the copyright claimant and it states that the

11   copyright claimant is DeliverMed Holdings LLC; correct?

12   A.       Yes, it does.

13   Q.       And then below that it says, quote, transfer

14   statement by written agreement, close quote; correct?

15   A.       Your quotes; right?

16   Q.       My quotes, I'm sorry.  Yes.

17   A.       Yes.  No, that's correct.

18   Q.       So according to this document there was a transfer

19   statement by written agreement to DeliverMed Holdings LLC;

20   correct?

21   A.       Yes.

22   Q.       Now, we took your deposition, we started on

23   January 16, 2012.  Do you recall that?

24   A.       I do.

25   Q.       And in advance of your deposition we served you

1    with a notice requesting that you produce various

2    documents including any documents relating to this logo,

3    any contracts, any assignments, any agreements; correct?

4    A.    Yes.

5    Q.    And you searched your files and you produced to us

6    what documents that you had; correct?

7    A.    Yes.

8    Q.    And on January 16 -- hold on a second.  Let me

9    pull this out.

10           MR. McGURK:  Your Honor, while counsel is

11    reviewing that, we're going to be having a call coming in

12    at 1:30.

13           THE COURT:  No, we changed that to 2:00.

14           MR. McGURK:  I see.

15           THE COURT:  I told Marcia to call up there and

16    change it to 2:00.

17           MR. McGURK:  Thank you, Your Honor.

18           THE COURT:  What exhibit number is this now?

19           MR. SCHUVER:  This is Defendant's Exhibit No. 9.

20    Q.    (BY MR. SCHUVER)  I'll show you what we have

21    marked as Defendant's Exhibit No. 9.  Do you have that in

22    front of you?

23    A.    Yes.

24    Q.    And this document's entitled agreement for

25    assignment of copyright; correct?

1    A.      Yes.

2    Q.      And this is what you produced at the time of your

3    deposition in January of 2012; correct?

4    A.      Yes.

5    Q.      And this copy, Defendant's Exhibit No. 9, there's

6    no signatures on them; correct?

7    A.      Correct.

8    Q.      And we questioned you about that in your

9    deposition on January 16, if you had a copy with

10   signatures on it; correct?

11   A.      I don't remember.

12   Q.      Well, between January -- then we, we came back to

13   your deposition again on January 19, 2012; correct?

14   A.      Yes.

15   Q.      And in between we had asked you if you would

16   search for the signed copy; correct?

17   A.      I believe you asked me to search for anything else

18   I might have.

19   Q.      Including the signed copy of, of this document.

20   A.      Is that in my deposition, that you asked for a

21   signed copy?

22   Q.      I believe so.  Since I wasn't prepared for this, I

23   can't cite to that.  But in any event, you don't recall

24   what you -- do you recall one way or another at this time?

25   A.      I do not.  I don't remember being asked to produce

1    the signed copy of this.

2    Q.      Okay.  What we have marked as Defendant's Exhibit

3    No. 9, this is what you indicated in your deposition was

4    the copyright registration application agreement assigning

5    the copyright to DeliverMed Holdings LLC; is that correct?

6    A.      Yes.

7    Q.      You didn't testify that it was Plaintiff's Exhibit

8    44; is that correct?

9    A.      Your question is, did I say this was -- I wouldn't

10   even know what Plaintiff's Exhibit 44 was.

11   Q.      Well, you were shown Plaintiff's Exhibit 44

12   earlier by Mr. McGurk.  That would be a signed document,

13   not the exact same thing as what we see as Defendant's

14   Exhibit No. 9; correct?

15   A.      They are not exactly the same, no.

16   Q.      Okay.  In fact, they are different; is that

17   correct?

18   A.      They are different because I signed the one and

19   Mr. Swift signed one, yes.

20   Q.      There's also some other differences; is that

21   correct?

22   A.      Well, I don't know what those are.

23   Q.      Okay.  But in any event when we took your

24   deposition in January of 2012, you identified Defendant's

25   Exhibit No. 9 as the document that you used to assign the

1    copyright to DeliverMed Holdings LLC; correct?

2    A.      Yes.

3    Q.      And at that point in time, that document was not

4    signed; is that correct?

5    A.      The one that you showed me wasn't signed, but I

6    had signed one.

7    Q.      Well, I showed you the one that you produced to us

8    in January of 2012; correct?

9    A.      I don't remember what you showed me.

10   Q.      Referring to your deposition at page 87, beginning

11   at line 20, I asked you the following question:  If you

12   will look at DET 0129, that's a document titled agreement

13   for assignment of copy; correct?

14          Answer:  Yes.

15          Question:  And is this what you are indicating in

16   the copyright registration application was the written

17   agreement I guess assigning the copyright to DeliverMed

18   Holdings LLC?

19          Answer:  Yes.

20          Is that correct?

21   A.      Yes.

22   Q.      So let's look at Defendant's Exhibit No. 9.  It

23   starts off stating that Linda Deeter and Deeter

24   Associates, Deeter, and DeliverMed Holdings LLC,

25   DeliverMed, hereby agree that Deeter will assign a

1  copyright in the logo created by Linda -- created by Linda

2  Deeter and Deeter for DeliverMed of a house and pestle; is

3  that correct?

4  A.    Yes.

5  Q.    It says, will assign.  This document does not

6  assign anything, it simply states that you will assign the

7  copyright if certain contingencies happen in the future;

8  correct?

9  A.    Yes.

10  Q.    Then if we look at the signed copy that we now

11  have, Defendant's Exhibit 44, it similarly starts off with

12  the same or similar sentence that you will assign a

13  copyright in the logo of a house and pestle created by

14  Linda Deeter and Deeter Associates; correct?

15  A.    Yes.

16  Q.    Again, it simply states that you will assign if

17  certain contingencies happened in the future; correct?

18  (Pause.)  Is that correct, Ms. Deeter?

19  A.    Well I'm looking, I'm trying to see what the

20  differences are.  (Pause.)  The Plaintiff's Exhibit 44 is

21  the one that I signed.  Defendant's Exhibit No. 9 appears

22  to be the one that you discussed in my deposition.

23  Q.    The one that you produced for us at the time of

24  your deposition; correct?  Is that correct, Ms. Deeter?

25  A.    Well, I'm not sure if I'm the one who produced it

1    or who produced it, but it appears that's definitely the

2    one.

3              MR. SCHUVER:  I guess we have lost the video,

4    Judge?

5              THE COURT:  Yes.  We'll just have to continue.

6              MR. SCHUVER:  That's fine.

7    Q.     (BY MR. SCHUVER)  Let's look at Defendant's

8    Exhibit No. 9, and we'll kind of point out if there is any

9    differences.

10              In Defendant's Exhibit No. 9, the document says

11    that you will be paid a total of $10000 in two separate

12    installments; is that correct?

13    A.     Yes.

14    Q.     It says the first installment of $5,000 will be

15    paid upon successful cancellation of the Schaltenbrand

16    copyright and the issuance of the Deeter copyright to

17    DeliverMed after registration with United States copyright

18    office; correct?

19    A.     Yes.

20    Q.     And that first installment has never been paid to

21    you; correct?

22    A.     Correct.

23    Q.     It then says, the second installment of $5,000

24    will be paid on or before December 31, 2011, if the

25    copyright has been assigned by that date.  If the

1    copyright has not been assigned by that date, the second

2    installment of $5,000 will be paid on December 31 of the

3    year in which the assignment is completed.  Is that

4    correct?

5    A.      Yes.

6    Q.      And that second installment has not been paid to

7    you; correct?

8    A.      Correct.

9    Q.      So, according to this document if the copyright

10   had been assigned to you, you would have received a

11   payment; correct?

12   A.      Correct.

13   Q.      You never received any money for this assignment

14   of the copyright; correct?

15   A.      Correct.

16   Q.      All right.  If we looked at Plaintiff's Exhibit

17   44, it similarly says that you are going to receive a

18   total of $10,000 in two installments; is that correct?

19   A.      Yes.

20   Q.      And you have received no payment for Plaintiff's

21   Exhibit No. 44; is that correct?

22   A.      Yes.

23   Q.      Now, $10,000, that's a decent size amount of

24   money; correct?

25   A.      Yes.

1   Q.      That's more than the $8,350 you charged for Mr.

2   Kovin and your staff to work on this project; correct?

3   A.      Yes.

4   Q.      And you have never charged as much as $10,000 for

5   an assignment of a copyright before; is that correct?

6   A.      Correct.

7   Q.      Now, both Exhibit 9 and Exhibit 44 state that in

8   addition to agreeing to assign a copy some time in the

9   future, you'll also agree to do some other things for this

10  $10,000; correct?

11  A.      What was that?

12  Q.      Well, for instance, one of the things that we see

13  both in Defendant's Exhibit No. 9 and Plaintiff's Exhibit

14  No. 44 is that for this $10,000 you agree that you will

15  cooperate in litigation against Michael Schaltenbrand on,

16  on his copyright; correct?

17  A.      Where is that?

18  Q.      Oh, let's see, on Defendant's Exhibit No. 9, it is

19  the second sentence, I'll read it to you, Deeter and

20  DeliverMed agree that they will cooperate in litigation

21  against Michael Schaltenbrand for wrongfully obtaining a

22  copyright on the work which he has admitted he did not

23  create.

24          Did I read that correctly?

25  A.      Yes.

1    Q.        And similarly I think it's either identical or

2    very similar language, let me find it on Plaintiff's

3    Exhibit 44, it looks like it's also the second sentence,

4    it says, Deeter Associates -- well it's not clear, I don't

5    know if that's a period or a comma, Deeter, period, Deeter

6    and Associates, DeliverMed agree that they will cooperate

7    in litigation against Michael Schaltenbrand for wrongfully

8    obtaining a copyright on the work which he has admitted he

9    did not create; correct?

10   A.        Yes.

11   Q.        And of course both documents state that upon the

12   successful prosecution of the federal litigation finding

13   that the Schaltenbrand copyright on the Deeter design logo

14   is invalid, Deeter will be paid the money that we have

15   been talking about; correct?

16   A.        Yes.

17   Q.        So you are being paid for your participation in

18   this lawsuit; is that correct?

19             MR. McGURK:   Your Honor --

20   A.        I guess --

21             THE COURT:   Hold on, there's an objection.

22             MR. McGURK:   Yes, Your Honor, I guess I'll object

23   to the characterization, client being paid for her

24   testimony, I think this mischaracterizes --

25             THE COURT:   Well, I don't think she's being paid

1    for her testimony but I'll allow the question.

2    Q.    (BY MR. SCHUVER)  Do you need the question

3    repeated to you, Miss Deeter?

4    A.    No, I remember your question and, no, I have not

5    been paid.

6    Q.    Well, I'm not asking you -- we know that you

7    haven't been paid, but you are being paid to participate

8    in this litigation, you will be paid if you are successful

9    against Mr. Schaltenbrand; correct?

10   A.    Um -- I'm reading into what you are saying that

11   you are thinking I'm doing this because I'm going to get

12   paid.  And that's not why I'm doing this at all.

13   Q.    Well, Ms. Deeter, you had no intention of

14   participating in this lawsuit if you hadn't been promised

15   by Mr. Swift and his attorneys that you would be paid;

16   correct?

17   A.    I was more interested in just having the right

18   thing happen.

19   Q.    Defendant's Exhibit 9 and Plaintiff's Exhibit 44

20   both indicate that all attorney's fees and expenses for

21   you and your company will be paid by DeliverMed Holdings

22   LLC; correct?

23   A.    That's right.

24   Q.    You flew to St. Louis for your deposition in, in

25   January; is that correct?

1    A.        Yes.

2    Q.        Who paid for that flight?

3    A.        Mr. Swift.

4    Q.        And did you have any meals, hotel room, anything

5    like that when you were there?

6    A.        No.   No hotel room and no meal.

7    Q.        Were you compensated for your time?

8    A.        Yes, I was.

9    Q.        Your regularly hourly rate is $185 an hour when

10   you are doing work through your company; is that correct?

11   A.        That's correct.

12   Q.        How much were you paid to give your -- blah --

13   give your deposition testimony in January of 2012?

14   A.        I don't recall and I don't have that in front of

15   me.

16   Q.        Do you recall if it was based on an hourly rate?

17   A.        Yes, it was.

18   Q.        And was it a higher hourly rate than your $185 an

19   hour?

20   A.        No.

21   Q.        It was not.   Do you recall what the hourly rate

22   was?

23   A.        I do not.

24   Q.        Do you have any documents that you can refer to

25   that, that would tell us how much you were paid for your

1    deposition testimony?

2    A.       We submitted an invoice for my time.  And I don't

3    have that in front of me.

4    Q.       I haven't received that invoice.  Who is it you

5    submitted that invoice to?

6    A.       To Mr. McGurk.

7    Q.       Mr. McGurk.  Okay.  And when did you submit that

8    invoice to Mr. McGurk?

9    A.       Some time after I was there.

10   Q.       Some time shortly after your deposition in January

11   of 2012?

12   A.       Yes.

13   Q.       How about today?  Are you also being paid for your

14   testimony here today, for your time?

15   A.       I am not.

16   Q.       Was it your understanding that the payments that

17   you received already for your time for testifying in the

18   deposition and for, and to reimburse you for your flight

19   to St. Louis, was that in addition to the promise of

20   $10,000 in the future?

21   A.       My flight to St. Louis was what was covered on the

22   invoice that I sent previously.

23   Q.       And you also had your time put on that invoice,

24   too?

25   A.       Yes.

1    Q.      I guess what I'm asking, that's not coming out of

2    the $10,000 that Mr. Swift and DeliverMed Holdings are

3    promising you when you do some time in the future assign

4    this copyright and are successful against Mr.

5    Schaltenbrand, that's in addition to that $10,000?  Or is

6    that, or do you have an understanding one way or the

7    other?

8    A.      I don't have an understanding one way or the

9    other.

10   Q.      Now, both Defendant's Exhibit 9 and Plaintiff's

11   Exhibit No. 44 state that you will assign a copyright in

12   the logo created by Linda Deeter and Deeter; is that

13   correct?

14   A.      Yes.

15   Q.      Then a little further down, at least on Exhibit 9,

16   and I haven't been able to cross-examine to Exhibit 44

17   yet, it states, Deeter will cooperate in the application

18   for a copyright on the house and pestle logo she designed;

19   is that correct?

20   A.      Well, it's the company.

21   Q.      Which company?

22   A.      Deeter.

23   Q.      Did Deeter design this logo or did Kovin Design

24   design this logo?

25   A.      Kovin was the graphic designer.  He was the

1    mechanic.  I was the art director.  It comes through our

2    company.

3    Q.    You have no written contractual agreement with Mr.

4    Kovin; is that correct?

5    A.    That's right.

6    Q.    Allan Kovin has never been an employee of your

7    company William R.  Deeter Associates Inc.; is that

8    correct?

9    A.    That's right.

10   Q.    So in Defendant's Exhibit No. 9 and Plaintiff's

11   Exhibit 44, we see references to you being the person who

12   designed, it says "she designed" on both of those

13   exhibits; correct?

14   A.    What line is that?

15   Q.    On the -- on Defendant's Exhibits?

16   A.    Yeah.

17   Q.    Defendant's Exhibit No. 9.  It is about the middle

18   of the first paragraph, you'll see the sentence, copyright

19   on the house --

20   A.    I see that.

21   Q.    Do you see that?

22   A.    I see that.

23   Q.    Let me read it for the record just so it's clear.

24   Deeter will cooperate in the application for a copyright

25   in the house and pestle logo she designed; correct?

1    A.        Yes.

2    Q.        And then in Plaintiff's Exhibit 44, it says,

3    Deeter and Deeter Associates will cooperate in the

4    application for a copyright on the house and pestle logo

5    she designed; correct?

6    A.        That's right.

7    Q.        And Mr. McGurk is the one who provided you with

8    these agreements for assignment of copy, I think you have

9    already told us that; is that correct?

10   A.        Yes.

11   Q.        And you had a phone call with Mr. McGurk prior to

12   purportedly executing either one of these documents,

13   Defendant's Exhibit 9 or Plaintiff's Exhibit 44; correct?

14         MR. McGURK:  Your Honor, I guess I'm going to

15   object and move to strike any reference counsel makes to

16   purported signature.  He's suggesting that the witness did

17   not sign it.  Your Honor, I think that's improper and I

18   would ask that the Court strike that.

19         THE COURT:  The Court's not going to strike it.

20         MR. SCHUVER:  Thank you, Judge.

21   Q.        (BY MR. SCHUVER)  Do you need the question read

22   back to you, Ms. Deeter?

23   A.        Yes, it was cut off.

24         MR. SCHUVER:  Can I have the court reporter read

25   that back?

```
 1              THE COURT:  You don't remember it?  I can try
 2    again, Judge.  Do you prefer that I do it that way?
 3              THE REPORTER:  I can read it.
 4              THE COURT:  Okay.
 5              (The pending question was read back by the
 6    reporter.)
 7              THE WITNESS:  It was --  I'm sorry, it was broken
 8    up.
 9              THE COURT:  Now you can remember it.
10              MR. SCHUVER:  Now I'll remember it, Judge.  Thank
11    you.
12    Q.     (BY MR. SCHUVER)  Let me ask you this:  You have
13    testified that you executed I guess at least Plaintiff's
14    Exhibit 44 on April 8, 2011; is that correct?
15    A.     Yes.
16    Q.     Okay.  March 30, 2011, you had a phone call with
17    Mr. McGurk; is that correct?
18    A.     I don't know the date.
19    Q.     Let's see if we can refresh your recollection.
20    Your deposition, at page 120, I'm asking you about the
21    phone call with Mr. McGurk.  And at line 18 the question
22    is:  Okay.  So you think that's the date, March 30, 2011?
23              And your answer is:  Yes.
24              (Pause.)
25    A.     Yes, because when we go above it --
```

1    Q.      It's referring to that, to a letter that he sent

2    you on April 1?

3    A.      Yes.

4    Q.      And that refreshed your recollection when we

5    showed you the letter, that the phone conversation

6    happened on March 30; is that correct?

7    A.      That's correct.

8    Q.      And in fact the April 1, 2011, letter from Mr.

9    McGurk in fact referred to a phone conversation that you

10   had with him the prior day on March 30, 2011; correct?

11   (Pause.)  That's okay, we'll move on.  You agree that

12   having reviewed this --

13   A.      One day --

14   Q.      The letter referred to March 30, 2011.

15   A.      Yes, it does.

16   Q.      Okay.  When you discussed your involvement over

17   the phone with Mr. McGurk about the logo on March, in

18   March of 2011, you informed him that Allan Kovin had been

19   involved with the design of the logo; is that correct?

20   A.      Yes, from the very beginning I have stated that

21   Deeter worked for Mark Swift, and Allan Kovin was the

22   graphic designer on the project.

23   Q.      And you told him that from the very beginning;

24   correct?

25   A.      Yes.

1    Q.       And in fact you made it clear to him that you do

2    not design; is that correct?

3    A.       That's correct.

4    Q.       You don't put pen to paper; direct?

5    A.       Correct.

6    Q.       And you made that clear to Mr. McGurk during this

7    March 30, 2011, phone conversation; correct?

8    A.       I think so.

9    Q.       Well, do you recall one way or another?

10   A.       No, I don't recall.

11   Q.       Okay.  Let's see if we can refresh your

12   recollection.  Page 132 of your deposition, in fact we'll

13   start at page 131 so we incorporate all of this.

14   Beginning on page 131, at line 19, question:  So, when you

15   discussed your involvement with the logo on March 30,

16   2011, with Mr. McGurk, you did inform him that Allan Kovin

17   had also been involved with the design of the logo?

18            Answer:  Yes, I made it clear that I don't design.

19            Question:  You made it clear to Mr. McGurk that

20   you don't design?

21            Answer:  This is a fine line between how it

22   happens but I don't put the pen to paper.

23            Question:  Okay.  And you made that clear to Mr.

24   McGurk on this March 30, 2011, phone conversation?

25            Answer:  I believe I did.

1          That was your testimony under oath back in January

2      of 2012; correct?

3      A.      Yes.

4      Q.      But nonetheless on April 8, 2011, after this phone

5      conversation with Mr. McGurk, he has you sign this

6      agreement for assignment of copyright that says that you

7      did design the logo; correct?

8      A.      It says that our company designed the logo and it

9      uses me as the contact person at the company, yes.

10     Q.      And you knew that Mr. McGurk was asking you to

11     join a lawsuit against Michael Schaltenbrand and Medicate

12     Pharmacy Inc. and Joey Siddle in which he was alleging

13     that you were the designer of this logo; correct?

14     A.      I was asked to join in the proceedings, yes.

15     Q.      Have you read any of the pleadings that were filed

16     on your behalf making allegations on your behalf in this

17     lawsuit?

18     A.      Personally, no.

19     Q.      You have never done that?

20     A.      Not all of them.

21     Q.      Okay.  But at least as of March 30, 2012, you had,

22     number one, informed Mr. McGurk that Allan Kovin was the

23     one who designed the logo; correct?

24     A.      Yes.

25     Q.      And that, number two, you made it clear to him

1    that you do not design; correct?

2    A.      Correct.

3    Q.      Now, Defendant's Exhibit No. 9, there is a

4    paragraph near the bottom, and I think it's identical or

5    very similar on Plaintiff's Exhibit 44.  Let me read you

6    the one in Defendant's Exhibit No. 9.

7            It says, Deeter and DeliverMed agree that the

8    trademark of the house and pestle logo by DeliverMed is

9    valid and was intended by the parties when the logo was

10   created.

11           That's on Defendant's Exhibit No. 9.  Do you see

12   that?

13   A.      Yes, I do.

14   Q.      Then on Plaintiff's Exhibit No. 44, similar

15   language, a little different, it says, Deeter, Deeter

16   Associates and DeliverMed agree that the trademark of the

17   house and pestle logo by DeliverMed is valid and was

18   intended by the parties when the logo was created.

19           Did I read that correctly?

20   A.      Yes.

21   Q.      So those paragraphs that we see in Defendant's

22   Exhibit 9 and Plaintiff's Exhibit 44, they are referring

23   to a trademark; correct?

24   A.      That's the word that they have, yes.

25   Q.      And you signed Plaintiff's Exhibit 44; correct?

1    A.        Yes.

2    Q.        And it says that you agree that the trademark of

3    the house and pestle logo by DeliverMed is valid; correct?

4    A.        Yes.

5    Q.        But you don't know anything about the trademark of

6    the house and pestle logo by DeliverMed; correct?

7    A.        That's correct.

8    Q.        You never reviewed the trademark; correct?

9    A.        I don't know that there is a trademark.

10   Q.        You don't even know if there is one.  You don't

11   know if, if any trademark that DeliverMed may have of the

12   house and pestle logo is even valid; correct?

13   A.        That's right.

14   Q.        The only reason you signed this document is

15   because Mr. McGurk told you to.

16   A.        No, I signed the agreement because I worked with

17   Mark Swift and DeliverMed, and I didn't know who Michael

18   Schaltenbrand was.  And it seems to me that this stated

19   that I worked with Mark Swift and DeliverMed.

20   Q.        But you knew nothing about the trademark of the

21   house and pestle logo; correct?

22   A.        That's right.  I don't.  I still don't know

23   anything about a trademark.

24   Q.        And you didn't object to signing this agreement

25   for assignment of copyright even though it states that you

1    agree that the trademark of the house and pestle logo by

2    DeliverMed is valid; correct?

3    A.        I followed my attorney's advice.

4    Q.        You weren't involved in any way in developing the

5    name DeliverMed; is that correct?

6    A.        No, I was not.

7    Q.        Okay.  You weren't involved in any process of

8    registering that name DeliverMed as part of any trademark

9    or anything like that; correct?

10   A.        Yes.

11   Q.        So on Defendant's Exhibit 9 and also on

12   Plaintiff's Exhibit 44, it says that you also agree that

13   the trademark of the house and pestle logo by DeliverMed

14   was intended by the parties when the logo was created.  Is

15   that correct?  (Pause.)  Same paragraph we were referring

16   to earlier.

17   A.        That's what it says.

18   Q.        You never had any discussion with anyone at the

19   time this logo was created in March and April of 2008

20   about a trademark?

21   A.        I did not.

22   Q.        So, it would be fair to say that you didn't even

23   think about a trademark when this logo was created?

24   A.        That would be fair.

25   Q.        Let's look at Defendant's Exhibit 12.

```
1           MR. SCHUVER:  That's a new one, Judge.

2           THE COURT:  Got it.

3    A.     Did you say Defendant's?

4    Q.     (BY MR. SCHUVER)  Yes, Defendant's Exhibit 12,

5    it's a large packet.  Now -- oh, I'll wait for you to get

6    that.  (Pause.)

7           THE COURT:  Can you put the first page of that on

8    the screen?

9           MR. SCHUVER:  Absolutely.

10          THE COURT:  Just the first page, I know it's a

11   packet, but.  Can you blow it up just a little bit?

12          MR. SCHUVER:  Sure.  Is there a section you want

13   to look at?

14          THE COURT:  No, bring it down a little bit.

15          THE WITNESS:  I don't think I have 12.

16          THE COURT:  My eyes aren't as good as they used to

17   be.

18          MR. SCHUVER:  I'm with you, Judge.

19   Q.     (BY MR. SCHUVER)  You don't think you have

20   Defendant's Exhibit 12?  It consists of 20, maybe 30 pages

21   or so?  It would be a fairly thick exhibit.

22   A.     Right.  (Pause.)  I don't have it.

23          MR. SCHUVER:  Jim, do you know?  I mean, is it

24   something that --

25   Q.     (BY MR. SCHUVER)  Ms. Deeter, is this something
```

1    that you need to look for?  I'm assuming it was sent to

2    you because it was part of the numbered exhibits that we

3    had identified that should have been given to you.

4    A.      I have them all in numerical order and I, I'm not

5    in a consistent sequence.  In other words, I don't go 1,

6    2, 3, 4, 5, 6 consistently.  I'm missing different

7    numbers.

8    Q.      Do you have anything that's a fairly large packet

9    of documents, like I said, about maybe 20, 30 pages thick?

10   A.      I have two others like that.

11   Q.      Why don't you pull those out?  What I'm looking

12   for is one that the first page has a title DeliverMed

13   house logo copyright.  And then below that it says,

14   neither Mike Schaltenbrand nor Medicate Pharmacy Inc. own

15   the copyright to the DeliverMed house logo.

16   A.      I really don't have that.

17           MR. SCHUVER:  Judge, I'm going to have to try to

18   do this and read portions.  I don't know if she's going to

19   remember --

20           THE COURT:  Try the best you can.

21           MR. SCHUVER:  I'll try the best I can.

22   Q.      (BY MR. SCHUVER)  Ms. Deeter, do you recall that

23   Mr. McGurk provided you with basically a narrative,

24   several pages long, of various purported facts of the

25   case?  And that you had produced that at the time of your

1    deposition in January of 2012?

2    A.      Yes.   Can I ask if I was supposed to also have 12

3    and 13?

4    Q.      You were probably supposed to have 13, but that's

5    not critical.   13 is a small --

6    A.      I don't have 11, 12 or 13.

7    Q.      Well, you were supposed to have all three of

8    those, is all I can indicate to you.   You don't have any

9    of those, is that correct, Ms. Deeter?

10   A.      I don't.   I don't have 11, 12 or 13.

11          MR. SCHUVER:   Judge, I'll do my best.

12          THE COURT:   Okay.

13   Q.      (BY MR. SCHUVER)  Ms. Deeter, in your deposition

14   you testified that you were provided with a group of

15   documents from Mr. McGurk that set forth a narrative of at

16   least purported facts in the case.   Do you recall that?

17   A.      Yes.

18   Q.      Okay.   And we had marked those as a group exhibit

19   in your deposition and you testified about those.   And you

20   said you received that packet from Mr. McGurk just prior

21   to coming to your deposition in this case in January of

22   2012; is that correct?

23   A.      Yes.

24   Q.      And we'll refer to in Defendant's Exhibit 12 at

25   Bates stamp No. DET 013 4, and again I'm at a little bit

1    of a disadvantage because I can't refer you to it because

2    you don't have the exhibit.  But I'll read to you what Mr.

3    McGurk wrote to you.

4              He stated, quote, on March 17, 2008, Linda Deeter

5    e-mailed to DeliverMed an attached page with several

6    samples of potential new logos including the house logo

7    under discussion here.  See following pages for a copy of

8    an e-mail from Linda Deeter asserting this date and then a

9    copy of the page with the logo samples.

10             Do you recall that in your, in the packet or

11   testifying about that in your deposition?

12   A.        Yes.

13   Q.        Okay.  Good.  So Mr. McGurk indicated to you in

14   this packet he sent you right before I had come to take

15   your deposition that you had e-mailed these samples to

16   DeliverMed; is that correct?

17   A.        John Tollefson and Mark Swift, yes.

18   Q.        That's what I was going to ask you about.  He

19   attaches to that, the next page is DET 0135.  Let me get

20   it up on the screen.  And I'm going to have to read it to

21   you again.

22             This is an e-mail from Linda Deeter to John

23   Tollefson with CCs to Bill Deeter, Drew Deeter, Jill

24   Eberts, Lucinda Lu, Shannon Jaeger, dated March 31, 2010

25   with attachments DeliverMed possibilities PDF.

1          Do you recall that?

2    A.     Do I recall doing that?

3    Q.     Yes.

4    A.     Yes.

5    Q.     So, when Mr. McGurk was saying you e-mailed it to

6    DeliverMed, you are referring to John Tollefson; is that

7    correct?

8    A.     Yes.

9    Q.     Referring back to DET 0134, again, I know you

10   don't have it in front of you, but Mr. McGurk states,

11   quote, the individual designer of the house logo was Allan

12   Kovin of Deeter, close quote.

13         Is that correct?  Well, you don't have it in front

14   of you, but assuming I have read that correctly, do you

15   have any objection to that?

16   A.     No, I don't.

17   Q.     Okay.  And so it is clear that Mr. McGurk knew

18   when he sent you this packet back in January of 2012 at

19   least that Mr. Allan Kovin was the designer of the logo;

20   correct?

21   A.     He was the graphic designer on the project.

22   Q.     And you already told us that on March 30, 2011,

23   you made it clear to Mr. McGurk that you did not design;

24   correct?

25   A.     Yes.

1    Q.        And I assume you also made it clear to Mr. McGurk

2    that Allan Kovin has never been an employee of your

3    company; correct?

4    A.        Correct.

5    Q.        And that you have no written contractual agreement

6    with Mr. Kovin; correct?

7    A.        Yes.  Correct.

8    Q.        But in this exhibit, DET 0134, Mr. McGurk

9    nevertheless states that Allan Kovin was, quote, of

10   Deeter, close quote; is that correct?

11   A.        Well, he was of Deeter.  He was a subcontractor to

12   us.  He wasn't out there doing this on his own.  He was

13   working for us.

14   Q.        Do you recall in the packet that Mr. McGurk sent

15   you receiving an article from the United States copyright

16   office titled Copyright Basics?

17   A.        Yes.

18   Q.        And I know you don't is it in front of you, but

19   that article starts in Defendant's Exhibit 12 at DET 0112;

20   is that correct?  Well, you don't know, but just for the

21   record.

22            At DET 0117, let me read to you a portion.  This

23   is a portion of what Mr. McGurk sent to you from the same

24   article from the U.S. copyright office under the title

25   "transfer of copy."

1    It states, quote, any or all of the copyright

2    owner's exclusive rights or any subdivision of those

3    rights may be transferred, but the transfer of exclusive

4    rights is not valid unless that transfer is in writing and

5    signed by the owner of the rights conveyed or such owner's

6    duly authorized agent.

7    Do you recall receiving that article?

8    A.    I do.

9    Q.    Okay.  Sir, do you know if Allan Kovin ever

10   provided you with a written and signed transfer of his

11   rights in the house and pestle logo?

12   MR. McGURK:  Your Honor, I guess I'm going to have

13   to object because of the fact that we have introduced that

14   transfer.

15   A.    Allan Kovin -- I kept Allan Kovin out of this as

16   long as I could.  And when --

17   THE COURT:  Hold on a second.  Hold on a second

18   Miss Deeter, there's an objection.  And the Court's going

19   to overrule the objection and consider it for its weight

20   and not the admissibility of it in terms of whether there

21   was or was not an agreement to transfer.

22   MR. SCHUVER:  I'm asking what her knowledge is.

23   THE COURT:  What her knowledge is, yeah.

24   Q.    (BY MR. SCHUVER)  Would you like me to repeat the

25   question to you or do you recall it?

1    A.        I would like you to repeat it, please.

2    Q.        Okay.  Let me ask you this:  Are you aware whether

3    or not Mr. Kovin, Allan Kovin or Kovin Design, ever

4    prepared a written and signed document transferring any

5    rights in the house and pestle logo to anybody?

6    A.        On Plaintiff's Exhibit No. 76 is the only document

7    I am aware of that Allan Kovin had signed.  And this came

8    about after an attorney for Mr. Schaltenbrand contacted

9    Allan and offered to purchase the logo from him.

10   Q.        And that --

11   A.        At that point --

12   Q.        I'm sorry, go ahead, didn't mean to cut you off.

13   Go ahead.

14   A.        Well, that's Plaintiff's Exhibit No. 76, that is

15   one I know of, and 77, both of those.

16   Q.        And that document of course is, that document of

17   course is dated March 20, 2012; is that correct?

18   A.        That's right.

19   Q.        And it's your understanding that this assigns

20   rights in the logo to you, Linda Deeter; correct?

21   A.        Well, the one says that Allan and I are

22   transferring it to DeliverMed Holdings.

23   Q.        At the time that you joined this lawsuit, you

24   obviously -- back in 2011, you did not have a written and

25   signed document from Mr. Kovin; is that correct?

1    A.      That's right.  I didn't.  I didn't want to involve

2    him in this.

3    Q.      The written and signed document that you have from

4    Mr. Kovin states that he received good and valuable

5    consideration for the assignment to you.

6            Did you pay Mr. Kovin anything on or after March

7    20, 2012, in consideration for the signing of that

8    document?

9    A.      No, I did not.

10   Q.      At any time, Ms. Deeter, did Mr. Schaltenbrand,

11   Mr. Siddle, or anyone from Medicate Pharmacy ever threaten

12   to pursue a claim against you or anyone else for use of

13   the house and pestle logo?

14   A.      Would you repeat that, please?

15   Q.      Sure.  I'm asking you this, let me start with

16   Michael Schaltenbrand.

17           Did he ever tell you that he was going to pursue

18   any type of legal action, any type of a claim against you

19   or anyone else for any type of infringement or use of the

20   house and pestle logo?

21   A.      Are you asking if I used the house and pestle

22   logo --

23   Q.      I'm asking you if Mr. Schaltenbrand ever

24   threatened to file or pursue any type of action against

25   you in that regard.

1    A.        No, not that I know of.

2    Q.        Same thing with Joey Siddle.  To your knowledge

3    he's never threatened or taken any action for any type of

4    infringement or use of the house and pestle logo?

5    A.        I don't know Joey Siddle.

6    Q.        And same question for Medicate Pharmacy.  You're

7    unaware of them taking any such action?

8    A.        Right.

9            MR. SCHUVER:  I think that's all the questions I

10    have, Judge.

11            THE COURT:  Mr. McGurk.

12            MR. McGURK:  Very brief, Your Honor.

13                    REDIRECT EXAMINATION

14    BY MR. McGURK:

15    Q.        I try and avoid saying I'll be short.  I'm

16    sensitive about that.

17            Mrs. Deeter, there has been some discussion about,

18    about payments to you here.  When you received a telephone

19    call from Mr. Schaltenbrand, how much did he offer you for

20    your interests in the logo?

21    A.        I don't believe I recall a specific amount of

22    money.  I didn't know who he was and I was so taken aback

23    by getting a call from someone about a logo I had created

24    previously, our company had created previously that I

25    don't believe I even got to that conversation.

1    Q.        Are you aware in this litigation that Mr.

2    Schaltenbrand has filed a counterclaim in this case

3    seeking to declare the logo created by Deeter as being

4    invalid?

5            MR. SCHUVER:  Objection.  She's already testified

6    she hasn't reviewed the pleadings.

7            THE COURT:  Overruled.

8    A.        No, I'm not aware.

9    Q.        (BY MR. McGURK) Who is Mr. Jeff Toner, T-O-N-E-R?

10   A.        He is our corporate attorney here, the attorney

11   for our business.

12   Q.        Did Mr. Jeff Toner have the opportunity of

13   reviewing the agreements that you have reviewed this

14   afternoon?

15   A.        Yes, he did.

16   Q.        And he made some changes to those?

17   A.        I believe he did.

18   Q.        On the issue of payments, you paid Kovin Design

19   because that's what Mr. Allan Kovin asked you to do; isn't

20   that correct?

21   A.        Yes.

22   Q.        In the same way that when you perform work you ask

23   payments be made to Deeter, the firm?

24   A.        That's correct.

25   Q.        Do you in fact intend that Mark Swift and

1    DeliverMed have the ownership of the logo in this case?

2    A.        Absolutely.

3            MR. McGURK:   I have no further questions.   Thank

4    you.

5            THE COURT:   Any follow-up?

6            MR. SCHUVER:   No, Judge.

7            THE COURT:   I just have a couple curiosity

8    questions, I guess.

9            THE COURT:   Where did, if -- first of all the

10   Court is going to deny the striking of Plaintiff's Exhibit

11   44, the substance of that exhibit, Plaintiff's Exhibit 44

12   and Defendant's Exhibit 9 is basically the same.

13   Defendants have had an opportunity to cross-examine Miss

14   Deeter on essentially the same document.

15           But I'm kind of curious why Plaintiff's Exhibit 44

16   just appeared just in the last few weeks and who it came

17   -- did it come from Mr. Toner and why wasn't it produced

18   -- I know, Mr. Cox, you said you received it from, from

19   Ms. Deeter's attorney.   Was that Mr. Toner?

20           MR. COX:   Mr. McGurk received it from Mr. Toner

21   and I forwarded it on.   He gave it to me.   If I can

22   explain, the reason -- what triggered this whole thing,

23   Judge, was they had just before that time, March 28th,

24   filed a motion in which they were claiming that they

25   didn't have a signed copy of it, in other words, with her

1    signature.  I then contacted Mr. McGurk and asked him to

2    obtain that.

3         He contacted Ms. Deeter's attorney, who had a copy

4    of it, who sent it to us on March 28th, to Mr. McGurk.  He

5    forwarded it to me.  I marked it immediately and forwarded

6    it to the defendants.  And that's how that came about.  We

7    had the unsigned version but we, that caused me to want to

8    get, or to find the signed version, follow-up with it, and

9    I did that and got it and sent it on.

10        THE COURT:  And I assume that unsigned version

11   was, was tweaked by Mr. Toner?  Because there is -- there

12   are some differences here.  Who --

13        MR. COX:  Apparently so.

14        THE COURT:  Who --

15        MR. COX:  Apparently so.

16        THE COURT:  Who made changes?

17        MR. COX:  That, I can't say.  I wasn't involved in

18   it.

19        THE COURT:  Well, Mr. McGurk, maybe you can shed

20   light on it.

21        MR. McGURK:  Yes, Your Honor.  For the record,

22   that draft was provided to Ms. -- Mrs. Deeter and to her

23   counsel and there were some suggestions, revisions made by

24   Mr. -- by counsel for Ms. Deeter.  And those revisions

25   were included in the final draft for signature for all

1    parties.

2         THE COURT:  But at the time of her deposition the

3    signed version was, was nowhere to be found?

4         MR. McGURK:  That was the problem, we were going

5    through the records, my records, as well as DeliverMed's

6    records and we were unable to locate that until we were

7    able to get it from Mr. Toner.

8         THE COURT:  But I said that the essential

9    substance of the documents are the same and so the Court's

10   going to deny defendant's motion to strike.

11        MR. McGURK:  Thank you, Your Honor.

12        THE COURT:  44 will be admitted.

13        Okay.  Thank you, Miss Deeter.  And I guess you

14   could almost go to dinner now.  We have gone through

15   lunch, you can almost go to dinner.  So you are, you are

16   excused.

17        THE WITNESS:  Thank you.

18        MR. SCHUVER:  Judge, housekeeping on admitting --

19        THE COURT:  And that can be done.  I think we have

20   a call coming in in 10 minutes from Chicago.

21        MR. SCHUVER:  Thank you, Your Honor.

22        THE COURT:  Okay.

23        (Court recessed from 2:20 p.m. to 2:32 p.m.)

24        THE COURT:  Okay, you can admit exhibits, Mr.

25   Schuver.

1           MR. SCHUVER:  Defendant's Exhibits 3.  Do you want
2    them individually or --
3           THE COURT:  Just jointly.
4           MR. SCHUVER:  3, 9, 12, 21, 33 and 47.  I think
5    that was all.
6           THE COURT:  Any objection?
7           MR. McGURK:  No objection.
8           THE COURT:  They'll be admitted.
9           (Off the record.)
10          THE COURT:  Go ahead and swear the witness in.
11          (Witness sworn by clerk.).
12          THE WITNESS:  Craig L. Greene, G-R-E-E-N-E.
13                    CRAIG L. GREENE,
14    having been first duly sworn, was examined and testifies
15    as follows:
16                    DIRECT EXAMINATION
17    BY MR. McGURK:
18    Q.     Mr. Greene, can you tell us the name of your firm?
19    A.     (Pause.)
20           (Off the record, video conference technical
21    issues.)
22    Q.     Mr. Greene, can you please tell us the name of
23    your firm?
24           (Off the record.)
25           VIDEO TECHNICIAN:  The only other option is to do

1    this by phone.

2              THE CLERK:  And we could do that.

3              THE COURT:  I understand.

4              VIDEO TECHNICIAN:  The only other option if it

5    keeps dropping is to do this by phone conference.

6              THE COURT:  I understand.

7    Q.    (BY MR. McGURK) Mr. Green, what is the name of

8    your firm?

9    A.    McGovern and Greene LLP.

10   Q.    Mr. Greene, what is your occupation?

11             (Off the record, video conference technical

12   issues.)

13             THE COURT:  Well, we have a couple options, we can

14   either do this by telephone or wait until he comes down

15   here later this week or first of next week and have him

16   testify in person.  Those are the two options.

17             MR. COX:  Is there a -- just a minute.  Is there a

18   place in Chicago where he could go and do the same thing

19   and not do it through the court there, by an outside

20   service of some kind?

21             THE COURT:  That I do not know.

22             (Off the record.)

23             MR. COX:  That might be an alternative for him to

24   come and set it up that morning, it's an idea.

25             MR. STINE:  I'm fine.

1     THE COURT:  Okay, we're back.

2     MR. McGURK:  Shall we try and soldier on?

3     Q.     (BY MR. McGURK) Mr. Greene, what is your

4     occupation?

5     A.     I'm a Certified Public Accountant, forensic

6     accountant with McGovern and Greene.

7     Q.     What do you mean by the term forensic accountant?

8     A.     What I mean by that term is that we provide

9     accounting services to a wide variety of clientele,

10    attorneys, corporations and the like, in matters where

11    there's potentially some litigation that may or may not be

12    filed and we do analysis to help the attorney in those

13    sorts of cases or the client.

14    Q.     Can you very briefly describe your educational

15    background?

16    A.     Yes, I possess a Bachelor's Degree in Accounting

17    from Aurora University.  I graduated in 1976.  I have a

18    Master's Degree in Criminal Justice from Boston University

19    in 2007.

20    THE COURT:  Is there a CV?

21    MR. McGURK:  Yes, Your Honor, attached as Exhibit

22    1 to Plaintiff's Exhibit 3 is Mr. Greene's CV.

23    THE COURT:  Okay.  Just, you know, that will

24    stand.  You don't have to go through everything.  I can

25    look at the CV and see his qualifications.

1        MR. McGURK:  Very well, Your Honor.

2   Q.      (BY MR. McGURK) And Mr. Greene, just -- and this

3   is one brief point.

4   A.      That's fine.

5   Q.      Have you ever acted as an instructor for any

6   federal law enforcement agencies?

7   A.      Yes, I have.

8   Q.      For whom?

9   A.      Yes, I teach contract and procurement fraud for

10  the Naval Criminal Investigative Services at the Federal

11  Law Enforcement Training Center in Glynco, Georgia.

12  Q.      In terms of basic accounting, which we may touch

13  on, have you ever been an accounting instructor?

14  A.      Yes, I have.  I taught principles of accounting at

15  Aurora University in 1977, I believe.

16  Q.      And are you being compensated for your work as an

17  expert witness in this case?

18  A.      Yes, I am.

19  Q.      First of all, I'm going to ask you if you have a

20  copy of what's been previously marked as Plaintiff's

21  Exhibit 3, which is the expert report of Craig L. Greene.

22  Do you have a copy of that?

23  A.      Yes, I do.  Yes, I do.

24  Q.      All right.  I'm going to ask everyone to turn to

25  page 11 of 11, our first order of business.  And at the

1    bottom, what is the date beside your signature?

2    A.        The date reads January 10th, 2011.

3    Q.        And what should the date read?

4    A.        The date should read January 10th, 2012.  That was

5    a typo that I made.

6    Q.        I'll correct that on its face.

7              In addition, did your firm McGovern Greene prepare

8    two other reports in this case?

9    A.        Yes, our firm did.

10   Q.        This will be very brief, but I'm going to ask you

11   if you have a copy of Plaintiff's Exhibit 1, which is the

12   report of findings of McGovern Greene dated May 17th,

13   2010.

14   A.        Yes, I do.

15   Q.        Was this prepared by your firm and under your

16   supervision?

17   A.        Yes, it was.

18   Q.        And then referring to Plaintiff's Exhibit 2, the

19   stock valuation report dated June 7th, 2010, I ask if this

20   was prepared under your supervision?

21   A.        Yes, it was.

22   Q.        Are you, is the report, Plaintiff's Exhibit 3, the

23   most current work that you have done on this matter?

24   A.        Is that the report that's dated the June 10th,

25   2012, sir?

1    Q.        I'm sorry, the January -- Plaintiff's Exhibit 3,

2    the one dated January 10, 2012, that's correct.

3    A.        Correct, yes, sir, that's the most recent report

4    that I have prepared.

5            MR. McGURK:  Most of our, the testimony will be

6    relating to Plaintiff's Exhibit 3, the 2012 report, but

7    there are certain aspects that may be referred to in the

8    prior exhibit.

9            THE COURT:  Okay.

10           MR. McGURK:  So for simplicity sake I would simply

11   move to admit everything and then we can go through the

12   individual ones.

13           THE COURT:  Any objections?

14           MR. STINE:  Judge, I do have an -- I mean, I don't

15   know what kind of foundation he plans to lay for 1 and 2.

16   If 3 is their report, I just want -- if he's just going to

17   be referring to exhibits in 1 and 2, I don't have a

18   problem with that.  But I mean, I think they have to lay

19   some foundation for this report before it's admitted.

20           THE COURT:  I assume he'll be doing that as he

21   goes along, and the Court's going to admit it and it will

22   go to the weight and not the admissibility.

23           MR. McGURK:  Thank you, Your Honor.

24   Q.       (BY MR. McGURK) Now, Mr. Greene, what was your

25   assignment in this matter?

1    A.        My assignment in this matter was to review various

2    financial documents of the relationship between Medicaid

3    pharmacy -- Medicate Pharmacy, rather, and DeliverMed.  I

4    examined various tax returns.   And in so examining them, I

5    determine what unpaid commissions were due to Mark Swift.

6    I also examined wages and determined the amount of unpaid

7    wages that were due to Mr. Swift.  I looked at the

8    distributions that were taken by Mr. Schaltenbrand and

9    determined what the distributions should have been to Mr.

10   Swift.   I also ascertained an amount that was due for some

11   excess box filling charges that were due to Mr. Swift.

12   And finally, using the methodology of Medicate Pharmacy's

13   accountants, I computed a value, a range of values for Mr.

14   Swift's interest in that company.

15   Q.        And turning to page 5 of 11 of Plaintiff's Exhibit

16   3, which is the January 2012 expert report, does the

17   summary of opinions reflect the amounts that you, that you

18   have derived from your review?

19   A.        Yes, it does.

20   Q.        Referring to the Exhibit 3 of this, which is the

21   very, at the very end of the Exhibit 3, that is, say

22   Exhibit 3 say of Plaintiff's Exhibit 3, can you tell us

23   what that is a listing of?

24   A.        These are a listing of the various documents that

25   I considered and relied upon in forming my opinions in my

1    expert report.

2    Q.      Referring to paragraph or point 10, what is the

3    most current general ledger that you reviewed for the

4    Medicate Pharmacy Washington Park entity?

5    A.      It was dated November 30th, 2011.

6    Q.      So all of the activity from November 30th, 2011,

7    to the present is not reflected in your report?

8    A.      That is correct.

9    Q.      Now --

10   A.      Just to clarify that point, in determining the

11   amount of wages that were due to Mr. Swift, I did consider

12   through the period of February 2012.

13   Q.      We will reach that point after we deal with point

14   one, which is unpaid shared profits.  And I'm going to ask

15   you to turn to page 7 of 11 of the January 2012 expert

16   report, Plaintiff's Exhibit 3, and ask if you can tell us

17   based upon this section how you determined the unpaid

18   shared profits for the time period listed?

19   A.      Sure.  It was -- Mr. -- Miss Sickon and Mr. Swift

20   were to receive 40 percent of the profits that were made

21   on the mail order sales business of Medicate Pharmacy.

22   And during discovery in this case, it was disclosed that

23   there were other financial statements that I had

24   previously not seen that showed the profits for that

25   particular enterprise under Medicate DeliverMed.  And what

1    I have done here is put together a table that lists the

2    years 2005 through 2007, and I reflect the net income that

3    is shown on the financial statements that were prepared by

4    the company's accountants Schaltenbrand and Schaltenbrand,

5    and I have cited here the various references to those

6    documents.   And I take that amount of net income and then

7    I multiply it by the portion that was due to either Sickon

8    or Swift in the amount of 40 percent.

9           So, for example, in the first row, I show the

10   profits as shown in the financial statements of $404,000.

11   I multiply that by 40 percent, which results in the

12   computation of $161,635.   From that, I deducted the amount

13   as of payments that were given to Sickon and Swift, and

14   the remaining amount due, the 145,933, is what I have

15   computed for the year 2005.

16          Likewise, I made that same computation for the

17   years of 2006 and 2007, where I show the profits as

18   determined by the outside accountants, multiply it by 40

19   percent, subtract the payments that were made to Swift and

20   Sickon, and determine the remaining amount that's due.

21          There was a payment in 2009, a lump sum payment of

22   129,000 which I also reduced the amount due the two of

23   them in determining the unpaid share of profits at

24   $860,647.

25   Q.      And the references in brackets, PP-927, for

1  example, what does that refer to?

2  A.     These are documents that have been produced in the

3  case, the Bates stamp number.  I believe the PP stands for

4  previously produced.

5  Q.     Now, referring to 2009, was that 129,000 actually

6  two lump -- payments of 60,000 and then 69,000?

7  A.     Yes, sir, it was.  It was two payments.

8  Q.     Now, turning to the unpaid salary component

9  starting at the bottom of page 7 and then continuing over

10  to page 8 of 11, can you tell us how you computed that

11  figure.

12  A.     Certainly.  As I point out in my report, in

13  mid-2008 Mark Swift was reviewing the financial records

14  that again were maintained by Schaltenbrand and

15  Schaltenbrand for the pharmacy and determined that Mr.

16  Schaltenbrand was in fact receiving a

17  thousand-dollar-a-week payment for a salary.  He

18  approached Mr. Schaltenbrand about that.  And when

19  confronted with the fact, Mr. Schaltenbrand agreed to pay

20  Mark Swift $151,000.  The agreement was to be over a

21  12-month period of time and the amount of $12,583 per

22  month.

23        In examining the accounting records, we determined

24  8 of the 12 payments were made through August of 2009 and

25  the remaining four payments were not.

1    Excuse me, I have a little bit of a head cold

2    coming on.

3    So as a result, $50,333 representing the portion

4    from September 2009 through December 2009 was not made.

5    And that is what I show up on my first number

6    there, the 50,333 represents what's still unpaid for the

7    years 2005 through 2007.

8    After Mr. Schaltenbrand terminated Mr. Swift, he

9    did not pay him the remaining amounts due for 2009, which

10    is computed at 15 weeks for a total of $15,000.

11    I have also computed the years 2010 and 2011 as

12    simply the number of weeks in the year, 52, times the

13    thousand, is $52,000.

14    Q.    And for --

15    A.    And for 2012, through the date of my report, seven

16    weeks had passed so that amount was $7,000.

17    So when you sum these numbers up, you arrive at a

18    total amount of unpaid salaries of $176,333.

19    Q.    At the time of your report was the scheduled trial

20    date in this matter February 21st?  And is that why you

21    used that date?

22    A.    That is correct, sir.

23    Q.    So we would simply take from the beginning of the

24    year to today's date, times a thousand to calculate what

25    the figure would be for 2012; is that correct?

1    A.      That, that is correct.  I calculated additional 10

2    weeks since that date til today.

3    Q.      Additional 10 weeks at $10,000 [sic] a week --

4    $10,000?

5    A.      At a thousand dollars a week or $10,000, correct.

6    Q.      Now, Mr. Swift and Mr. Schaltenbrand had the

7    agreement that since Mr. Schaltenbrand was receiving a

8    thousand dollars a week from the mail order operation, Mr.

9    Swift was to be receiving that amount.  And in fact he did

10   receive that during 2008 and all the way through the date

11   of his, his termination.  Do you understand that?

12   A.      Yes, I do.

13   Q.      Well, if Mr. Schaltenbrand increased his salary

14   from a thousand dollars a week to a substantially higher

15   salary, would that agreement mean that Mr. Swift should

16   not be receiving merely a thousand dollars a week but the

17   higher salary?

18           MR. STINE:  Your Honor, I'm going to object, I

19   haven't been saying much up until now --

20           THE COURT:  I'm going to sustain that.

21   Q.      (BY MR. McGURK) Let's turn to unpaid distribution

22   starting on page eight at the bottom.

23           First of all, what, can you briefly describe what

24   a sub S corporation, or what I guess today is referred to

25   as an S corporation, what is that?

A.        Yes.    An S corporation is originally formed as a
tax entity to be used by small businesses to alleviate the
burden of double taxation.    Under the internal revenue
code, corporations pay a tax on their corporate earnings.
And when they pay their shareholders, they distribute
those funds typically as dividends and those are taxed as
well at the individual's tax rate.    In order to relieve
this extra burden on small businesses, some years ago a
new entity or a new tax entity, if you will, was formed
called a subchapter S corporation, wherein if you were a
small business and you met the requirements of that, you
know, of a small business corporation, your shareholders
at that time I think was less than 25 or 30 shareholders,
and your revenues were below a certain amount, you could
elect under the internal revenue code to be treated as
this subchapter S corporation.

        And instead of the profits being taxed at a
corporate tax rate, rather the profits of the company were
distributed to the owners of the company based upon their
pro rata share of ownership, and the individuals would
report that amount of income or loss on their personal tax
returns.    So it would eliminate this double taxation.

Q.        Now, in the circumstance of the case here, did you
understand that there was an agreement between Mr. Swift
and Mr. Schaltenbrand concerning distributions of profit

1    from the endeavor?

2    A.        It was my understanding that Mr. Swift had a

3    percentage ownership of the endeavor and that therefore

4    would participate in those profits.

5    Q.        Can you explain your calculations on page 9 of 11

6    in terms of the distributions to Mr. Schaltenbrand, what

7    is the source of that information?

8    A.        Certainly.  The distributions shown to Mr.

9    Schaltenbrand, those figures come directly off of the tax

10   returns that were filed for Medicate with the Internal

11   Revenue Service for the tax years ended December 31, 2008,

12   2009, and 2010.  The amount of distributions shown as of

13   November 2011, that amount comes from the financial

14   statements prepared by Schaltenbrand and Schaltenbrand for

15   the Medicate Pharmacy.

16            So these amounts here represent payments from the

17   companies made directly to Mr. Schaltenbrand as a

18   distribution of the, it appears the profits of that

19   subchapter S corporation, to him.

20   Q.        And again, the end date here is November 30, 2011,

21   and does, therefore does not reflect any distributions to

22   Mr. Schaltenbrand from that date to the present date; is

23   that correct?

24   A.        That is correct.

25   Q.        Now, how is it you calculate the pro rata

1    distributions due to Mr. Swift?

2    A.        Under the internal revenue code, as a subchapter S

3    corporation, when distributions are made the distributions

4    must be made to all shareholders.  And those distributions

5    have to be paid based upon the percentage ownership in the

6    company.

7            In this particular case, Mr. Schaltenbrand had

8    showed a 52 and a half percent interest in the company.

9    So what I did was, it was my understanding that Mr.

10   Swift's interest was 37 and a half percent, based on some

11   e-mail correspondence that I had reviewed.  So what I did

12   was I simply took the 37 and a half percent which

13   represented Mr. Swift's ownership, divided it by the 52.5

14   percent amount which represented Mr. Schaltenbrand's

15   ownership, and determined that for every dollar that Mr.

16   Schaltenbrand took out, then under the internal revenue

17   code Mr. Swift should have also been distributed in this

18   case 71.43 cents, or 71.43 percent of what Mr.

19   Schaltenbrand has taken.

20           So, for example, in 2008 I have taken 71.43

21   percent of the 935,399 of Mr. Schaltenbrand to determine

22   what the pro rata distribution to Mr. Swift should have

23   been, which is shown as a $668,142.

24   Q.        Did that pro rata distribution calculation change

25   or did you change the amount for years after 2008?

1    A.        Yes, I did.

2    Q.        How is it you choose that?

3    A.        For years after 2008, it's my understanding that

4    Mr. Swift's ownership percentage was reduced from 37 and a

5    half to 35 percent, and that Mr. Schaltenbrand's ownership

6    was reduced from 52.5 percent to 51.  So following the

7    same formula, I simply took Mr. Swift's percentage of 35

8    percent, divided it by 51 percent, to arrive at 68.63

9    percent.  So in this particular instance, for every dollar

10   that Mr. Schaltenbrand was paid under the internal revenue

11   code, Mr. Swift should have received 68.63 cents, or, so

12   68.63 percent of what Mr. Schaltenbrand took.  And that is

13   the figures that I applied for the years 2009 and

14   subsequent.

15   Q.        Mr. Greene, the distributions that are reflected

16   on page 9 of 11 to Mr. Schaltenbrand are taken from the

17   tax returns; is that correct?

18   A.        Yes.  Those -- well, for the years 2008 through

19   2010, those come directly from the tax returns that I was

20   given for Medicate Pharmacy.  For the year 2000 --

21   November 2011, it came from their accounting records.

22   Q.        Well, I want you to assume for purposes of my

23   question that, that some error had been made and in fact

24   the Medicate Pharmacy was not as profitable as, as the

25   financial statements reflected originally and therefore it

1    was less profitable.  Would that change your opinion as to

2    the amount owed to Mr. Swift?

3    A.        No, it would not.

4    Q.        Why?

5    A.        There's a difference here.  These represent actual

6    distributions or amounts of money that were paid from the

7    company directly to Mr. Schaltenbrand.  So those payments

8    have been made and those have been classified as

9    distribution.

10           And again, under the internal revenue code, if one

11    shareholder takes distributions then the other

12    shareholders must receive the same amount of distributions

13    or must receive distributions based upon their pro rata

14    percentage of ownership.

15           So whether or not it was more profitable or less

16    profitable would not impact that because the distributions

17    had already been paid out in these amounts.

18    Q.        Turning to the bottom of page 9 of 11,

19    reimbursement for excess box filling charges, can you

20    explain what that entry refers to?

21    A.        I reviewed an a e-mail that was prepared by Mr.

22    Siddle.  And Mr. Siddle was the, I believe the operations

23    manager for Medicate Pharmacies.  And what he discovered

24    was that there was a error in the amount of box charges

25    that were applied to diabetic supplies.  It should have

1    been charged in the amount of $15, in fact it had been

2    charged at the amount of $20 for this period of August

3    2005 through July 2008.

4         Mr. Siddle computed the amount of overcharges and

5    the amount of allocation of those overcharges to both

6    himself and Mr. Swift.  The amount that he computed for

7    Mr. Swift was $30,132.  And that is the figure which is

8    shown on the bottom of page 9.

9    Q.     Now let's turn to page 10 of 11, business

10   valuation.  First of all, how did you compute the figures

11   on page 10 of 11 of your report of January 2010.

12   A.     What I did in this particular computation was, I

13   used the methodology that had previously been used by

14   Medicate's accountants Schaltenbrand and Schaltenbrand

15   where they multiply profits by a weighted average factor

16   to determine value.  So what I have done is basically use

17   their formula and inserted into the formula numbers for

18   net profit for the years 2005, 2006 and 2007 that were

19   shown in the financial statements that we subsequently got

20   that were previously undisclosed and discussed in the

21   beginning of my testimony with regards to commissions.  I

22   put those net profits in there.  And then using their

23   methodology, multiplied those profits by these three

24   factors, 1, 2 and 3, to determine what a weighted average

25   amount would be.

1        And when we as accountants do weighted average, we

2    multiply it -- we give more weight to the more recent

3    years, and that's why the year 2007 is multiplied by 3.

4        So you determine a subtotal figure which is shown

5    there at the 8,080,436.  We then divide that number by 6,

6    which is the sum of the factors that were used, the 1, the

7    2, and the 3, and that gives me a weighted average income

8    for those three years of 1,346,739.

9        I multiplied that figure by the number of 7, which

10   again is the methodology that was used by Schaltenbrand

11   and Schaltenbrand, to come up with a total value of

12   $9,427,175.  So that's just simply multiplying the

13   weighted average by what we'd call a cap rate of 7 to

14   arrive at this 9.4 million.

15       Now I then took various ownership percentages

16   attributed to Mr. Swift.  I have shown the amount, if he

17   were to have a 40 percent ownership, then I would multiply

18   that 9.4-million-dollar figure by 40 percent and arrive at

19   the 3,778,870.  And I have shown it for 37 and a half

20   percent and 35 percent.  And I'm just simply taking that

21   9.4 million and multiplying it by those representative

22   percentages to give a range of value between 35 percent

23   and 40 percent for Mr. Swift's ownership.

24   Q.    Now, Mr. Greene, is it not true that there are

25   many, many different methods of valuation for valuing

1    businesses?

2    A.       Yes, there is.

3    Q.       However, did you have occasion to review the

4    Handbook of Small Business Valuation Formulas specifically

5    as to a methodology for use as to drug stores?

6    A.       Yes, I have.

7    Q.       You cannot see the camera --

8            MR. STINE:  Your Honor, I'm going to object unless

9    -- I mean, is that disclosed on his report?

10           MR. McGURK:  It was one of the documents he refers

11   to the methodology that he, he thought was, was reasonable

12   by --

13           MR. STINE:  Can you -- I'm not saying he didn't,

14   can you show me in the report wherever it was disclosed,

15   where he reviewed that publication.

16           MR. McGURK:  Yes.

17           MR. STINE:  I'm entitled to see what he looked at.

18   Q.       (BY MR. McGURK) All right.  First of all, let's go

19   back in terms of the, the methodology.  The methodology

20   used by the Schaltenbrand and Schaltenbrand firm that you

21   have described here, is that accepted?  Is that a standard

22   methodology?

23   A.       It appears to be, yes.

24   Q.       Now --

25   A.       Yes.

1    Q.        -- is this calculation a formal valuation of the

2    company under the professional standards?

3    A.        No, it is not.

4    Q.        And are you simply using the calculations, the

5    methodology used by the Schaltenbrand and Schaltenbrand

6    firm in plugging in the numbers from the financial

7    statements?

8    A.        Yes, I am.

9             THE COURT:  I'm going to jump in here and ask --

10            MR. McGURK:  Yes.

11            THE COURT:  -- why a cap of 7 on the times?

12            THE WITNESS:  Essentially that was the method that

13    was used by Schaltenbrand and Schaltenbrand, and I simply

14    changed the amount of net profits based on the financial

15    statements.  But that is the cap rate that they used.

16            THE COURT:  What is the cap rate?

17            THE WITNESS:  The cap rate is a multiple of

18    earnings to determine what the value is.  When you think

19    of an investment, when you invest money into a bond, you

20    receive a portion called interest, and that interest is

21    the earnings on that investment.  It's kind of the same

22    thing with a cap rate.  If you, for example, Your Honor,

23    if you invested $100,000 and you were receiving 5 percent

24    interest, then each year you would receive $5,000.  Since

25    the cap, since it's 5 percent, then that's a cap rate of

1    20.   Twenty times the 5,000 would take you back to the

2    amount of the investment, which would be $100,000.

3          When businesses are valued, they typically use a

4    cap rate and multiply that times some form of earnings or,

5    you know, there's various methods but it could be net

6    income, it could be cash flows, to determine value.   And

7    the cap rate is a measure that can be applied based upon

8    the risks and profitability of the business.   In this

9    particular case, the cap rate was chosen by Schaltenbrand

10   and Schaltenbrand to be the number 7.   So if you think

11   that would be the equivalent of, what, roughly a 13

12   percent return, multiplying 13 by 3 is 91, a little bit

13   more than that, I'm sorry, about 13 and a half percent

14   return.

15         But that cap rate was selected by them.   I did

16   review the publication that Mr. McGurk is referring to.

17         MR. STINE:   Your Honor, I'm --

18         THE COURT:   Okay, you have answered my question.

19   Go ahead.

20   Q.    (BY MR. McGURK) Now referring to page 7 of 11 of

21   your report, you refer, you use the years 2005 through

22   2007.

23   A.    Correct, to determine the amount of unpaid

24   commissions and profits.

25   Q.    And referring to page 10 of 11, you also use the

1    years 2005 through 2007?

2    A.        Correct.

3    Q.        Why do you use those three years?

4    A.        I used those three years because the only set of

5    financial statements that appear to properly account for

6    this entity were the ones that have recently been

7    disclosed by Schaltenbrand and Schaltenbrand and --

8    showing that the DeliverMed Medicate's profits, and I

9    haven't been able to obtain any financial statements of a

10   like kind since that date.  So, to me that's the most

11   reliable set of financial statements I can use to, to

12   determine that computation.

13   Q.        Now, if you were to be advised that there was

14   another bank account reflecting activity at another bank

15   by the entity and those receipts were not included in the

16   financial statements for the years 2005 through 2007, that

17   obviously would mean your calculation would be low; is

18   that correct?

19   A.        It may be.  I mean, I don't know what -- you know,

20   again, you'd have to try to determine what impact this,

21   this additional information may have on the profits of the

22   business.

23   Q.        Now let's turn to the issue of, of commingling.

24   What do you understand that term to mean in terms of, of

25   businesses?

1        MR. STINE:  Your Honor, I'm going to object.  I

2   don't see any place in his report that he uses the word

3   commingling.  He has given no opinions on commingling and

4   now we're asking him to talk about it.  I don't know

5   where --

6        THE COURT:  Mr. McGurk, are you -- are you

7   switching subjects now or --

8        MR. McGURK:  Well, I, I'm trying to demonstrate,

9   Your Honor, that this report is, accepts the financial

10  statements provided by Schaltenbrand and Schaltenbrand.

11  And to the extent that those financial statements include

12  the costs of other entities, that certainly should be a

13  factor that the Court should consider in terms of

14  determining the issue of valuation.

15       THE COURT:  So you are talking about commingling

16  other businesses into this --

17       MR. McGURK:  That's right.  In other words, if, if

18  other -- if the expenses, for example, the expenses of DME

19  are being paid through Medicate Pharmacy Central, that

20  factor certainly is --

21       THE COURT:  I understand.

22       MR. McGURK:  Do you understand?

23       THE COURT:  I will admit it for, and will consider

24  it for whatever the, whatever the Court to consider -- I

25  will -- you can go ahead and inquire about that.  The

1    Court may or may not consider whatever the testimony is.

2          MR. McGURK:    Thank you.

3    Q.      (BY MR. McGURK) Mr. Greene, what do you understand

4    the concept of commingling to be in the concept of

5    businesses owned by a single owner?

6    A.      Yes, I do.

7    Q.      And what is that?

8    A.      Commingling typically means that there are

9    transactions that are related to either another entity or

10   transactions related to an individual that are paid by a

11   business entity for which no benefit is achieved.   In

12   other words, these are expenses that should have gone to a

13   different business entity or perhaps they're expenses of

14   an individual and as a result they should not have been

15   paid by this entity, and the entity received no benefit

16   from the expenditure of those funds.

17   Q.      Did you attempt in making your determination of

18   the unpaid share of profits due to Mark Swift, did you

19   attempt to break out any expenditures for other entities?

20   A.      No, I did not.

21   Q.      Now, turning to the concept of personal expenses

22   being paid by a corporate entity, if personal expenses are

23   paid by a corporate entity for the owner, are those

24   appropriate for determination of the profits of the

25   company?

1       MR. STINE:  Your Honor, I'm going to object again.

2   This witness has given no opinion that I can see on the

3   profits of this company.  He's given no opinion regarding

4   personal expenses versus corporate expenses.

5       THE COURT:  The Court's aware of that.

6       MR. STINE:  Okay.

7       THE COURT:  Okay.  The Court's aware of that.

8       MR. McGURK:  Rather than ask the question be read

9   back, Your Honor, may I restate it?

10      THE COURT:  Sure.

11  Q.      (BY MR. McGURK) First of all, Mr. Greene, is it

12  appropriate for personal expenses to be paid by a company

13  for the owner of the entity, and deducted from the

14  business profits?

15  A.      Typically, no.  No.  From an IRS standpoint, they

16  usually look at a test called ordinary and necessary

17  expenses of a business.  If those items that are paid are

18  not in fact related to that business then it would be

19  inappropriate to put them on the financial statements nor

20  deduct them on the tax returns.

21  Q.      And as with the issue of commingling, did you

22  attempt to do an analysis of the financial records of

23  Medicate Pharmacy to determine personal expenses paid that

24  were not appropriate?

25  A.      No, I did not.

1    Q.       A couple of basic questions.  In terms of

2    reviewing the books here, the financial books, can you

3    simply give us a, a brief explanation of, of the

4    relationship between the, the general ledger books of

5    account and then the tax returns, explain how those work

6    together?

7    A.       Certainly.  In accounting we have something, what

8    we call source documents, so when a business goes out and

9    pays its bills they write checks that are considered

10   source documents, when they incur expenses they get

11   invoices from a vendor which are considered source

12   documents.  When they sell their goods, they may invoice

13   their customers.  That's a source document.  When the

14   money comes into their business to pay for those goods,

15   that deposit is a source document.

16            In the world of accounting, what we do is that all

17   these various source documents are collected into what's

18   commonly referred to as journals.  Most small business

19   accounting systems have journals consisting of a sales

20   journal that accounts for all the sales of their goods or

21   services to their customers.  They have a cash receipts

22   journal that accounts for all the money that's paid in by

23   their customers for these sales of goods and services.

24   They have a cash disbursement journal which accounts for

25   all of the checks that are written out of the business for

1    its business expenses and other things.  They have

2    typically a purchases journal which records all of the

3    invoices for all of the items that are purchased by the

4    company.  And then they typically have a payroll journal

5    which records all payroll to their employees.  And I may

6    have missed some, but also a general journal where

7    accountants may make entries of a noncash nature or for

8    actions due to books and records.  These various journals

9    are summed up, especially in the old days when we used to

10   do it by hand, they would sum these journals up and the

11   totals of those journals would be posted or recorded into

12   a general ledger.

13         So the general ledger was a summary.  Accounting

14   is really a summary process.  Source documents are

15   accumulated, summarized into a journal.  Journals are

16   totalled, summarized, and put into what is called a

17   general ledger.  A general ledger is a listing of the

18   accounts of the business and entries are made from the

19   various journals to those accounts.

20         Accounts would include such things as the amount

21   of cash in the bank, amounts due from customers, amounts

22   due to vendors, the sales that are made by the company,

23   the expenses incurred such as occupancy, rent, telephone,

24   utilities, labor costs, advertising, marketing, all these

25   various accounts are listed in this general ledger.

1    What happens is, each month totals are posted from

2    the various journals often into the general ledger, but

3    today with our computer accounting system sometimes it's

4    posted in much more detail.  But in any event, the general

5    ledger then is totalled, typically once a month.  Those

6    totals show how much is expended by the various accounts.

7    And those figures then, in the old days, they would go to

8    another document, summarized into another document called

9    a trial balance.

10    From the trial balance, that was literally what

11    accountants would call it, to make sure that the books

12    were in balance.  Of course today with computers there's

13    much more accuracy.

14    From the trial balance, financial statements would

15    be prepared.  And those financial statements were used by

16    the owners, lenders, customers, you know, people like

17    that.  And in preparing a tax return, typically a tax

18    return, you would use a combination of the financial

19    statements and the underlying accounting documents that I

20    described in order to prepare the tax return.

21    Q.    Mr. Greene, what is treasury stock?

22    A.    Treasury stock is stock that has been previously

23    issued by the company.  What I mean by that is that the

24    shareholder, the owners of the company in a corporation

25    are issued what's called shares of stock.  They typically

1    pay in some amount for those shares of stock and often we

2    use something called par value.  And often par value is --

3    for example, a dollar a share.  Investors may in fact pay

4    much more than a dollar and when they purchase the stock,

5    it is accounted for as common stock and the additional

6    amounts of money beyond that is called additional paid in

7    capital.  So the stock is now issued to the shareholders

8    and they hold it.

9         For various reasons, from time to time companies

10   may decide to purchase the stock directly back from the

11   shareholders.  The reason that they do that is especially

12   in larger companies by purchasing back the stock, it

13   reduces the number of shares outstanding.  And when you

14   reduce the number of shares outstanding, then the

15   computation that we use called earnings per share goes up.

16   The reason why that's important is, in the markets today,

17   the capital markets, the larger or higher the earnings per

18   share is of the company, the more valuable the stock is.

19   So often there's an incentive for companies to buy their

20   stock back so that they could reduce the number of shares

21   outstanding.

22        When they buy the shares back, it's typically

23   referred to as treasury stock.  In other words, it's a

24   stock that's now been acquired y the shareholders that is

25   being held by the company within their treasury.  And they

1    have that stock now available to resell to other

2    shareholders should they so desire.

3    Q.      Returning -- turning -- I'm going to ask you to

4    turn to page 5 of 11 of your report.

5    A.      Okay.

6    Q.      I'm just going to use a handwritten sheet here to

7    just do some totals.  And the first entry is 860,000 --

8    I'm sorry, $860,647 for the 2005-2007 past profit; is that

9    correct?

10   A.      That's correct, the unpaid share of profits for

11   those years.

12   Q.      And the past wages, you had calculated through

13   February 21st of this year as being $176,333.

14   A.      That is correct.

15   Q.      And the unpaid profit distributions based upon the

16   distributions to Mr. Schaltenbrand were 642,269; is that

17   correct?

18   A.      Yes, it is.

19   Q.      And then the box fill item that you have testified

20   to is $30,132.

21   A.      Yes, sir.

22   Q.      The total we have come to here is $1,709,381.  All

23   right?

24   A.      I haven't done the math, but I trust.

25   Q.      Then using the midpoint of the valuation between

1    the 3.2 million and the 3.7 million, using 3.5, the total

2    value -- the total amount of all of these figures is

3    $5,209,381.   Do you see that?

4           MR. STINE:  He can't see it.

5    A.        To be honest with you, I can't see it.  I have not

6    done the math, sir, I'm sorry.  If you'd like me to, I

7    can, but --

8           MR. STINE:  Judge, we'll stipulate that that's

9    what that adds up to.

10          THE COURT:  All right.  I need to jump in here

11   right now.  It's scary when your law clerk is thinking the

12   same thing you are thinking.  And she handed me a note,

13   and I've been dying to ask this question but I think I

14   know the answer to it.

15          MR. STINE:  I hope you're not going to ruin my

16   brilliant cross-examination by preempting me.

17          THE COURT:  I might.  One and three, you know,

18   the, getting the 860,647 of unpaid share of profits and

19   the 642,269 unpaid profit distributions, are you talking

20   about the same thing just in different years?  I mean,

21   I've heard testimony about the, the 50 percent, 40 percent

22   and 10 percent, and then there was an adjustment.  And you

23   have unpaid share of profits for '05, '06 and '07 and then

24   you do the unpaid distributions of '08, '09 and '10.  But

25   are you really talking about the same thing, the same

1    percentage distribution?

2         THE WITNESS:  No, I'm not, Your Honor.  If I can

3    explain, I think I can clear this up.  The 860,647 --

4         THE COURT:  I know they come from different -- one

5    comes from financial statements and the other one comes

6    from I guess tax returns, I guess.  Go ahead.

7         THE WITNESS:  Correct.  But the 2005, '06 and '07,

8    this amount represents, what my understanding the

9    agreement was, before Mr. Swift was to become an owner and

10   a shareholder within the company.

11        And it's my understanding the agreement was, is

12   that Mr. Swift and Miss Sickon was to receive 40 percent

13   of the profits.  So, for the years 2005, '06 and '07,

14   those computations are the agreement that says, I will

15   give you 40 percent of the profits.  Now --

16        THE COURT:  Okay, what's the difference -- what's

17   the difference between that and the 642,000?

18        THE WITNESS:  Beginning in 2008, it then changes.

19   And instead of me giving you 40 percent of the profits, I

20   now make you an owner of the company.  And since the

21   company filed as an S corporation, what it did was it made

22   distributions to its shareholders.  In this case, the only

23   distributions that were made were to Mr. Schaltenbrand.

24        But what we're saying is, is that if Mr. Swift is

25   a shareholder of that company, then he should -- he, too,

1    should have received distributions for the years 2008,

2    '09, '10 and into '11.

3            THE COURT:   And the same -- hold on a second.

4    Would that be in the same percentage as before?

5            THE WITNESS:   Percentages --

6            THE COURT:   Pardon?

7            THE WITNESS:   No, sir.   The -- originally my

8    understanding was for the year 2008, the ownership was

9    37.5 percent by Mr. Swift, and then subsequent the

10   ownership changed to 35 percent by Mr. Swift.

11           THE COURT:   But you are still talking percentages?

12           THE WITNESS:   Yes, sir.   But these percent -- but

13   these distributions are not the same thing as net income.

14   Distributions are the amounts or the sums that Mr.

15   Schaltenbrand has taken out of the company.

16           Now, presumably they are distributions of income

17   but they are not the same thing as net income.

18           THE COURT:   Okay.   Go ahead.

19           THE WITNESS:   Does it help or still clear as mud?

20           THE COURT:   Clear as mud, but go ahead.   I think I

21   understand where you are coming from.

22           THE WITNESS:   In other words, the -- you know, you

23   have both the change in percentages but you also have a

24   change in the character of the agreement.

25           THE COURT:   Right.

1          THE WITNESS:  The original agreement was, I'll

2     share profits.  The new agreement is, you are now my

3     business partner and if you're my business partner then

4     you should receive distributions just as I do.

5          THE COURT:  Okay.  Go ahead.

6          MR. McGURK:  Those are all the questions I have,

7     other than we would offer Plaintiff Exhibits 1, 2 and 3.

8          THE COURT:  1, 2 and 3, they will be admitted.

9          MR. McGURK:  Thank you.

10          MR. STINE:  Judge, can we take just a one-minute

11     break?

12          THE COURT:  We'll take a 5-minute break.

13          (Court recessed from 3:39 p.m. to 3:47 p.m.)

14          THE COURT:  All right.  Okay.  We are back on the

15     record.  Cross-examination, Mr. Stine.

16                    CROSS-EXAMINATION

17     BY MR. STINE:

18     Q.     Mr. Greene, my name is Kevin Stine.  I'm one of

19     the attorneys representing the defendants in this case.

20     You've talked in your exhibit, Plaintiff's Exhibit 3, in

21     your later report about this new information that was just

22     discovered.  Are you just saying it was new to you?

23     A.     Well, it was my understanding that it was new to

24     the attorneys.  It was certainly new to me when I prepared

25     this report, yes.

1  Q.      Okay.  You weren't implying somehow that it was

2  hidden from you, were you?

3  A.      It was given to me by counsel earlier this year.

4  Q.      Okay.  If you would, turn to page eight of your

5  report, which I think is 6 of 11, but I'm going to refer

6  to the page numbers on the bottom.

7  A.      Yes, sir, 6 of 11, you say?

8  Q.      Yes.  And it's the first sentence of the paragraph

9  at the top that says "payments of profits were made to

10  Sickon under this agreement until mid 2007 and were to be

11  reported on the federal government form 1099."

12          Do you see that?

13  A.      Yes, sir, I do.

14  Q.      Okay.  What -- did you see any 1099s given to Ann

15  Sickon in reviewing any of the materials in this case?

16  A.      Not that I recall.

17  Q.      Would you have expected to see one?

18  A.      Well, I believe there was one issued in 2007 that

19  was issued to Mr. Swift.  If in fact payments were made to

20  Miss Sickon then, yes, I would have.

21  Q.      Okay.  And then later on in that paragraph, I

22  think it's the last sentence, it says, this agreement

23  continued through the end of 2007 at which point the

24  parties agreed to a change in the compensation structure

25  and a federal form 1099 was issued to Mark Swift for 2007.

1          Is that the 1099 you were just speaking about?

2    A.        I believe so, yes.

3    Q.        Okay.  Now, at some point I think you testified

4    that the agreement changed in mid-2007 -- or strike that.

5    You didn't testify.

6          In your report you stated that the agreement

7    changed some time in mid-2007 so that the share of the

8    profits originally payable to Sickon would be payable to

9    Mark Swift as he took over the mail order business; is

10   that correct?

11   A.        Yes, that is my understanding.

12   Q.        What mail order business are you referring to

13   there?

14   A.        I believe the sale of the pharmaceutical drugs

15   through the mail.

16   Q.        Okay.  So all mail order business of Medicate

17   Pharmacy Inc.?

18   A.        As related to DeliverMed, as I recall.

19   Q.        Okay.  So you understood that there was a separate

20   component under Medicate Pharmacy Inc. that was referred

21   to as DeliverMed?

22   A.        Yes, sir.

23   Q.        Okay.

24   A.        As I saw in the financial statements.

25   Q.        And that's what you were referring to there?

1    A.        Yes, sir.

2    Q.        Okay.   Was it your understanding that prior to

3    mid-2007 that Ann Sickon was handling the administration

4    of the mail order?

5    A.        I don't know if I had any knowledge of that.

6    Q.        Okay.

7    A.        I know it was originally -- it was my

8    understanding she was to receive payments.

9    Q.        I'm just asking because you say in mid-2007 Mark

10   Swift took over the administration of the mail order and

11   he would start receiving the money.   Were you, was it your

12   understanding that -- who did he take it over from?

13   A.        Oh, I'm sorry, from Miss Sickon, his wife.

14   Q.        Okay.   So your understanding was prior to mid-2007

15   Ann Sickon was doing the mail order administration for the

16   DeliverMed project?

17   A.        That's what it would appear, yes.

18   Q.        Okay.   You also state that under the new agreement

19   Swift was to acquire a 35.32 percent ownership in Medicate

20   Pharmacy Inc.   Who told you that?

21   A.        That I reviewed in the e-mail dated January 16th

22   that Mr. Schaltenbrand had sent to Mr. Swift.

23   Q.        And is that e-mail a part of your report?

24   A.        I reference it down at the bottom of page 6.

25   Q.        Okay.   But you don't have it as an attachment, you

1    are just referencing that date of an e-mail?

2    A.    It was shown as an exhibit in our May 17, 2010,

3    report, I believe.

4    Q.    Okay.  Let's talk now about this first component,

5    this unshared share of profits that's on page 9 of your

6    report.

7         THE COURT:  Page 7 of 11?

8         MR. STINE:  7 of 11.  I'm sorry.

9         THE WITNESS:  Yes, sir.

10   Q.    (BY MR. STINE)  And I'm going to go to your table.

11   And my understanding on your direct examination is that

12   the numbers for 2005 and 2006 were taken from financial

13   statements under the name of mail order, had mail order in

14   the name of it; is that correct?

15   A.    I believe that it said Medicate DeliverMed.  I

16   don't recall -- I'm not certain as I sit here whether or

17   not it said mail order.

18   Q.    Okay.

19   A.    As I recall, it said DeliverMed.

20   Q.    And what you did is you basically pulled the

21   numbers for 2005 and 2006 of the net income as shown on

22   those financial statements, multiplied times 40 percent to

23   come up with the second column; is that correct?

24   A.    Yes, sir.

25   Q.    And then where did you get the number in the third

1    column?

2    A.    I reference here that they show in the financial

3    statements payments to Sickon and Swift, so I have

4    referenced back to those same set of financial statements.

5    Q.    So if we --

6    A.    Right under there, the PP-926 would be from that

7    same set of financial statements.

8    Q.    Okay.  You would agree that these calculations are

9    only as accurate as the financial statements that you

10   relied upon; is that correct?

11   A.    Yes.

12   Q.    So if the financial statements overstated profit,

13   you are overstating the net amount due Sickon and Swift;

14   right?

15   A.    That's possible, yes.

16   Q.    Well, is it -- is it anything else but true?

17   A.    If the numbers were to be greater -- or, I'm

18   sorry, if the numbers shown here are greater -- is that

19   what you are saying?  Than what they should be?

20   Q.    What I'm saying is, in 2005 if the financial

21   statements are wrong and there was not $404,087 of net

22   profit but instead there were only $200,000 in net profit,

23   the number on the far right will go down; correct?

24   A.    That is correct, sir.

25   Q.    Okay.  The profit number you used for 2007, where

1    did you get that number?

2    A.        That also came out, came off a financial statement

3    that was prepared by Schaltenbrand and Schaltenbrand.

4    It's PP-932.

5    Q.        Do you recall what the name was on that financial

6    statement?

7    A.        I'm thinking it said the same thing, which is

8    Medicate DeliverMed, which I'm not certain as I sit here

9    but that's the document I looked at.

10   Q.        I thought you testified on direct, and maybe I'm

11   wrong, that because the financial statements that were for

12   the Medicate DeliverMed that you refer to in 2005 and 2006

13   were not complete for 2007, so you got 2007 from a

14   different place.  That's not true?

15   A.        I believe you are confused, sir.  I believe you

16   are talking about the next section where we talk about the

17   distributions.

18   Q.        Okay.  So if I look at the financial statements --

19   A.        These three years all came from financial

20   statements prepared by Schaltenbrand and Schaltenbrand.

21   Q.        What I'm asking you is, the financial statements

22   for 2005 and 2006, I think you state -- let me ask you

23   this:  Do you have your source documents with you?

24   A.        No, I do not, sir.

25   Q.        Because so far into evidence I don't think we have

1    any documents that have PP-927 or PP-931, and maybe I'm

2    mistaken.

3            MR. STINE:  I -- do we have them?

4            MR. McGURK:  The PP that's referred to is a Bates

5    number at the bottom of the page, and we did that to

6    identify documents that had been previously produced.  And

7    that's why that's -- that's why that number appears.  And

8    we did not redact Bates numbers, we did redact --

9            THE COURT:  The PP?

10           MR. McGURK:  No, we redacted identifiers such as

11   Social Security numbers or account numbers, those types of

12   redactions.

13           MR. STINE:  Okay.

14   Q.      (BY MR. STINE)  So you believe that the Medicate

15   net income for -- S and S prepared financial statements

16   for 2007 came off of the same set of financial statements

17   as 2006 and 2005 just for a different year?

18   A.      Well, you are saying the same set of financial

19   statements.  Obviously these are all three different

20   years, but there were three different sets of financial

21   statements prepared by Schaltenbrand and Schaltenbrand,

22   and that is the source of where these figures come from.

23   And again, you know, I assume these were the Bates numbers

24   that was in evidence, that these are the numbers that were

25   shown on the documents that were given to me.

1   Q.        Okay.   For 2007, would it surprise you if the net

2   income through September of 2007 was only $559,000?

3   A.        I have no opinion.   I haven't seen it.

4   Q.        Okay.   You didn't see anything that showed that?

5   A.        Not that I recall.

6   Q.        Okay.   Are you aware that Medicate Pharmacy Inc.

7   is on an accrual based accounting?

8   A.        Yes.

9   Q.        And what does that mean?

10  A.        Accrual based accounting means that you record

11  transactions, for example, on the revenue side which is

12  the sales, you record the transactions when revenues are

13  earned.   That is, if the product is shipped it may not be

14  paid for but it is earned, so therefore you record it on

15  an accrual basis as income at that point in which shipment

16  occurs.

17          Likewise on the bills side, you record expenses

18  when they are incurred.   And by incurred I mean I have

19  used that product, that service and so forth, even though

20  I may not have paid for it.

21          So from an accounting perspective, accrual is the,

22  in accounting what we do is match the revenues with the

23  appropriate expenses in the time period in which the

24  transaction occurred, not necessarily when it was paid,

25  which is a cash basis.

1    Q.       So if you have a one million dollar sale in 2007

2    and I send a bill for that, that gets listed for revenue

3    in 2007; is that correct?

4    A.       Presuming that you meet all the revenue

5    recognition criteria of generally accepted accounting

6    principles, yes.

7    Q.       Regardless of whether it gets paid in 2007 or not,

8    that's considered revenue on the books; correct?

9    A.       Well, may I have -- I'm sorry, may I have your

10   example back one more time?

11   Q.       If I have a -- if I bill somebody a million

12   dollars for a product sold in 2007, I send the bill in

13   2007 but I don't get paid in 2007, I get paid zero, I

14   still have a million dollars of revenue shown on my tax

15   return for 2007; correct?

16   A.       Using accrual method, as long as those products

17   are delivered and they meet the criteria for what we call

18   revenue recognition which means you have to show the sale

19   actually occurred in 2007, the answer is yes.

20   Q.       And if you are on accrual basis accounting, isn't

21   it true that in order to calculate revenue, accounts

22   receivable play an integral part in making that

23   calculation?

24   A.       Well, as part of recording revenue on a set of

25   books and records on the accrual basis, yes.   Accounts

1    receivable are the other asset, if you will, when an item

2    is sold but not paid for.

3    Q.       So, for example, in 2007 I make a mistake, my

4    accounts receivable are actually $200,000 on the books, I

5    make a mistake and I list them as $2.2 million on the

6    books, that will show a corresponding false increase in

7    revenue for 2007; correct?

8    A.       It may.  I mean, I --

9    Q.       Okay.

10   A.       You're making mistakes.  You could make mistakes

11   in other parts of the books.  But presumably if you are

12   telling me that you made a mistake on both sides, then the

13   answer is yes.

14   Q.       Okay.  Okay, let's move on to unpaid salaries.

15   Have you ever terminated an employee?

16   A.       Yes, I have.

17   Q.       And did you continue to pay that employee's salary

18   after you terminated them?

19   A.       If we had a severance agreement, you know, in

20   effect, yes.

21   Q.       What if you didn't have a severance agreement?

22   A.       No.

23   Q.       Okay.  You were aware that Mr. Swift was

24   terminated as an employee of Medicate Pharmacy Inc. in

25   September of 2009; correct?

1    A.        I was aware that I know payments were stopped

2    being made, that I do know.

3    Q.        Well, you were aware he was terminated, weren't

4    you?

5    A.        I wasn't there so I don't know if he was actually

6    terminated or if they just had a falling out or what the

7    circumstances were.  I know payments stopped.

8    Q.        Well, turn to page 7 of 11 of your report and read

9    the top sentence for me.

10   A.        Oh, okay.  Schaltenbrand in 2009 terminated

11   Swift's employment with the company.  All right.

12   Q.        So you knew he was terminated; right?

13   A.        That's what I have written, yes.

14   Q.        But you, despite that, continue to state that he

15   is accruing salary at a thousand dollars a week after that

16   date; is that correct?

17   A.        Correct.

18   Q.        Okay.  So do you think that's wrong?

19   A.        What's wrong, sir?

20   Q.        That you continue to accrue salary after he's

21   terminated?

22   A.        Well, I'm not their accountant, I'm simply showing

23   damages.  That if Mr. Swift was in fact wrongfully

24   terminated, this is what he's owed.

25   Q.        Well, do you know if there's a wrongful

1    termination claim in this lawsuit?

2    A.        I don't know that, no.

3    Q.        Okay.  Now, you assert that your understanding is

4    Mr. Swift was promised $151,000 and part of that was

5    repaid and part of that was not repaid; is that correct?

6    A.        That is correct, sir.

7    Q.        And that was a promise to pay $151,000; correct?

8    A.        That is my understanding, yes.

9    Q.        Now, you testified earlier it was your

10   understanding that Mark Swift did not become involved in

11   the mail order operations until mid-2007; is that correct?

12   A.        As I have written in the report, yes.

13   Q.        Why would Mr. Swift be entitled to any salary when

14   he wasn't working at Medicate Pharmacy?

15   A.        It's my understanding this was the agreement back

16   then between himself and Mr. Schaltenbrand, and that

17   payments were made which we see in the payroll against

18   this 151,000, we saw these payments of 12,583.

19   Q.        Well, was it your understanding that he should

20   have received a W-2 for those payments?

21   A.        If he received money, yes, he should have for

22   salary.

23   Q.        Even the back payments?

24   A.        If it was received -- yes, if it was paid as

25   salary, yes.

1    Q.        Okay.  So if he didn't receive a W-2 it probably

2    wasn't paid as salary, would you agree with that?

3    A.        I don't know that.  I don't know how it was

4    treated on the books and records.  I don't know if errors

5    were made by Schaltenbrand or not.

6    Q.        Well, let me ask you this:  If I was not your

7    employee in 2006, can you make an agreement with me after

8    that date to pay me back wages for 2006?

9    A.        I think you're asking me to render a legal

10   opinion, which I'm not qualified to do.

11   Q.        Okay.  Isn't it true that if Mr. Swift had been

12   paid a salary in 2005 and 2006 and 2007, that salary would

13   be deducted as an expense from the net -- before

14   calculating net profit?

15   A.        That is correct, sir.

16   Q.        You didn't take that into consideration in

17   calculating net profit here, did you?

18   A.        Portions of it appear to have been taken into

19   consideration, those portions that were paid.

20   Q.        I didn't understand you.  You broke up.

21   A.        I'm sorry.  Which figure are you referring to?

22   Q.        I am referring to the figure you are claiming he

23   is owed back salary prior to 2007, that's your first line

24   under salary, $50,333; is that correct?

25   A.        Yes, sir.

1    Q.      So if he's paid that $50,333, that will reduce the

2    net income for 2005, 2006 and 2007 on page 7 of 11;

3    correct?

4    A.      From an accounting perspective it would be what --

5    in the year in which it was paid.

6    Q.      Even if they're on an accrual basis?

7    A.      I don't know if they have reflected this on the

8    financial statements.  The answer to your question is, on

9    an accrual basis, yes, it should reduce those profits in

10   those previous years.  As I sit here, I don't know if

11   these amounts are reflective in those numbers or not.

12   Q.      Okay.  And if they're not, they should be?

13   A.      If these salaries are going to be paid, yes.

14   Q.      Okay.  Let's move on to page 9 of 11.  The first

15   column, 2008 distributions to Schaltenbrand, $935,399.

16           THE COURT:  I want to go back to, before -- while

17   I have this curiosity.  Have you ever heard of non W-2

18   salary?

19           THE WITNESS:  No.  But I mean, I guess what I was

20   trying to simply state is that, you know, businesses can

21   pay salaries and not issue W-2 forms.

22           THE COURT:  Businesses can pay salaries to an

23   individual and not issue a W-2?

24           THE WITNESS:  Yeah, it may be illegal but I'm

25   simply --

```
 1              THE COURT:  Oh.
 2              MR. STINE:  I thought you didn't -- weren't going
 3    to give a legal opinion.
 4              THE COURT:  I just was curious whether or if you
 5    had ever heard of non W-2 salary.
 6              THE WITNESS:  No, I haven't, Your Honor.
 7              THE COURT:  Okay.  Now we can get on to unpaid
 8    distributions.
 9    Q.        (BY MR. STINE)  The 2008 distributions to
10    Schaltenbrand, $935,399, did that come off of the Medicate
11    Pharmacy Inc. federal tax return filed in 2008?
12    A.        As I recall, yes, it has a bate stamp.
13    Q.        Do you know what line or what description it would
14    be on the tax return?
15    A.        Sure.  There's actually a couple places it's
16    shown.  There's a Schedule K that shows distributions to
17    owners.  It's also shown on page 4 of the tax return as
18    well as, the form 1120-S
19    Q.        Okay.  Would that be shown under -- strike that.
20              Well, let me ask.  Would that be shown under a
21    schedule called M-2?
22    A.        As I recall.
23    Q.        Okay.  And the same would be true for 2009, it
24    came off the Medicate Pharmacy Inc. tax return; is that
25    correct?
```

1    A.    Yes, it -- well, as I recall, yes, that -- I

2    reference the Bates number here as to those forms.

3    Q.    Okay.  Well, you don't have a Bates number for

4    2010.  Where did that come from?

5    A.    It came off the tax return but as you'll note on

6    my exhibit 3, I think it is, I indicate that it was not,

7    there was no Bates numbers on them.  That's Item No. 8.

8    So that was not stamped, the copy that I had at least.

9    Q.    So your testimony is the 272,800 for 2010 also

10   came off of the Medicate Pharmacy Inc. tax return for

11   2010?

12   A.    As I recall, yes.

13   Q.    Okay.  And then where did -- 2011 did not come off

14   of a tax return; is that right?

15   A.    That is correct.

16   Q.    And I think you said that came off of a financial

17   statement?

18   A.    Correct.  That's a financial statement that was

19   prepared by Schaltenbrand and Schaltenbrand.

20   Q.    Okay.  In your calculation you assumed that Mr.

21   Swift is entitled to receive 37.5 of the net profits of

22   Medicate Pharmacy Inc.; is that correct?

23   A.    That is correct.

24   Q.    So if that is not true your calculation's wrong;

25   is that correct?

1    A.        If it's supposed to be a different number then,

2    yes, it would affect the calculation.

3    Q.        Okay.  Now in this section I want to make sure I

4    understand your opinion because I'm not sure I do.  I

5    understand your opinion, I don't agree with it, but I

6    understand your opinion under unpaid share of profits.

7    You are talking, it's a pretty straightforward opinion,

8    you take the net profit times 40 percent, less the amount

9    paid, and that's what you get; right?

10   A.        Correct, sir.

11   Q.        Okay.  But under this section, you aren't

12   calculating or dealing with net profit at all, are you?

13   A.        No, I'm basing it on the distributions that Mr.

14   Schaltenbrand took.

15   Q.        Okay.  So let's assume that in 2008 Medicate

16   Pharmacy Inc. made one dollar in net profit.  And let's

17   suppose that that is proven beyond a reasonable doubt.

18   Your opinion is that Mark Swift is still entitled to

19   $202,669.  Is that your opinion?

20   A.        In distributions based upon the internal revenue

21   code, yes, sir.

22   Q.        Is it -- so your testimony is anytime there's a

23   distribution to one owner, there has to be a distribution

24   to all owners pro rata to their ownership interest in the

25   company?

A.      Based on the internal revenue code section that I
cite, yes.

Q.      Well, does that always happen?

A.      Every subchapter S corporation I have dealt with,
it has to.

Q.      Okay.  Do you know what a capital account is?

A.      Yes, I do.

Q.      And what's the purpose of a capital account?

A.      Capital account is typically used in a sole
proprietorship business to account for the owner's
investments, less their draws, plus their profits, minus
their losses.  But this is not -- this is a corporation,
not a sole proprietorship.

Q.      So a capital account would, that would be
appropriate to use if we had a partnership; is that true?

A.      That is true.

Q.      Okay.  And under a partnership situation, all
distributions don't have to be equal, do they?

A.      Depends on what the partnership agreement provides
for.

Q.      Okay.  Well, let me ask you this:  In your
experience do you see partnership that don't have
agreements where there are other than pro rata
distributions being made on a regular basis?

        MR. McGURK:  Your Honor, I guess I'm going to

1    object because I don't exactly understand the question.

2              THE COURT:   Yeah, why don't you --

3              MR. STINE:   Okay, I'll rephrase.

4              THE COURT:   Okay.

5    Q.       (BY MR. STINE)  Isn't the purpose of a capital

6    account within a partnership to keep track of what

7    distributions have been made to different partners so that

8    in the end they can even it all out, if somebody took too

9    much or somebody took too little?

10   A.       Well, it's more than just distributions.   What it

11   is, is really that partner's equity holdings in the

12   business, so it's affected by more than just

13   distributions.   It's affected by profits, contributions to

14   the company and the like.   And that's the purpose of it.

15   Q.       Okay.   Do you know if Mark Swift was a shareholder

16   of Medicate Pharmacy Inc.?

17   A.       It's my understanding he was supposed to be.   As

18   shown on the tax return, he was not.

19   Q.       And you may have answered this and, if so, I

20   apologize.   Is my understanding of the chart on page 9 of

21   11 correct, that this has nothing to do with net profits?

22   A.       That is correct.

23   Q.       Okay.   Let's move on to reimbursement for excess

24   box filling charges.   Is your expert opinion rendered in

25   this section simply that you read an e-mail that Joe

1    Siddle said Mark Swift is owed $30,000?  And so Mark

2    Swift's owed $30,000?

3    A.    I --

4    Q.    I'm sorry.

5    A.    I -- oh.  I also thought I saw testimony where Mr.

6    Schaltenbrand had agreed to that amount.  But the basis of

7    it is, is the computation that was performed by Mr.

8    Siddle --

9    Q.    And so if that computation was wrong --

10   A.    -- as shown in the e-mail.

11   Q.    If that computation is wrong, your number's wrong;

12   correct?

13   A.    Yeah, I have not tested that number.  I have

14   accepted it from Mr. Siddle.

15   Q.    And you don't even know what the number means, do

16   you?

17   A.    Reimbursement for excess box filling charges, is

18   what I am told that it is?

19   Q.    Who told you that?

20   A.    That is my understanding by looking at the e-mail.

21   Q.    Okay.  So your opinion in that sense does really

22   nothing to assist the Court, does it?

23        MR. McGURK:  Your Honor, I'm going to object on

24   the basis of argumentative.

25        THE COURT:  Overruled.  Cross-examination.

1  A.       What it helps is determining the total amount of

2  damages that are owed to Mr. Swift.

3  Q.       (BY MR. STINE) Okay.

4  A.       That is another claim that Mr. Swift has against

5  Mr. Schaltenbrand.

6  Q.       Okay.  Let's turn to page 10 of 11, which is page

7  12 of your report, which is the business valuation.  Your

8  report is not a business valuation, is it?

9  A.       No, it is not.

10  Q.       Okay.  What is the effective date of this

11  valuation?

12  A.       The figures used through the year 2007, it gives

13  some idea of what the potential value would be as of

14  today.  But the figures stop at 2007 because I don't have

15  information after that.

16  Q.       So you would agree that to the extent this is a

17  valuation, it's a valuation as of 2007; correct?

18  A.       The figures that I have used are through 2007.

19  And again, it's not -- I did not perform a valuation.  I'm

20  simply doing a computation based upon figures that have

21  been presented to me in the new set of financial

22  statements using the methodology by the accountants.  I

23  did not -- as I very clearly point out, I am not doing a

24  valuation.

25  Q.       You wouldn't want this methodology to be on your

1    record for future cases, would you?

2    A.        I don't know that.  I'm not a business valuator

3    nor do I, you know, and I made that very clear.

4            MR. STINE:  Your Honor, based upon that I would

5    move to strike this portion of the report.  If he's not a

6    business valuator and he's not giving that opinion, I

7    don't want to waste anybody's time going through it.

8            THE COURT:  I'm not going to strike it.  It will

9    go to the weight not to admissibility.

10   Q.       (BY MR. STINE)  So if this is done for valuation

11   as of 2007, what is the purpose of coming up with this

12   valuation?

13   A.        It's to show the amounts based on the profits we

14   knew at that time.  Those profits were based on financial

15   statements I believe.  This was the same methodology that

16   was submitted to Mr. Swift in the same period of time in a

17   previous valuation by the accountant Schaltenbrand and

18   Schaltenbrand.

19   Q.       So what you are saying is, if all of these numbers

20   are right and if this methodology is right, and if Mr.

21   Swift is a 35 percent owner, I'm going to use the smallest

22   number since I'm the defendant, then Mr. Swift's interest

23   in this company at the end of 2007 was worth

24   $3,299,500.11 --

25           MR. McGURK:  Your Honor, he's misstating this.

1    It's three million, Your Honor --

2         MR. STINE:  I'm sorry.  I told you I was

3    representing the defendant.  That was not intention.

4         THE COURT:  I was going to saying, I mean, I'd pay

5    that, let's if, I'd leave.  Go to the next bar.

6    Q.    (BY MR. STINE)  Let me restate that.  You are

7    stating that as of the end of 2007 if all these things are

8    correct, the value of Mr. Swift's 35 percent interest, if

9    he had one, was $3.3 million; correct?

10   A.    Based on the methodology, yes, sir.

11   Q.    And that if he wanted to sell his interest at that

12   point, that's what he should be paid; correct?

13   A.    I don't know that, sir.

14   Q.    Well, let me ask you this:  If he gets paid $3.3

15   million for his value of the business as of December 31,

16   2007, he wouldn't be entitled to any future profits or any

17   future wages or any future distributions, would he?

18   A.    It would depend on the agreement, sir.

19   Q.    Well what if there's no agreement?

20   A.    I, I don't know if I can answer your question.

21   Q.    You can't answer that question?

22   A.    Well, I think it's a hypothetical question.  What

23   you are saying is, is we're going back now to 2007 where,

24   and he was paid 3.3?  Then the answer is, no, of course

25   not.  He sold the business back in 2007.

1  Q.      I'm going down the path you took me.  You took me

2  to 2007.  That's where I'm at.

3  A.      Well, actually Mr. Schalt -- Schaltenbrand and

4  Schaltenbrand took us down that path.

5  Q.      Okay.  And I think you testified on direct

6  examination that the reason these, the third column over

7  you have these X factor of, 3, 2, 1, is that the most

8  current data is the best data.

9  A.      The data that's shown here is the best data that

10  we seem to have which is the years '05, '06, '07.

11  Q.      But let's suppose those numbers were drastically

12  different in 2012, '11, and '10.  You'd rather use that

13  data, wouldn't you, if you were trying to valuate a

14  company today?

15  A.      Of course.

16  Q.      Okay.  And really something five years old isn't

17  very reliable, is it?

18  A.      I'm not sure I understand the question.

19  Q.      Well, these numbers are five years old.  How

20  reliable is that to try and valuate the company today?

21  A.      If you are saying information five years old, to

22  put a value on it today, no, it is not as reliable as

23  something more current.

24  Q.      Okay.  Do you believe the methodology of

25  Schaltenbrand and Schaltenbrand is a proper valuation

1   methodology to use in this case?

2   A.      I simply know that it's one method of valuation.

3   I did not do a business valuation of it, so I have no

4   opinion.  I do, however, know that this is one methodology

5   that can be used for a pharmacy.

6   Q.      But you have no opinion whether it should be used

7   in this case, whether it's proper to use in this case, or

8   anything like that, do you?

9   A.      That is correct.

10  Q.      Do you believe that Schaltenbrand and

11  Schaltenbrand employed a methodology that experts in

12  valuation find essential?

13  A.      Again, I, I'm not purporting to be a valuation

14  expert so I have no opinion.  I simply stated that this is

15  a methodology that I have seen written in a text that has

16  been used.

17  Q.      Okay.  Saw it on the internet?

18  A.      No.   Treatises.

19  Q.      Okay.  Do you believe that the methodology of

20  Schaltenbrand and Schaltenbrand is scientifically valid?

21  A.      I have no opinion.

22  Q.      You would agree that if the numbers in the first

23  column, the net profit numbers are erroneous, that this

24  valuation is erroneous; correct?

25  A.      I would agree that, if the numbers are erroneous,

1    the computation that's shown is erroneous.

2    Q.        Have you ever performed a business valuation?

3    A.        Yes, I have.

4    Q.        Okay.  Did you -- have you ever used this method

5    to perform a business valuation?

6    A.        Yeah, value -- a professional practice is often

7    valued this way so I believe, yes, I have, many years ago.

8    Q.        Same thing, same formula, it's a multiple of

9    revenues it's not quite the same formula but it's similar.

10    Q.        You said that there is a, you used a 7 cap rate

11    because that's what Schaltenbrand used; is that correct?

12    A.        That's correct.  I used their methodology.

13    Q.        Okay.  Would you pull out Plaintiff's Exhibit 2

14    and turn to page 28.

15    A.        I'm sorry, sir.  I don't have them marked.  Which

16    one is that?

17    Q.        That is your stock valuation report dated July 10,

18    2010 -- I'm sorry, July 7, 2010.

19              MR. McGURK:  I believe that's --

20    A.        It's prepared by a person in my firm, but I will

21    pull it out.  What page, sir?

22    Q.        (BY MR. STINE)  28.  Do you have page numbers on

23    the bottom of yours or not?

24    A.        I'm sorry, I don't.

25    Q.        Okay.  Then it might -- it's MS 000319.  Do you

1    see those numbers on the bottom right-hand corner or not?

2    A.      Give me one second, sir.

3    Q.      Okay.  Or maybe it would help you, it's Exhibit 3.

4    A.      That's helpful, sir.  Thank you.

5    Q.      Is that the stock valuation report by

6    Schaltenbrand and Schaltenbrand that you reviewed as part

7    of your report in this case?

8    A.      I believe that there was another one.

9    Q.      Well, what one, what cap rate does this report use

10   that is attached as Exhibit 3 to your report?

11   A.      I used the cap rate of 5.

12   Q.      Okay.  And obviously the higher the cap rate the

13   more the value, the higher the value; right?

14   A.      The higher the computation, yes.

15   Q.      Now, did you tell me just a minute ago that you

16   did not prepare this report, Plaintiff's Exhibit 2?

17   A.      That is correct.  It was -- well, it was prepared

18   by one of my staff members under my review.

19   Q.      Well, is that, was Plaintiff's Exhibit 3 prepared

20   the same way?

21   A.      No.  Exhibit 3 was prepared by myself.

22   Q.      Okay.  You told me you were a forensic accountant;

23   is that correct?

24   A.      Yes, sir.

25   Q.      Were you hired this case to review the books and

1    records of Medicate Pharmacy Inc. from a forensic

2    accounting point of view?

3    A.      Partially, in coming up with these opinions.  The

4    question is, did I do a thorough audit of them?  The

5    answer is no.

6    Q.      Okay.  And I think you said that a subchapter S

7    corporation, the owners pay tax on their personal return

8    is that correct?

9    A.      Yes.  The taxable income is distributed on a

10   schedule K-1, it's typically reflected on the -- it's

11   reflected on the personal income tax return.

12   Q.      Okay.  And you don't know if Mark Swift got a K-1

13   in this case, do you?

14   A.      The tax returns that I saw did not show that he

15   did.

16   Q.      Okay.  You also testified that owners of a

17   corporation are issued shares of stock.  Do you know if

18   Mark Swift was ever issued any stock in this case?

19   A.      I don't know that.

20   Q.      Okay.

21          MR. STINE:  I don't have anything further, Your

22   Honor.

23          THE COURT:  Any redirect?

24          MR. McGURK:  Very brief, Your Honor.  I think we

25   have solved one issue that counsel raised.  You heard the

1    questions.

2                         REDIRECT EXAMINATION

3    BY MR. McGURK:

4    Q.      Mr. Greene, Mr. Stine asked whether you got the

5    multiple or the cap rate off the internet.  Do you

6    remember that question?

7    A.      Well, I think he might have asked about the

8    methodology being off the internet.

9    Q.      Do you recall your testimony about using a

10   treatise for the cap rate for drug stores?  Do you recall

11   that?

12   A.      Yes, sir.

13   Q.      And was the name of that book, "Handbook of Small

14   Business Valuation Formulas?"

15            MR. STINE:  I'm going to object.  I didn't ask

16   anything about the cap rate.  I asked about the

17   methodology.

18            THE COURT:  I'm going to allow it.  Go ahead, Mr.

19   McGurk.

20   Q.      (BY MR. McGURK) By Glenn Desmond, D-E-S-M-O-N-D

21   and John Marcello, M-A-R-C-E-L-L-O, Valuation Press Inc.?

22   A.      Yes, I have seen that handbook.

23   Q.      And for drug stores, does that use the total

24   business value by applying multiples ranging from 6 to 7

25   as being a multiple for the net profit formula?

1    A.       Yes, it does.

2             MR. STINE:  Can I see that?

3    Q.       (BY MR. McGURK) Did you see any 1099 forms for

4    2005 or 2006 for either Mark Swift or Ann Sickon?

5    A.       Not that I recall.

6    Q.       Referring to the issue, to the question Mr. Stine

7    raised about termination, is it your understanding that

8    partners can fire their partners?

9             MR. STINE:  Your Honor, I'm going to object.

10            THE COURT:  I'm going to sustain that objection.

11   Q.       (BY MR. McGURK) All right.  For 2007, did you use

12   the -- in your report, did you use the Schaltenbrand and

13   Schaltenbrand work papers and the 1099 issued by the

14   Schaltenbrand firm to Mark Swift?

15   A.       As I recall, yes.

16   Q.       On the issue of the testimony I believe, if I, if

17   I recall the testimony, Mr. Stine asked if the

18   calculations on your report, if the, if the information on

19   the report is, is wrong, that is to say, if the net

20   profits were lower than shown in the Schaltenbrand and

21   Schaltenbrand books, then as a result the amount due Mr.

22   Swift would be wrong is that -- do you recall that

23   testimony?

24   A.       Yeah, I think for the years 2005 through 2007,

25   yes.

1    Q.       Well, similarly, if the calculations of

2    Schaltenbrand and Schaltenbrand are wrong, for example,

3    because of commingling, costs for other entities or using

4    personal expense -- or paying personal expenses and the

5    profits should have been higher, similarly the amount due

6    Mr. Swift would be higher; isn't that right?

7    A.       For those years, yes.

8            MR. McGURK:  I have no further questions.

9            THE COURT:  Any follow-up?

10            MR. STINE:  No, Your Honor.

11            THE COURT:  Okay.  Thank you, Mr. Greene.

12            And I also want to thank the Northern District

13    court personnel that helped put this together.

14            You are excused and thank you very much, Mr.

15    Greene.  Have a -- what's the weather like in Chicago?

16            THE WITNESS:  It's rainy, cloudy, nasty.

17            THE COURT:  Well, see, you should have been down

18    here.  It's sunny and 80 degrees and you guys should have

19    been down here.

20            MR. McGURK:  Your Honor, I would like to add my

21    thanks to Mr. Joe Novak from the clerk's office.

22            THE COURT:  Yes, Mr. Novak, thank you very much.

23            VIDEO TECHNICIAN:  I'm sorry we had connection

24    problems but I guess it worked out.

25            THE COURT:  That's fine.  Thank you very much.

1          MR. STINE:  Your Honor, at this time I would like

2     to renew my objection to the admissibility of 1 -- or

3     Plaintiff's Exhibit 1, Plaintiff's Exhibit 2, and

4     Plaintiff's Exhibit 3.  I think the testimony of the

5     witness was clear that these reports are not admissible as

6     expert reports.  They did not, he did not employ the

7     methodology that experts in valuation find essential, the

8     reasoning and methodology underlying the testimony is not

9     scientifically valid, and under the Frymire versus KPMG

10     case in the Seventh Circuit it's simply not admissible.

11          THE COURT:  Well, the Court's going to admit them

12     and, but their admissibility will go to the weight that

13     the Court gives their opinions not to their admissibility.

14          MR. STINE:  Thank you.

15          THE COURT:  It's been a long day, ladies and

16     gentlemen.  I just found out that the Cardinals won today,

17     so I will show up tomorrow.  If they hadn't of won, I

18     wouldn't be here.  I'd be depressed.

19          MR. STINE:  I'd be rooting for the Cubs if I'd

20     have known that.

21          THE COURT:  Okay, Mr. Cox, tell me what the

22     program is for Thursday.

23          MR. COX:  Well first, I'd like to move to admit 7.

24     That was the document that Mr. Siddle brought.

25          THE COURT:  That will be admitted.

1    MR. COX:  Housekeeping.  And we would ask that the

2    original of that fax be produced to us, including the fax

3    cover sheet.  In other words, that's just page two and

4    three of the fax.  And --

5        THE COURT:  If he has it.

6        MR. COX:  Well I'm asking that, that the

7    defendants get it from their accountants.  They're the

8    ones that sent it, which will tell us who sent it, when it

9    was sent, if there's anything written on the fax cover

10   sheet about it, and flesh out what we have are limited,

11   limited information now.

12       If they can ask their accountants to get the

13   original fax and produce it to us.  And if not, if they

14   don't have the fax, at least the Schedule C that was

15   prepared, the original of it.  We'd prefer to have the

16   whole document in its original form to view and see what

17   it says.

18       THE COURT:  Okay.  See if you can't --

19       MR. STINE:  I'm not sure I understand.  I thought

20   he brought the original Schedule C with him?

21       MR. COX:  He brought what he received as his fax.

22   I'm asking for the document that was faxed on the other

23   end.

24       MR. STINE:  So you're talking about everything

25   from the accountant's end?

1          MR. COX:  Yes, and the fax cover sheet to go with

2     it.

3          MR. SCOTT:  We'd like Mr. Schaltenbrand Senior to

4     bring that with him tomorrow.

5          MR. STINE:  I'll have him look.

6          MR. COX:  And Mr. Schaltenbrand Senior to answer

7     your question will be on the stand tomorrow.  I think we

8     have to finish up with Mr. Siddle.

9          THE COURT:  Right.

10          MR. COX:  And then we'll have Mr. Swift will

11     begin.

12          THE COURT:  How many Witnesses are you going to

13     have?

14          MR. COX:  That will be it.

15          THE COURT:  Mr. Siddle will be the last one.

16          MR. COX:  I would just ask that Mr. Schaltenbrand

17     Senior, he's coming to testify would bring that together

18     with any work papers they used to create those numbers,

19     where they got them.  In other words, they're preparing a

20     Schedule C we'd like to see the documents he used to,

21     where he got those numbers and, and the fax cover sheet to

22     go with it.  So we'll get the full picture of what

23     happened here.

24          THE COURT:  Okay.

25          MR. STINE:  We got an issue here, Judge.

1          THE COURT:  Uh-huh.

2          MR. STINE:  I don't represent Schaltenbrand and

3    Schaltenbrand or Larry Senior or Larry Junior.   Mike

4    Schaltenbrand can't really talk to him about anything

5    that's going on in here.   How do we do this?

6          MR. COX:  You can talk to them, I would think.

7          MR. STINE:  I guess I can ask him.

8          THE COURT:  You can ask him.   Yeah, ask him to

9    bring it.

10         MR. STINE:  I can do that.

11         MR. COX:  Thanks.   Yeah.   That's what the plan is

12   for tomorrow, Judge.

13         THE COURT:  Okay.

14         MR. COX:  And I would say Mark will take us into

15   Friday as well.

16         THE COURT:  Okay.

17         MR. STINE:  Probably won't get to Mark.

18         MR. COX:  We may not get to Mark, who knows.   But

19   that's the order.

20         THE COURT:  Okay.

21         THE CLERK:  8:30?

22         THE COURT:  8:30.   And we'll go as long as we can.

23         (Court recessed at 4:39 p.m.)

24

25

1                    <u>REPORTER'S CERTIFICATE</u>

2          I, Christine A. Simpson, Registered Merit Reporter

3    and Certified Realtime Reporter in and for the United

4    States District Court for the Southern District of

5    Illinois, do hereby certify that I was present at and

6    reported in machine shorthand the proceedings in the

7    above-mentioned court; and that the foregoing transcript

8    is a true, correct, and complete transcript of the

9    electronic recording.

10         I further certify that I am not an attorney for,

11   nor employed by, nor related to any of the parties or

12   attorneys in this action, nor financially interested in

13   the action.

14         I further certify that this transcript contains

15   pages 477-740 and that this reporter takes no

16   responsibility for missing or damaged pages of this

17   transcript when same transcript is copied by any party

18   other than this reporter.

19         IN WITNESS WHEREOF, I have hereunto set my hand at

20   Benton, Illinois, this 26th day of April, 2012.

21

22              *s/Christine A. Simpson, RMR, CRR*

23              _____

24              Christine A. Simpson, RMR, CRR

25