```
 1                    U.S. DISTRICT COURT
                  SOUTHERN DISTRICT OF ILLINOIS
 2
    DELIVERMED HOLDINGS, LLC, an     )
 3  Illinois Limited Liability Company, )
    MARK SWIFT, LINDA DEETER, and   )
 4  WILLIAM R. DEETER ASSOCIATES, INC., )
                                     )
 5                   Plaintiffs,     )
                                     )
 6  v.                               ) Case 3:10-cv-684-JPG
                                     )
 7  MICHAEL L. SCHALTENBRAND,        )
    MEDICATE PHARMACY, INC, and,     )
 8  JOEY D. SIDDLE,                  )
                                     )
 9                   Defendants.     )
    _____ CONSOLIDATED WITH:
10
    MARK A. SWIFT,                   )
11                                   )
                     Plaintiff,      )
12                                   )
    v.                               ) Case 3:10-cv-685-JPG
13                                   )
    MEDICATE PHARMACY, INC, and      )
14  MICHAEL L. SCHALTENBRAND,        )
                                     )
15                   Defendants.     )

16

17          TRANSCRIPT OF BENCH TRIAL PROCEEDINGS

18         BEFORE THE HONORABLE J. PHIL GILBERT
                UNITED STATES DISTRICT JUDGE
19
                     April 26, 2012
20

21

22  COURT REPORTER:    Christine A. Simpson, CRR, RPR, CSR
                       UNITED STATES DISTRICT COURT
                       301 W. Main Street
23                     Benton, IL  62812
                       (618) 439-7725
24

25  Proceedings recorded by mechanical stenography, produced
    by computer-aided transcription.
```

```
 1
         APPEARANCES:
 2
         FOR THE PLAINTIFFS:  A. Courtney Cox, Esq.
 3                            SANDBERG, PHOENIX & VON GONTARD
                              2015 West Main Street, Suite 111
 4                            Carbondale, IL  62901
                              (618) 351-7200
 5
                              Russell K. Scott, Esq.
 6                            GREENSFELDER, HEMKER & GALE PC
                              12 Wolf Creek Drive, Suite 100
 7                            Swansea, IL  62226
                              (618) 257-7308
 8
                              James A. McGurk, Esq.
 9                            LAW OFFICES OF JAMES A. McGURK, PC
                              10 South LaSalle Street, Suite 3300
10                            Chicago, IL  60603
                              (312) 236-8900
11
         FOR THE DEFENDANT:   Kevin J. Stine, Esq.
12                            Laura E. Craft-Schrick, Esq.
                              Mark S. Schuver, Esq.
13                            MATHIS, MARIFIAN & RICHTER, LTD.
                              23 Public Square, Suite 300
14                            PO Box 307
                              Belleville, IL 62222
15                            (618) 234-9800

16                            Ned W. Randle, Esq.
                              POLSTER, LIEDER, et al.
17                            12412 Powerscourt Drive, Suite 200
                              St. Louis, MO  63131
18                            (314) 238-2400

19

20

21

22

23

24

25
```

```
1                              I N D E X

2                            WITNESSES

3   ALL WITNESSES:                                    PAGE:

4   For Plaintiff:

5     JOEY D. SIDDLE:
        Cross-Examination by Ms. Schrick              744:21
6       Redirect Examination by Mr. Cox              757:14
        Examination by The Court                     775:20
7       Further Redirect Examination by Mr. Cox      777:21
        Recross-Examination by Ms. Schrick            778:8
8       Further Redirect Examination by Mr. Cox       797:5
        Re-examination by The Court                   807:9
9       Further Recross-Examination by Ms. Schrick   809:13

10    MARK A. SWIFT:
        Direct Examination by Mr. Cox                812:15
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1          (Proceedings began at 8:28 a.m. in open court.)

2          THE CLERK:  This Honorable Court is now in

3    session.

4          MR. McGURK:  Your Honor, one small thing.

5    Yesterday we showed via distance the witness Mr. Craig

6    Greene two pages of the Handbook of Small Business --

7          THE COURT:  Right.  I remember that.  You want

8    that admitted?

9          MR. McGURK:  I thought just admit it so the record

10   would be clear.

11         THE COURT:  Okay, it will be admitted.

12         MR. McGURK:  That will be Plaintiff's Exhibit 98.

13         THE COURT:  Okay, that will be admitted.

14         MR. McGURK:  Thank you, Your Honor.

15         MS. SCHICK:  Are we ready to proceed?

16         THE COURT:  We are ready to proceed.

17                    JOEY D. SIDDLE,

18   having been previous sworn, was examined and testifies as

19   follows:

20                   CROSS-EXAMINATION

21   BY MS. SCHRICK:

22   Q.    Good morning, Mr. Siddle.

23   A.    Good morning.

24   Q.    You've talked to the Court in two, in a couple

25   pieces, so I'm going to go over a couple background things

1    just to make sure we are all on the same page.

2         Could you tell me again what is your role in this

3    mail order business that we have been discussing?

4    A.    I oversee all the operations of the Pharmacy and

5    the mail order.

6    Q.    Do you hold any licenses or certifications

7    relevant to that?

8    A.    I have a tech license from 2003, a pharmacy tech

9    license.

10   Q.    Okay.

11   A.    Yes, ma'am.

12   Q.    Okay.  And do you have any role in the billing

13   process of the Pharmacy?

14   A.    Yes, ma'am.  I have to make sure all the billings

15   are going out to the difference insurances.

16   Q.    I think you told us Tuesday that Mark had a

17   marketing role with the business; is that correct?

18   A.    Yes.  One of his roles, yes.

19   Q.    What other roles did he have?

20   A.    One of the most important things is sell the

21   business -- sell all the patients off.  And he had some

22   financial stuff he dealt with, fixing things and looking

23   at books and stuff.

24   Q.    Do you know if he had any financial background or

25   experience?

1    A.        Yes.   He told me that he was a, a master's and

2    CPA, a Master's Degree in Accounting.

3    Q.        Okay.   And what was Mike's role in the mail order

4    business?

5    A.        Mike was the, the pharmacist.   He would come in

6    and check the meds for us for the mail order part.   He

7    made sure the contracts were in place with the different

8    insurance companies, negotiated things with them, and

9    negotiated the buying of the drugs.

10   Q.        Okay.   And you said that Mike was a pharmacist.

11   Is Medicate Pharmacy Inc. a licensed pharmacy, to the best

12   of your knowledge?

13   A.        Yes, ma'am, it is.   Each -- yeah, Medicate Central

14   Pharmacy is, yes.

15   Q.        Did you and Mark have titles that you refer to

16   each other as?

17   A.        Yeah, at the beginning Mark had said that, Joe,

18   you be the COO and Mike's the CEO, and I'll be the CFO,

19   was kind of our little titles like that.

20   Q.        And we talked about a formula that you used to

21   calculate profits.   Was there an agreement on that formula

22   when the group began in 2005?

23   A.        Yes.   We had to come as a group to figure out what

24   that, that piece of business coming into an existing

25   pharmacy, how to build that, that group, all the overhead.

1    So basically we looked at the revenue.  Do you want to

2    walk through it now?

3    Q.      Well, yes.  What was the agreements in terms of

4    how you were going to calculate the profits?

5    A.      Yes.  We would take the adjudicated, how much we

6    billed to the insurance companies, what the system told us

7    the drug cost was, and then -- and minus that off.  And

8    then minus off $7 for overhead per prescription.  That's

9    how we calculated to get an idea of what that department

10   does.  And then, then we had to figure out how to pay off

11   the, the marketing out the profits of that.

12   Q.      Okay.  And who had agreed to that formula?

13   A.      All three of us, Mark, Mike and myself.

14   Q.      Now tell me again, why was that $7 per scription

15   included?

16   A.      We had to cover the cost of what that's costing

17   the pharmacy for us to be working within their pharmacy

18   within their pharmacists and all their techs, we gotta

19   figure out what our portion cost to that business.

20   Q.      What were some of the costs or expenses that you

21   understood to be part of that 7-dollar charge?

22   A.      Wow.  All the computers, all the internet, the,

23   the electricity, the, the rent, all the insurances, the

24   health insurances, the licenses, the billing process, the

25   switching stations that charges so much for switching and

1    charging prescriptions, the staff, their payroll, the, the

2    robots that count the meds, and of course all the techs

3    and all the pharmacists.

4        MS. SCHRICK:  Your Honor, may I approach the

5    witness?

6        THE COURT:  Yes.

7    Q.    (BY MS. SCHRICK)  Mr. Siddle, I'm handing you

8    what's been admitted as Plaintiff's Exhibit 97.  Do you

9    recognize that as something you discussed with Mr. Cox

10   yesterday?

11   A.    Yes, ma'am.

12   Q.    Okay.  And he went through certain of the expenses

13   that are listed there, and asked you if you had deducted

14   those, if they were included in your -- let me rephrase

15   that.

16        He went through certain of those expenses and

17   asked you if they were included in the 7-dollar charge

18   that we have been discussing; is that correct?

19   A.    Yes, ma'am, we did.

20   Q.    Okay.

21        THE REPORTER:  Could you slow down just a little

22   bit?

23        MS. SCHRICK:  Yeah, I'm sorry.

24        THE REPORTER:  Thank you.

25   Q.    (BY MS. SCHRICK) Did the mail order operation have

1    a physical location where it operated out of?

2    A.        Yes, ma'am.

3    Q.        Did it have office supply expenses?

4    A.        Yes, ma'am.

5    Q.        Do you see those reflected on line 18 of part two

6    of the Schedule C?

7    A.        No, it says zero.

8    Q.        Is mail order share of rent reflected on line 20

9    of this exhibit?

10   A.        No, it says zero.

11   Q.        How about its share of utilities on line 25?

12   A.        Nope, it says zero.

13   Q.        Were those things that you consider to be

14   legitimate expenses of the mail order business?

15   A.        Yes, ma'am.

16   Q.        Were those things that you consider to be part of

17   that 7-dollar charge?

18   A.        Yes.

19   Q.        Mr. Siddle, I'm handing you what's been admitted

20   as Plaintiff's Exhibit 8.  Do you remember discussing

21   portions of that with Mr. Cox yesterday?

22   A.        Yes.

23   Q.        Could you turn to page 34 of that document?

24             THE COURT:  Where is 8, K. Jane?

25             THE CLERK:  It may be in your box.

```
 1              THE COURT:  I got it here.  I got it here.  Okay.

 2   Q.       (BY MS. SCHRICK) Mr. Siddle, if you could turn to

 3   page 34, if you are not already there?

 4   A.       Yes, ma'am, I am.

 5   Q.       What is page 34 of Exhibit 8?

 6   A.       This is the, for Medicate Central Pharmacy -- let

 7   me back up a second.  This is for the Medicate Pharmacy

 8   DeliverMed mail order split up, its financials.

 9   Q.       And for what time frame is this financial

10   statement?

11   A.       This is showing the month of December 31st -- the

12   month of December for 2005.

13   Q.       Okay.  And I'm going to draw your attention to the

14   operating expenses section.  Do you see that?

15   A.       Yes, ma'am.

16   Q.       Do you see any rent expense shown on that

17   operating expenses section?

18   A.       There's no rent on here, no, ma'am.

19   Q.       How about computer expense?

20   A.       No, ma'am.  None.

21   Q.       Equipment?

22   A.       No, there's none.

23   Q.       Telephone?

24   A.       No, ma'am.  There's none.

25   Q.       Insurance for employees?
```

1    A.        No, there's none.

2    Q.        Okay.  Did mail order have those expenses?

3    A.        Yes, ma'am.

4    Q.        Okay.  Mr. Siddle, I have handed you Plaintiff's

5    Exhibit 9.  Could you turn to handwritten page 24 of that

6    exhibit, please.

7    A.        Yes, ma'am.

8    Q.        And what is page 24?

9    A.        This is the financials for Medicate Pharmacy

10   Central there in Washington Park, and it's for December,

11   end of December 2005.

12   Q.        Okay.  So that would be the same time frame as

13   what we just looked at on the mail order --

14   A.        Yes, the same month.

15   Q.        Now looking at the Central financial statement, do

16   you see an entry for computing expenses?

17   A.        Yes, ma'am.

18   Q.        Do you see an entry for insurance?

19   A.        Yes.

20   Q.        Employee benefits?

21   A.        Yes, there's an entry.  Yes.

22   Q.        Insurance for employees?

23   A.        Yes.

24   Q.        Licenses?

25   A.        Yes, ma'am.  There's an entry.

1    Q.        And rent?

2    A.        On the next page, yes.

3    Q.        Okay.

4    A.        There's an entry.

5    Q.        So all of those expenses are broken out

6    specifically on the Central financial statement; is that

7    correct?

8    A.        It is, correct, yes.

9    Q.        And in addition to all of those specific expenses

10   there's also an entry for miscellaneous; is that right?

11   A.        Yes.  On page 25, yes, there is.  There's a large

12   entry, yes.

13   Q.        Was it your understanding that all of those

14   specific expenses that are shown on the Central financial

15   statement but not on the mail order statement were part of

16   the 7-dollar charge?

17   A.        Yes, ma'am, it is.

18   Q.        Okay.  Changing gears here, Mr. Siddle.  Were you

19   present in Court when Mike was questioned about certain

20   charges for Disney vacation trips?

21   A.        Yes, ma'am, I was.

22   Q.        Okay.  Did you consider Mike's testimony generally

23   accurate in that regard?

24   A.        Yes, it was accurate.

25   Q.        Okay.  How do you know that?

1   A.      Because I was the one that booked the flights for

2   Mr. Smith.

3   Q.      Okay.  Did you have any other role in coordinating

4   Mr. Smith's travel?

5   A.      Yes.  I dealt with all the, the breakouts of any

6   type of bonuses, and he gets a little bit amount of money

7   every month.  And he came to me and asked me if -- he

8   wanted to go to Disney with his kids for the first time

9   and didn't have a credit card.

10  Q.      Let me ask you this:  What is Mr. Smith's role in

11  Medicate Pharmacy?

12  A.      He has -- he oversees all the, like we have a

13  robot, he oversees all of that.  He oversees all of the

14  shipping department.  And he's a pharmacist tech, too.

15  Q.      Okay.  Does he then work for mail order?

16  A.      Yes, he does a little bit of both, for both

17  pharmacies.  He does some of the retail, a little bit.

18  Most of the time, 90 percent of his stuff is mail order,

19  yes.

20  Q.      So if you could, just tell me sort of step by

21  step how the arrangement for Mr. Smith for that vacation

22  worked.

23  A.      He and I were just talking and he had, his kids

24  had never been to Disney and --

25          THE REPORTER:  Could you just slow down just a

1    little bit for me, please?

2              THE WITNESS:  Yes, ma'am.

3              THE REPORTER:  Sorry to interrupt.

4    A.        He had told me that they wanted to go to Disney

5    and had no credit card.  And I came up with the idea and

6    said, hey, we pay you so much every, for bonuses every

7    month, what if I withheld that and I go to Mike and asked

8    him if they would book the flights and everything for

9    Disney for you.  He was all excited.

10             I went to Mike and asked if we could do that.  He

11   said yes, as long as you show, you know, that, you know,

12   he's paid it back or don't take off whatever you have to

13   take off and we started booking it.

14   Q.        (BY MS. SCHRICK) Okay.  And how many trips did Mr.

15   Smith take pursuant to that type of arrangement?

16   A.        One in 2009 and 2010.

17   Q.        Okay.  Mr. Siddle, I have just handed you what's

18   been marked as Defendant's Exhibit 224.  Do you have that?

19   A.        Yes, ma'am.

20   Q.        Okay.  And do you recognize that?

21   A.        Yes, ma'am.  Hold on.  (Pause.)  Yes, I do.  It

22   has to do with his trips and what was being booked.

23   Q.        And who prepared or printed the documents that are

24   included in that exhibit?

25   A.        I printed all of these.

1    Q.       Okay.   Turning your attention to the first page,

2    can you tell me what that reflects?

3    A.       Every month he got a -- I put together like a memo

4    to Alisha, who is the bookkeeper, to let them know how

5    much the check was being cut.   So what I did during that

6    time, I didn't, I just kind of held them off and then did

7    one big one showing from October to May, and it breaks out

8    what he was supposed to be getting.   And then I minused

9    off what the trip cost that year and what the balance was.

10   Q.       Okay.   And according to page one, what was the

11   trip cost of the 2010 trip?

12   A.       $4,006.30.

13   Q.       And according to page one, how much had been

14   applied to the cost of the 2010 trip?

15   A.       $3,435.

16   Q.       Okay.   And are there other similar memos

17   reflecting withholdings from Mr. Smith's bonuses in this

18   Exhibit 224?

19   A.       Yes, there is.

20   Q.       Do you have an understanding as to how much those

21   invoices total?

22   A.       Total of both trips?

23   Q.       Right.

24   A.       Around 6500.

25   Q.       Okay.   Could you turn to page seven for me, please

1    with.

2             THE COURT:   Of 224?

3             MS. SCHRICK:   Yes, Your Honor.

4    Q.       (BY MS. SCHRICK) What does page seven reflect?

5    A.       This is the trip he took in 2010.   This is the

6    flights that I booked for him.

7    Q.       Okay.   And can you tell me who the passengers are

8    that you booked flights for specifically?

9    A.       There, two of his children and then a friend of

10   one of their friends came along, too.   There was four of

11   them.   Christopher Smith, his two daughters, and another

12   girl Kayla that was coming along too.

13   Q.       And turning to page nine, what does that reflect?

14   A.       This is a confirmation at the Disney resort.

15   Q.       And again, who was staying at the Disney resort in

16   this reservation?

17   A.       Mr. Smith, his two children, and then Kayla was

18   there, too, yes.

19   Q.       Okay.   And are there similar documents in Exhibit

20   224 relating to the Smith family's 2009 trip?

21   A.       Yes, there is, on No. 19.   Yes.

22   Q.       Okay.   And just to be clear, where were the

23   expenses for the Smith family's two trips initially

24   charged?

25   A.       Charged to the company credit card --

1    Q.      Okay.

2    A.      -- for Washington Park.

3    Q.      And did you have Mike's consent to place those

4    charges on the credit card?

5    A.      Yes, ma'am.  Both times I, I told him about it and

6    he said it was okay.

7    Q.      To your knowledge were those charges repaid by Mr.

8    Smith?

9    A.      Yes, ma'am, it was.

10          MS. SCHRICK:  I don't have any further questions

11   at this time, Your Honor.

12          THE COURT:  Redirect -- or recross-examination?

13                   REDIRECT EXAMINATION

14   BY MR. COX:

15   Q.      Mr. Siddle, let me start with what you were just

16   talking about.  Do you know whether Mr. Smith received a

17   W-2 or 1099 for these payments to him?

18   A.      As far as I know, I don't think so.  But I'm not

19   sure.

20   Q.      When did you create these memorandums that we're

21   looking at, looking on, for example, the first page of

22   Exhibit 224?  When did you create that?

23   A.      I created this one June 14, 2010.

24   Q.      And looking at this, it appears that, that this is

25   for the period of October 9th -- I'm sorry, October 2009

1    through May of 2010; is that correct?

2    A.     Yes, sir.

3    Q.     So that would capture all the bonuses for that

4    period?

5    A.     Yes, sir.

6    Q.     Okay.  And if we look at this, we see payments to

7    him for various bonuses.  I wanted to ask you, who's in

8    charge of the shipping there?

9    A.     Well over -- that's Todd's responsibility, yes,

10   sir.  That's Mr. Smith's.

11   Q.     So it's Todd's responsibility to make sure things

12   are shipped correctly?

13   A.     Correct.  Yes, sir.

14   Q.     And yet he got a bonus for correcting three -- I'm

15   sorry, 4,040 double shipments?  Is that correct?

16   A.     Yes, sir.

17   Q.     That's where you ship things out twice?

18   A.     No.  What happens is that a, a patient's tray

19   comes across with all his meds in it.  Sometimes their

20   meds get separated into two different trays.

21   Q.     Mm-hmm.

22   A.     And then all of a sudden we're shipping meds to

23   the same person, the same day, but two different trays,

24   which means double the cost in postage.  So his job was to

25   double check to make sure we weren't shipping twice to one

1    patient in one day.  And he put those into one box and

2    then, and then backed out the postage for that one box.

3    Q.      And so that was his job, right, to catch those?

4    A.      Well, he had staff underneath him was supposed to

5    do it.  His job at the end of the day, to make sure that

6    wasn't going to happen.

7    Q.      Okay.  But that was part of his regular job;

8    right?

9    A.      Yeah.  Yeah, it was.

10   Q.      Okay.  And he was paid for that, his job, right?

11   A.      Yes, sir.

12   Q.      But here you are giving him a bonus for actually

13   doing his job; right?

14   A.      His job was to oversee his staff to make sure they

15   did that.  And, yeah, he was getting a bonus to make sure

16   they did it.

17   Q.      So would this reflect all of the, all of the

18   commission -- I'm sorry, bonuses that he would have been

19   entitled to for the period October '09 through May 10th of

20   2010?  October '09 to May 2010?

21   A.      Yes.

22   Q.      All of them?

23   A.      Yes, all of them.

24   Q.      Okay.  If you would turn to the second page.  So,

25   this is January of '09.  Are these previous bonuses that

1    were paid to him at that time?

2    A.      Yes.  On that date I turned around and paid him, I

3    mean, Alisha paid him for that commission for that, for

4    that time period, yes.

5    Q.      Okay.  So what I want to make clear here is that

6    this commission was paid to him back in January of '09;

7    correct?

8    A.      Correct.

9    Q.      Yeah, that was long before the idea of the trip

10   came about; right?

11   A.      Yes.

12   Q.      Okay.  Going on to February of '09, the same

13   thing, that was paid to him in February of '09, was not

14   applied to the trip, just paid to him; correct?

15   A.      Yeah, this was an, examples of the different memos

16   that went out.

17   Q.      Same in May of '09; correct?

18   A.      Which page?  Where are you at?

19   Q.      Page four.

20   A.      Oh.

21   Q.      It was paid to him at that time, was not credited

22   toward the trip; right?

23   A.      That is correct.

24   Q.      You said that Mike's testimony was accurate, I

25   believe.  Mike testified that Mr. Smith paid this back in

1    cash.   Did you ever see any cash?

2    A.      No, sir.  He didn't.

3    Q.      Okay.  Now then, so you said the total amount of

4    the trip was $6500; right?

5    A.      I said, yeah, right around for both trips.

6    Q.      Okay.  And so it looks like he applied 3435.  Did

7    he pay cash for the rest of it?

8    A.      No.  He withheld another one of his bonuses he was

9    supposed to get.

10   Q.      Where is that?

11   A.      I -- I'm sure that back, back in my computer, I

12   just printed some stuff out to show what was happening

13   back then.

14   Q.      So we don't have anything here to show what he,

15   where he came up with the difference between the 3435 and

16   the 6500?

17   A.      No, sir, not right here.  No.

18   Q.      All right.  Now then, Exhibit 9, please?  Turning

19   to page -- let's see here -- 49, please.  Do you have that

20   page, sir?

21   A.      Yes, I do.

22   Q.      Okay.  This is the statement for Central.  Looking

23   at the, for the period ending December 31, 2005, do you

24   see that?  The right-hand column?

25   A.      I must be -- I'm on December 31st, 2007.  Am I on

1    the wrong page?  I'm on page -- wait a second.

2    Q.      I'm sorry.  My mistake.  It's the handwritten

3    number 34.  I'm sorry.

4            THE COURT:  Handwritten 34?

5            THE WITNESS:  Not 49?

6            MR. COX:  Yes.  That's correct.  That's my

7    mistake.  I apologize.  Handwritten page 34.

8            THE COURT:  This is entitled Medicate Pharmacy

9    Central income statement?  Is that what you are looking

10   at?

11           MR. COX:  Yes, sir.

12   Q.      (BY MR. COX)  And in the right-hand column, let's

13   see, I just want to go through you how, with you how this

14   works, okay?  So we have sales, and the total sales for

15   2005 were 3.2 million, rounded; is that correct?

16   A.      That is correct.

17   Q.      And then we take off, in the next group we take

18   off the cost of goods sold, and that was 2.1 million;

19   correct?

20   A.      That is correct.

21   Q.      And then we get the gross profit, which is 1.1

22   million; right?

23   A.      Yes, sir.

24   Q.      Then we subtract off all of the operating

25   expenses, which were $726,000; is that correct?

1    A.        On page 34 to 35, yes, sir.

2    Q.        Yes.  And then we are left with a income, net

3    income of 382,000; correct?

4    A.        That's correct.

5    Q.        And then that would be divided up, you'd get 10

6    percent, Mark 40, and Mike 50; is that correct?

7    A.        No, sir.  This is for the Pharmacy of Medicate

8    Central, this is not for just the mail order.

9    Q.        Oh, so this includes both the mail order and the,

10   and the regular pharmacy?

11   A.        This includes Medicate Central Pharmacy, all their

12   financials.

13   Q.        And the mail order.

14   A.        Yeah, mail order's in there.  Yes, sir.

15   Q.        Okay.  So if we want to know how to break it out,

16   we would have to have a separate statement; right?

17   A.        Yeah, those -- that's that -- that exhibit I did

18   on the invoices for what that cost of the mail order was

19   doing within that pharmacy.

20   Q.        Well, let's take a look here now.  Let's see, I

21   want to find the right page that Miss Schrick was going

22   over with you.  If we go to Exhibit 8?

23            THE COURT:  Exhibit 8?

24            MR. COX:  Yes, Exhibit 8.

25            THE WITNESS:  8.

```
1    Q.        (BY MR. COX)  This is 34.  Is this the page she

2    reviewed with you?  Page 34?

3    A.        Earlier she did, yes, that's on the DeliverMed

4    mail order.

5    Q.        Right.  This is just the mail order part of it;

6    correct?

7    A.        No, sir.

8    Q.        This isn't for the mail order portion of the

9    business?

10   A.        What this is for, is all the things that our

11   bookkeeper could see as a piece that only deliver, only

12   the DeliverMed mail order actually did.  This is not like

13   there -- that's all that was.

14   Q.        Well, the mail order --

15             THE COURT:  Hold on a second.  I don't understand.

16             MR. COX:  I don't either.  That's what I was going

17   to ask.

18             THE COURT:  Try again.

19   Q.        (BY MR. COX)  You heard Larry Junior testify that

20   he kept the books and records of the mail order separate

21   for a period of time; correct?  Did you hear that

22   testimony?

23   A.        Yes, I can tell you what I, what I thought they

24   were doing.

25   Q.        The question is -- no, that's not my question.
```

1    Did you hear him testify to that?  That he kept these

2    separate for the mail order?

3    A.        Yes, I remember that.

4    Q.        And that he would keep track of, of, of the, of

5    this and used it to obtain a net profit; correct?

6    A.        I'm not sure if I heard him say that.

7    Q.        Well, let's go through it.  He, he records here

8    sales for the mail order portion of the business 1.7

9    million, and then they deduct off the cost of goods sold,

10   1.2 million, for a gross profit of 550,000.  Then they

11   deduct off operating expenses and come with a net income

12   of $404,087.  And that is the figure that you would be

13   entitled to 10 percent of; correct?

14   A.        No, sir.

15   Q.        So this is not the accurate net income for that

16   period?

17   A.        If I understood this, all they were trying to do

18   is figure out what exactly the cost of the mail order

19   within the pharmacy was.  These P and Ls, I never saw,

20   except once or twice, because they were just trying to get

21   an idea of what this is costing.  They didn't --

22   Q.        Okay.  In order --

23   A.        -- find it -- they didn't -- all this was was

24   pieces taken out of Central and put it here.  But all of

25   these numbers were in Central's.

1    Q.       So in order to get a true picture of what the mail

2    order business is doing, what the true net profit is, you

3    would have to deduct off $7 per prescription from this to

4    arrive at the real net profit.  Is that what you are

5    saying?

6    A.       Now, if these numbers, they would have had to put

7    in things like the insurance payments to, you know, health

8    insurance and all these other divisions over there.

9    Q.       Okay.  So you wouldn't take just a $7 and write

10   that off of the net profit, you would actually go in and

11   plug in the actual expenses attributable to the mail order

12   and put them in here, wouldn't you?

13          MS. SCHRICK:  Objection, Your Honor, as to

14   foundation.  He didn't prepare these, he doesn't, you

15   know, that is not his --

16          THE COURT:  Well, I'm trying to figure out what

17   this witness, how he figures what his, his, what his,

18   where his 10 percent draw comes from.

19          MR. COX:  Yes, sir, I agree.  I -- you know,

20   we've, we've talked about --

21          THE COURT:  I'm going to overrule the objection

22   because I don't know -- I mean, we have a bunch of

23   financial statements and everything and I don't know where

24   Mr. Siddle, whether there's a document that shows you

25   where your 10 percent comes from or not.

1    Q.      (BY MR. COX)  Yeah, in other words, just to

2    figure, to figure your, your 10 percent of the net income

3    we have to deduct off the expenses.  And what I hear you

4    say is that all of the expenses aren't on here.  We would

5    have to go someplace else and draw some of those expenses

6    over here to get a different number.  Is that what you are

7    saying?

8    A.      Yes.  I put together every month a invoice just

9    showing how much was coming in for the mail order, how

10   much was basically going out for cost of goods.  And the

11   overhead of all, what we figured at $7 per scription for

12   all overhead, that's the number, that's the document that

13   tells me what my 10 percent is.  Now, out of my 10 percent

14   we have to take care of marketing, but that's the

15   document.

16          THE COURT:  Has that document been admitted into

17   evidence?

18          MR. COX:  In fact, we had talked, we had shown

19   that as an invoice, as an exhibit, when I talked with him

20   earlier and I asked him to explain all that, where he was

21   deducting off the $7.

22   Q.      (BY MR. COX)  But what I'm saying is, when we look

23   at this document, which were prepared by the accountants

24   for the firm, we don't see that deduction of $7, do we?

25   A.      No.  This was just a reflection of what Alisha,

1    who is the bookkeeper, look -- was told.  Would you

2    please, if there's a bill that you know for a fact is only

3    for mail order, make sure that Schaltenbrand and

4    Schaltenbrand knows, because we gotta kind of get an idea

5    if this $7 is even close to what we're trying to figure

6    this whole thing out.

7    Q.    So they put --

8    A.    And they put -- and they put these doc -- they put

9    those numbers not on a spreadsheet but on a financial.

10   Q.    So the only person that was creating a document

11   that reflected this $7 being deducted off was you;

12   correct?

13   A.    I was the only one, that was my responsibility, to

14   come up with a document every month that showed our sales,

15   adjudicated revenue, that shows our cost of goods for that

16   mail order, and it shows that $7 that we three agreed to,

17   we think that's what we should charge for, to complete

18   that overhead so we know what the pharmacy has to get

19   money back for what they are doing.

20   Q.    So you --

21   A.    I was the one --

22   Q.    Answer the question.

23   A.    I'm sorry.

24   Q.    You're the only person that was doing that; right?

25   A.    Yes.  And every month I e-mailed --

1    Q.        Thank you.  That's the end of the question.

2    A.        Sorry.

3    Q.        Now the next part -- the next part is --

4    A.        Sorry.

5    Q.        Just relax.  It's okay.  The next part is that the

6    accountants were not doing that at all, were they?

7    A.        Sir, I didn't even know the accountants were

8    separating this until several months after that.

9    Q.        Well you, you have looked, you have looked at the

10   Central financial statements.  You saw those, didn't you?

11   A.        Yes, sir.

12   Q.        You don't see the $7 there anyplace, do you?

13   A.        No.  It wouldn't be there.

14   Q.        No.  And you didn't even know that Larry Junior

15   was keeping separate records for the mail order?  They

16   didn't show you these?

17   A.        Not on December 31st, 2005, no.

18   Q.        When did you first learn that these existed?

19   A.        I would almost say probably in the middle of 2006,

20   I actually saw a copy sitting --

21   Q.        Okay.

22   A.        -- in our office.

23   Q.        So you saw it and you saw the $7 wasn't on there;

24   right?

25   A.        I didn't go through it, I just saw it.

1    Q.      You didn't read it?

2    A.      No.  That wasn't -- my job was to put together an

3    invoice every month and let everybody know what the

4    cost --

5    Q.      So you didn't go to the financial records to get

6    the information to create your invoice?

7    A.      No.  Not there, no, sir.

8    Q.      Mm-hmm.  Who did you share the invoice document

9    with that you created?

10   A.      I e-mailed Mike Schaltenbrand and Mark Swift.

11   Q.      That's the only people you showed it to?

12   A.      And Alisha.  I gave it to her, a copy -- I made a

13   copy and gave a copy to her.

14   Q.      Three people you showed it to.

15   A.      Yes.

16   Q.      How many employees does Central have separate --

17   let's go back to -- let's go back to this time of December

18   of '05.  December '05.  How many employees did Central

19   have that were not part of the mail order business?

20   A.      I'm not sure how to answer that because in, in,

21   like let's say in retail all of a sudden we get hit with a

22   bunch of people, so we would move some of the people in

23   the back to help them out.  So we'd move people back and

24   forth like that.  So who only, only did mail order, let me

25   think a second.  (Pause.)  Probably one guy in shipping

1    who didn't do anything for retail except take out their

2    trash.  (Pause.)  That only did mail order?  Probably two,

3    two or three.

4    Q.      How many -- my question was, how many did you have

5    that did not do mail order?

6    A.      That totally did not do mail order?  Two.

7    Q.      Give us some sense if you would of the size of the

8    facility there in Washington Park.  How big is it?

9    A.      At that time or right now?

10   Q.      At that time, back in December of '05.

11   A.      Square footage?

12   Q.      Well, just give us a sense of the size of it, if

13   you would.  Is it as big as this room?

14   A.      Oh, no, no, no.  You would have a, a front retail

15   where people come and sit down, it's a small room about

16   the size of that.  And then you had --

17   Q.      Jury box.

18   A.      Yeah.  And then you had a pharmacist behind like a

19   wall like that, and he's doing his meds.  And you had a

20   tech right there.  And you had a guy who was, a lady who

21   was checking people out.  That's the front side.

22          And there was an office right to the side of there

23   where Alisha and I sat.  And then behind us is a bathroom.

24   And then there's a small room that we kept some meds and

25   stuff in.  And the next room over was a room for all the

1    shipping, which is -- the shipping room was probably a

2    fourth of this room, and that's where you had the robot

3    and a pharmacist checking the meds and two shipping guys

4    and all those boxes.   And then a room about that same size

5    in the back where we had -- 2005?   That's all there would

6    be.

7    Q.      Okay.   These memos about bonuses to employee -- to

8    this employee Todd Smith were not produced in discovery,

9    they were produced just this week; correct?

10   A.      Yes, sir.

11   Q.      And did you give any bonuses to anybody else?

12   A.      At that time, yes, sir.

13   Q.      Who else got bonuses?

14   A.      Off the top of my head, Faye Johnson -- at what

15   time, sir?

16   Q.      Back at the time Mr. Smith's getting his bonuses.

17   A.      There was only two people, Faye Johnson and Todd

18   Smith.

19   Q.      Let's look again at this invoice that we had been

20   talking about.

21            MR. COX:   91, Judge.

22            THE COURT:   91?

23   Q.      (BY MR. COX)   And this is the invoice we had

24   talked about earlier as an example of what you had been

25   doing.   And I think you said you shared this with Mike and

1    Alisha and Mark; correct?

2    A.      Yes, sir.

3    Q.      You didn't share it with the Schaltenbrand

4    accounting firm; correct?

5    A.      No, sir.

6    Q.      And these numbers, we look here, show revenue.

7    And where did you get that number of revenue for this

8    particular work?

9    A.      That's an adjudicated number.

10   Q.      Where, where did you get it?

11   A.      I'm sorry, the software told me that.

12   Q.      The software told you that.

13   A.      Mm-hmm.

14   Q.      Okay.  It'll tell you how many patients you ship

15   to.  Is this for a month?

16   A.      For a month, yes, sir.

17   Q.      Okay.  And then we see acquisition cost --

18           THE COURT:   This was for the month of August 2005?

19           THE WITNESS:  Yes, sir.

20           MR. COX:  Yes, August of 2005.

21           THE COURT:  It was generated on September 1, 2005.

22           THE WITNESS:  That is correct.

23   Q.      (BY MR. COX)  And this would have been actually

24   the first month you were in operation; right?

25   A.      Yes, sir.

1    Q.        Mm-hmm.    And so then you, so you take then off the

2    cost of goods.    Where do you get that number?

3    A.        The cost of goods is when you pull the report up,

4    it will tell you what the, the sales number or the

5    adjudicated revenue, and then it would show the cost of

6    goods at the bottom, what the, what the computer told you

7    that the cost of goods was.

8    Q.        Now over on page 34, we see that, of Exhibit --

9    A.        I, I closed it.    I'm sorry.    Exhibit 8?

10    Q.        Page 34 of Exhibit 8, the one we were looking at.

11    So far you are tracking the way Larry Schaltenbrand was --

12    Junior was doing it.    And then we -- he -- after the cost

13    of goods is obtained you get the gross profit.    And then

14    he starts subtracting operating expenses.    Do you see

15    that?

16    A.        On -- over here?    34?

17    Q.        Yes, sir.

18    A.        Yes.

19    Q.        But on your chart that you have created here, you

20    don't subtract the operating expenses, do you?    You just

21    subtract this 7-dollar overhead cost; correct?

22    A.        That's operating expense.

23    Q.        Right.    But you don't, you don't capture the

24    expenses that Mr. Schaltenbrand has done on his accounting

25    sheet here, do you?

1    A.        No.  I wouldn't, I wouldn't do that, no.

2    Q.        So you wouldn't even count those operating

3    expenses, you just go straight to the $7 as covering all

4    expenses; correct?

5    A.        Yeah, we were just trying to capture what it would

6    cost --

7    Q.        Okay.

8    A.        Yeah, that's all.  Yeah, I mean, they captured

9    that $7 to capture all expenses except marketing.

10   Q.        Have you ever worked as an accountant?

11   A.        No.

12   Q.        Studied accounting?

13   A.        No.

14   Q.        Anything like that?

15   A.        No, sir.

16   Q.        All right.  Very good.

17             MR. COX:   Those are all the questions I have,

18   Judge.

19                           EXAMINATION

20   BY THE COURT:

21   Q.        Before you get off -- so as I understand it from

22   your testimony, your 10 percent would be taken off the

23   2700 -- looking at Plaintiff's No. 91, the 2721.29, you'd

24   get 10 percent of that?

25   A.        Yes.  We still have some marketing cost that's not

1   in there but that would, 10 percent of that would be mine,

2   yes.

3   Q.      Well then you say -- I'm still confused as to

4   where, how you figure -- when you receive money from this

5   business, there had to be some kind of document or report

6   that showed you how much you were owed.  Isn't that not

7   true?

8   A.      That's true.  And we got one.

9   Q.      You got one?  Where is it?  Because if you say

10  that this is -- this still isn't correct, that you still

11  have some more to take off of here.  Where is it?

12  A.      I would send these to Mark.  And then about,

13  starting in '06, Mark would send an e-mail saying, I have

14  calculated all the revenue coming it and I have looked at

15  Joe's stuff, and we should start splitting 45,000 a month.

16  And we split up the percents off of that.

17          It was like, kind of like a draw number that he'd

18  come up with a number.  And then Mike would go, we can't

19  do that, we don't have it in the checking account.  Then

20  all of a sudden he'd go, well, we need to start splitting

21  something.  And then Mark would go, let's at least split

22  30,000 then.  And finally Mike would say, okay, let's

23  start splitting 30,000 and we'll figure it out later.

24  Q.      Well, where did this 30,000 -- is there a document

25  that would show there was a 30,000 that needed to be split

1    someplace or was that just --

2    A.      That was --

3    Q.      -- in Mark's head?

4    A.      Mark told us that that's how much he perceived

5    that we were making as a mail order business and we should

6    start splitting up profits.  At first, Mike did not want

7    to do that.  He said, we gotta pay back the loan.

8    Q.      Okay.  So, so what you are telling me is that

9    neither -- this Court should not consider either

10   Plaintiff's 8 or Plaintiff's 91 in determining what the

11   true accounting of the division of profits was for

12   DeliverMed, the mail order business?

13   A.      That's correct.

14   Q.      So none of these documents are accurate?

15   A.      No.  We just found -- and we found out at the end

16   that we took way too much money.

17   Q.      Okay.

18           MR. COX:  Just a, just a brief followup.

19           THE COURT:  Followup.

20                     FURTHER REDIRECT EXAMINATION

21   BY MR. COX:

22   Q.      But Exhibit 91 was created completely by you, all

23   these invoices; correct?

24   A.      Yes.

25   Q.      And these financial statements were created

1    completely by Schaltenbrand and Schaltenbrand accounting;

2    is that correct?

3    A.        That is correct.

4              MR. COX:   All right.

5              THE COURT:   Miss Schrick.

6              MS. SCHRICK:   Thank you, Your Honor.

7                        RECROSS-EXAMINATION

8    BY MS. SCHRICK:

9    Q.        Okay.  Mr. Siddle, we're going to have a few more

10   things to talk about now.  In the very beginning, what was

11   the idea behind the mail order business, just the basic

12   idea?

13   A.        Was to be able to bring patients in and sell those

14   patients off to somebody.

15   Q.        Okay.  In the beginning was there any discussion

16   about sharing profits or splitting distributions or

17   commissions?

18   A.        The very beginning, there wasn't.  We were trying

19   to build a business and sell it off.  That didn't happen

20   until later.

21   Q.        Okay.  Who was going to be doing the selling?

22   A.        Mark had an idea to be able -- he had the

23   telemarketing, Mark was going to get us the patients, and

24   then he was going to try and find somebody to buy it.

25   Q.        Okay.  Did he do that?

1    A.       No.   He didn't do that, no.

2    Q.       Okay.   And then I think you testified previously,

3    there was times when after that didn't happen he started

4    suggesting people take distributions or commissions; is

5    that right?

6    A.       That's correct.   About three or four months into

7    it, yes.

8    Q.       Okay.   Now, what was your understanding of the

9    agreement for how the commissions or distributions were

10   going to be calculated?

11   A.       The very beginning, Mike had told both of us that,

12   there's no, not going to be any distributions or any type

13   of split, any type of profits, until all the telemarketing

14   is paid for.   And then after a couple months Mike -- Mark

15   wanted money, so Mark basically said, listen, guys we're

16   going to sell this whole thing, let's just put the

17   marketing money into the bank loan and we'll pay that off

18   first.   We sell this business for $26 million and then

19   we'll split everything after that.   So let's start

20   splitting some money every month.

21           So, he come up with a figure.   I think we're doing

22   this much.   I think, I think we're, our profit should be

23   about 35 -- $30,000 a month, so let's split 30,000.   So

24   he'd take 30,000 on his e-mail and go, okay, out of 30,000

25   Mark, Mike, you'd get, if that's the number you get 15,000

1    and then he's say make sure Alisha cuts these checks --

2    THE COURT:   Can you slow down a little bit?

3    THE WITNESS:   I'm sorry.

4    THE REPORTER:   Thank you.

5    THE COURT:   The court reporter has a stun gun down

6    there.   I can see it.

7    (Off the record.)

8    Q.    (BY MS. SCHRICK) Okay, Mr. Siddle, so we talked a

9    little bit kind of about the concept.   When the commission

10    started being paid out, what was your understanding of the

11    agreement as to how those numbers were being calculated?

12    A.    My -- how I was thinking when I got the document

13    from Mark saying we should split 30,000, in some cases

14    100,000, I asked him, where are you getting this number?

15    Because according to my numbers, that's not adding up.

16    He'd say, oh, Joe, he goes, I think your numbers are

17    wrong.   There's a lot more profit coming into this

18    pharmacy for the mail order.   I think you're totally

19    wrong, Joe, I'm serious, more money is coming in.

20    I'm like, well, he's an accountant.   Okay.   And

21    obviously I should have stopped it but I thought, well,

22    I'm getting 10 percent of whatever you all are splitting

23    so they, so Mike -- Mark would say, we're going to split

24    at one time 60,000, and 100,000 a month, and then, and

25    then Mike would look at the checking account and go, well,

1    we have enough in there.  So they would, they would cut

2    checks and I'd get 10 percent of whatever that number Mark

3    came up with.

4    Q.      Okay.  Let me ask you this, Mr. Siddle, turning to

5    Exhibit 91 -- do you have that in front of you?  That's

6    the invoice that you prepared.

7    A.      Yes, ma'am.

8    Q.      And this is just a representative invoice;

9    correct?

10   A.      Yes, ma'am.

11   Q.      You prepared them monthly.  And you sent them to

12   Mr. Swift and Mr. Schaltenbrand monthly?

13   A.      Yes.

14   Q.      Okay.  Now, you testified earlier that there was

15   some inaccuracies with this.  What, if anything, is not

16   reflected on this document?

17   A.      The only thing it doesn't reflect here is the, the

18   telemarketing costs that we were accruing, that the

19   pharmacy was paying for.

20   Q.      Okay.  And what was your understanding of the

21   arrangement as to when those telemarketing costs were

22   going to be paid for by mail order, so to speak?

23   A.      At the very beginning, we were supposed to pay

24   that off first before we split any type of profits.

25   Q.      Okay.  What if the mail order was sold, what would

1    happen?

2    A.      I was told that if we find someone to buy all the

3    patients, we would transfer the patients to them, and then

4    whatever the amount was, the first thing Mark said we

5    promise that we will pay off that loan at the bank and

6    then we'll pay off what we have to pay off and then we'll

7    split the difference.  And I'd get 10 percent of whatever

8    it was.

9    Q.      Okay.  So despite the fact that doesn't reflect

10   the bank loan or the marketing expense, this total net

11   profit number is accurate to the best of your knowledge?

12   A.      Yes, ma'am, it is.

13   Q.      And would that be true of your other monthly

14   invoice?

15   A.      Yes, ma'am.

16   Q.      And this monthly invoice does reflect the $7 per

17   prescription overhead charge; correct?

18   A.      Yes, ma'am.

19   Q.      Okay.  Why did you use $7 per prescription instead

20   of trying to come up with actual numbers?

21   A.      Since we were using a pharmacy, we weren't sure

22   what that number was.  Like, okay, all that overhead, how

23   do we calculate what we charge back to that department?

24   And so all three of us said, we think $7, because we have

25   all the shipping costs, everything.  So they -- we came up

1    with the number 7.

2         Obviously later on we found out that that number

3    probably wasn't right because we weren't sure.  We were

4    guessing.

5    Q.      And just to be clear, this Washington Park

6    facility, how many business operations are going on there?

7    A.      Four.

8    Q.      Four.  Okay.  And would mail order be one of

9    those?

10   A.      Yes.

11   Q.      And then --

12   A.      Retail.

13   Q.      Retail.

14   A.      Hospice.

15   Q.      Okay.

16   A.      And we had a long term care facility that we sent

17   them meds, and that was a different department.

18   Q.      Okay.  And in terms of hospice, retail, and long

19   term care, would that all fall under Central?

20   A.      Yes.

21   Q.      Okay.  Mail order was also part of Central?

22   A.      Yes.

23   Q.      Okay.  You, your invoices, reflect the mail order

24   numbers?

25   A.      Yes.

1    Q.        They don't have anything to do with these other

2    business operations?

3    A.        That's correct.

4    Q.        Okay.  But all of those are in the Washington Park

5    physical building?

6    A.        That's correct.

7    Q.        Okay.  How many rent bills does the Washington

8    Park physical building receive?

9    A.        One.

10   Q.        How many electric bills?

11   A.        One.

12   Q.        Would that be true of all of its overhead, so to

13   speak, expenses?

14   A.        Yes, ma'am.

15   Q.        Okay.  Did the mail order financial statements

16   reflect all of those overhead expenses?

17   A.        No, ma'am.

18   Q.        Okay.  What was the purpose of the $7 in that

19   context?

20   A.        The $7 in that context, we were just trying to

21   figure out what our cost was for our portion of overhead

22   as a mail order.

23   Q.        Okay.  You said you gave your invoices to Alisha,

24   the bookkeeper?

25   A.        Yes.

1    Q.        Do you know what she did with those invoices?

2    A.        I'm not sure.

3    Q.        Do you remember when Mr. Cox asked you about the

4    revenue number, and the revenue number in the financial

5    statements?

6    A.        Yes.

7    Q.        Was it your testimony that those numbers

8    corresponded?

9    A.        I'd have to look.  I apologize.  I'm not sure if

10   we're talking about the same thing.  I'm not sure.

11   Q.        Okay.

12             THE COURT:  Question:  Do you -- Exhibit No. 91,

13   do you have these for every month?

14             THE WITNESS:  I have every month until the end of

15   2007, yes, sir.

16             MS. SCHRICK:  We're getting there right now, Your

17   Honor.  If I may approach Mr. Siddle?

18             THE COURT:  Yes.

19             MS. SCHRICK:  This is Exhibit 153.

20   Q.        (BY MS. SCHICK) Mr. Siddle, I have just handed you

21   what's been marked as Defendant's Exhibit 153.  Do you

22   have that?

23   A.        Yes, I do.

24   Q.        Okay.  And can you tell me what this is?

25   A.        The first page?

1    Q.      Well, what is this exhibit?  What is this?

2    A.      What this was, I was asked to put together what

3    exactly the, the, the revenues for each one of those

4    years.  And I was told to try to figure out exactly what

5    the profit would have been, and the distributions of all

6    the different, you know, moneys that was given out to Mike

7    and me, and all the sales for each month.

8    Q.      Okay.  Let me ask you this:  Does this include all

9    of your invoices that we had just discussed, like Exhibit

10   91?

11   A.      Yes.  I see the first one and I see the last one,

12   the end of 2007, so they should all be there.

13   Q.      Now, why were you preparing these invoices from

14   2005 to 2007?

15   A.      Because I was told we -- I had to find out exactly

16   what the mail order part was doing and then report it back

17   to Mike and Mark.

18   Q.      Okay.  Who asked you to figure out and track these

19   numbers?

20   A.      Mark and Mike.

21   Q.      Okay.

22   A.      And me.

23   Q.      Okay.  You wanted to know, too?

24   A.      Oh, yeah.

25   Q.      Okay.  So let's look at Bate stamped page

1    Defendant's 5831, is that the same as Exhibit 91?

2    A.      This one page?

3    Q.      I think it spills over, right, on to the second

4    page?  There's a column that kind of got cut off, the page

5    behind it.

6    A.      This here?

7    Q.      Exhibit 91, is that Defendant's 5831?  Yes, that's

8    Exhibit 91, right?  Okay.  Can you compare that to Exhibit

9    Defendant's 153 and then in the bottom right-hand corner,

10   the part that says Defendant's 5831.

11   A.      Yes, I see on the next page, it's the exact same

12   number.

13   Q.      Okay.  And that is an invoice that you prepared?

14   A.      Yes, ma'am.

15   Q.      And just to go through the process here, this

16   revenue number, where did you obtain that?

17   A.      Basically the software told me what was

18   adjudicated that month for that.

19   Q.      Okay.  When you say adjudicated, tell me what that

20   means?

21   A.      Whenever the -- I'll slow down.

22           Whenever the software submits a, what they call

23   adjudicated claim, in other words, it's saying to the

24   insurance company, you owe us this.  And they kick back

25   within less than second, this is how much you are being

```
 1    paid.  That's what that's called.  It's adjudicated

 2    revenue.  Doesn't mean we are going to get that back, it

 3    just means we should get that back.

 4    Q.       So your computer bills insurance companies and

 5    other providers an amount for the prescriptions?

 6    A.       The amount that they choose what it is but, yes.

 7    Q.       Well, you send out your number, right, and then

 8    they tell you back --

 9    A.       Yeah.

10    Q.       -- what they're going to pay?

11    A.       So the software captures what that, that insurance

12    company says they're going to pay and that, that's what's

13    called adjudicated revenue.

14    Q.       What the insurance company is going to pay?

15    A.       Correct.

16    Q.       Okay.  So in terms of the revenue number, tell me

17    what these different entries mean.  Third party --

18             THE REPORTER:  Could you, could you start over and

19    please slow down?

20             MS. SCHRICK:  I'm sorry.  Sure.

21    Q.       (BY MS. SCHRICK)  In the revenue number, the first

22    entry is third party revenue without copay.  What does

23    that mean?

24    A.       The system told me that's how much you should get

25    back.  Then there's a separate number for copay.  In other
```

1   words, that's the number you should get back from the

2   patient.  I didn't add that number in because we hadn't

3   gotten that amount back yet so I, I put that separate.

4   Q.      Okay.

5   A.      The next line -- do you want me to go through the

6   next line?

7   Q.      Yes.

8   A.      The next line is what copays we did collect.  So,

9   out of $664, we did collect $245.

10  Q.      Okay.  So if I add the 245 to the 59,000 I get

11  your 60,217 on the next line?

12  A.      Yes, ma'am.

13  Q.      And that's what you have described as total third

14  party revenue?

15  A.      That's correct.

16  Q.      Okay.  Then there's another entry in revenue;

17  right?

18  A.      That's correct.

19  Q.      The total MCA revenue?

20  A.      Yes.

21  Q.      What is that?

22  A.      Medicare, when you bill Medicare, it's different.

23  They don't adjudicate.  Medicare, you tell them how much

24  you want and they will tell you in 45 days if you are

25  going to get it or not.  Because that patient could have

1    went to another pharmacy and billed for diabetic strips or

2    whatever it was, and they're not going to pay us.  So I

3    can't use the adjudicated amount because most likely I

4    know I'm not going to get that total amount.

5         So the first line was, this is how much Medicare

6    was billed.  The next line is what we collected.  So we

7    did collect $1,169 that month.

8    Q.    Okay.

9    A.    And so as you can see, all I added then was the

10   1,169.

11   Q.    Okay.  And if I add the third party revenue and

12   the MCA Medicare revenue, I get your total revenue number;

13   correct?

14   A.    That's correct.

15   Q.    Okay.  And then from that you subtract out your

16   cost of goods sold?

17   A.    That's correct.

18   Q.    Okay.  And then you subtract out the $7 per

19   prescription?

20   A.    That's correct.

21   Q.    Okay.  Now, where were these revenue streams

22   coming into?  What, what entity or what account?

23   A.    It was all coming into Medicate Central

24   Pharmacy's, into the checking account or a check was made

25   and we deposited, they deposited it into the checking

1    account of Medicate Pharmacy.

2    Q.        Okay.  So why did we need this invoice then?

3    A.        Because we -- the -- when the money come in they

4    don't, they don't tell you what that came from.  Like that

5    came from mail order or that came from this.  So all we

6    had was that number.  So we're hoping that number is

7    correct.  But that's the only number we had, so we had to

8    hope that that's what came in.

9    Q.        So to get that number would it be correct that you

10   pulled from your computer system information on the

11   prescriptions that were mail order patients and totalled

12   them up?

13   A.        Yeah, we actually, on every patient we gave them a

14   name so we knew when that, our system would tell us

15   because we identified each patient, what patient it was,

16   hospice or long term care, retail, you know, or mail

17   order.  We gave it names.  So every patient had an

18   identifying name to it.

19            So the software then would tell me, well, you

20   know, out of that money you guys adjudicated for the whole

21   pharmacy, $59,000 was just mail order.  The system would

22   know that because we gave it the correct names.

23   Q.        Okay.  Then down at the bottom there's an entry

24   that says WP to DM.  Do you see that?

25   A.        Yes, ma'am.

1    Q.        What does that mean?

2    A.        At the very beginning the concept was, we had a

3    separate checking account for DeliverMed mail order.    What

4    we were supposed to do, and this is why I gave this

5    document to the bookkeeper, what was supposed to happen

6    was they were supposed to write a check to DeliverMed's

7    checking account for 61,000 and some change.    Then --

8    Q.        Can I stop you right there, Mr. Siddle?

9    A.        Yeah.

10   Q.        Why were they going to do that?

11   A.        Because we had to make sure we separated the

12   funds.    We had to make sure that we -- that's how much we

13   think was, that was mail order's portion.

14   Q.        So you got one check from whoever the provider was

15   into Central, some of that was for retail, some of that

16   was for mail order, some of that was for other things?

17   A.        All coming in.

18   Q.        Okay.    But this is the number that you are asking

19   Central to give to mail order?

20   A.        Correct.

21   Q.        For the mail order money?

22   A.        That's correct.

23   Q.        Okay.    And then you were going to write a check

24   from DM, which would be the mail order?

25   A.        So the mail order was supposed to write a check

1    back to the pharmacy for cost of goods sold.   Then they

2    write another separate check for the overhead cost of $7 a

3    scription.   At this time that was 9,380.   So they were

4    supposed to write another check back to them.   That way,

5    the only thing that was in that checking account was

6    $2,721, and then that would -- every month that would be

7    in there.   And then we would take, you know, whatever out

8    of there like telemarketing money.   Or if we would have

9    split money up, we could take it out of there.

10   Q.      Okay.   And so that 9380 that's showing on this

11   invoice, that's the total of the $7 per prescription for

12   all the prescriptions that month.

13   A.      Correct.   Because the software told me how many

14   prescriptions that month mail order did, which was 1,340

15   that month.

16   Q.      Okay.   And I think you told me you prepared these

17   invoices through 2007; is that right?

18   A.      That's correct.

19   Q.      Okay.   Are the totals of those invoices reflected

20   on the first page of Exhibit 153?

21   A.      If you look to the very right column, it would

22   show you the total DM revenue for that -- are you talking

23   about the first page here?

24   Q.      Right.   Your summary sheet?

25   A.      Oh.

1    Q.      The first page?

2    A.      Yeah, that's a summary sheet for all four years

3    but that was -- yeah, that would actually show.  On the

4    right side it would show 2005 and how much the revenue

5    was, $1.8 million for, off of my invoices what we actually

6    did.

7              MR. COX:  Your Honor, show my objection without a

8    foundation as to who created this particular document,

9    that's the first page.

10             THE COURT:  Who created this?

11   Q.      (BY MS. SCHRICK) Mr. Siddle, tell me about the

12   first page.  Who --

13             THE COURT:  You're talking about this page;

14   correct?

15             MS. SCHRICK:  I am, Your Honor.

16   Q.      (BY MS. SCHRICK) The first page of Exhibit 153,

17   Mr. Siddle, who prepared that?

18   A.      I prepared that.

19             THE COURT:  Okay.

20   Q.      (BY MS. SCHRICK) Tell us how you prepared it.

21   A.      Mark would send us a document here and there.  It

22   looked something like this.  After several years, I

23   realize he was showing how much profit we were getting.

24   And he was taking his numbers from this spreadsheet and

25   how he kind of figured why we should be splitting whatever

1    that was that month.

2         And so I finally started taking apart his

3    spreadsheet and realized that he wasn't using a net profit

4    of 9 percent or 12 percent or 10 percent, that my

5    spreadsheet --

6         THE COURT:  I -- you're not answering her

7    question, but I have a question.  Do you have a copy of

8    the spreadsheets that Mr. Swift sent you --

9         THE WITNESS:  Yes.

10         THE COURT:  -- that you -- is -- that you used to

11    create this document?

12         THE WITNESS:  He first created.  All I did was

13    change the numbers that were correct.  He wasn't using

14    real numbers.  I put -- so I totally redid the spreadsheet

15    and I put the real numbers in, that I know that happened

16    in the pharmacy.

17    Q.    (BY MS. SCHRICK)  So, Mr. Siddle, would it be fair

18    to say this is a format that Mr. Swift created?

19    A.    Correct.  It was a format that I actually then

20    changed to correctly represent exactly what was happening

21    in the mail order side.

22    Q.    The substantive numbers on this spreadsheet, whose

23    numbers are those?

24    A.    Those are all my numbers and it came from the

25    software and it came from the pharmacy.

1   Q.      Okay.   Are the backup for those numbers part of

2   this Exhibit 153?

3   A.      Right.   Everything on this first page is totally

4   backed up, and all these sheets after it.

5   Q.      Okay.

6           MS. SCHRICK:   Does that help, Your Honor?

7           THE COURT:   Yes.

8           MS. SCHRICK:   At this time we would move for the

9   admission of Exhibit 153.

10          MR. COX:   I object.   I don't think they can move

11  to admit an exhibit in our part of the case.

12          THE COURT:   Well, they have been doing it all, for

13  the last several days.

14          MR. STINE:   I guess he liked those.

15          MR. COX:   I'd like to cross-examine, first.

16          THE COURT:   It will be admitted subject to

17  cross-examination.

18  Q.      (BY MS. SCHRICK)   Okay.   Mr. Siddle, you talked

19  about a separate bank account.   Are you aware of a U.S.

20  Bank account for the mail order business?

21  A.      Through the proceedings, yes.

22  Q.      To your knowledge was that account ever used in

23  the mail order business?

24  A.      Not at Washington Park, no.

25  Q.      Okay.

1    MS. SCHRICK: I think that's all I have for now,

2    Your Honor. Thank you.

3    THE COURT: Mr. Cox.

4    FURTHER REDIRECT EXAMINATION

5    BY MR. COX:

6    Q.    Mr. Siddle, who were the three partners in this

7    mail order business?

8    A.    Mike, Mark and I.

9    Q.    Okay. And the three of you were entitled to a

10    percentage of the net profit; is that right?

11    A.    Yeah. Everything's paid for, we should be, yes,

12    sir.

13    Q.    Okay. Let's take a look at page one of Exhibit

14    153. We have Mike, Joe and DeliverMed. But not Mark.

15    Where is Mark?

16    A.    Mark is DeliverMed.

17    Q.    Well, DeliverMed meaning the mail order business?

18    Or DeliverMed Holdings LLC, meaning a corporation that's

19    doing the marketing? Which one?

20    A.    DeliverMed LLC, that's who Mark is.

21    Q.    So you think that Mark is the same as the

22    corporation that he and his family own?

23    A.    Well, a lot of his commissions or a distribution,

24    what you call that, was actually transferred, wire

25    transferred, the exact same amount, it's the same account,

1    every month.  Once he got a distribution --

2    Q.      But Mark individually is the partner, isn't he?

3    Not DeliverMed.

4    A.      At the very beginning when we started this, Mark

5    came in with DeliverMed.  That was him.  Okay?  He had a

6    concept.  Okay?  It was DeliverMed.

7    Q.      Well --

8    A.      Mike had a pharmacy --

9    Q.      Just a minute, sir.  I'm just asking, you

10   testified that Mark was the partner individually, not the

11   corporation; correct?

12   A.      Then why would Mark have us transfer --

13   Q.      Is that correct, sir?

14   A.      Yes, he's -- that's correct.  That's what I said.

15   Q.      All right.  Now, you were telling us that you

16   created these numbers from all of these documents that are

17   underneath this; right?

18   A.      That's correct.

19   Q.      Including in those documents are invoices which

20   you have talked about; correct?

21   A.      Correct.

22   Q.      Any other doc -- types of documents that you have

23   used and relied upon in creating this?

24   A.      Yes, sir.

25   Q.      What types of documents would those be?

1    A.        After 2007, starting in 2008 when we changed the

2    percents, then I had to use P and Ls of Medicate Central

3    to calculate the overhead.

4    Q.        And did this 7-dollar charge stay on the whole

5    time or did it drop off at some point?

6    A.        During the first, '05, '06, '07, that's how we

7    calculated it.  But the problem was, we knew that the

8    adjudicated amount, we weren't sure that was really coming

9    in.  And we weren't sure that the cost of goods was

10   totally collect.  And the $7, we were sort of guessing.

11   So Mark came up with the idea, well, wait a second, it's a

12   big piece of business now, let's redo the percents and now

13   we're going to deal with real numbers that are coming back

14   into the pharmacy for, you know, that patients --

15   Q.        Well --

16   A.        We changed the numbers.

17   Q.        Okay, thank you.  Just tell me what when that

18   happened.

19   A.        It started happening in January 2008, we, we

20   changed the way we were doing things.

21   Q.        I've gotcha.  Okay.  So then we see in here you

22   are relying on, it looks like some financial statements

23   from Schaltenbrand and Schaltenbrand and, and it looks

24   like you've got some other types of documents in here.

25   Did you assemble all these documents into this exhibit?

1    A.        All these documents I, I, I copied, yes.  I didn't

2    put the whole thing together like they did, but all those

3    documents, I gave them.

4    Q.        And so you are saying if we look through all these

5    documents we're going to come up with your numbers that

6    are shown on page one?

7    A.        We should, yes.

8    Q.        Now, under the column DeliverMed you have shown

9    here, this would really be Mark's share; right?

10   A.        That's correct.

11   Q.        Okay.

12   A.        Because he's DeliverMed.

13   Q.        Okay.  Well, he's not DeliverMed, isn't that

14   right?  I mean, that's a corporation.  Right?  You

15   understand?  You understand the difference between a

16   corporation and a sole proprietorship, we talked about

17   that in your tax return.

18   A.        Yes, sir.

19   Q.        So what you are talking about here is really

20   Mark's share; right?

21   A.        Mark's share.

22   Q.        Okay.  So according to your calculations it looks

23   like, if you add all that up, that when we get to the

24   bottom here, can you tell me based on this period of 2005,

25   it looks like it goes through August of 2009, whether Mark

1    is owed any money for distributions?

2    A.       He's not -- no, he's not owed anymore money, no.

3    Q.       And, and you are not owed any money; right?

4    A.       Ooh, no, I'm upside-down.

5    Q.       Was Mark upside-down?

6    A.       He's upside-down by $690,294.

7    Q.       So according to your calculations here, Mark's

8    been overpaid by $690,000?

9    A.       According to the profit of DeliverMed -- I mean,

10   not DeliverMed, the mail order portion, yes.

11   Q.       All right.  And as I understand it, you did not

12   use any of the financial statements of Schaltenbrand and

13   Schaltenbrand to create these numbers for the period 2005

14   through 2007; correct?

15   A.       That's correct.

16   Q.       Now, going back to my Exhibit 91, the way I

17   understand this, you have explained it is that the $7,

18   looking at the bottom --

19   A.       I apologize --

20   Q.       91?  It's the one-page.  It's your invoice, it's

21   just a one-pager.

22   A.       I know.  And I think I misplaced it.  I don't know

23   -- I apologize, sir.

24   Q.       Well, we'll find it.  I'm sure it hasn't gone too

25   far.

1   A.        Hold on, I think I might have put it inside this,

2   hold on, when I was looking at it and comparing it.

3   (Pause.)  Yes, sir, I'm sorry.  I put it inside here next

4   to the other invoice to match it up.

5   Q.        So you're saying that, as I understand fund

6   transfers at the bottom, there would be a check going from

7   Washington Park to DeliverMed in a separate account.

8   Where was that account kept?

9   A.        I just -- I have no idea.  I just gave him the

10  number, what they were supposed to do.

11  Q.        So you don't know where this bank account was?

12  A.        No.  I was just told to do that, and they were

13  going to figure all that out and open an account for that

14  piece.

15  Q.        And, and Mike was the only person who could write

16  a check, wasn't he?

17  A.        On what?

18  Q.        On, on the Washington Park account.

19  A.        Yeah, the Washington Park Pharmacy account, yeah,

20  he's the owner.

21  Q.        And, and was he the only person that could write a

22  check on this DeliverMed account this was deposited into?

23  A.        I'm not sure.  I'm not sure.  Because I found out

24  later they weren't doing that.  The Pharmacy was not doing

25  what, what they were supposed to do.

1    Q.      You mean, you are saying that they didn't write a

2    check from Washington Park to DeliverMed?  Mike didn't do

3    that?

4    A.      And then DeliverMed didn't write checks back to

5    Washington Park.  It didn't happen.

6    Q.      When you say DeliverMed here, we're of course

7    talking about the mail order.

8    A.      Yeah, that's what we called it.

9    Q.      Sure.

10    A.      The mail order portion of it, yes.

11    Q.      Just being clear.  So there weren't checks being

12    written back and forth?

13    A.      Later on, I found out it wasn't happening.

14    Q.      Okay.  So it was just all going into the pot, and

15    you didn't know what accounts they were going into.

16    A.      Yeah but I kept my numbers, I kept my monthly

17    thing going.

18    Q.      Sure.  Okay.  Then -- so these 7-dollar numbers,

19    we have been told in testimony so far that Larry

20    Schaltenbrand, Junior, created Exhibits 8 and 9 and these

21    various financial statements.  That those financial

22    statements were then combined into combined financial

23    statement.  And Mr. Schaltenbrand Senior would take those

24    tax return -- or these financial statements and, from

25    those financial statements, create the tax returns;

1    correct?

2    A.      One piece that you are mistaken.  They would take

3    Medicate Central and East St. Louis and combine them.

4    They never combined this Medicate DeliverMed one at all.

5    That was just --

6    Q.      Let's just think on that for a minute.  We were

7    told that in the Medicate Central financial statements, in

8    fact you told us this today, that that included both the

9    over the counter and the mail order, all combined into

10   one; right?

11   A.      Yes, sir.

12   Q.      So then all of that information for mail order and

13   Central would be combined with East St. Louis, it would be

14   put in a combined financial statement, and from that Mr.

15   Schaltenbrand Senior would create the tax returns.  Is

16   that correct?

17   A.      That is correct.  I thought you were referring to

18   the DeliverMed P and L.

19   Q.      And we know from looking at those financial

20   statements that were being used to create this tax return

21   that this $7 does not appear in any of those; correct?

22   A.      No, it wouldn't.  No.  No, sir.  It does not.

23   Q.      Okay.  So, in creating the documents that are used

24   to create the tax returns, we see that that $7 would not

25   have been used in calculating the taxes on this

1    corporation; correct?

2    A.      Everything that $7 represented, overhead,

3    insurance, is there.  It's just, they're breaking it out

4    to the detail.  All I was doing was trying to figure out

5    what we should charge to that department.

6    Q.      Sure.  And you have told us the $7 was a guess;

7    right?

8    A.      Yes, it was.

9    Q.      So, if we want to know what actually happened, the

10   accurate expenses, not the guess of the $7, we would need

11   to go to the financial statements, wouldn't we?

12   A.      There are certain things that would be unplugged

13   from there to do that but, yeah, because the, the

14   financial statements included distributions or commissions

15   to Mike or Mark, and it included telemarketing, and it

16   included things that, that shouldn't be included within

17   that $7 yet.  It should not be there yet.

18   Q.      But what we're seeing is, we want to know what the

19   real expenses of the business, the real overhead of the

20   business, the things that were reported on the tax

21   returns, we would need to go to the financial statements,

22   not the $7 you were guessing about; correct?

23   A.      We would have to first slice out of those, those

24   financials.  Because I am not -- my part of my $7 did not

25   include distributions to Mark and Mike and me.  It didn't

1    include that.

2    Q.      Well --

3    A.      I wouldn't include that within the $7.  Within the

4    $7, we did not have marketing included in that, the

5    telemarketing thing.  So that wouldn't be correct.

6    Q.      Okay.  But if we look at the financial statements,

7    we have all the expenses, all the telemarketing expenses,

8    everything's reported there so it's the accurate

9    information, not the guess that you are making, you have

10   said about the $7; correct?  Isn't that right?

11   A.      No, sir.

12   Q.      Okay.  You talked about operations being operated

13   out of Washington Park.  Were any DME operations also

14   operated out of Washington Park?

15   A.      DME meaning what?  DME products?

16   Q.      Medicate DME.

17   A.      Oh, at the very beginning, I think the first two

18   years, they were in a portion of that building that we

19   were at.  When we were very small, they were using the

20   building with us.

21   Q.      Okay.  And used the equipment?  Computers and so

22   on?

23   A.      Yes.  Yes.  The internet, they used that and

24   stuff.

25   Q.      Were they paying the $7?  Medicate Pharmacy DME?

1    A.       I don't know how they were going to pay Mike back

2    for being in there.   I have no idea.

3    Q.       Okay.

4            MR. COX:   I don't think I have any further

5    questions, Judge.

6            THE COURT:   I just have a few more questions, Mr.

7    Siddle.

8                        RE-EXAMINATION

9    BY THE COURT:

10    Q.       I understand when this arrangement first started

11    between you and Mr. Swift and Mr. Schaltenbrand that the

12    percentage of the partnership was 50, 40, 10; is that

13    correct?

14    A.       Yes, sir.

15    Q.       And you said, said it changed in January 2008?

16    A.       Yes, sir.

17    Q.       Okay.   Tell me about the change.   What was

18    changed?

19    A.       It was changed because we weren't sure of the

20    numbers, the invoices I was doing, was correct, so we had

21    to change it.   Mark came with an idea saying that, we're

22    not sure if those adjudicated numbers really came back

23    into the pharmacy.   We're not sure if they really did come

24    back, so we had to --

25    Q.       I'm not asking you to tell me how to make a watch,

1    I'm asking what the time is.  Just tell me what changed.

2    A.        What changed was, we had to reflect real numbers

3    so we used the P and Ls within the pharmacy.

4    Q.        Did the percentage of the arrangement change?

5    A.        Yes.

6    Q.        Okay.  What was that percentage change?

7    A.        It changed from I think 35 for Mark, 53 for Mike,

8    and mine was right around 12.  I'm hoping that adds up to

9    100.

10    Q.        Did, as I understand it, that when that changed

11    that everything was, was folded into the Medicate

12    Pharmacy, it included the retail as well as the, the --

13    was it still in your mind a partnership or were you part

14    of a corporation or what?

15    A.        No.  In my mind what happened was, we were trying

16    to figure out what truly was the profit for the mail

17    order, and we knew our numbers weren't working.  So that

18    way we knew the numbers were coming in, we knew those

19    numbers were correct because there was cash just coming

20    in.  But we never took partnerships in the company.

21            That question came up one time in a meeting and

22    Mark asked Mike, could we trade our percents of profit

23    into shares one day?  And Mike said, I don't know.  I

24    haven't figured out what the company's worth or anything.

25    We are just doing these calculations to figure if we're

1    making a profit and what, how much money needs to go back

2    to the bank for the loan.  That's all --

3    Q.      So in your mind it was still a partnership?

4    A.      Partnership within us three, but not into a

5    company where I shared shares of a company.

6    Q.      Okay.  All right.

7            THE COURT:  Anybody have any questions based just

8    on my examination?

9            MR. COX:  No, Your Honor.

10           MS. SCHRICK:  I have one quick followup.

11           THE COURT:  Yes, go ahead.

12                       FURTHER RECROSS-EXAMINATION

13   BY MS. SCHRICK:

14   Q.      Mr. Siddle, just to follow up on the judge's

15   question.  When that 2008 agreement was made and the

16   percentages changed, what entity's numbers were those

17   percentages calculated off of?

18   A.      Totally off of Mark's numbers -- I'm sorry.  Ask

19   the question again.

20   Q.      What entity were those percentages taken from?

21   What numbers were you using when you applied those

22   percentages, what entity's numbers?

23   A.      What they did, what I was told, was they took the

24   retail, how much that was worth in the business, and how

25   much the mail order was, and it was like an 80/20.  So

1    they smooth the numbers down where, instead of I'm being

2    here, it would be down here, to try and get it the same so

3    that we're dealing with the same number.

4    Q.    Okay.  But why did you have to adjust the numbers?

5    A.    Well, because it was a retail business in there.

6    There was other pieces of business that Mike owned.

7    Q.    Where were those, the retail business was part of

8    what?

9    A.    Medicate Central Pharmacy.

10    Q.    Okay.  And so the new percentages were going to be

11    applied to the numbers of what entity?

12    A.    Medicate Central Pharmacy.

13    Q.    Was it going to be applied --

14    THE REPORTER:  Wait a minute.  You're going to

15    have to slow down.

16    MS. SCHRICK:  Okay, I'm sorry.

17    THE REPORTER:  Would you repeat your answer?  "So

18    the new percentages were going to be applied to the

19    numbers of what entity?"

20    THE WITNESS:  Medicate Central Pharmacy.

21    Q.    (BY MS. SCHRICK)  Were those new numbers going to

22    be applied to the earnings of the East St. Louis Pharmacy?

23    A.    No.   Never was.

24    Q.    Were those percentages of Medicate Pharmacy Inc.?

25    A.    No, it wouldn't be because that's, that's, that's,

1    we're just dealing with Medicate Central Pharmacy, just

2    that location.

3            MS. SCHRICK:  No further questions, Your Honor.

4            THE COURT:  You may step down.

5            We'll take a 10-minute recess.  Who's your next

6    witness?

7            MR. COX:  Mark Swift.

8            (Court recessed from 9:48 a.m. to 10:01 a.m.)

9            (Witness sworn by clerk.)

10           THE WITNESS:  Mark, middle initial A, Swift,

11   S-W-I-F-T.

12           THE COURT:  Can you give me some idea Mr. Cox of

13   the exhibits you are going to be using with Mr. Swift,

14   unless of course you may say all of them, I don't know.

15           MR. COX:  Well, I think we'll be using a good deal

16   of the ones --

17           THE COURT:  And you do realize your boss is in the

18   back of the room.

19           MR. COX:  I did.  And I'm a little nervous

20   actually about that, so I will be critiqued when I get

21   home, I'm sure, but --

22           THE COURT:  Do you know what exhibits you are

23   going to be --

24           MR. COX:  I'm not sure what they will all be.  But

25   I can tell you most of them for a good part of it will be

1    Exhibit 6, which are the e-mails we'll go through, and a

2    couple of others I think the Court already has.  So I

3    think a lot of what we're going to start with is

4    explaining how the business began, how Mark came up with

5    the idea and developed this and got the contract with the

6    State and brought it to the pharmacy, so I don't think

7    he'll be strong on a lot of exhibits as we explain that.

8           And then we'll move into Exhibit 6 will be the

9    main source of exhibits, I think, today.

10          THE COURT:  Okay.

11                  MARK A. SWIFT,

12   having been first duly sworn, was examined and testifies

13   as follows:

14              DIRECT EXAMINATION

15   BY MR. COX:

16   Q.     Mark, let me begin by asking you, did you receive

17   anything in the mail from Mike Schaltenbrand in September

18   of 2009?

19   A.     Yes.

20   Q.     And about when was that?

21   A.     8th or 9th of September.

22   Q.     And what was it?

23   A.     The UPS box with a piece of paper crumpled up

24   inside.

25   Q.     And what kind of box?  What size?

1    A.       Maybe about 20 inches by 14 inches, maybe two or

2    three inches thick.

3    Q.       And when you opened up that box what did you find

4    inside it?

5    A.       That crumpled up piece of paper which was printed

6    like on a 45-degree angle which said, effective September

7    1st, you are terminated Medicate.

8    Q.       And was it signed?

9    A.       No.

10   Q.       Let me show you Exhibit 70.

11            THE COURT:  That's a new exhibit?

12            MR. COX:  I think I showed this to Mr.

13   Schaltenbrand, to Mike Schaltenbrand.

14            MR. SCOTT:  I think it's been admitted, Your

15   Honor.

16            MR. COX:  I'll put it right here, Judge.

17            THE COURT:  Yeah, put as many documents as you can

18   on the Elmo so --

19            MR. COX:  I will.

20            THE WITNESS:  Can I use the screen to look at

21   things, too?

22            THE COURT:  Yeah, sure.

23   Q.       (BY MR. COX)  Mark, did you ever receive Exhibit

24   70?

25   A.       Not until discovery.

1    Q.        Discovery in this lawsuit?

2    A.        Yes.

3    Q.        So this is not the document you got in the box

4    crumpled up?

5    A.        No.   This is not the document I got in the box

6    crumpled up.

7    Q.        All right.   Mark, I'd like to go back to the

8    beginning and explain how this whole thing got started.

9    And just a few questions just to, about your background,

10   if we can.   Where are you from?

11   A.        Originally born, you mean?

12   Q.        Yeah.

13   A.        West Ellis, Wisconsin.

14   Q.        And did you grow up there?

15   A.        I spent my school years there and then -- during

16   the school year, and then the summer I worked on a farm.

17   Q.        Did you go to college?

18   A.        Yes, I did.

19   Q.        What year did you graduate from undergraduate?

20   A.        I technically graduated twice because I have a

21   double major.   The first time I graduated was 1990 -- I'm

22   sorry, 1982, in May.   And then I graduated again in that

23   same year in December.

24   Q.        And what were your degrees?

25   A.        First degree was in accounting, second degree was

1    in finance.

2    Q.       And when you were in college did you work?

3    A.       Yes.   First couple years, I worked in a print

4    shop; I printed envelopes.   And painted buildings in the

5    summer.   And my last three years of college I worked in

6    the foundry, I shovelled steel in a smelter.

7    Q.       Did you do any interning with any companies during

8    college?

9    A.       My last -- that period of time when I graduated

10   from one degree and was pursuing the other degree, I

11   worked for Blue Cross Blue Shield on a government project

12   for Medicare and Medicaid, a special project.

13   Q.       Tell the judge just a little bit about that

14   project.

15   A.       This goes back to that time frame when hospitals

16   used to be paid on a cost basis.   And they selected three

17   areas of the country to examine cost data and develop a

18   general cost model for turning into a prospective pay

19   system which ultimately became a DRG system, which all

20   hospitals are paid in the country on now.

21   Q.       Now after you graduated from college what did you

22   do?

23   A.       From undergrad?  I continued on Blue Cross for

24   about another year and, during the process of

25   transitioning that, and then I was recruited to work for

1    Deloitte Haskins and Sells, which is now referred to as,

2    was referred to Deloitte Touche, and now it's called

3    Deloitte Consulting firm.  It's a worldwide consulting

4    firm.

5    Q.        And Deloitte is D-E-L-O-I-T-T-E?

6    A.        Correct.

7    Q.        And the second name is Haskins, H-A-S-K-I-N-S?

8    A.        Right.

9    Q.        Okay.  Then did you attend graduate school after

10   that?

11   A.        I worked for a number of years before I went to

12   graduate school.

13   Q.        Where did you go to graduate school?

14   A.        University of Chicago.

15   Q.        And did you graduate from there?

16   A.        I received an MBA from the University of Chicago

17   with an emphasis in economics.

18   Q.        And what year was that?

19   A.        That was in December of 1990.

20   Q.        Did you work while you were in graduate school?

21   A.        I worked for the first year for Baxter Travenol,

22   which is called Baxter International now.  And then I was

23   recruited away by one of our clients to do some special

24   projects for him while I finished up for my last year.

25   Q.        What kind of work was that?  What area, what

1    field?

2    A.        All in healthcare.

3    Q.        Healthcare?

4    A.        Yes.  With the, with a special projects was in

5    healthcare and alternative site work, meaning respiratory

6    clinics, nursing facilities, nursing agencies.  I worked

7    for the Bill Yarmuth family.

8              THE REPORTER:  I'm sorry, you worked for?

9              THE WITNESS:  The Bill Yarmuth family,

10   Y-A-R-M-U-T-H.  He's now the U.S. Senator there.  And they

11   owned all the -- or they owned two-thirds of the

12   licensures for nursing in the State of Kentucky.

13   Q.        (BY MR. COX) Are you married?

14   A.        Yes, I am.

15   Q.        And when were you married?

16   A.        Gotta get this right.  March 2nd, 1991.

17   Q.        So, pretty soon after you graduated from your

18   graduate work?

19   A.        Yes, about three months afterwards.

20   Q.        And what's your wife's name?

21   A.        Ann, middle initial C, Sickon, S-I-C-K-O-N.

22   Q.        And what does she do for a living now?

23   A.        Well, she helps take care of our son for one

24   thing, but she also is a not-for-profit lawyer board

25   member for a couple of agencies and -- that's on a

```
 1   volunteer basis.  And then she works now, they have asked
 2   her to work on the HAMP program, if you're familiar with
 3   the HAMP program of the United States.
 4   Q.      I'm not.
 5   A.      Stands for Homeowners Aid Mortgage Plan, for when
 6   people are upside-down on their mortgages, she serves as a
 7   mediator between the bank and the people and tries to
 8   resolve things.
 9   Q.      Okay.  Do you have any other children besides your
10   son?
11   A.      I have two daughters.
12   Q.      Okay.  After you graduated from graduate school,
13   in addition to getting married, what did you do?
14   A.      I immediately set up my own business, Bill Yarmuth
15   from the Yarmuth family continued to give me some work,
16   and I started doing some consulting work.  And I set up a
17   number of businesses which I had been trained by both
18   Baxter International on how to do, and also by training
19   through working with the Bill Yarmuth group.
20   Q.      What kind of businesses?
21   A.      All of them were alternate site businesses.  By
22   alternate site I mean anything outside the hospital like
23   pain clinics, pain management clinics, MRI clinics,
24   physical therapy clinics, high tech IV pharmacies, set up
25   a couple of mail order pharmacies for a combination
```

1    between Yarmuth Group and PruCare.   A variety of

2    businesses I was hired to set up outside the hospital

3    environment, all healthcare.

4    Q.      Was there a business you set up called Health

5    Alliance?

6    A.      Yes, that was several years later I set up Health

7    Alliance.

8    Q.      And tell me about, tell us about that, what was

9    it.

10   A.       we were approached the first time by some, that

11   was when the, that was David Citron was at the State of

12   Illinois and he had a situation where he brought to me the

13   idea of how I've got some high risk patients that I need

14   some special taken care of, how would you approach it?  So

15   we set up a mail order pharmacy for that and served those

16   patients.  And then acquired several other contracts with

17   states for similar type business.

18   Q.      And about when did that start?

19   A.      1997.

20   Q.      And where did it operate?  What area?

21   A.      Area meaning geographical area?

22   Q.      Yes, sir, mm-hmm.

23   A.      We had a facility in Buffalo Grove, Illinois.  We

24   had a facility in Baton Rouge, Louisiana; had a facility

25   in Jackson Mississippi; had a facility in Fort Lauderdale,

1    Florida; and we had an alternate facility in the Miami

2    area.

3    Q.      And when you say high risk patients, what kind of

4    folks are you talking about?

5    A.      The State classifies them, and they have different

6    names for them.  But they're a high risk individual

7    basically, is somebody who is on a multiple of drugs,

8    usually has a economic and a social factor that make them

9    high risk.  By social factor I mean they don't have

10   relatives or people that can help them get their drugs to

11   them, they can't get out and about, they may live alone by

12   themselves.  Economically, I think that's self

13   explanatory, when people have low income, they don't want

14   the people spending their disability checks and State

15   funded checks on hiring cab services to get to pharmacies

16   and get to doctor visits, so they're classified as high

17   risk.

18   Q.      Okay.  And so tell us about when you got out of

19   that business.

20   A.      In 2003, an investment group came in because we,

21   we had a mixed blessing, a fortune, we got a very large

22   contract but it required -- with the State of Louisiana,

23   which was the largest contract of its time for medical

24   services for high risk patients and it required that we

25   brought in a very large partner with some dollars.  So we

1    were able to convert our cash -- or, I'm sorry, our stock

2    from one company to the other company, the new company,

3    and they funded it with another $35 million of capital.

4    Q.      And why did you decide to get out of it?

5    A.      Because we could not service that contract. I --

6    it was -- I was -- we were so small and we had this big

7    contract. It overwhelmed us. We just could not do it.

8    We were -- we had to get help, you know.

9    Q.      Okay.

10   A.      If -- and we couldn't turn our back on the State

11   since we pursued the contract.

12   Q.      Okay. So in Health Alliance, did Health Alliance

13   itself own pharmacies?

14   A.      Yes, in all those locations I mentioned.

15   Q.      Okay. So the, the Health Alliance Corporation

16   itself owned the pharmacies and did the mail order through

17   those pharmacies?

18   A.      Exclusive mail order through each of those

19   pharmacies. One of them had a retail component. That was

20   the one in Buffalo Grove.

21   Q.      Okay. So when you got out of that business what

22   did you do after you sold that interest? Gone back home

23   to, where's home?

24   A.      Home is Kenilworth, Illinois, which is nine miles

25   from like Northwestern University on the Lake by Evanston

1    area.

2    Q.      Okay.  And so what did you do after you got out of

3    Health Alliance?

4    A.      Well, my wife was getting into, she wanted to get

5    into the businesses, she had been a nurse and she had been

6    -- she has a variety of degrees, she's a nurse and she

7    also has her master's in public health, I guess it is, and

8    she's got her law degree.  So she wanted to get into a

9    program of servicing similar type situation, a little bit

10   different, in the State of Florida.  We had a first

11   opportunity.  So she set up DeliverMed company, DeliverMed

12   Holdings.  And I helped her.

13               MR. STINE:  Your Honor?  Never --

14               THE COURT:  What's your --

15               MR. STINE:  I was going to object, the question

16   was what did he do, he told us what his wife did, but then

17   he said he helped her, so.

18               THE COURT:  Okay.

19   Q.      (BY MR. COX)  Did you and your wife have any

20   discussions about getting a contract with the State of

21   Illinois?

22   A.      Yes.

23   Q.      And what was that contract you were seeking?

24   A.      I was contacted by some folks at the State of

25   Illinois, and this would have been 2004.  And we were

1    actually in Florida doing work when we were contacted.

2    And that the State of Illinois was looking at expanding a

3    program for what they refer to as the high utilizer drug

4    users.

5            And the idea was, I don't mean to get, explain in

6    too great a detail so just give me a moment, but the

7    hospitals in the major metropolitan areas have underneath

8    them what they call support hospitals.  For example, like

9    in Chicago you have St. Anthony and Mercy, very small

10   hospitals.  And what happens is when patients don't get

11   their drugs or don't take their drugs, they go to the

12   emergency room of the major hospitals, or the smaller

13   hospitals and cause huge economic hardship on them for

14   simple things, they didn't get their blood pressure pills

15   for several days, those economic social reasons we

16   discussed.  And it was starting to strain the system a

17   lot.  So they wanted to look at the high utilizers.

18   Q.      So are these similar type patients that you were

19   serving in Health Alliance?

20   A.      Yes.  The unique difference between them was in

21   Health Alliance you had a contract with the State.  In

22   the, what the State was talking about now is, we will help

23   you recruit where you will have individual patients.  From

24   a business risk perspective, it's fantastic.  Because if

25   the State wakes up the next morning and doesn't want you

1    as a client, you lose a whole bunch of patients.  But if

2    you have to require -- you know, thousands of patients

3    have to all wake up and decide that they didn't want you.

4    So it was a contract with individual patients, servicing

5    individual patients.

6    Q.       I see.  Now, does this involve Medicaid?

7    A.       Did it involve Medicaid?

8    Q.       Yes.

9    A.       Yes.

10   Q.       And what is Medicaid and how is that different

11   from Medicare?

12   A.       Medicaid is -- Medicare, people are aware of,

13   it's, you know, it's usually age based, you need to be 65

14   or older or you're legally disabled.  Medicaid has

15   economic reasons why you are on it, and it also is not

16   only economical but it can be what they call the

17   proportional economic, which means like even though you

18   maybe make a quarter million dollars a year but you have a

19   son who has hemophilia and it cost you 200,000 a year,

20   they're going to help you out.  And the Medicaid plan is

21   funded partially by the State, in this case, the State of

22   Illinois receive 30 percent from the State, and 70 percent

23   from the federal.  Where Medicare receives 100 percent

24   from the federal.

25   Q.       Well, why did you and your wife want to get

1   involved with this contract with the State?

2   A.      Well, what we liked about it was when we sat down

3   and talked about the State, it had of course good economic

4   potential.  But there was also a factor that we felt

5   equally important is when the State started showing us the

6   demographics, and it's hard to believe but in the State of

7   Illinois in all 102 counties that we have, there are

8   actually counties that lack a pharmacy or have one

9   pharmacy, or only have two physicians, and there are some

10  remote areas like that.

11          Plus, in the Downtown south side of Chicago there

12  was, they were showing us economic areas where people

13  could be literally blocks from a pharmacy but, because of

14  copays and deductibles they may have, they may not be able

15  to afford it at that time and have to pay it later.  But

16  if they went to those local pharmacies, they would be

17  turned down for getting their drugs, thus falling back

18  into the whole operation of where they go back into the

19  hospital ER.

20          So they had these two factors of, call it

21  demographically unable to service as well as economically.

22  And it, we liked the idea of that a lot.  We're going to

23  be able to help the people, we're going to be able to make

24  some money, and it's going to keep going.

25  Q.      Now then, what did you have to do, what did you

1    and your wife have to do in order to bid on this contract?

2    What was that process?

3    A.        The process was very long.  It took us about 18,

4    20 months to complete.  What we did is, we had to build

5    first -- first of all, we had to build a, a computer

6    system or, that could record or could sort through the

7    data for the patients.  Then we had to contract with

8    various printers on behalf of the State to where the State

9    could then contract with the printer to have the printing

10   information sent to the people to be notified by mail.  We

11   had to then go through focus and test groups to do our

12   telemarketing analysis of what had to be done or said on

13   the phone so that we could achieve the results.  We had to

14   go through focus groups on the mailings.  We had to go

15   through State meetings approving the mailings.  We had to

16   go to through State meetings to approve the phone call.

17   We had to interview a variety of call centers for it.  We

18   had to develop database sources to sort out once the

19   information would come from a call center or a mail house,

20   to come back to us with the information where we could to

21   turn it into a usable spreadsheet.  The list goes on.

22   There's a lot, lot of work involved.

23   Q.        Let's break that down just a little bit.  What

24   kind of program did you have to develop in terms of the

25   computer and, and other aspects of the program to make

1    this work?

2    A.        Well, we developed what's called a logarithmic

3    function program, which we took every county in the State

4    of Illinois, all 102 counties.  We broke it down then by

5    economic information because we were, with the Medicare,

6    one of the major factors is economics of person.  And then

7    we would have to break down that data to the ZIP code area

8    of the county.  Then we have to break that ZIP code data

9    down to further data so that we could target the market

10   and reach the patients we want.

11            There are, what, 13.8 million people in the State

12   of Illinois.  We wanted to bring that down to the people

13   that can service these areas.

14   Q.        So you were trying to identify specific people?

15   A.        Correct.

16   Q.        In order to develop that program did you have to

17   hire people to help you?

18   A.        We hired a lot of subcontractors, contractors we'd

19   call, people that wrote programs for us, people that, we

20   hired various data houses to obtain information for us.

21   U.S. Med, which is a mail house for med, Alesco, a variety

22   of mail houses that could sell us information on data

23   economics and -- it's called demographics in those

24   particular areas.

25   Q.        And what did it cost to develop this program?

1    A.       Developed all that over 20 months, we invested in

2    excess of 300,000.

3    Q.       And where did that money come from?

4    A.       My wife took it out of her ERA.

5    Q.       Did Michael Schaltenbrand or Joey Siddle or

6    Medicate Pharmacy Inc. pay for any of the costs to develop

7    that program you have just described?

8    A.       No.

9    Q.       This software program, what was your involvement,

10   I understand you had people that were actually programming

11   stuff, but who developed the model for that?

12   A.       I developed the model.

13   Q.       What is a model?

14   A.       It's like defining air.  A model is a, is

15   basically a concept of, of how we can in this case

16   numerically use information to arrive at the results we

17   want.  And then when you change the information, the

18   results will change.  And with a model, you do what they

19   refer to as stress testing, where you put excess amounts

20   or minimal amounts and see what the range is, the relevant

21   range.  So it involves a lot of statistical data and

22   economic data that we -- I had gone to school for.

23   Q.       Okay.  So during this 18 to 20 months it took to

24   create all this program to make the bid with the State,

25   was this before Michael Schaltenbrand was involved, before

1    Joey Siddle was involved, before Medicate Pharmacy was

2    involved?

3    A.      Well, we had done some -- my wife had done some

4    work and we had helped her in 2004 with some diabetic

5    patients.  It was before we were doing these mail order

6    patients that we are talking about as a result of this

7    case, it was long before that.  Before that time frame.

8    Q.      It would have been before that time?

9    A.      Yeah.

10   Q.      Okay.  And who ultimately made the actual bid on

11   the contract?

12   A.      My wife did under the minority, women minority

13   contract bid.

14   Q.      And what corporation or business actually bid on

15   the contract?

16   A.      It was DeliverMed Holdings.

17   Q.      And what is DeliverMed Holdings and who owned it

18   at the time of the bid?

19   A.      2004-2005, at the time of the bid, my wife owned

20   100 percent.  It is a corporation.  It is a Illinois

21   corporation.

22   Q.      Okay.  And that --

23   A.      I'm sorry.

24   Q.      And that later changed in terms of ownership at

25   some later time?

1    A.        Let me change that.  It's an LLC, Illinois LLC.  I

2    apologize.  To answer your question, did it change?  It

3    changed a couple of times over that time frame.

4    Q.        Okay.  But at the time this business started, she

5    was the owner?

6    A.        Yes.

7    Q.        Okay.  Now then, so the program gets started.

8    You get the contract.  What did you have to do with

9    respect to the State in terms of your interaction with the

10   State to get them to choose you as the, as the party or

11   you and your wife to have this?

12   A.        Well, you go through the process of making a

13   formal bid.  You go through the process, that way you

14   answer a variety of their questions which in this case

15   dealt with, dealt with all the things associated with the

16   call centers, call scripts, information as how you are

17   going to move the information, HIPAA requirements, how

18   you're going to protect the information, and all those

19   things have to be addressed and we had to make a formal

20   presentation to the State.

21   Q.        You mentioned a couple of things I wanted to ask

22   you about.  You talked about scripts.  How would the

23   actual contact with the patients occur?

24   A.        Initially when the State was doing their work,

25   what we, we developed was a, a mailing that would go to

1    the patients.   And the mailing would go out of a

2    contracted mail house by the State.   Then the people would

3    receive it and then do a call into the, a call center to

4    get the information.   So we had to develop the call

5    scripts and the data collection information format to

6    collect that data.

7    Q.      What is a call script exactly?

8    A.      It's very similar to just a, a computer that comes

9    up here.   And when the person calls in with their phone

10   number, it tells by public information who lives at that

11   address.   And then they'll say, you know, are you calling

12   us, Mrs. Smith, about -- and then talk to them.   Present

13   what your concept that you are trying to have the patient

14   register for.   Get approval for the patients.   All this is

15   being recorded.   Then you go through and get, collect, I

16   mean, some of the scripts, they have about 160 to 200

17   pieces of information you had to collect.

18          So a patient that would call in and would come on,

19   that was maybe 6, 7 scripts, could take as much as 40, 45

20   minutes to get all their information.

21   Q.      So you wanted to have it be uniform so everybody

22   was on, I guess as you say, working off the same script?

23   A.      Well, it's more than we wanted to be uniformed

24   it's, a requirement to the State contract.

25   Q.      Okay.

1    A.       That you follow the script, that you follow

2    through the methodology, that you submit to them.

3    Q.       All right.  So, how were Illinois Medicaid

4    patients notified about this program?

5    A.       Initially, they were notified by the mailing that

6    went out from the mail house who the State contracted

7    with.  Then it had a phone number, if the patient wanted

8    to contact, and they would call the call center and either

9    receive information as to here's what the program's about

10   and make a decision, or they could fill a card out and

11   mail it back, which in case we would call them.  With a

12   different call script because that was an outbound call

13   script.

14   Q.       Okay.  At some point -- well, let me ask this

15   before I move ahead.

16   A.       Sure.

17   Q.       What kind of hours are we talking about that you

18   and your wife invested in this program in addition to your

19   money over this 18 to 20 months?

20   A.       Well, the -- the, the model building was crazy

21   hours.  I mean that's, you know, 12, 15 hours a day

22   because you're dealing with people or you're sending them

23   your model and you're sending it back and having --they're

24   revamping.  Call scripts, you know, you do focus groups

25   late at night when people are off work.  So I mean, you

1    know, it well exceeded 50, 60 hours a week.

2    Q.      Now, after this program was developed which you

3    just told us about did you expand this program beyond just

4    the Medicaid patients?

5    A.      Yes.   What happened is, in 2004 the United States

6    Government was changing the Medicare for the dual

7    eligibles.   Dual eligibles meaning a person was both on

8    Medicare and Medicaid, to where those folks would be

9    covered under the Part B as in -- D -- as in dog -- drug

10   program that everybody is aware of now.   And then the, in

11   the past Medicare was always primary but Medicare did not

12   cover prescription drugs so it was all covered by the

13   State Medicaid program.

14          With this program changing like this to Part D --

15   as in dog -- what we did with the State, what the federal

16   government in essence did is now Medicare is going to pay

17   for those drugs and Medicaid in many instances will pay

18   for the copays, deductibles for noncovered patients.

19          So I attended a bunch of seminars in, that the

20   United States Government was giving, one was three or four

21   days in New Orleans, that went through how the program

22   would work.   And one of the pieces of public information

23   they released by a stroke of luck was they broke down

24   every state ZIP code and sub ZIP code of the total number

25   of people and relying in the sub ZIP code numbers were

1    these people who were dual eligibles.

2           So having developed this model, I now had a very

3    golden key piece here that I could take, put into my

4    model, and now tighten it down to where I could identify

5    with almost an 80 percent accuracy that if I market it by

6    telemarketing or by phone to that area, I would have a

7    higher ability to get patients.

8    Q.     Did you have to develop a software program for

9    this expanded part of the program?

10   A.     Yeah, well, we developed software that ran off of

11   the Microsoft system, yes.

12   Q.     And did -- was there a cost for that --

13   A.     Yes.

14   Q.     -- in developing this part of the program?  What

15   was that?

16   A.     Oh, specifically that cost invoice I don't

17   remember, but it was included in that in excess of

18   300-something thousand dollars.

19   Q.     Okay.  Now did Michael Schaltenbrand or Joey

20   Siddle contribute anything to development of this expanded

21   program?

22   A.     No.  Not to this expanded model and program, no.

23   But we also did that model program for -- I did it for the

24   State of Florida, too.

25   Q.     Okay.  Let's turn now to the call centers

1    themselves and find out something about how they actually

2    worked.  How would you go about reaching people from, that

3    you wanted in your program, how did you go about conveying

4    information to them about what you were doing?

5    A.      Well, as a result of this new information I got

6    with the new Part D program, I was able to change the

7    model, as I said, expand or change the model to where I

8    would then reach out to data houses and buy lists of

9    patients -- I'm sorry, lists of people I would buy, in

10   those ZIP codes.

11         And then through all the different logarithmic

12   functions we would literally add those patients -- or

13   people to the program and it would filter out who would

14   fall in our demographics area.  And then we could tighten

15   up the model perspective and be able to contact those

16   patients.

17   Q.      What exactly is a call center?

18   A.      Well, that's changed over the years.  Years ago, a

19   call center was, you know, we were all watching, late at

20   home watching TV and they'd be calling up and they would

21   try to sell you aluminum siding or things of that nature.

22   What developed was the, it's called the DNC, the Do Not

23   Call list was started by the FCC, which controlled that.

24   And it put a lot of call centers out of business.  So the

25   call centers that are left are primarily intake call

1    centers.

2         But then we would train, my wife and I would hold

3    groups, I would also have, hire people who were in the

4    area who had knowledge of telemarketing, and we took some

5    of those people, contracted with them and trained them how

6    to be outbound call center people.  So we would take our

7    list, run it through the DNC, these people can be called,

8    then we had these trained people to make outbounds while

9    the inbounds would come through mailing.

10   Q.       I see.  And how you did you go about selecting

11   these call centers?

12   A.       Well, most of them we would, the first thing we

13   would do is get on the internet and find every call center

14   we could in the United States.

15   Q.       When you say "we," who do you mean?

16   A.       I was primarily doing that myself.  And then my

17   wife did a lot of the interviewing, finding, do you fit

18   this criteria?  And if they fit certain criteria, then

19   we'd go the next step and then I would start to negotiate

20   with them to see what they could do.  Some of them were so

21   large that I couldn't offer them attractive business, that

22   it was just a waste of time.  And some of them were so

23   small that they couldn't give us the services we needed.

24   And we would -- even though we were doing this on our own

25   we would parallel what the State wanted us to do as far as

1    standards.  So we would train those people.

2    Q.      And, and the ones that were selected, where were

3    these call centers located?

4    A.      Well, Chicago; Rockford, Illinois; there was one

5    in Decatur, Georgia; Idaho; Iowa; and there's one I think

6    in Atlanta.  There might have been others, I can't think

7    right now.

8    Q.      In this program did you ever use any call centers

9    that were not American call centers?

10   A.      You mean located in the United States?

11   Q.      Correct.

12   A.      They're all located in the United States.

13   Q.      Uh-huh.  And why did you do that?

14   A.      Well, very -- many reasons.  One, the State

15   required it on their side of the contract.  The other

16   reason is, we wanted to have people with, that could

17   properly pronounce people's names, that we wouldn't have

18   any confusion with, you know, the dialects or things of

19   that nature.  And frankly, I was very nervous about having

20   information of potential patients or information about our

21   models and patients leaving the country.

22   Q.      Now then, the training you talked about that was

23   provided to these call centers, who paid for that?

24   A.      We did.  My wife and I.  It was DeliverMed who

25   paid for it.

1    Q.       And did Joey or Michael pay for any of that

2    training of these call centers?

3    A.       Not the training part, no.

4    Q.       Did you test the program you developed to see

5    whether it would work?

6    A.       Well we would always -- when you have a call

7    center, what you do is you, they, they -- when you have

8    selected individuals, you have to go through a process of

9    where they go through a training and they run through mock

10   calls with you.  And they'll call you and say, the next

11   four people are going to call you, are going to use --

12   address you as this name, and then you would try to

13   challenge them on the phone to go off script or challenge

14   them to get other information or challenge them to, you

15   know, to not follow the script basically.

16   Q.       And did you have to spend money to go through that

17   testing process?

18   A.       Yes.

19   Q.       Did Joey or Mike pay for any of that testing of

20   the program?

21   A.       No.  Not the testing part, no.

22   Q.       That was you and your wife and DeliverMed?

23   A.       And -- yes.

24   Q.       Now then, in addition to call centers did you use

25   direct mailing?

1    A.      Yes, we used direct mailing.

2    Q.      What is direct mailing?

3    A.      Well, what we -- we handle direct mailing

4    ourselves.  In other words, we would write a letter or we

5    would write a brochure and then we would do a merge

6    between our data sources that we have run through our

7    group into this letter and personalize it, print off a

8    label on another computer, and mail it out to the

9    individuals.

10   Q.      And who developed these marketing materials for

11   the mailing?

12   A.      Well, I wrote most of it.  And then -- but when

13   you deal with focus groups you find out nobody likes what

14   you write.  So we had to revamp and revamp them and so at

15   the end it was a product of many people's input,

16   collaborations.

17   Q.      What's a focus group?

18   A.      Well, we tried to get people in our demographic

19   groups or people in our age groups that we were targeting

20   and had them look at the piece of paper.  And I mean,

21   there are people who professionally look at color of

22   paper, fonts, what attracts people.  We all know it, we

23   all get junk mail and occasionally a piece catches your

24   eye and you open it.  And what does it take?  What does it

25   take to get that person to want to open that piece of

1    mail.

2    Q.       Now that you have this program developed, you have

3    the contract with the State, you set up the call centers,

4    you have done the direct mailing creation and all of that,

5    all of that cost up to this point has been on your side is

6    that correct?

7    A.       It's been DeliverMed side, yes.

8    Q.       Right.  Not Mike or Joey.

9    A.       No.  Not at this point, no.

10   Q.       Now then, after you developed this program, these

11   programs, what was the next step you had to take to make

12   this all happen?

13   A.       I just have to -- because to answer the question

14   is a little different.  I hadn't made any mailings yet.  I

15   hadn't done any calls yet.

16   Q.       Sure.

17   A.       Now I had to get a pharmacy.

18   Q.       You needed a pharmacy?

19   A.       We needed a pharmacy to service the patients.

20   Q.       And was that because you don't have a pharmacy?

21   A.       That's correct.

22   Q.       Okay.  And so what was the role of DeliverMed

23   Holdings going to be if the pharmacy was going to become

24   involved?

25   A.       They were going to use their model and use their

1  marketing abilities to market the patients.

2  Q.      And then they would do what with those patients in

3  terms of the pharmacy?

4  A.      Referring, referring them then to be serviced by

5  the pharmacy that we contract with.

6  Q.      Okay.  Could you have chosen any pharmacy in the

7  State of Illinois to do this partnering with you?

8  A.      I -- we could have chose any pharmacy out of 38

9  states in the United States, because 38 states are allowed

10  to ship drugs into the State of Illinois.  So we could

11  have picked 38 states and chose any.

12  Q.      So who did you and your wife choose to be the

13  pharmacy that was going to partner with you to carry out

14  this program you had created and carry out the contract

15  you had with the State?

16  A.      Ultimately Medicate Pharmacy, Incorporated.

17  Q.      Now, to your knowledge had Medicate Pharmacy ever

18  been in the mail order business before you invited them to

19  be part of this mail order business?

20  A.      They told me they were, they just virtually did no

21  mail order.

22  Q.      Okay.  So this was something new, I guess?

23  A.      Yes.

24  Q.      Please tell the judge how it came to be that you

25  selected Medicate Pharmacy to be the pharmacy that you

1   wanted to partner with.

2   A.        I knew Joe Siddle from Health Alliance.  He sold a

3   product then to, to Health Alliance.  He was one of our --

4   we were one of his vendors -- or he was one of our

5   vendors.  We were one of his customers.  So I knew that.

6            And I contacted Joe Siddle and I said, I need to

7   find some pharmacies that want to do Medicaid.  I know you

8   operate in the State of Illinois a lot.  And Joe mentioned

9   that he was now not with HDI but he was working for this

10  Medicate Pharmacy full time doing work.

11  Q.        Did he tell you who the pharmacy was owned by?

12  A.        He told me it was owned by Mike, and he said, his

13  last name is Schalt-something, he said, I can't remember

14  his last name, I don't know how to pronounce it, but I'll

15  introduce you to him.

16  Q.        Okay.  And did he tell you what Medicate Pharmacy

17  did?

18  A.        Well, he told me to meet them at -- the first

19  meeting we came down to, he had me drive down to the

20  Washington Park pharmacy.  And I met him at the Washington

21  Park pharmacy and he introduced me to Mike Schaltenbrand

22  for the first time.

23  Q.        Had you ever heard of Mike Schaltenbrand before

24  that day?

25  A.        No.

```
1              THE COURT:  Can you put a time frame on that?

2              MR. COX:  Yeah.

3    Q.        (BY MR. COX)  When was that, Mark?

4    A.        That was spring of 2005.

5    Q.        '05?  '05?

6    A.        I'm sorry, spring of 2004.  Finally met Mike in

7    maybe early summer of 2004?

8    Q.        What was that, what did that meeting consist of?

9    Where was it and what, what, who was present and what was

10   said?

11   A.        Well, I met, I stayed at a Holiday Inn, I think it

12   was, out near Alton.  And Joe and I met for dinner and he

13   told me he was going to introduce me the next morning to

14   Mike.  And I showed him our spreadsheet of our forecasts.

15   He asked if I could give him a copy of that.  I gave him a

16   copy.

17             We went to dinner and the next morning I went to

18   the pharmacy and we waited a few hours and Mike showed up.

19   Q.        And tell me about that meeting.  What a took

20   place?

21   A.        Well, I described what we were doing.  And Mike

22   would, had to go, he was only there for a couple minutes.

23   I described what we were doing and he -- we kind of left

24   and they said they'd let me know if they were interested.

25   Q.        Now at that meeting was there any discussion at
```

1    all about the structure of the business?

2    A.       No, we weren't even to that point yet.

3    Q.       Okay.   So then that's the spring or early summer

4    of 2004.   Take us to the fall of 2004.   What happened

5    then?

6    A.       Fall -- well, Joe Siddle called me up and said

7    that they were not interested in doing this, that they

8    were successful at what they were doing, and they wanted

9    to move forward on their own and good luck to me.

10   Q.       So had you heard anything from them since back in

11   the spring through the fall when he called?

12   A.       No.

13   Q.       Did he say why they weren't interested.

14   A.       He just said they were having good luck at what

15   they were doing and they just didn't want to look at

16   anything else.

17   Q.       And when did you next hear from them, either Mike

18   or Joey?

19   A.       Well I heard, we knew -- we were still -- keep

20   working on this contract working with the State and so we

21   didn't have a decision if we were going to finally get it

22   yet and I was -- I specifically remember this.   I was

23   driving at a very dark night with my family in the car, we

24   were driving that long drive, if anybody's done it, to get

25   to the Grand Canyon, it's like 12, 15 mile ride of just

1    pure darkness.  And the phone rang and I didn't even know

2    I had cell coverage.  And Joe said, are we, are we going

3    to do this thing or not?  And I said, well are you still

4    interested?  He said -- you weren't before.  And he said,

5    I've got to do it, we've got to do it because they're

6    cutting the respiratory reimbursement, and if I don't do

7    something I'm going to have to get a job as a salesperson

8    again.

9            I said, well, if you're interested, we haven't

10   selected anybody, we still don't have the final contract

11   to move forward.

12   Q.      And when was that call?

13   A.      I know it was spring break in March of 2005.

14   Q.      So you hadn't heard anything since, since earlier

15   and --

16   A.      No.

17   Q.      -- now comes the call in 2005.  Did you have a

18   meeting with them after that call from Joey?

19   A.      Yes.  Maybe like April, like a few weeks later, I

20   met with Joe and Mike at the Holiday Inn in Springfield,

21   Illinois.

22   Q.      And was your wife present?

23   A.      She was on the speaker phone for a while but not,

24   she wasn't physically there.

25   Q.      And tell us about that meeting.  What happened.

1    Who all was present, you and Mike, Joey --

2    A.        And my wife on the speaker phone for part of it.

3    Q.        All right.  Tell us about that meeting.

4    A.        We -- I rented a little conference room that they

5    have there.  And, you know, we discussed what, they --

6    they told me what they could do, what services they could

7    provide, and Mike showed me some financial statements from

8    2003 and 2004, what he was making and the profitability,

9    and how they could turn their retail aspect into a retail

10   and a full blown mail order.

11   Q.        What were you seeing in the financial information

12   that he was showing you at that time?

13   A.        2003, he had an amazing bottom line that he showed

14   me which was like 22, 23 percent profitability, just huge

15   profitability in numbers.  It was very profitable little

16   businesses he had.

17   Q.        And how was it in terms of sales?

18   A.        He showed me the one for East St. Louis and, which

19   he called St. Mary's at the time, and he showed me another

20   one, I think he called it Central.  And then he showed me

21   -- but there was no combined one that he showed me.  And

22   they were very, very small but they were very profitable

23   for a sole proprietorship.  I mean, I think he was -- if,

24   if 800,000, 900,000-dollar sales at that point.

25   Q.        And what kind of net profit were they looking at

1    just when they were retail at that time?

2    A.       He was doing very well, like I said, about 20 to

3    23 percent bottom line.  He was doing very, very well.

4    Q.       Okay.  Did they seem anxious to, Mike and Joey, to

5    partner with you in this mail order business?

6    A.       Joey was very, very anxious.  And Mike was, you

7    know, conducting like a businessman and, you know,

8    negotiating different options, different things, proposing

9    different ideas.

10   Q.       Now, were there any discussions at this point

11   about whether there would be a partnership?

12   A.       Yes, there was a discussion about having a

13   partnership to divide the profits for the mail order

14   business and do the operations.  And Mike said, I have the

15   pharmacy, Joe can do the operations, you can do the

16   marketing and help with some other things down there, and

17   we'll divide the profits up.

18   Q.       Now who were going to be the partners at this

19   point when it started?

20   A.       Initially we discussed 50 percent for Ann and 50

21   percent for Mike.

22   Q.       Okay.  So you weren't going to be a partner at

23   this point?

24   A.       No.

25           MR. STINE:  Your Honor, I want to object.  He

1    already said he was going to be a partner.  He was going

2    to do the marketing, he said.

3              THE COURT:  Well, I heard what he said.  You can

4    cross-examine him on it.

5              MR. STINE:  Okay.

6    Q.       (BY MR. COX)  And was Joey supposed to be a

7    partner at this point?

8    A.       Was he supposed to be a partner?

9    Q.       Right.  Was he -- you said 50 for Ann and 50 for

10   Mike.  How did Joey get involved?

11   A.       At the meeting it was offered, Mike offered up the

12   idea of why don't you guys give 10 percent, I'll give 10

13   percent, Joe will have 20, I'll have 40, your wife and

14   family whatever will have the other 40 percent, and so it

15   will be a 40, 40, 20.

16   Q.       So did Ann give 10 percent of her 50 to, to Joey?

17   A.       Yes.

18   Q.       Did Mike?

19   A.       No.

20   Q.       So that's how it ended up being 50, 40, 10?

21   A.       Correct.

22   Q.       Now then, at that time was there a discussion

23   about whether Mike would have a salary in this business?

24   A.       Well, we said to -- you know, because his

25   profitabilities, I was greatly concerned that what if he

1   decided to take a half a million dollar salary and then

2   the bottom line would be smaller.  I said, what about

3   salary?  Mike stated, I will not take salary until this

4   business is profitable or until -- and then at that time

5   you guys get a matching salary.  And he -- then Joe

6   described that, he said, well, if I'm going to do this I

7   need to have $2,000 a week.

8   Q.      So did you later learn that Mike had in fact been

9   taking a salary from the beginning?

10  A.      Yes.

11  Q.      And was that known to you until sometime later?

12  A.      Not until much time later.

13  Q.      And so what did Mike in the meeting call this

14  entity that was being created?

15  A.      Mike called it a partnership.

16  Q.      Now did Mike have any comments on why Joey would

17  be doing the operations?

18  A.      He felt that he didn't -- Mike said he didn't want

19  to, you know, mess with being that business.  He had

20  enough going on with his retail businesses.  And he had

21  the facility, he was providing the structure, he said, so

22  he didn't want to mess around with the, doing this

23  business.

24  Q.      And so whose idea was it to hire Joey to do the

25  operations?

1    A.        Joey's.   Joey proposed the idea.

2    Q.        Okay.   Then we've talked here about this

3    partnership.   We have Ann and Mike and Joey.   We talked

4    about 50, 40, 10.   Was there any discussion at all about

5    payment of a 7-dollar overhead back to Medicate Pharmacy

6    Central?

7    A.        There was no discussion with me, no, or my -- when

8    my wife was on the phone, there was no discussion with her

9    about any 7-dollar fee.

10   Q.        Now then, so let's think about this for a minute.

11   We have this partnership of these three people.   They're

12   going to share in the net profits; is that right?

13   A.        Correct.

14   Q.        What is the role of DeliverMed Holdings

15   corporation in this business, this mail order business?

16   What's its role?

17   A.        Well, DeliverMed is really no different than

18   Medicate.   It's an entity that is providing services to

19   the partnership.   Medicate is an entity providing services

20   to the partnership.

21   Q.        When you say Medicate, you're talking about

22   Medicate Pharmacy?

23   A.        Medicate.

24   Q.        I don't want it to sound like Medicaid.

25   A.        That was one of the problems.   It sounded like we

1    were saying Medicaid.

2          Medicate Pharmacy would provide services to the

3    partnership.  DeliverMed would provide services to the

4    partnership.

5    Q.     And those services DeliverMed Holdings was

6    providing to the partnership, was it doing that just for

7    reimbursement of its expenses or was it to get a portion

8    of the profit?

9    A.     No, it was the reimbursement.  We forecasted each

10   model as to -- we did a reverse.  We developed a model

11   that would say, okay, we want to obtain 500 patients this

12   month.  We were going to back into it.

13         To get 500, we know if we mailed so many letters

14   we're going to get so many response.  We get so many

15   responses, we can get so many people interested.  If we

16   get so many people interested, we may get so many signed

17   up.

18         If we make so many calls, we're going to -- same

19   scenario.  And when you get to the end and you say, okay,

20   what are all those costs going to cost for this campaign

21   to get 500?  And we divided that up by week or by month

22   and said, this is what it's going to cost to fund it.  So

23   we knew how much it was going to cost to mail, we knew how

24   much it was going to cost to call, and we did those

25   programs that way.

1    Q.      So DeliverMed's getting its expenses, no profit.

2    What about Medicate?  What was its role?  Medicate

3    Pharmacy.

4    A.      Medicate Pharmacy would do basically what we call

5    the back room operations.  Which is, once all the

6    information is developed, once we get the physicians'

7    names and everything, the patients register, the patients

8    sign up, Medicate Pharmacy takes over and starts to

9    service the patient, get the information in the back room.

10        Then when they get the information in the back

11   room, when the patient is ready to receive their drugs,

12   Medicate Pharmacy would ship it out.  They do that all on

13   cost, like the financial statements show, and then you

14   have a profit of that organization, partnership, and you

15   divide it 40, 50, 10.

16   Q.      Okay.  So, just to summarize here, we have

17   DeliverMed's up here getting the patients, finding people

18   that want prescriptions, they are feeding that information

19   then to Medicate Pharmacy?

20   A.      Feeding information of people that are interested.

21   Q.      Right.  Of, of who's -- wants prescriptions.  So

22   Medicate Pharmacy's filling those prescriptions.  And then

23   after those prescriptions are filled and there's a profit

24   left over from that activity, that would be divided by the

25   partnership; is that correct?

1    A.       Right.  Medicate then established a bank loan that

2    it would go and borrow money for the marketing.  Let me

3    use an example, say they borrowed $15,000 in marketing;

4    they would put that on to their income statement.  Then

5    the revenue would come in and it would pay for those

6    expenses, one of the expenses being marketing, and then it

7    would have a bottom line.  When it pays those expenses it

8    takes that cash to those people and pays.

9         So, if they borrowed from the bank, and they got

10   the reimbursement through the financial statement for the

11   marketing, paid the bank.

12   Q.       Okay.  We'll talk a little bit more about that

13   later.

14        THE COURT:  I'm a little -- I need some

15   clarification.

16        MR. COX:  Sure.

17        THE COURT:  All right.  We have DeliverMed Holding

18   which is going to do the marketing; correct?

19        MR. COX:  Yes.  It's going to get the patients

20   through marketing --

21        THE COURT:  It's going to get the patients and so

22   they're expending funds to do that; correct?

23        MR. COX:  Yes, they have expenses.

24        THE COURT:  They have expenses.  You have Medicate

25   Pharmacy, which is going to do the operations --

1          MR. COX:  Correct.

2          THE COURT:  -- which receives the, the patients'

3     information and dispenses the drugs; correct?

4          MR. COX:  Correct.

5          THE COURT:  They get their expenses paid.

6          MR. COX:  Yes.  And those are shown on the

7     financial statements as of those expenses.

8          THE COURT:  Right.  And then after the expenses of

9     Medicate and DeliverMed are paid, there is a -- assuming

10    there is a net profit, that is divided 50, 40, 10?

11         MR. COX:  Correct.

12         THE COURT:  Okay.

13         MR. COX:  That's correct.  And I think the

14    important point is that the profit all is shared by the

15    partners, not by -- there's no profit going to the

16    corporations.  I think everybody agrees on that.

17         THE COURT:  Correct.  Okay.  So far, I have not

18    seen any expenses of DeliverMed in this trial, though;

19    correct?

20         MR. COX:  No, those are being shown on those

21    financial statements.  When you -- no.  I'm sorry.  For

22    DeliverMed Holdings?

23         THE COURT:  Yes.

24         MR. COX:  Yeah, you will see those as

25    telemarketing expenses.  That's --

1     THE COURT:  Okay.  Those are telemarketing

2     expenses.

3     MR. COX:  Right.  Larry -- Larry Junior talked

4     about the telemarketing expenses being marketing expenses.

5     THE COURT:  Okay.  But all the money would go into

6     Medicate.

7     MR. COX:  Correct.

8     THE COURT:  And Medicate would pay DeliverMed's

9     expenses for telemarketing?

10     MR. COX:  Yeah, they would -- and they -- you can

11     see on the mail order, you can see on the various

12     financial statements the telemarketing expense coming off.

13     You will also see it called call centers, as well.

14     So any expenses that were being incurred to get

15     the patients are shown on the financial statements as

16     telemarketing expense, call centers and so on.

17     THE COURT:  Okay.  All right.

18     MR. COX:  So they are being deducted off.  That's,

19     that's literally an expense of the business.

20     Q.     (BY MR. COX)  So the, the partners we have here

21     now are -- of course now we're at the spring of 2005.  At

22     that time it was Ann and Mike and Joey.  At some point did

23     the partners change?

24     A.     The partners of the partnership?

25     Q.     Yes.

1    A.        Yes.

2    Q.        Who -- when was that date changed and what was the

3    change?

4    A.        What was the change or why was the change?

5    Q.        No.   When was it and what did it change to.

6    A.        In -- we were in the process of selling -- Mike

7    requested to be bought out in 2007.   We were in the

8    process of contacting what is referred to as mezzanine

9    finance people.

10        Which, a mezzanine finance person is a description

11   of a person, in effect if you think of a baseball stadium,

12   an upper seat.   They take a position behind the bank and

13   all the other vendors and fund the, or loan money to the

14   company at a higher interest to buy it out.

15        And originally Mike wanted to be bought out, and

16   Joe and we wanted to stay on so Mike said you could buy my

17   portion out.   So we had gone through a very lengthy

18   process with mezzanine finance people and got it down to

19   two mezzanine finance companies to buy Mike out.

20        One of the key factors in the mezzanine finance

21   group coming out was they said, the folks in particular I

22   think it was Patriot Capital said, if we're going to put

23   our money in here -- looked at my wife and I and said,

24   you're going to have to spend four or four days a week

25   down there in Washington Park because we're investing down

1    there and we don't -- we want to make sure that's -- we're

2    investing you.

3         My wife had very little interest in spending three

4    or four days a week in Washington Park, Illinois.  And she

5    was becoming increasingly frustrated by not getting our

6    distributions, not -- always having excuses and she just

7    said, you know, I'm at that point now where I want to do

8    something good and I want to go out and do volunteer work.

9    She said, you take over for my role, you step in my shoes,

10   take over whatever is owed, take over complete operations.

11        So I started doing not only the portion that I was

12   doing but I started doing the mailing portion which she

13   was in charge of.  So the whole percentage stayed the

14   same, 40, 50, 10, but the name Mark Swift occurred over

15   Ann Sickon.

16   Q.     And that change occurred in August 2007?

17   A.     Yeah, August, approximately.  Late summer.

18   Q.     And did, did Michael and Joe agree to that change

19   in the partners?

20   A.     Yeah, we just went forward, yeah.  It was not --

21   it was no big change to them because they were not

22   interested in who was doing the mailing and who was doing

23   the other aspects of DeliverMed as long as it was getting

24   done.

25   Q.     Were there any profits owed to Ann at that time

1    that had not been distributed to her when that change took

2    place?

3    A.        Yes.

4    Q.        And did you reach an agreement with Ann and

5    Michael and Joey about those unpaid profits, who they

6    would go to?

7    A.        Yes.   We referred to it, I was going to step in

8    her shoes and take over her role and act in her capacity

9    in all areas now.

10   Q.        And Mike and Joey agreed to that?

11   A.        Yes.

12   Q.        And that change would then have been retroactive?

13   A.        Well, I was a shareholder or a part of the

14   partnership from that point forward.   But I would take in

15   effect all of her, what is due her, yeah.   Yes.

16   Q.        Okay.   So what did you call this mail order

17   business?   What was it called?

18   A.        We just referred to it as DeliverMed Medicate

19   Pharmacy, but I see it also referred to as Medicate

20   DeliverMed Pharmacy.

21   Q.        Did you use the name Medicate in the calls?

22   A.        No.   We discontinued that pretty early on.

23   Q.        Why?

24   A.        Well, because for the reason you just brought up

25   earlier, if I say Medicate, did I say Medicate or did I

1    say Medicaid?  And what happened is, we were starting to

2    be confused where we were with the Medicaid department.

3    And so we started using the name DeliverMed Medicate

4    rather, or just DeliverMed.

5    Q.      Just to clarify a bit, in August and September of

6    2005 when the business first ramped up and began

7    operating, were you an owner of DeliverMed Holdings LLC at

8    that time?

9    A.      No.

10   Q.      Okay.

11           THE COURT:  Is this Exhibit 6?

12           MR. COX:  This is Exhibit 6, Your Honor.  And I'll

13   put these on the screen for us here.

14   Q.      (BY MR. COX)  Just to clarify in that last

15   question, who was the owner of DeliverMed if, if you know

16   in September or August of 2005?

17           MR. STINE:  I'm going to object, Your Honor.  If

18   he wasn't an owner, how does he know who was the owner?

19           THE WITNESS:  I'm very familiar with the owners.

20           THE COURT:  He may know.  He may answer.

21           THE WITNESS:  I'm very familiar with the owners.

22   The owners were my wife, who I'm very familiar with, and

23   she was parceling up part of her shares to our children.

24   Q.      (BY MR. COX)  Was that to your children or some

25   trusts or --

1    A.       Yeah, children's trusts.  Two were education --

2    all three were educational trusts, one converted to

3    disabled child trust or indigent child trust.

4    Q.       All right.  Let's take a look at Exhibit 6, page

5    17.  We're looking here at an e-mail.  This e-mail is

6    between you and Joe.  What date is this Mark?

7    A.       June 7, 2007.

8    Q.       And please tell the judge what you are talking

9    about here, you and Joe, explain this.

10   A.       In June, we had worked it down to maybe three or

11   four mezzanine companies to buy out Mike's interest.  And

12   I had been working, started working with Larry

13   Schaltenbrand extensively in putting together like a

14   booklet, in effect, of -- a book of forecasting where we

15   are, showing the financials and things of that nature.

16            And one day Joey sees me doing this and he faxes a

17   whole bunch of these invoices to one of the mezzanine

18   companies.  And they called me and said, what, what is

19   this?  And then Joey sent me a copy of this thing.  And I

20   was responding to that.

21   Q.       Let me show you --

22            THE COURT:  May I jump in here?  Are we talking

23   about Plaintiff's Exhibit -- the invoices?  Is that like

24   Plaintiff's Exhibit 91?

25            MR. COX:  We are.  I was just going to show that

1    to him and clarify that.

2    Q.      (BY MR. COX)  You see Exhibit 91 there.  Is this

3    the, an example of the invoice you are talking about in

4    this e-mail?

5    A.      This is an example, yes.

6    Q.      And so what are you asking Joey here?

7    A.      Well, I don't know, this has nothing to do with

8    the finance of the company, nothing to do with the taxes

9    or financial statements, and I'm asking him, what are you

10   -- stop sending these to people.  I'm trying to sell this

11   company and be consistent throughout with the taxes.  The

12   -- let's start there, trying to use the source documents

13   to agree to the general ledger to agree to the financial

14   statements to agree to the taxes so people can make sound

15   business decisions on if they're going to buy Mike out at

16   the value he was setting.

17   Q.      And did you tell him not to do any of these

18   invoices?

19   A.      I said, Joe, please don't do any more of these

20   invoices.  We are trying to sell the company.  We need to

21   be consistent.  Retract these from everybody you -- I said

22   dent them to.  I meant, sent them to.

23   Q.      And how did he respond?

24   A.      You are the only one that sees them.

25   Q.      Meaning you, Mark Swift?

1    A.        Yes.    And I replied, thank you, thank you.

2    Q.        Mark, was there ever an agreement with Medicate

3    Pharmacy and with these partners that Medicate Pharmacy

4    was to be paid the sum of $7 per scription -- per

5    prescription?

6    A.        No.

7    Q.        Now then, let's go back to when this business

8    started.    When did, when did you actually find out that

9    the State had awarded this contract?    When did that

10   happen?

11   A.        It's interesting when you learn from the State

12   that you get a contract.    They called us in early, late

13   July -- late June, early July, and said, we're going to go

14   ahead with you, we want to move forward with this

15   contract, do you have a pharmacy, we are ready to go, we'd

16   like to start in three weeks.

17            THE COURT:    What year are we talking about?

18            MR. COX:    2005.

19            THE WITNESS:    2005.

20            MR. COX:    Sorry, Judge.

21   A.        And you have just spent 20 months working for this

22   and when it happens they want you to start

23   instantaneously.

24   Q.        (BY MR. COX)    Okay.    So where are we in 2005?

25   A.        Let's just say after the 4th of July period,

1    probably.

2    Q.        Okay.   So July 2005?

3    A.        Early July.

4    Q.        Okay.   And then what happened in terms of this

5    business that you had been discussing in, when you finally

6    learn that you had the contract there in July 2005, what

7    happened?

8    A.        Well, I approached -- I approach --

9              (Courtroom deputy sneezed.)

10             THE COURT:   Bless you.   Make sure that's in the

11   record.

12             THE WITNESS:   Let it be known that plaintiff said

13   bless you.

14   A.        What I do is, I called Joey and Mike and I said,

15   you know, we got it, we're going forward, this is really

16   happening and I need to now get you signed up as the

17   pharmacy for this contract.   So we hired -- I hired -- my

18   wife hired and we met with Conlin and Associates.   My wife

19   actually met with them, I didn't, the first time.   Met

20   with Conlin and Associates and said, we need you to get an

21   approval of a pharmacy for this contract very fast.

22             MR. STINE:   Your Honor, I'm going to object.   If,

23   if his wife had this meeting, I mean, if he wasn't there

24   how does he have any foundation to say what happened at

25   this meeting?   Hearsay.

1          THE COURT:  He said he was there.

2          THE WITNESS:  I was on the phone.

3          THE COURT:  Sustained.

4          THE WITNESS:  I was on the phone --

5          THE COURT:  Pardon?

6          THE WITNESS:  I was on the phone.

7          THE COURT:  Oh, well, okay.  You were on the

8    phone.

9          THE WITNESS:  I wasn't at the meeting.  I will

10   admit I was not at the meeting at, on Wacker Drive, I was

11   on the phone.  They patched me in on the phone.

12         THE COURT:  Okay.

13   Q.     (BY MR. COX)  And, so go ahead and tell us there

14   what happened.

15   A.     Well, what happened is, we said to Conlin we were

16   going to contract with them to make sure all the paperwork

17   was done, expedite as quick as possible, have some people

18   go down to the State and they put together, Conlin put

19   together the contract with the State to have Medicate as a

20   participating pharmacy for it.

21   Q.     Okay.  And when did the operations of the mail

22   order business actually begin?

23   A.     Actually began in late July, early August 2005.

24   And the reason I say late is because we had prepared

25   mailings that had gone out and we started getting patients

1    like really early August.

2    Q.      So the first patients start flowing from

3    DeliverMed down to Medicate Pharmacy in early August 2005;

4    is that correct?

5    A.      Correct.

6            (Off the record.)

7    Q.      (BY MR. COX)  Turning to a slightly different

8    topic, when this business started was there an accounting

9    firm that was going to be doing accounting for the

10   business?

11   A.      Yes.

12   Q.      And who decided to use Schaltenbrand and

13   Schaltenbrand as accountants for the business?

14   A.      That would have been made by Michael

15   Schaltenbrand.

16   Q.      Were you asked?

17   A.      No.

18   Q.      So --

19   A.      I was told that's who we were using.

20   Q.      So, was Schaltenbrand and Schaltenbrand acting as

21   accountants for the partners, including your wife and

22   later you?

23   A.      Yes.

24   Q.      And as a partner, did you rely on them,

25   Schaltenbrand and Schaltenbrand, and trust Larry Senior

1  and Larry Junior and their firm to provide you with

2  accurate financial information?

3          MR. STINE:  Your Honor, I'm going to object and

4  this time I'd like to know what dates he's talking about.

5  Is he talking about August 2007 forward when he's

6  testified he became a partner?  Or is he talking about

7  prior to it when he wasn't a partner?

8          THE WITNESS:  I could answer that.

9          THE COURT:  Okay, set the time frame.

10         MR. COX:  All right.

11 Q.      (BY MR. COX) When is this taking place?

12 A.      That was discussed at the meeting in, with, in

13 Springfield, Illinois, that we had to figure out the

14 partnerships.  And so that would have been, like I said,

15 around April 2005.

16 Q.      And were you and your wife from that point forward

17 as they did the accounting work, your wife as a partner,

18 later you as a partner, relying on them to provide you

19 with accurate financial information?

20         MR. STINE:  Your Honor, again I'm going to object

21 to anything prior to August of 2007 when he testified that

22 he became a partner.  If he wanted to rely as a partner

23 after that, he can answer that.  If you want to bring Ann

24 Sickon in here to testify what she relied on prior to

25 that, I think she can do that.  But I don't think this

1   witness can testify to anything prior to the date he

2   became partner.

3          THE COURT:  Sustained.

4          MR. COX:  All right.

5   Q.      (BY MR. COX)  At some point you, when you became a

6   partner did you rely on those financial statements?

7   A.      Yes.

8   Q.      Did you rely on the financial statements to

9   understand the business before 2005, reviewing those past

10  financial statements as well?

11  A.      Yes, I did but --

12         MR. STINE:  Your Honor, again I'm going to object.

13  His reliance is immaterial just like mine is immaterial if

14  I'm not a partner.

15         THE COURT:  Well, you can't answer until I --

16         THE WITNESS:  I understand.

17         THE COURT:  -- until I make a ruling.  I'm going

18  to overrule the objection.  You may answer.

19  A.      Okay.  Now, make sure I answer your question

20  properly, okay?  I obviously relied on them when I was

21  representing to the mezzanine company and using historical

22  data of 2004, 2005, 2006, 2007, of the accuracy of the

23  Schaltenbrand financial statements.  Because I was

24  representing to these folks, this is what the business is

25  doing and we're buying, we're going to be borrowing money

1    to buy Mike out.

2    Q.      (BY MR. COX)  Now, from the beginning of the

3    business in 2005 were you asking for financial information

4    from Schaltenbrand and Schaltenbrand?

5    A.      Say the question again, please?

6    Q.      When the, from the time the business started were

7    you asking to be provided with some financial information

8    about what was going on with the business?

9    A.      We may --

10        MR. STINE:  Your Honor, same objection if he's

11   talking about pre-August of 2007.

12        THE COURT:  All right.  He already testified, Mr.

13   Cox, that he relied upon the historical data from 2004,

14   '05, '06 and '07, when he was representing to these folks

15   that, what the business was doing and they were trying to

16   buy Mike Schaltenbrand out.  So I don't understand your

17   next question, if he's already looked at them.

18        MR. COX:  Right.  He's looking at those at a later

19   time.  I'm asking him about if he was asking for

20   information as it went along, starting in 2005 to follow

21   what was happening with the business.

22        THE COURT:  Okay.  Well, then I will sustain that

23   objection because he was not a partner in 2005.

24        MR. COX:  Right.  But -- well, let me lay a little

25   bit of foundation.  It may help, Judge.

1        THE COURT:  Okay.

2    Q.      (BY MR. COX)  From the beginning of the business

3    in 2005 when Ann was a partner, were you involved with

4    Larry Schaltenbrand Junior in discussing some financial

5    information of the business?

6    A.      Yes.

7    Q.      And describe for the judge what your role was in

8    interacting with Larry Schaltenbrand Junior in terms of

9    the finances of the business from 2005 forward.

10   A.      Well again, we had requested information several

11   times, had not received any --

12          MR. STINE:  Your Honor?  Who's "we"?

13          THE WITNESS:  Can I --

14          THE COURT:  You're going to have to say who's

15   "we."

16          THE WITNESS:  I was just about to.

17   A.      In May of 2006, my wife and -- Ann had dinner in

18   Las Vegas with Mike and his then fiance, and we were

19   talking about getting information, and we had requested

20   then, too.  And we had requested subsequent.  They were

21   working on information and working on breaking apart and

22   figuring out how the mail order was doing.

23   Q.      (BY MR. COX)  And were you getting the information

24   that you and your wife had asked for?

25   A.      In what time frame?  I'm sorry.

1    Q.      In what you have described for us.  You said you

2    had asked for information.  Did you get it?

3    A.      Much later.  We got it much later.

4    Q.      About when did you start getting this information

5    you were requesting?

6    A.      The first time Mike decided he wanted to sell the

7    business, which would have been the premarital asset

8    decision, which would have probably been late summer 2006,

9    we received some information then.

10   Q.      Now, let's go back to the mailings.  I want to

11   find out what Ann is doing in terms of work for this

12   business and what you were doing in terms of work for this

13   business.  In doing the direct mailings, what, if any,

14   involvement did Ann have in that?

15   A.      Well, she ran --

16          MR. STINE:  Your Honor, I'm going to object.  He

17   said he wasn't an owner of DeliverMed Holdings who they

18   said was doing the direct mailings.  Why can't they bring

19   Ann in here and tell us what she was doing.  I don't know

20   how he can testify to what somebody else was doing if he's

21   not an owner of the company doing it and he wasn't doing

22   it.

23          THE COURT:  You have to lay a foundation.

24          MR. COX:  All right.

25          THE COURT:  And is she going to be testifying?

1          MR. COX:  I understand that they will be calling

2    her as a witness.

3          THE COURT:  Okay.

4          MR. COX:  They have listed her as a witness.  I

5    can lay a foundation, Judge.

6          THE COURT:  Okay.

7          MR. COX:  This is -- they all did this together.

8    I can explain it.

9    Q.    (BY MR. COX)  If you would then, Mark, tell us who

10   was involved in handling the direct mailings.

11   A.    My wife, Ann Sickon.

12   Q.    And were you present when that was being done?

13   A.    Yes.

14   Q.    And where was that being done?

15   A.    In my house.

16   Q.    And tell the Court how that was being done as you

17   observed it.

18   A.    Well, I assisted in setting up the computer so I

19   was very familiar with it.  We had a series of HP

20   printers, high speed printers, lined up.  And each one had

21   a laptop in front of it.  And what would happen is, the

22   first printer, we would print out the standard brochure,

23   the second printer would print out the letter where it got

24   merged with the person's name on it, and the third printer

25   would print out the mailing label.  So they would grab all

1    three together, put in an envelope, fold, stuff, label,

2    meter the envelope and go.

3    Q.    And were you engaged in that, actively in that

4    process?

5    A.    Unfortunately, I spent many a nights folding.  But

6    I, I was primarily trying to keep the printers and all the

7    data sources working together so they could stuff the

8    envelopes.

9    Q.    And what did you observe as Ann's involvement in

10   that?

11   A.    We had varying from as few as one to as many as

12   nine -- six, I think six would probably be the average,

13   women working around a table stuffing the envelopes.

14   Q.    And was Ann involved in that?

15   A.    She stuffed a lot of envelopes, yes.

16   Q.    What would you estimate the number of hours Ann

17   was working in that part of the business?

18   A.    Well, I can tell you the number of envelopes.  We

19   stuffed over a quarter million envelopes over the time.

20   Q.    Now then, where is the pharmacy physically located

21   that we are talking about here?

22   A.    Kingshighway and Washington Park.

23   Q.    Now, in addition to assisting with the mailings in

24   Chicago did you go to the pharmacy in Washington Park

25   starting in 2005 when the business began?

1    A.        Yes, in 2005 we received an overwhelming response

2    of people wanting to sign up, which caused a very large

3    bottleneck from what was coming from DeliverMed to the

4    pharmacy.  And I had spent quite a bit of time down there

5    that late fall, winter time frame, just assisting any way

6    I could, faxing faxes, while Joey was doing a pretty darn

7    good job of developing faxing systems.  But initially it

8    was sitting on a fax machine punching each individual

9    number of doctors and faxing the prescriptions off, so it

10   was a lot of manual labor.  We were throwing as many

11   bodies as we could at it.

12   Q.        And how many days per month would you say you were

13   there at that time?

14   A.        I would go two to three days a week.  Two --

15   mainly two to three weeks a month, never four weeks.

16   Probably three weeks is average, so probably somewhere

17   between six and nine days a month.

18   Q.        Now when, when you were there you were helping

19   Joey basically; is that right?

20   A.        Joey and the -- and his wife was one of the people

21   also was sitting there working on this, so I was helping

22   those folks.

23   Q.        Now, in that time frame starting in 2005 going

24   forward, in addition, or including the time you were

25   spending at the pharmacy, about how many hours a week were

1    you devoting to this business?

2    A.       Including the pharmacy, including everything, 50,

3    60 hours a week.   We were working on weekends, too.

4    Q.       Now when you went to the pharmacy on the days you

5    have told us about, did you see Michael there?

6    A.       I saw him once during the week.   But he, pretty

7    much his routine was he'd come in on late Friday

8    afternoons, like around 2:00 or 3:00.   But that's about

9    it.   But I saw him one full day there with us during the

10   week.

11   Q.       Well, how is it that Joey rather than Michael who

12   is a pharmacist was running the day to day operations?

13   A.       Well, he was running the operations.   There was a

14   pharmacist on duty, Terry Maddox at that time I believe.

15   And there was also a, later on a Steve Burroughs, I think

16   his name was.

17   Q.       Were you ever present in the pharmacy when Michael

18   and Joey were discussing Michael reviewing the

19   prescriptions?

20   A.       Yes, that --

21   Q.       When was that?

22   A.       That one particular day Mike just came in for a

23   few minutes --

24   Q.       When, when was it?   Can you give us a time frame

25   for the Court?

1    A.      Well, let me -- I'll probably put it in the time

2    frame, we didn't have the automated Script Pro system in.

3    So we probably, that would be November, December of 2005.

4    Q.      Okay.  And what happened?

5    A.      What happens is, there's these like white trays

6    with everybody's drugs in the trays and the paperwork.

7    And before they're sent out they have to be reviewed by a

8    physician -- I'm sorry, a pharmacist, for accuracy.  And

9    Joe's crew was really putting out a lot of patients that

10   day and they were stacked, you know, 10, 15 high on a

11   table, and they were everywhere.

12          And Mike came shooting in.  Joe, you know, needed

13   Mike to review these because the other pharmacists were

14   busy.  Joe pressured Mike a little bit too much or for

15   what Mike's standards were, I guess, and Mike just

16   screamed and went off that he's too busy for this stuff

17   and screamed at him, got in his car -- or his truck,

18   rather, and shot down a few blocks or whatever and came

19   back a few minutes later and reviewed them all.  And it

20   was rather embarrassing because I think Joe was screamed

21   at like nobody I have ever seen screamed at before.

22          MR. STINE:  Your Honor, I'm going to object to the

23   relevance of that.  I don't know where he's going but I

24   guess we'll find out.

25          THE COURT:  I don't know either so --

1      MR. STINE:    Okay.

2      THE COURT:    The Court won't be considering that.

3  Q.      (BY MR. COX)  Did Joe ever make complaints to you

4  about the work he was doing compared to the work Mike was

5  doing?

6  A.      Yes.

7  Q.      What were those complaints and when were they

8  made?

9  A.      Well, since Joe never got his 10 percent from

10  Mike, Joe would constantly, by constantly, maybe every

11  month or two months, he would come up to me and we'd go to

12  dinner at night and he would say, I need you to go to Mike

13  and help me get more percentage of business because I'm

14  doing all this work and he's doing nothing.  And I would

15  say, that's not my business, I gave my 10 percent, you

16  know, you're on your own.  My wife gave her 10 percent,

17  you're on your own.  This is 2007, 2008, he was still

18  asking for more and more ownership.

19  Q.      Now then, you have told us that Schaltenbrand and

20  Schaltenbrand was handling the accounting for the

21  partnership.  Who was handling the receipt of money that

22  is coming into the partnership and the deposit of that

23  money into the bank?

24  A.      Well it was, a lot, some of it was later on

25  electronically transferred.  But Alisha did all the

1    deposits, I believe.  I mean, sometimes she would bundle

2    them up and Joe would run them to the bank or sometimes

3    she'd bundle them up and Mike would run them to the bank.

4    But it was all, she is doing the recording for all of it.

5    Q.      And who is Alisha?

6    A.      I believe her name's Alisha Greer, and she's a

7    bookkeeper at the Washington Park facility.

8    Q.      She -- what's her relationship to Medicate

9    Pharmacy?

10   A.      An employee, bookkeeper at Washington Park.

11   Q.      Did you participate in the receipt or deposit of

12   any money?

13   A.      No.

14   Q.      Did you have the authority to write any checks?

15   A.      No.

16   Q.      Who had the authority to write checks for the

17   partnership?

18   A.      Only Michael.

19   Q.      And did you rely upon and trust Michael to handle

20   that part of the business?

21   A.      Yes.

22   Q.      Let's take a look at Exhibit 20.

23   A.      Are you putting that on the board, too, or no?

24   Q.      I will.  We have looked at this before but I have

25   a few questions for you about it.  Now this is that

1    signature card we have looked at before for this bank

2    account at Bank of O'Fallon.   And this bank account number

3    ends in what number?

4    A.      Mine's redacted here.   Account number?

5    Q.      Okay.  Let me ask you this:  It says the name of

6    the account holder is DeliverMed.   And if we -- as you

7    have heard, Michael Schaltenbrand signed this as president

8    of DeliverMed.   Did you or anyone on your behalf authorize

9    him to use the name or open this account called

10   DeliverMed?

11   A.      Nobody on my behalf or myself, no.

12   Q.      Who was the president in 2006?  Was there a

13   president of DeliverMed?

14   A.      It's an LLC.  In 2006, my wife was the president.

15   Q.      Now, was this a partnership that you and your wife

16   had with them sometimes called Medicate Pharmacy

17   DeliverMed?

18   A.      Was this a part of the partnership?

19   Q.      No, I'm asking was there a partnership called

20   Medicate Pharmacy DeliverMed that you and your wife -- you

21   and previously your wife were partners of?

22   A.      Yes.

23   Q.      And was there a president of the Medicate Pharmacy

24   DeliverMed partnership?

25   A.      No.

1    Q.      When did you first learn of the existence of this

2    account in the name of DeliverMed?

3    A.      During the discovery of these proceedings.

4    Q.      And before the discovery in this lawsuit did you,

5    did Mike ever tell you about it or did you have any

6    knowledge of it --

7    A.      No.

8    Q.      -- at all?

9    A.      No.  I had no knowledge of it, no.

10   Q.      Now looking at the tax ID number, you see that

11   there?

12   A.      Mine's redacted.  I think it's says Reporting

13   SSN/TIN.  There's nothing after it.

14   Q.      Or below?  Upper left-hand corner?

15   A.      Okay, I see it.  Okay.

16   Q.      What is that tax ID number?

17   A.      I don't know.

18   Q.      It begins two-zero?

19   A.      Yes.

20   Q.      Have you ever seen that before?

21   A.      Yes, during these proceedings.

22   Q.      Before the time you filed this lawsuit had you any

23   knowledge that there was such a tax ID number?

24   A.      No, I did not.

25   Q.      Did you authorize anybody to obtain this tax ID

1    number?

2    A.    No, I did not.

3    Q.    Did anybody ever tell you prior to these

4    proceedings that it had actually been obtained?

5    A.    No.

6    Q.    All right.  While we are on this topic, let's look

7    at Plaintiff's Exhibit 30.  Turning now to page seven, and

8    you have heard the testimony about this, we're not going

9    to go through this in detail.

10        Here Joey has testified that he got a Schedule C

11   and used that Schedule C to create this page in his tax

12   return and he got that from Schaltenbrand and

13   Schaltenbrand.  Did Schaltenbrand and Schaltenbrand send

14   you or Ann a similar Schedule C to the one that Joey has

15   here?

16        MR. STINE:  Your Honor, I'm going to object.  If

17   he wasn't the partner, I don't know how he would know what

18   would be sent.

19        MR. COX:  He can testify to whether he knows or

20   not.

21        MR. STINE:  Okay.

22        THE COURT:  Yeah, he can testify whether he knows.

23        THE WITNESS:  Well, we -- can I answer now?

24        THE COURT:  Yes.

25   A.    We filed joint taxes.  We never got a Schedule C

1  from DeleveryMed, the sole proprietorship of Joey Siddle,

2  or from any DeleveryMed.

3  Q.      (BY MR. COX)  When did you learn that the

4  partnership accountants had sent this Schedule C to Joey

5  and not to you or Ann?

6          MR. STINE:  Objection, Your Honor.  I don't think

7  it's been established that it wasn't sent to Ann.

8          THE WITNESS:  Well, yes --

9          THE COURT:  Well, I think if they file a joint tax

10  return, I think that he can testify that Ann did not -- I

11  mean that they did not receive it.  So I'm going to allow

12  the questioning.  I assume you -- well, I don't know

13  whether you are calling Ann or not but --

14          MR. STINE:  Depends on what he says.

15          THE COURT:  Okay.  You can answer --

16          THE WITNESS:  Can I answer that question now?

17          THE COURT:  Yes, you can answer it.

18          THE WITNESS:  Okay, so I answer it correctly, can

19  -- I hate to have you read it back to know, because I know

20  you have a stun gun.

21  Q.      (BY MR. COX)  Well, let me ask you again, when did

22  you learn that the partnership accountants had sent the

23  Schedule C to Joey?

24  A.      Today's Thursday?  Wednesday.

25  Q.      Is that during the trial here?

1    A.       Yes.

2    Q.       Okay.   Moving to the year 2006.

3    A.       2006 in this exhibit or --

4    Q.       Yeah, we're just going to talk about 2006 here.

5    What I wanted to talk about is at some point did Michael

6    start indicating that he wanted to sell the mail order

7    business?

8    A.       Yes.

9    Q.       And about when was that?

10   A.       Well, we were always trying to build the business

11   up and hopefully find a seller for it.  But he wanted to

12   sell it in a very tight frame, tight time frame in say

13   June, July of 2006 so it wouldn't be back a premarital

14   asset.

15   Q.       And let's look at page nine of Exhibit 6.

16   A.       Can I clarify the last answer?

17   Q.       Sure.

18   A.       The objective of the very business that you build

19   is to have an exit strategy.  Our exit strategy was some

20   day possibly sell the business out.  And so Mike wanted to

21   do it on a tighter time frame.

22   Q.       Well, let me ask you about that.  Here we are,

23   let's take a look at this --

24   A.       I'm sorry, what page?

25   Q.       Page nine.  I'll put it right up here.  We have

1    looked at this before but what I wanted to ask you about

2    is, at the time Mike is talking about needing to sell this

3    by August.   At that point in time were you or Ann

4    indicating anything about selling the business?

5    A.      No.

6    Q.      How about Joey?  Was he talking about selling the

7    business at that time that you heard?

8    A.      Not talking to me about selling the business, Joey

9    did not.

10   Q.      So only at this point Michael is the only one

11   wanting to sell the business?

12   A.      Yes.

13   Q.      And when you received this, you see what he's

14   saying here at the top about the premarital and so on?

15   Did you ever talk to Michael about why he wanted to sell

16   the business at that time?

17   A.      Yes.

18   Q.      Did you call him after you got this e-mail and

19   discuss it with him?

20   A.      I called him for sure, and I remember I think I

21   e-mailed him and I said, premarital asset?  I didn't know

22   he was getting married.

23   Q.      And tell the judge about that conversation with

24   Michael about this.

25   A.      Well, I called Mike and I -- we finally had got a

1    hold of him and he said that he had just got engaged and

2    he was going to get married and he wanted to sell this

3    business as soon as possible.  He didn't want it to be

4    ownership with a premarital asset, he didn't want her to

5    be part, have any ownership in it.  And I told him, there

6    is no way you can sell a business in less than 30 days

7    unless you put it on an auction block.  It was just

8    impossible.

9    Q.      Well, let's go to page six of Exhibit 6.  In this

10   e-mail you are talking about a potential sale price.  Why

11   are you coming up with a potential sale price at this

12   time?

13   A.      Well, we had some discussions about, what is this

14   worth, what we're doing?  As in, I went out and talked to

15   some people and got a couple interested parties, but what

16   is it worth?  Because Mike wanted to cash out some of the

17   business at that time.  Again.

18          And we took a calculation based upon numbers we

19   got from different sources.  We got, it reads here, it

20   says, based on Joey's number of currently servicing 4,000

21   patients.  And at a sales time in, you know, a month or so

22   I get another 400 patients, based upon their figure of

23   $368 of revenue, which is an accurate number, you multiply

24   them together you get your monthly revenue, analyze it.

25          Schaltenbrand statements were showing -- or

1    Michael actually sent an e-mail, said about, he was

2    getting about 17.1 percent profit now.  And that was in

3    one of his e-mails.  And we multiply them together, and we

4    used 8 times at that, because that was, one of the folks

5    picked the midpoint, told me to pick a midpoint that I

6    talked with, between 7 and 9 times earnings.

7    Q.      Now this method that you've got here, is this a

8    common method that you used?

9    A.      Well, it's a model method that a lot of people use

10   in businesses that involve --

11           MR. STINE:  Your Honor, I'm going to object unless

12   they can lay a foundation.

13           THE COURT:  Sustained.

14   Q.      (BY MR. COX)  Okay.  Is this the same, are you

15   using the same model here that was used by the

16   Schaltenbrands in arriving at their valuation?

17   A.      Basically.

18   Q.      Okay.  And, and where were you getting these

19   numbers?

20   A.      Well, Joe gave me that he was servicing 4,000

21   patients in June of that year.  And we calculated our

22   average patient per month because we were doing monthly

23   shipments, it was $368; that came off of the computer

24   system showing how much, and we just divided by the number

25   of patients.  So I multiplied those together, annualized

1    it, 12 months, showing what 12 months sales were, 17.1

2    percent.  Mike sent me an e-mail.  I say, are you still

3    getting 23 percent profit?  He said, no, we were getting

4    less now, about four or five percent less because of Part

5    D in the year 2006.  So I used that 17.1.  Came up with an

6    annualized projected income -- shouldn't say income, it

7    says revenue -- times 8, because I took the multiple of,

8    between 7 and 9, and you got $26 million of potential sale

9    price.

10   Q.      So at this point you're, you're talking with them

11   about beginning the process of perhaps selling it; is that

12   right?

13   A.      Yes.

14   Q.      But did you, did you know the time frame that

15   Michael wanted to sell it on until you got the later

16   e-mail about the marriage?

17   A.      Well, yes, I mean it was, it was very

18   serious-like, 30 days I gotta sell this.  Then it brings

19   reality to it rather than just, we're talking with people,

20   seeing what it's worth.  But "I gotta sell this in 30

21   days, I'm getting married" brought real serious attention

22   to it.

23   Q.      After you sent this e-mail did Michael ever

24   communicate to you that he disagreed with the calculation

25   you had made?

1    A.        I don't recall him ever responding to it in any

2    fashion.

3    Q.        All right.  After Michael told you he wanted to

4    sell the business, please tell the judge what steps you

5    took to actually sell the business.

6    A.        Well, I told him I couldn't sell it in 30 days for

7    a premarital asset.  So I had took my Rolodex and called a

8    bunch of people and found out who out there, what's the

9    best way to approach the sale of this business, who would

10   be interested.  Would it be interested in selling it to a

11   corporation?  Would it be interested in selling it to

12   somebody who wants to get into the business?  Would it be

13   better to sell it to these management groups?  And it was

14   suggested from a couple of different sources that I talked

15   to, and I talked to a lot of people, that best approach

16   is, if you wanted to stay in the business, you can make a

17   mezzanine finance transaction where you buy your partners

18   out, is the best methodology to use.

19   Q.        Did you have any success in finding a buyer at

20   that point?

21   A.        Well, you have a buyer for Mike's shares.  You

22   have mezzanine funds.  And we had eight term sheets that

23   we, from eight organizations willing to do the mezzanine

24   financing, and we got it down to two or three that we

25   decided would make the best -- by "we," I'm talking about

1   myself and some friends that I kind of discussed in the

2   industry how mezzanine works, that I could present it to

3   Mike as potential buyers for his business.  Patriot

4   Capital, a group out of Boston, I can't remember their

5   name right now, and then another group out of New York,

6   Halbren Capital [phonetic]?  And they're mezzanine finance

7   folks.  Two of them flew to Chicago to meet with me to go

8   through the potential sale.  We got very far down the

9   road.

10  Q.      All right.  Let's take a look now --

11          THE COURT:  What was the time frame for this?

12          THE WITNESS:  This -- can I answer?

13  MR. COX:  Yes.

14          THE COURT:  Yes.  If I ask a question, you can

15  answer.  If they ask questions, it depends.

16          THE WITNESS:  I got the ground rules.

17          This would have been, this would have been during

18  the very hot summer of 2007, because I remember one of my

19  -- I had to pull over, coming back from the pharmacy I had

20  to pull over at the rest stop for two hours and have a

21  conference call with some folks about how we wanted to

22  price it, how we wanted to look at doing a mezzanine deal.

23  Q.      (BY MR. COX)  Did that ultimately take place?

24  A.      No.  Michael decided August, September time frame

25  that he changed his mind.  He didn't want to sell.

1    Initially he said these are the conditions for selling,

2    and they were conditions that I could not possibly imagine

3    any finance person agreeing to.  And then he said he just,

4    why would he -- he told me he would be a fool to sell

5    because this thing is growing.  It's getting bigger.

6    Q.    So how much time would you estimate you had spent

7    trying to realize this sale for Michael?

8    A.    I spent a couple of hours every day for probably,

9    you know, five days of course, not weekends, but four?

10   Three months?  You're always faxing.  You're always

11   following through.

12   Q.    Let's take a look now at this -- this is page ten

13   of Exhibit 6.  In the first sentence, this is an e-mail

14   from Mike to you; is that correct?

15   A.    Yes.

16   Q.    And what's the date of it?

17   A.    It's September 14, 2006.

18   Q.    He's writing to you, and what's he saying to you

19   here in the first sentence?

20   A.    Remember when we spoke a moth ago about my taking

21   a distribution of 187,000 to pay off -- to pay Lisa off?

22   Q.    Then what does he say?

23   A.    I did so at the beginning of September.

24   Q.    So is he talking about taking a distribution?

25   A.    Yes.

1    Q.      Before we continue with this, let's talk just a

2    little bit about a distribution.   What is a distribution?

3    A.      A distribution is taking a distribution of the

4    profits, or a distribution is taking the profits plus the

5    basis of the company.   You are taking money out of the

6    company for your personal use.

7    Q.      Did you have any understanding or agreement with

8    Michael or Joey at any time about how the three of you

9    would handle distributions?

10   A.      Well, yeah, we would to it on a pro rata basis of

11   50, 40, 10.   My wife was same thing, 50, 40, 10.

12          MR. STINE:   Objection, Your Honor.   No foundation

13   as to what his wife's agreement was or --

14          THE COURT:   Overruled.   That's already in

15   evidence.

16   Q.      (BY MR. COX)  And did you agree or was there any

17   agreement about Michael taking this 187 out of the

18   business in September 2006?

19   A.      I don't remember speaking to Michael about taking

20   187.   And this is done, notification is done two weeks

21   after it was taken because he says the beginning of

22   September.

23   Q.      And what does he say about what's left over after

24   he took this 187,000-dollar distribution?

25   A.      There is only about 50,000 to 75,000 left to use

1    for the call center or distributions.  We need to sell

2    this part of the business and start again in Iowa, e-mail

3    and let's talk -- let's pick a time to talk before the

4    wedding.  Thanks, Michael Schaltenbrand.

5    Q.      Now, when he says to pay Lisa off, what is that?

6    What do you understand that to mean?

7    A.      Well, subsequent to this e-mail I found out what

8    he said is he was trying to buy out part of his alimony

9    and child support for what he referred to as pennies on

10   the dollars.  I didn't know what that meant.  But 187,000

11   was gone.

12   Q.      So at this point, here we are in 2006, your --

13   Ann's the partner; is that right?

14   A.      Yes.

15   Q.      But Mike is communicating to you as though you're

16   a partner, explaining the distribution he took and what's

17   left to pay and so on; is that correct?

18   A.      Well, the reason he's mainly communicating to

19   me --

20           MR. STINE:  Objection, Your Honor.  I don't know

21   how he knows the reason Mike Schaltenbrand was

22   communicating with him.

23           THE COURT:  Sustained.  Why don't you start --

24   looks like there was an e-mail on September 6th from Mr.

25   Swift to Mr. Schaltenbrand that -- start at the bottom and

1    go up.  It says, subject, update report.  And it says,

2    thank you, Mark Swift.

3         And then Mr. Schaltenbrand responded to that

4    e-mail the next day or on -- yeah, the next day, September

5    14th.

6         MR. COX:  Well, I don't know that he's responding

7    to an e-mail.  Mark says thank you to some other thing

8    he's received and Mike is starting with a new thing here.

9         THE COURT:  Well, why don't you explain to the

10   Court what the September 13th e-mail was about, Mr. Cox?

11        MR. COX:  Well, I would, Judge, except I don't

12   have that September 13th e-mail.

13        THE COURT:  It's right here.  It says, subject,

14   update report.

15        MR. COX:  I thought you meant the one that Mark

16   was responding to.

17        THE COURT:  No, the one that Mark sent.

18        MR. COX:  Okay, I can ask him about that, surely.

19        THE COURT:  Yeah.

20   Q.    (BY MR. COX)  Mark, at the bottom we see here an

21   e-mail from you, and you are sending it to both Mike and

22   Joey; correct?

23   A.    Yes.

24   Q.    And what is the, what are you saying in this

25   e-mail?  What do you say?

1    A.      Well, it talks about how there's an attachment of

2    an updated report.

3    Q.      So you had received some sort of report and you

4    were thanking them for sending you some kind of report?

5    A.      Yeah.

6    Q.      Okay.

7            THE COURT:  Was that an attachment to the e-mail?

8            THE WITNESS:  It doesn't say there's --

9            MR. COX:  It's not an attachment to this e-mail.

10           THE COURT:  Okay.

11   Q.      (BY MR. COX)  It's a thank you for a previous

12   e-mail and report he had received.  And then the part that

13   Mike is writing is really a new discussion that he's

14   initiated.

15           Now then, the amount that he's talking about here,

16   the 50 to 75,000, he's saying that's all that's left to

17   pay for what?

18   A.      For the call center or distributions.

19   Q.      So the call center would be to pay DeliverMed for

20   -- Holdings for its expenses, is that what he's talking

21   about when the call centers --

22   A.      Yes.

23   Q.      And distributions would be what?

24   A.      Distributions to be received at that time by Ann

25   or Joe.

Q.      So he has taken out 187,000 for a distribution and left only that amount to pay for both marketing and distributions for you and Joey?

A.      No, for Ann and Joe.

Q.      I mean Ann and Joe, right.  Now, was that enough to pay the call center at that time and to distribute moneys to other partners?  Was that enough left?

A.      At this time frame we were doing aggressive marketing, so that would not be enough money to pay the call center.  This $187,000 was a shock to the system, as you are trying to sell a business, somebody's grabbing money out of the accounts and changing the next month's financials and representing the company, company situation to people that it's just not so.  I mean, it looks like a big kitty you just grab money out of.

Q.      Did you have any discussions with Michael about taking distributions out of the business to pay for personal expenses?

A.      Personal expenses?

Q.      Right.  Like paying alimony to his wife and so on, did you talk with him about that?

A.      Well, I later learned, later in talking about we learned in 2006, when we were -- 2007, a lot more, that there was an automatic withdraw out of the company to pay his ex-wife every, I think it was the third Friday of

1    every month?  Or something to that effect.  And it would

2    range from $6,250 a month to as high as, which they would

3    then add another one and there would be two automatic

4    withdrawals that drove it to $16,250 a month.  Whether

5    there was bills to pay or whatever, it came out every

6    month.

7    Q.      Did you talk to Mike about taking these

8    distributions, these moneys out of the business and have a

9    conversation about that?

10            MR. STINE:  Your Honor, I'd like a time frame.

11            THE COURT:  Time frame.

12            MR. COX:  I was going to ask him when, if he said

13   there were conversations, I'll ask him when.

14            THE COURT:  Okay.

15   A.      The first time I noticed it was when we were going

16   through --

17            THE COURT:  That's not the question.

18            THE WITNESS:  Okay.  I'm sorry.

19            THE COURT:  The question is:  Did talk to him?

20            THE WITNESS:  Yes.

21   Q.      (BY MR. COX) And when was that --

22            THE COURT:  Next question is:  When?

23            MR. COX:  That's the next.

24            THE WITNESS:  That would be late 2006.

25   Q.      (BY MR. COX)  Okay.  Tell us about that

1    conversation.

2    A.       I first approached Larry Junior when I saw it in

3    his office, and that was one of the first times I met

4    Larry Junior, was late 2006, asking him what these were.

5    Larry Junior stated that that's paying for his ex-wife's

6    alimony and child support.

7             And I said, well, wait a minute, it's coming out

8    of the business?  And he said --

9             MR. STINE:  Your Honor, I'm going to object on the

10   basis of hearsay.

11            THE WITNESS:  I was there.

12            THE COURT:  Sustained.

13            THE WITNESS:  Okay.

14   Q.       (BY MR. COX)  So what did you do then?

15   A.       I asked Mike about that, that distributions that

16   he was taking for -- an automatic distribution every third

17   Friday or some, I think it was the second or third Friday

18   of every month.  And he explained that he had to pay her

19   that money for a number of years.

20   Q.       (BY MR. COX)  And what did you say?

21   A.       That's a distribution to you.  And we had a

22   conversation back and forth where he would say, no, it's

23   not a distribution, it's a distribution to my ex-wife.

24   That doesn't count towards me, it's her money now.  I

25   said, no, it comes out of the partnership.  You are taking

1    away from the partners.  It's your distribution.  And I

2    don't think he ever understood what I was referring to.

3    Q.      All right.

4            THE COURT:  If you're moving on to another topic,

5    we're going to recess until 1:00.

6            MR. COX:  All right.  That's fine, Judge.  Thank

7    you.

8            (Court recessed from 11:56 a.m. to 12:59 p.m.)

9            THE COURT:  Okay, we are back on the record.  Mr.

10   Swift is still on the stand.

11           Mr. Cox, you may continue your inquiry.

12           MR. COX:  Thank you, Judge.

13   Q.      (BY MR. COX)  We are now looking at page seven of

14   Exhibit 7.

15           THE COURT:  Of Exhibit 7?

16           MR. COX:  Yes -- 6 -- I'm sorry, page 7 of

17   Exhibit 6.

18   Q.      (BY MR. COX)  We see at the bottom an e-mail you

19   have written to Mike.  This is May the 20th of 2006 now

20   and it looks like you've -- what are you talking about

21   here at the bottom?

22   A.      Would you like me to read it or --

23   Q.      Just explain to us what your subject it.

24   A.      The revenue schedule for what we are doing for the

25   mail order business.

1    Q.      And what are you talking about there in the last

2    line, we are shaking more revenue out with the audit on

3    patient files.  What's going on there?

4    A.      Patients receive their drugs every 30 days.  The

5    system had some major problems where, if a person ran out

6    of prescription refills, they would fall off the register

7    in the computer system.  So when we were referring to

8    shaking out more revenue is we'd go back and look and see

9    what patients we lost that way, try to get, get them on

10   the program.

11   Q.      Is that something you were assisting with?

12   A.      Yes, I was.

13   Q.      Now, looking above here, is this a response that

14   you receive from Mike there at the top?

15   A.      Are you referring to one dated Wednesday, May 24,

16   2006 --

17   Q.      Right.

18   A.      -- that section?  Yes.  I received that.

19   Q.      And what is Mike saying to you in this e-mail?

20   A.      He's saying that he -- Mark, I have issued $50,000

21   to myself in distributions this month.  Mike.

22   Q.      Did the partners receive a proportional

23   distribution at that time?

24   A.      No.

25   Q.      Did you talk with him -- did you talk with Mike

1    about that particular 50,000-dollar distribution, what it

2    was for?

3    A.        Yes.

4    Q.        And when did you talk with him?

5    A.        Around that time frame.

6    Q.        After you received the e-mail?

7    A.        Yes.

8    Q.        And did you talk with him by phone?

9    A.        In person.

10   Q.        All right.  And tell the judge about that

11   conversation.

12   A.        I --

13             THE COURT:  When was that?

14             MR. COX:  He said just shortly after he got this

15   e-mail.

16             THE COURT:  Where was it?

17   Q.        (BY MR. COX)  Where did you have that

18   conversation?

19   A.        At the pharmacy in Washington Park.

20   Q.        All right.  And what was said at that time?

21   A.        That he had took a 50,000-dollar distribution to,

22   because he was in the middle of doing his project in his

23   home.  He was doing some work on his home.  I don't really

24   recall what it was.

25   Q.        All right.  And did you talk with him then about

1    him taking that distribution?

2    A.      Yes.

3    Q.      And what was said?

4    A.      Well I asked him, okay, I mean, you'll put it on

5    the schedule of your distribution but we have to get, the

6    rest of us have to catch up on distributions.  My wife

7    hadn't got one in quite some time then.  I don't know if

8    Joey did or not.

9    Q.      All right.  And what was Mike's response?

10   A.      We will catch up.

11   Q.      Did they?

12   A.      No.

13   Q.      We are now to page eight --

14           THE COURT:  Hold on a second.  I want to stay on

15   seven.

16           MR. COX:  Sure.

17           THE COURT:  I revised and updated the revenue

18   schedule.  Where -- whose rev -- you know, who's revenue

19   schedule and where did it come from.

20           MR. COX:  Oh, sure, I'd be glad to.

21   Q.      (BY MR. COX)  The Judge is asking about the lower

22   e-mail here about the revenue schedule.  Would you explain

23   what that is, where it came from, and how it was created?

24   A.      We would take the numbers off of the computer

25   system about the adjudicated claims for that week, and I

1    would record it on a revenue schedule so we could start

2    trending and seeing how weekly, monthly and annual sales

3    would go.

4            THE COURT:  So was it your revenue schedule or was

5    it Joey's revenue schedule?

6            THE WITNESS:  This was the one that I did for the

7    company.  I was developing like bar charts about how sales

8    were going.

9    Q.      (BY MR. COX)  And then you say in the second

10   sentence here, the revisions are based upon the final

11   December 31, 2005, financial information your father's

12   provided.  What does that mean?

13   A.      He provided what the profitability percentages

14   were for the, from the financial statements of December

15   31st, 2005, for Medicate Pharmacy Central.

16   Q.      I see.  And so at this point you are relying on

17   that financial information to help you revise and, or

18   these schedules?

19   A.      Yes.

20   Q.      And were you relying on them to be accurate?

21   A.      Did I rely on my schedules to be accurate?

22   Q.      No, were you relying on Schaltenbrand's

23   information to be accurate at this time?

24   A.      Yes.

25   Q.      Okay.  And at the same time then you go on to say

1    you are trying to get more revenue by, as you described

2    it, shaking it; is that right?

3    A.        Correct.

4            MR. COX:  Does that answer your question, Judge?

5            THE COURT:  The last sentence says, we are shaking

6    more revenue out with the audit on the patient files.

7            Is the more revenue coming from the financial

8    statement of Schaltenbrand or from the revenue schedule?

9    Where is the shaking coming from?

10           THE WITNESS:  Neither.  We were going into the

11   patient files because a patient was listed on the, on the

12   pharmacy system by the number of refills they had.  If a

13   patient ran out of refills, it didn't give us an

14   opportunity at that time to contact a doctor and get more

15   refills on those prescriptions.  So what we started to do

16   is go through line -- patient by patient and finding those

17   that were falling off the system because they didn't have

18   refills, contacting the doctor or the patient to see if we

19   could get more refill orders to fill more orders.

20           THE COURT:  Well, that last sentence to me

21   implies, and correct me if I'm wrong, that you are making

22   more money than you thought, based on, from the financial

23   information provided.  Is that a wrong assumption?

24           THE WITNESS:  Yes, it is.  It means -- like using

25   me as an example, say I have four refills on my drugs.

```
 1    Every month I would get a refill.  If I had zero refills,

 2    not only would I get not my refill because there's no

 3    refill to fill for the patient for their prescriptions,

 4    but my name would fall off the list as an active patient.

 5              THE COURT:  I see.

 6              THE WITNESS:  And we would get no warning that

 7    they weren't an active patient so we couldn't do anything.

 8              THE COURT:  Go ahead.

 9    Q.      (BY MR. COX)  Did Mike to your knowledge ever take

10    a distribution to pay his taxes?

11    A.      Yes.

12    Q.      About how much was that?

13    A.      Several hundred thousand dollars.  I don't

14    remember the exact amount.  I'm sorry.

15    Q.      And at that time were the other partners given a

16    -- well, when was that, first of all.

17    A.      Approximately April 14th, 13th, of 2007 -- 2008.

18    Q.      And did you get a pro rata distribution as a

19    partner at that time as well?

20    A.      No.

21    Q.      How about Joey, do you know if he got one?

22    A.      No.

23    Q.      No, he did not --

24    A.      No, I know he did not.

25    Q.      Very good.  I know I didn't ask that question very
```

1    well.

2          So, so Mike's taking a lot of money for taxes but

3    you are not getting a distribution.  Joe is not getting a

4    distribution.

5    A.        Correct.

6    Q.        All right.  Let's take a look at page 42 of

7    Exhibit 6.  This is an e-mail from Mike to you.  What's

8    the date?

9    A.        October 29, 2007.

10          THE COURT:  Question:  As of this date is Swift a

11   partner?

12          THE WITNESS:  Yes.

13          MR. COX:  Yes.

14          THE COURT:  Okay.

15   Q.        (BY MR. COX)  And let's take a look at the first

16   sentence.

17   A.        Mark, I spoke with Alisha and she has 177K --

18   meaning 177,000 -- in account, but it was 145,000 for

19   Friday.  I will check with her on Wednesday for A/R --

20   meaning accounts receivable.  Part of the problem she says

21   is that IPA -- Illinois Public Aid -- is only paying for a

22   couple of days at a time versus a week at a time

23   previously.

24          Do you want me to keep going?

25   Q.        No, that's fine.  So, so the issue here appears to

1    be that there's very little money in the account to pay

2    for things; is that correct?

3    A.      Correct.

4    Q.      And at this time we were able to determine, is

5    Mike still taking an automatic distribution for alimony of

6    6250 and additional moneys, is that's what's going on in

7    this time period?

8    A.      Yes.  However, it's a minimum of 6,250 and a

9    maximum of 16,250.

10   Q.      Was there ever a time in this partnership with,

11   with Mike and Joey that getting distributions was not a

12   problem?

13   A.      No.

14   Q.      Please describe for the judge generally what the

15   problems were with getting distributions.

16   A.      We never would get our proportionate share of the

17   distributions, as I'm saying Joe or myself.  We would be

18   told that there's no money in the account.  We would be

19   told that there is -- we're not making money.  We would be

20   told there's bills coming in.  We would be told a variety

21   of reasons.

22   Q.      Were you ever shown the credit cards statements of

23   the business credit cards or the ones in Mike's name that

24   were being paid from the business --

25   A.      Yes.

1    Q.        -- either one?

2    A.        Yes.

3    Q.        When were you shown those?

4    A.        During these proceedings.

5    Q.        After the lawsuit was filed?

6    A.        Yes.

7    Q.        Back at the time charges were being added to them

8    were you aware of those charges or were those shared with

9    you?

10   A.        Let me rephrase.  Are you saying when the charges

11   occurred was I aware of them?

12   Q.        Were you aware of what was on the credit card

13   statements at the time they were being charged.

14   A.        No.

15   Q.        Did you know that Mike was charging personal

16   expenses that were being paid by the business on these

17   cards?

18   A.        No.

19   Q.        When did you learn he was doing that?

20   A.        When we started getting through discovery and

21   subpoenas, credit card statements, many of the things

22   looked unusual.

23   Q.        Did you know for example that the business had

24   paid about $10,000 for Mike's wedding reception?

25   A.        No.

1    Q.       Did you attend the wedding?

2    A.       Yes.

3    Q.       Did Mike say anything to you at the wedding about

4    paying for the wedding?

5    A.       I was very, very impressed with the wedding.  It

6    was beautiful.  The setup was beautiful.  And my wife and

7    I approached him to shake his hand and congratulate him

8    after the ceremony part, prior to the reception, and I

9    said, this is amazing.  I said, I just can't believe how

10   beautiful this is in such a short time you put it

11   together.  He said, oh, that's okay, you're paying for

12   this.

13   Q.       Did you understand at that time what he meant?

14   A.       I just assumed he was congratulating on the

15   success that everybody's been enjoying from the mail order

16   business.  I did not know that, what it meant.

17   Q.       All right.  Let's go to page 91.  And what is this

18   e-mail?

19   A.       I was -- the bottom part in December 26, 2007 --

20   Q.       Are you on page 91?

21   A.       No, I'm on 92.  I apologize.

22   Q.       Turn to 91, please.

23   A.       That was basically the same one on the next page.

24   I was inquiring about a 250,000-dollar payment I saw from

25   Central, which is also called Washington Park, to what was

1    called St. Mary's, then became East St. Louis, but also

2    referred to in many instances as Kenneth Hall Pharmacy.

3              And $250,000 was transferred from the Washington

4    Park financials to the Kenneth Hall or East St. Louis

5    pharmacy and I was inquiring was he taking a distribution

6    or, or was he paying a loan to or making a loan to the

7    other pharmacy?  And I was inquiring on that.

8    Q.       Why did you think it had to be one or the other?

9    A.       Because I cannot think of a third option it could

10   be.  It's either as a loan or he took it as a

11   distribution.

12   Q.       So, did he respond to your question here in this

13   e-mail?

14   A.       No.

15   Q.       Did you --

16   A.       But he responded to the e-mail but he didn't

17   respond to the question.

18   Q.       That's what I mean, he didn't answer the question?

19   A.       He did not answer the question.

20   Q.       Were you ever able to figure out what he was doing

21   here transferring money from one to the other, what it

22   was?

23   A.        I could not figure out what that $250,000 was for.

24   If it had ever been paid back or if it was a distribution.

25   He could not figure that out.

1    Q.       If you would, Mark, please explain to the judge

2    what, if anything, you saw happening in the business as

3    far as the relationship between these distributions and,

4    and also the payment of Mike's personal expenses and the

5    need to, for the business to borrow money.  Was there a

6    relationship between the two that you saw in reviewing the

7    financial records?

8    A.       Yes.  In reviewing the financial records, I saw a

9    lot of times that large distributions are being taken,

10   taking away the cash from operating the business, which

11   then forced the business to go borrow funds from the bank

12   to do its operations.

13   Q.       And --

14           MR. STINE:  Your Honor, could we get a time frame

15   on that?

16           THE COURT:  Yeah, set a time frame.

17           MR. COX:  Sure.

18   Q.       (BY MR. COX)  What time period are you seeing that

19   happen?

20   A.       Now.  And post that, 2005 through 2010, and now I

21   see it in the papers we got for 2011.

22   Q.       So it was an ongoing issue from day one forward?

23   A.       I've seen it going on from day one.

24   Q.       Now then, let's take a look at page 133.  And

25   before we take a look at that page, let me ask you this

1    question:   What was money being borrowed for in the

2    business, the different debts?  What was that for?  What

3    do you do with the money?

4    A.      Well, there is two things that the loan was

5    supposed to be for.  The first was, we would be borrowing

6    money from the bank for the marketing.  Then as we got the

7    revenue from the marketing results, we had that money back

8    in our account to pay back the bank.  Then a large part of

9    the loan -- but the remaining exclusive loan should be

10   what we refer to as floating -- float for the A/R.  In

11   other words, borrow 85 percent of our receivables so that

12   we could fund more purchases of drugs to create more

13   receivables and continually cycling through the process,

14   so that at any one time you should have 85 percent of your

15   receivables should be the maximum of your bank loan.

16   Q.      So if the money's coming in and you have this loan

17   to help you get the money to come in, I guess the idea is

18   to, you should pay back that loan really as it comes in?

19   A.      Right.  As soon as your money comes in, you pay

20   back the loan.  And you can reborrow money if you want to

21   have more receivables.

22   Q.      And over time did you see the debt increase in the

23   business?

24   A.      Yes.

25   Q.      And why was that, based on what you were looking

1    at in the financial statements of Schaltenbrand and

2    Schaltenbrand?

3    A.      Well, it was increasing the loan because we were

4    increasing our sales which was increasing our receivables.

5    And in recent years that paperwork we got, we saw the

6    revenue drop between 2009 to 2011 by $2 million a year,

7    but the loan went up $300,000 and I can't figure out it

8    makes any sense whatsoever.

9    Q.      What effect would the distributions that are being

10   taken out by Michael Schaltenbrand have on that, what you

11   have just described there?

12   A.      The money has to come from somewhere.  It either

13   comes from profits or he's been borrowing from the bank

14   loan.

15   Q.      All right.  Let's take a look now at 133.  Here we

16   are in December of 2008.  Now this is an e-mail from Mike

17   to you.  It looks like it's around Christmas.  And what is

18   the message here he's giving you with respect to

19   withdrawal of moneys from the line of credit?  First of

20   all, tell us what the line of credit is.

21   A.      The line of credit was the bank loan at Bank of

22   O'Fallon.

23   Q.      How did that work?

24   A.      Bank of O'Fallon's loan was based upon

25   collateralized assets, 85 percent of our receivable

1    balance plus we were allowed to borrow a percentage of our

2    inventory.  We didn't really carry a lot of inventory, so

3    it wasn't that big of a number.  And those two combined

4    gave you your borrowing base that you could borrow to buy

5    more drugs and service your patients.

6            THE COURT:  Could I ask a question here?  Mr.

7    Swift, were you a borrower, in other words, a signer to

8    these bank loans and line of credit to Bank of O'Fallon?

9            THE WITNESS:  Do you mean a guaranty, sir?

10           THE COURT:  Yeah, or did you, did you sign the

11   documents to borrow the money?  Were you one of the

12   signators to the documents?

13           THE WITNESS:  Not to the documents, but to the

14   guarantor.

15           THE COURT:  Pardon?

16           THE WITNESS:  Not to the documents, loan

17   documents, but to the guarantor.  Personal guaranty, I

18   was.

19           THE COURT:  Okay.

20   Q.      (BY MR. COX)  And then it says McKesson.  Would

21   you talk about what that is, please.

22   A.      Prior to AmeriSource Bergen, a major or larger

23   drug distributor was McKesson, which is a large

24   corporation.

25   Q.      And so what is he saying he's to do here with the

1    line of credit with respect to that?

2    A.    Should I read it?

3    Q.    Well, just explain it to us.

4    A.    Well, he said a McKesson bill came due and he had

5    to pull a large amount from our account on Friday and I

6    will -- and I had to pull $35,000 from the line of credit

7    to insure that all checks would clear.  In addition, I'm

8    delaying paying $30,000 worth of bills to accomplish this.

9    As you see it would be nice to take a distribution but

10   there are no funds from which to distribute from.

11   Q.    All right.  So there is a problem money-wise at

12   this point?

13   A.    Yes.

14   Q.    All right.  Now in reviewing the financial

15   statements have you been able to determine why there was a

16   money problem at that point?

17   A.    Large distributions were taken out by Michael.

18   Large distributions were taken out to pay his personal tax

19   bills.

20   Q.    All right.  Now then, there is a note down here at

21   the bottom about a John Tollefson.  We should release John

22   Tollefson, it's costing us $10,000 a month.

23        Let's just take a moment and talk about John

24   Tollefson and who he is and how he fits into this picture.

25   First of all, do you know John Tollefson?

1    A.        Yes.

2    Q.        How long have you known John Tollefson?

3    A.        27 years.

4    Q.        And has he worked for you or DeliverMed Holdings

5    as a consultant before he became a consultant for Medicate

6    Pharmacy?

7    A.        No.   John has not worked as a consultant or an

8    employee for DeliverMed Holdings ever.

9    Q.        Okay.  Were you just friends?

10   A.        Been friends for 27 years.

11   Q.        Okay.  Now, how is it that he came to be

12   associated with Medicate Pharmacy here or this DeliverMed

13   mail order business?

14   A.        Initially when we had that bottleneck that we

15   talked about in late fall early winter of 2005 and we were

16   throwing as many hands we could on the problem.  One of

17   the people we brought in to help with the faxes and

18   getting reports and everything was John Tollefson in 2005,

19   and he did that for a little bit into 2006.

20        In 2008 -- John hadn't, hadn't been around doing

21   anything with, with us and then in 2008, in March 10th

22   through the end of May, we went on a very, very aggressive

23   marketing campaign which was very successful.  I mean, we

24   garnered about 865 new patients.

25        By garnering these patients, they were forwarded

1    down and Joe was working on the operations, registering

2    these patients.  I didn't see Joe for part of June.  And

3    in early July we both met up at a convention in Las Vegas

4    sponsored by one of our medical suppliers.  Joe approached

5    me in the room and said, we have a major problem.  And I

6    said, what's the problem?  And he said, I lost so many

7    patients through the system that every, every patient we

8    basically got during this campaign is gone.  And I was

9    very upset and I said, all right, you take an hour and you

10   tell me what the solution to this problem is.  And I went

11   my way in the convention and he went this way.

12          And he came back and said, I need help, I need

13   somebody to help me.  And he said, I need John Tollefson

14   to come in and help me because I'm going to Africa for a

15   week or ten days pretty soon.  I said, well, you get on

16   the phone and call John, see what he's doing, see what

17   he's working on, see if he'll drop it and come here.

18          John was up there probably by August, I think.

19   And stayed there for over a, about a year.

20   Q.       Was he an employee of the business or was he there

21   as a consultant?

22   A.       He was a consultant.

23   Q.       And was he paid on a W-2 or a 1099?

24   A.       A 1099.

25   Q.       And after John was there for a while did things

1   improve?

2   A.      They improved dramatically initially and levelled

3   off and then we started doing marketing again.  It was --

4   you know how I referred to shaking the revenue?  He went

5   through line by line of every patient and, all the lost

6   ones, he tried to get as many back on.  And I had him keep

7   track of the numbers and the amount of revenue, and I

8   don't recall the number but it was substantial, like

9   $30,0000 a month was rescued back.  We still lost an

10  awful, awful lot.

11  Q.      Do you have any knowledge about why this problem

12  came to be a problem, that problem that Joey brought to

13  you?

14  A.      Somebody wasn't paying attention.  And John had

15  written a series of e-mails as to what he saw the

16  solutions were, and that was given to Joe after he came

17  back from Africa.  But they kept John for a long time.

18  Q.      And so here we come to this e-mail in December of

19  '08 where the suggestion is being made, we need to release

20  him, we're paying him $10,000 a month.

21          Do you have any sense of how much money John was

22  able to save for the company with his work?

23  A.      Well, if you are saving -- let's just say low side

24  of 250, high side 300, you're saving about 3 million, two

25  and a half to $3 million a year of revenue.

1    Q.      Did you ever make any loans to Joey?

2    A.      Yes.

3    Q.      What loans were those?

4    A.      Made two loans, one in early September 2006 for

5    $3,000, and one in call it September 19 or 20, 2007, for

6    $8,000.

7    Q.      And what were those for, if you know?

8    A.      The first loan, he told me he had some expenses he

9    had to take care of.  The second one, he wrote back in the

10   e-mail and said that he needed it because he had to pay

11   his son's tuition at St. Louis School of Pharmacy, and he

12   was going to go ahead and write a check and I had to get

13   the money there so that that check he wrote would clear.

14   Because they were going to throw him out if he didn't pay

15   his bills.

16   Q.      And did he pay you back for those?

17   A.      Yeah, he paid me back.  Yes.

18   Q.      Okay.  Good.  All right.  Let's turn to a

19   different topic here.  We are now going to talk about

20   selling the business.  And I want to first look at page 15

21   of Exhibit 6.  Let's begin with the bottom e-mail.  What

22   is that e-mail?

23   A.      It's dated December 11, 2006, I think -- is it?  I

24   can't read -- yes.  Subject, distributions.  Mike, comma

25   -- I'm sorry, it's from me to Mike.

1        And it says, Mike, comma, were any distributions

2    made last week for the November distribution?

3    Q.      Now, is the e-mail at the top his response to you?

4    A.      Yes.

5    Q.      And what is his response?

6    A.      It's dated December 14th, Thursday.  It's from

7    Mike Schaltenbrand to myself.

8    Q.      Okay.

9    A.      It says, Mark --

10   Q.      And what is he saying to you in this e-mail?  How

11   is he responding to you?

12   A.      He's basically responding that there -- he can

13   continue with the distributions later but right now they

14   are, they are out of cash.

15   Q.      All right.  And then he goes on to talk about

16   talking with Alisha about the distributions.  What is he

17   saying there?

18   A.      I have spoken with Alisha and she can continue to

19   do so, so well as we distribute 30,000, 24,000 and 6,000

20   to myself, you and Joe respectively.

21   Q.      Okay.  So throughout this process of making

22   distributions, who's controlling the distributions

23   themselves, what's distributed?

24   A.      Mike Schaltenbrand.

25   Q.      And he writes the checks?

1    A.       He writes the checks.  He signs the checks.  He

2    makes the distributions.  He makes the wire transfers.

3    Q.       All right.  Then it goes on to say, hope to hear

4    from you about possible offers and options.  What's he

5    talking about there?

6    A.       Selling the business or partnering the business or

7    distributing the business, merging the business, some type

8    of transaction.

9    Q.       And here we are in December of '08 and what are

10   your efforts at this point in --

11            MR. STINE:  Your Honor, it's '06.

12   A.       '06.

13            MR. COX:  I'm sorry.  My apologies.

14   Q.       (BY MR. COX) In '06, what are your efforts that

15   you are making, if any, to sell the business at this

16   point?

17   A.       Well, at this point we are just now starting to

18   talk and look at options for mezzanine because he wants to

19   get out and it takes quite a long time to sell a business

20   of this type.  Mezzanine financing.

21   Q.       I did want to stop for just a moment and have you

22   explain exactly how mezzanine financing would equate to a

23   sale.  Could you explain that to us?

24   A.       Oftentimes when you hear about a management group

25   buying out the owners of the business, or when you hear

1    about what they call a leverage buyout where a group of

2    employees will buy out the business, it often involves a

3    practice called mezzanine financing.

4        And mezzanine financing is nicknamed after

5    baseball stadiums where you have the mezzanine is the

6    upper section of seats.  And what that means is, a

7    mezzanine comes through and loans the money to the people

8    who want to buy out the business at a much higher interest

9    rate than is the going rate because they're taking a lot

10   of risk on, and they also have options to purchase shares

11   at a set price at some time in the future.  And that's how

12   they get their reward for the risk they are taking.

13       The risk they are taking is that below them, the

14   first people that get paid are usually the vendors, the

15   banks and all their secured creditors.  So that stack that

16   they're on top of makes it called a mezzanine financing.

17   Q.    All right.  Thank you.  Did you ever tell Michael

18   or Joey that the partnership needed to borrow more money

19   in order to make the business more valuable to sell?

20   A.    Let me repeat that back to you.

21   Q.    Sure.  Did you ever tell Mike or Joey that the

22   partnership needed to borrow more money so it would make

23   the business more valuable to sell?

24   A.    I can't imagine how taking more loans out without

25   having that loans correspond to an increase in sale and

1    profitability could ever make a business more valuable.

2    It would make it less valuable.

3    Q.      So did you tell them that?  Did you tell them that

4    they needed to borrow more money to make it more valuable?

5    A.      No, not unless you wanted to borrow it to grow,

6    not borrow just to make it valuable.  It's a complete --

7    I'm sorry to say, it's a ridiculous statement.

8    Q.      Would it have an opposite affect?  Would it make

9    it less valuable?

10   A.      Dramatically opposite effect, less valuable.

11   Q.      So going back to this e-mail now, he is, he is

12   indicating that the business is behind in payments?  Is

13   that what he's talking about?

14   A.      Behind from extended payments from 28 to 40 days.

15   Q.      And what does that mean?

16   A.      Well, HD Smith, who is listed above there in the

17   first sentence, was the, was their drug distributor prior

18   to McKesson and AmeriSource Bergen.  It was a longtime

19   relationship of Mr. Schaltenbrand's.  And they offered him

20   28-day terms.  In other words, he would purchase

21   something, he had 28 days to pay it.

22           But it looks, this looks like he extended the

23   payments from 28 days to 40 days, so he got better credit

24   terms from them.  And it says, we are behind from the

25   extended.  So even though it's been extended, he is behind

1    in his payments.

2    Q.      Do you know how much Mike had taken in

3    distributions around this time?

4    A.      Not 'til much later when I saw the taxes.

5    Q.      And what did you learn then?

6    A.      If you got a financial statement, I can give you

7    the exact numbers what was taken out, but a huge amount of

8    money was taken out.

9    Q.      And what, that was for his ex-wife and a

10   distribution for himself?

11   A.      His regular third Friday of every month

12   distribution for his ex-wife and distributions for him.

13   Q.      And how much did the other partners receive this

14   month?  What we're looking at here.

15   A.      This is December 14th.  I think we didn't receive

16   ours until either the end of December or the beginning of

17   January.  So several weeks later we received a

18   distribution.

19   Q.      Let's move forward now from December '06 to July

20   of 2007.

21          THE COURT:  Still Exhibit 6?

22          MR. COX:  Yes, sir.

23   Q.      (BY MR. COX)  Page 21.

24   A.      Is it possible to focus that a little more?  It's

25   hard to read this copy.

1    Q.      Well, this is a tough one to read, that's for

2    sure.

3    A.      Okay.

4            THE COURT:  I'm having a hard time reading what I

5    have.

6    Q.      (BY MR. COX)  Is that better?

7    A.      For my eyes, anyway.

8    Q.      This is an e-mail from Mike -- from you to Mike

9    and Joey.  What's the date?

10   A.      July 13, 2007.

11   Q.      And at this time, Mark, are you still trying to

12   sell the business?

13   A.      This is getting to the point where I have a lot of

14   interest from the mezzanine folks.

15   Q.      Okay.

16           THE COURT:  Can I interrupt?  Why do I keep asking

17   myself that question.

18           I need to clarify something on this.  Everyone, I

19   mean, today, even Mr. Siddle, every one has said -- is the

20   business you're talking about just the mail order business

21   or does that include the Medicate, too?  The Medicate

22   Pharmacy?  Is -- what is actually are you trying to find a

23   buyer for?

24   Q.      (BY MR. COX)  At this, at this time in July of

25   2007 what are you out there trying to sell, the mail order

1    part or Central also with it?

2    A.        All of Central.

3    Q.        And is that because Mike wants to sell all of

4    Central?

5    A.        Mike wants to sell all of Central.  Plus, nobody's

6    going to buy these patients without all the records, all

7    the facility, all the provider numbers, applications,

8    everything.  They want to buy the whole thing, do what

9    they want with it.  But they want the whole business of,

10   of Medicate Pharmacy.

11             THE COURT:   Okay.  Did that include East St.

12   Louis?  The St. Mary's operation, too?

13             THE WITNESS:   At this point, no.

14   Q.        (BY MR. COX)  Now then, did Michael tell you why

15   he wanted to sell the business?

16   A.        Well, he had a few reasons.  One, he wanted to

17   take money off the table; he thought it grew to a

18   substantial amount and he wanted to take some money off

19   the table.  And one of the other reasons, he said it was a

20   desire of his to eventually have another retail pharmacy

21   in the O'Fallon area and he wouldn't mind selling this one

22   off and reaping the profits.

23   Q.        All right.  So at this point is he wanting to sell

24   all of his interest in Central including the mail order?

25   A.        At this date?

1    Q.        Yes.

2    A.        Well, again, if you -- can I read the e-mail?

3    Because that kind of explains it.

4    Q.        Okay, explain this to us.

5    A.        It says, I am -- I am writing to Mike

6    Schaltenbrand and Joey Siddle on July 13, 2007.   The

7    subject is, singing the same song.

8              And for several weeks I was -- this is not

9    reading, I'm discussing.   For several weeks I was trying

10   to get information so I refer to it as singing the same

11   song.

12             I'm still looking for the info on sale.   Everybody

13   has to give me their ideas a couple of weeks ago.

14   Everybody should be completely aware that late February we

15   were cash proving out over four week moving average of

16   813,000.   Today we hit a low of $581,000.   The new system

17   has lost patients of 232,000 or a reduction of 29 percent.

18   Devastating.   Was the reason we went to the new system was

19   to prevent patient loss.   I have a buyer but we need to

20   get tightened up on the loss of patients.   The profit

21   multiple is dropping from 5.5 maybe 3.5-3.7 times earning

22   due to the loss of patients.   Sales dollars holdback will

23   definitely occur due to patient loss.

24             Were the distributions made.   I did not receive

25   the wire.   Let me know.   Nobody returns my e-mails.

1    Q.        Well, let's talk just a moment about what is

2    happening here with this new system.   Why is this loss

3    occurring?  Were you able to figure that out?

4    A.        Yeah, John worked on figuring it out in that --

5    I'm sorry, not John.   Joey figured out some of the

6    problems that were causing the, with the new patient

7    system and how we had it set up and he was learning how

8    that worked better later on.

9    Q.        And were you able to fix this?  Was it able to be

10    repaired?

11    A.        It was able to be repaired after a lot of loss,

12    yes.

13    Q.        And why are you concerned about the loss?  I mean,

14    of course we're all concerned about losing money but in

15    terms of the sale why were you concerned about this loss

16    occurring?

17    A.        When you are selling a business and you have

18    financials and a book put together of financials for a

19    period of time, and then when you are in negotiations or

20    trying to structure the deal and you bring up a new set of

21    financials which shows a decline in income, it is not a

22    good thing.   People walk from the deal.   People mistrust

23    you.

24    Q.        So at this point Mike's wanting you to sell the

25    Central business.   You are looking at the sales and seeing

1  them go down and you are concerned about how that's going

2  to affect the sale.  Is that a good summary of it?

3  A.      Yes.  It's a, basically it's hemorrhaging and

4  nobody wants to buy a hemorrhaging business.

5  Q.      All right.  And then at the end you make a request

6  for distribution.  What's that about?

7  A.      We're trying to find out where the distributions

8  are for the month that were supposed to come.  I must have

9  been told that I was going to receive some type of wire

10  and I didn't receive it and I said nobody's returning my

11  e-mails.  I was trying to get a hold of people to answer

12  these various questions.

13  Q.      All right.  Now then, in terms of the sale, what

14  were you having to put together in terms of information

15  that you would need to give to a potential buyer?

16  A.      It can vary in their request from four, five, six

17  years of statements, financial statements, meaning four,

18  five, six years of the P and L -- profit and loss

19  statements.  It can also include a list of your major

20  accounts, a list of your assets.  It can involve a list of

21  your, let's call them potential clients you are working

22  on.  You need a balance sheet.  You need all of your

23  financial information, loans, purchasing arrangements.

24  You need to have any type of contract that you have.  You

25  need to show your patient volume and patient revenue for a

1    trending period so that it looks like it's continuing to

2    grow on a, some angle better than flat, at a 45, 15, 20

3    percent growth, no declines.

4         You have to put all this information together to

5    disclose where you are, where you have been, how you got

6    there and where -- so they can make their decision as to

7    where they want to go.

8    Q.    Okay.  Now, you were the person assembling this

9    information to share with potential buyers?

10   A.    Correct.

11   Q.    And did you gather financial statements or were

12   you given financial statements from Schaltenbrand and

13   Schaltenbrand?

14   A.    I received all my financial statements from

15   Schaltenbrand and Schaltenbrand, yes.

16   Q.    And did you rely on those financial statements

17   that they gave you in dealing with these potential

18   purchasers?

19   A.    Yes.

20   Q.    And you told --

21        MR. STINE:  Your Honor, I'll object to that.  I

22   don't know how he's relying on them in dealing with

23   purchasers.  I may be able to understand why the potential

24   purchasers would rely on them, but it sounds to me like

25   he's just a conduit passing information.

1        MR. COX:  Your Honor, if I may --

2        THE COURT:  Objection's overruled.  You can

3  cross-examine on it.  Go ahead.

4        MR. STINE:  Okay.

5  Q.      (BY MR. COX)  Were you relaying information to

6  potential purchasers about the financial situation that

7  was going on with the business?  Were you giving them

8  information?

9  A.      Yes.

10 Q.      And were you relying on these financial

11 information from Schaltenbrand and Schaltenbrand in your

12 communications with these potential purchasers?

13 A.      Yes.

14 Q.      In terms of the guaranty that you signed, where

15 you guaranteed the debt, did you rely on the financial

16 statements of the business in determining whether you

17 would execute that guaranty or not?

18 A.      Oh, yes.

19 Q.      And did you rely on them to be accurate?

20 A.      Yes.

21 Q.      Did anyone ever tell you during the process where

22 you were relying on these financial statements that those

23 were, that they were in any way inaccurate?

24 A.      No.

25 Q.      Now let's turn to page 25 of Exhibit 6.  Here we

1    are in the summer of 2007 now, the business has been

2    operating about two years, and what has Michael's

3    involvement been in the mail order business during that

4    two years?

5    A.      Michael wasn't very involved.  He had

6    relationships he had built with HD Smith and McKesson to

7    purchase drugs.  He had the pharmacy.  He knew some people

8    for pharmacists if we had a fill-in pharmacist or

9    whatever, but his involvement was not that great.  He was

10   primarily there pretty much on Fridays only, for a few

11   hours on Fridays.

12   Q.      So basically it's you and Joey working together at

13   the pharmacy to make this work?

14   A.      Yes.  Joey was there 7:30, 8:00 in the morning,

15   until about 9:00 or 10:00, and then he left for a few

16   hours.  And then he would come back around 2:00 or 3:00

17   and he'd stay 'til 5:00, 4:30, 5:00 every night, five days

18   a week.  I mean, he would actually go in there sometimes

19   on Saturdays and paint and do maintenance and things like

20   that, too.

21   Q.      And let's take a look now at page 25.  This, at

22   this time in the summer of 2007, is this when the business

23   is having problems losing patients?

24   A.      It's losing patients and we're trying to sell it

25   at the same time.

1    Q.        The date of this is what?

2    A.        This is -- I can't tell if it's July 18th or July

3    19, 2007.

4    Q.        And this is --

5    A.        I'm sorry, it's July 19.

6    Q.        Okay, very good.    And then Joey is sending you an

7    e-mail, and also to Michael; is that right?

8    A.        Correct.

9    Q.        And what's Joey talking about in this e-mail?

10   A.        He's trying to defend the position as to why the

11   patients are being lost or to explain the position as to

12   why the patients are being lost.

13   Q.        Okay.   And so he's providing you with some

14   numbers?

15   A.        Yes.

16   Q.        And then what's he, what's his sort of, what's the

17   purpose of this exactly?

18   A.        Well he's trying to say that the patients, the

19   reason we're losing patients is the patients are leaving

20   and it has nothing to do with the software.

21   Q.        Does he indicate how many patients you are losing

22   at this point?

23   A.        We're losing about 10 percent of our patients a

24   year.   We will need 25 new patients each month to offset

25   that.   We refers previously to 154 cancel patients for a

1    period of time of January of '07 to July 18th.

2    Q.      At this time whose job was it, whose job was it to

3    enter the patients into the system?

4    A.      By the system, you mean -- which system?

5    Q.      Into the software system so they would be

6    serviced?

7    A.      You're talking about the pharmacy computer system?

8    Q.      Yes.

9    A.      That would be the group of women -- that would be

10   that group of women that Joe Siddle managed.

11   Q.      So, was it his responsibility to see that the

12   patients were being entered into the system?

13   A.      Yes.

14   Q.      Was it his responsibility to see that the patients

15   were being serviced in terms of getting the prescriptions

16   that they had ordered?

17   A.      Yes.

18   Q.      And did you determine, did you determine what was

19   happening in terms of this loss of revenue?  We see it's

20   not the software.  What was the problem?

21   A.      Well, he said that they were leaving because they

22   wanted to leave.  And so I took a list of the patients

23   that we had transferred, meaning DeliverMed had

24   transferred down, and I gave those back to the call center

25   and said, call these patients that we're no longer

1    servicing, find out why they left.

2    Q.      And what was the result of that investigation?

3    A.      I would say the overwhelming majority in the 80,

4    90 percent of the patients, said that nobody ever gave

5    them --

6             MR. STINE:  Your Honor, I'm going to object.  I

7    don't know what his basis of making this statement is.  If

8    he has some report to reference that -- yeah, seriously --

9             MR. COX:  Your Honor, this isn't being offered for

10   the truth --

11            THE COURT:  It's not offered for the truth of the

12   matter asserted, it's background.

13   Q.      (BY MR. COX)  So what were you discovering in your

14   investigation was really happening?

15   A.      Customers left because once they were signed up

16   nobody ever responded to them with any drugs, any

17   prescription request, anything.  They were completely

18   forgot about.

19   Q.      So what steps, if any, did you take to correct

20   this problem?

21   A.      We printed off a list of all the DeliverMed

22   patients as such, gave them back to the call center and

23   said, try and resign these people up.  We had their

24   information but just try to get them to commit to come

25   forward.

1    Q.       And was that successful?

2    A.       A small percentage.   But people were pretty upset

3    and bitter at that time that they didn't want to sign back

4    up.

5    Q.       Now at this time in the summer of 2007 were there

6    any problems receiving distributions?

7    A.       Yes.

8    Q.       And what were those problems?

9    A.       There's never any money.   We've got too many bills

10   to pay.   Records don't indicate it, meaning their records

11   at the bank say we don't have enough money.   Things like

12   that.

13   Q.       Now, you had told us earlier that there was a

14   change in the partnership there in August of 2007.   You

15   took Ann's place as the partner with the agreement of Mike

16   and Joey.   But we have been looking at e-mails here up to

17   this point where there's a lot of communication between

18   you and Mike and Joey about numbers and what's going on in

19   the business and you have described your involvement.

20   What was your relationship to this business during that

21   period of time when Ann was a partner?   What were you

22   functioning as?

23   A.        I was helping out on two or three of my wife's

24   relationships, what she had with different pharmacies.

25   Q.       And were Mark -- I'm sorry.   Were Mike and Joey

1    treating you as a partner in providing information and

2    sharing information with you?

3    A.      I was not getting much information but, when I'd

4    get it, they were forwarding information to me.

5    Q.      All right.  Now let's take a look at Exhibit 31,

6    please.

7           (Off the record.)

8    Q.      (BY MR. COX)  Let's take a look at Exhibit 31.  We

9    have talked about this with previous witness.  Can you,

10   Mark, just walk us through this, what is this document to

11   begin with, where did it come from, what is its purpose,

12   and so on.

13          MR. SCHUVER:  Can you put it on the screen,

14   Courtney?

15          MR. COX:  Sure.

16   Q.      (BY MR. COX)  This is just the first page.  Let's

17   talk about this, Mark.  Give us the background on this

18   document.

19   A.      A few weeks prior to this --

20   Q.      What's this?

21   A.      I'm sorry.  November 15, 2007.  Michael wrote an a

22   e-mail and said that he was going to increase lines of

23   credit but he would do it only if we all agreed to

24   guarantee the partners to be liable to the bank on those

25   loans at the Bank of O'Fallon.

1    Q.      In other words, up to this point you and Joey had

2    not been liable on the debts of the business?

3    A.      No, just the -- Mike was the guarantor, and I

4    believe it was secondary guarantor behind the corporate

5    assets of the business, our receivables.

6    Q.      And so he's asking you and Joey to now also

7    guarantee the debt?

8    A.      Correct.

9    Q.      And were you willing to do that?

10   A.      Yes.

11   Q.      And did Joey indicate whether he was willing to do

12   that to you?

13   A.      Yeah.  Joey and I had a private discussion.  He

14   said, if you're going to do it, I'll do it.

15   Q.      And do you know who actually prepared this

16   document?

17   A.      I was told Mike's lawyer.  I don't know who that

18   is.

19   Q.      Who told you that?

20   A.      Mike.

21   Q.      Who is his -- you don't know the name of the

22   lawyer?

23   A.      Occasionally threw a name Tom Cannady out.  He had

24   other lawyers, too.  I don't know which one it was.

25   Q.      And how did you come to receive the document?

1    A.        I believe I received it by e-mail.

2    Q.        And so, and we had looked at that e-mail earlier

3    with, with Mike, but this is -- is this the actual

4    document that was signed?

5    A.        This -- you mean the one on the screen here?

6    Q.        Yes.  Look at your exhibit.  You can see all the

7    pages.

8    A.        Right.  I mean, there were some changes that we

9    had to make and there were more structural changes because

10   they had the wrong name of the company down and had it as

11   an LLC and we made some changes that way, plus it had a

12   blank line for the loan numbers.  And we had to get the

13   loan numbers.  We filled that in.

14   Q.        So is this the document, the actual document you

15   signed?

16   A.        Yes.

17   Q.        Let's go to the first page then.  Does this set

18   out accurately at this time the partnership interest of

19   each of the three of you partners?

20   A.        Yes.

21   Q.        And below that we see some numbers that have been

22   filled in.  Do you know what those are?

23   A.        Are you talking about the, like the 501573?

24   Q.        Yes.

25   A.        Those are the loan numbers that we are

1    guaranteeing.

2    Q.       And I see some initials that appear to the right

3    of those numbers.   What are those?

4    A.       Those are my initials, meaning I made the change

5    on the document.

6    Q.       So you filled in the number?

7    A.       Right.

8    Q.       Where did you get those numbers?

9    A.       I called Kip Atkins up.   And he told me, he sent

10   me an e-mail telling me these are the two loans and the

11   balances as of the date you are going to guarantee.

12   Q.       Who's Kip Atkins?

13   A.       I think his actual name is Kevin Atkins.   And he's

14   a vice president of Bank of O'Fallon in O'Fallon,

15   Illinois.

16   Q.       Looking at the top, can you tell me -- well, let's

17   see here.   What's the name of the entity that's described

18   in the first paragraph?

19   A.       It's listed as Medicate Pharmacy LLC.   And that

20   number goes down -- or, and then you go to the next line,

21   that's why he crossed it off, because it's a corporation,

22   not an LLC.

23   Q.       Okay.   So you corrected that --

24   A.       Correct.

25   Q.       -- on the form so it would reflect that?

1    A.       Yes.

2    Q.       Okay.   And why is that listed rather than this

3    partnership?

4    A.       Because the lender -- I'm sorry.   The borrower of

5    these loans is Medicate Pharmacy LLC.

6    Q.       Now looking at the description of the ownership of

7    that entity that's described here on this document

8    prepared by Mike's attorney, are, are you and Mike and

9    Joey shown as owners of that?

10            MR. STINE:   Your Honor, I'm going to object on the

11   basis he refers to this is prepared by Mike's attorney.

12   He said he didn't know who prepared it --

13            THE COURT:   Sustained.   Refer to the document.

14            MR. COX:   All right.   Your Honor, he had testified

15   that an attorney was, made it, according to Mike.   He

16   didn't know the name.

17            THE COURT:   Just --

18            MR. COX:   All right.

19            THE COURT:   Hold on a second.   He didn't answer

20   the question.

21            MR. COX:   Okay.   Thank you, Judge.

22   Q.       (BY MR. COX)  In terms of the ownership, what is

23   shown here of the ownership of this entity known as

24   Medicate Pharmacy?

25   A.       Correct, that is the ownership of the borrowers in

1    the following amounts, Michael Schaltenbrand, 50 percent;

2    Mark Swift, 40; Joey Siddle, 10.

3    Q.        All right.

4          THE COURT:  Now, hold it a second.  The borrower

5    according to this document is a corporation.  It says the

6    borrower.  And the next, whereas the ownership of the

7    borrower -- were you an owner of -- 40 percent owner of

8    Medicate Pharmacy the corporation?

9          THE WITNESS:  No.

10          THE COURT:  So that's not correct here then?

11          THE WITNESS:  No, we were the 40 and 50 percent

12    owner at this time of the mail order business.

13          THE COURT:  Of the partnership.

14          THE WITNESS:  Correct.

15          MR. COX:  I think I may be able to clear this up a

16    little bit for the Court with my next question.

17          THE COURT:  Okay.

18    Q.        (BY MR. COX)  At this time, and here we are in

19    late 2007 going into 2008, we have had discussion about

20    the change in partnership.  What discussions are going on

21    with you and Mike and, and Joey at this time about the

22    change from having a partnership in the mail order

23    business to owning part of the Medicate Pharmacy Central?

24    A.        Mike had made the decision in the fall of 2007

25    that he no longer wanted to sell the business.  He stated

1    in his e-mail, I'd be a fool to sell my business.  I want

2    to talk to you about other arrangements.

3           That's when he said, I'd like my partners to be

4    owners of the overall pharmacy.  I was very agreeable to

5    that, and that is how we then converted our ownership in

6    the mail order to an ownership percentage in the overall

7    pharmacy.

8    Q.     So you went from being partners in the mail order

9    to being owners of the entire Medicate Central, the retail

10   and the mail order; is that correct?

11   A.     Yes.  And -- well, it was all components of

12   Central because mail order, he factored in Cambridge, long

13   term care facilities as well as the hospices.  It was

14   everything that happened in the brick building.

15   Q.     If you would, we've had a little testimony about

16   that.  Let's just pause for a moment and have you explain

17   what those different parts are.  Let's start with

18   Cambridge.  What's that?

19   A.     Well, Cambridge is, it's my understanding, I've

20   never been to the facility but I understand it is a long

21   term care facility meaning it's like a nursing home or it

22   is a nursing home, slash, you know, assisted living

23   center.  Because that's my understanding of it.  And then

24   there's Hope Hospice was another one which is

25   self-explanatory, it's a hospice, home -- a hospice care

1    facility.

2    Q.        Any other parts of the business there that, in

3    addition to the mail order and the over the counter?

4    A.        Nothing of significance.  Mike did some

5    calculations, it was like 79, 80 percent was mail order, a

6    small percentage was retail, and the Hope Hospice in

7    Cambridge comprised the remaining 20 percent.

8    Q.        So, you indicated you were agreeable to this

9    change that Mike suggested.  Was Joey also agreeable?

10   A.        Yes.

11   Q.        And so does this document that's here executed in

12   November 15th reflect what it is you and Joey agreed to

13   that Mike suggested?  Is this reflecting that same thing?

14          MR. STINE:  Your Honor, I would object.  The

15   document speaks for itself.  In fact, I think he's already

16   testified it doesn't reflect what his, what the agreement

17   was.

18          THE COURT:  It's subject to cross-examination.  He

19   may answer.

20   A.        This reflects the 40 percent, 50 per -- 40, 50, 10

21   of the relationship as a revolving then, and guaranteeing

22   those loans as revolving then to ownership of the overall

23   business effective January 1, 2008.

24   Q.        (BY MR. COX)  Okay.  So the plan was to move

25   toward that, and this reflects that change that was

1    coming.

2    A.        Correct.  Well, it reflects where we are now and

3    our willingness to guarantee the debt to go to the next.

4    Q.        Okay.  So in order to get into the business to be

5    an owner of all of that you have described he wanted you

6    to guarantee the debt, and you did that.

7    A.        It was part of the whole deal, yes.

8    Q.        Okay.  And did you sign it?

9    A.        Yes.

10   Q.        And did Joey Siddle sign it?

11   A.        Joey signed it.  I had -- I signed and notarized

12   it.  And Joey signed his.  I don't think he notarized it,

13   though.

14   Q.        And then after that, what happened to it?

15   A.        This?

16   Q.        Yes.

17   A.        I know a copy went to Bank of O'Fallon because I

18   sent it there from -- we were in the pharmacy that day and

19   I faxed it over to Kip.

20   Q.        The one with both signatures on it?

21   A.        All three pages or four pages, whatever it is

22   here.

23   Q.        This is the entire document that you faxed over to

24   Kip?

25   A.        Yep.

1    Q.        Okay.

2    A.        Faxed it over to Kip at the Bank of O'Fallon.

3    Q.        Mark, do you know how long that guaranty lasted?

4    How long a guarantor of those debts?

5    A.        I -- I don't know when the loans -- Michael then

6    took those two loans somewhere in 2008, 2009, and

7    consolidated them into one loan which broke that guarantee

8    because we guaranteed the two separate, so I don't know

9    how long that was, but it was quite some time.

10   Q.        All right.  Now, going to page 77 back in Exhibit

11   6.  And I'm going to apologize in advance for this one.

12             MR. STINE:   What number is that, Courtney?

13             MR. COX:   Page 76 of Exhibit 6.  (Pause.)  I'm

14   sorry, I pulled the wrong page.

15             (Pause.)

16             THE COURT:   What exhibit?

17             MR. COX:   Page 76 of Exhibit 6.

18   Q.        (BY MR. COX)  Now, at the top, Mark, is this an

19   e-mail from you to Mike?

20   A.        At the very top one, November 25, 2007, yes.

21   Q.        Just below that is another e-mail, and we have

22   examined that and the e-mail at the bottom extensively

23   with Mike about this, how much he wants and all this, so

24   on.

25             What I wanted to ask you about was the e-mail at

1   the top.   And would you read that for us?  It's so -- can
2   you read it okay?
3   A.       I think I can.
4   Q.       Okay.
5   A.       Well, it's Monday November 26, 2007.  It says --
6   it's from myself to Mike.
7            It says, the agreement we have developed is
8   completely enforceable by the bank.  So until we
9   restructure the FIN -- federal identification number --
10  and the issuance of the shares you will have complete,
11  have complete -- and that's in capital letters -- and the
12  bank will have complete -- in capital letters --
13  enforceability in collecting the debt.  In actuality, we,
14  we are -- there's -- I'm having a little trouble reading
15  that now.  We are -- Joe and I -- are turning our rights
16  over to you in the shares of the A/R -- accounts
17  receivable -- to the bank.  I will see you Monday evening.
18  I worked with Kip on this and the you can rest assure it's
19  completely enforceable.  See you Monday evening and
20  Tuesday.
21  Q.       So, here you are talking -- are you talking about
22  the guaranty at this point, this enforce -- something
23  that's enforceable?
24  A.       Yes.
25  Q.       In other words, are you assuring Mike here that,

1    that the bank can enforce its debt obligation against all

2    of the account receivable?

3    A.        Against the account receivable and then on to the

4    guarantors.

5    Q.        Right.  And so why are you sending this message to

6    him?  Why are you telling him this?

7    A.        Because in Mike's e-mail, which was I guess on

8    Friday the 23rd, I guess is the way it looks, it says, I

9    don't know, it's like the third line from the bottom, it

10   says, they see it -- okay, I'm sorry, I have to back up

11   one sentence.

12            Also the role change my position with the bank.

13   They see it as I am still the responsible party for the

14   2-3 million dollars.  I then have a side agreement

15   unenforceable by the bank with you and Joe.  If you are

16   going to use the Bank of O'Fallon and guarantee the three

17   of us we will have to put it on the note.

18   Q.        Mark, would you have signed this guaranty,

19   personally guaranteeing your assets for the debt of this,

20   if you were not going to receive a share of that Medicate

21   Central Pharmacy business?

22   A.        No.  No, I would not.

23   Q.        So the agreement you talk about here is, the

24   agreement we have developed, and that agreement is that

25   you will get and Joey will get and Mike will get a share

1    of the complete pharmacy, that business, in exchange for

2    you guaranteeing these debts and becoming responsible on

3    them; is that correct?

4    A.    Correct.

5    Q.    Okay.  Let's go to the next page, December 3rd,

6    2007, page 77.

7          MR. COX:  Finally, one I can read.

8    Q.    (BY MR. COX)  This is from you to Mike?

9    A.    Yes.

10   Q.    And we're seeing here, followup for the wire

11   transfer for the loan of 107,643.

12         Let's stop there and would you explain to the

13   Court what that's about?

14   A.    Yes.  Because we were running all the time short

15   to cash, that we wanted to continue to go ahead with the

16   marketing in various areas.  So I advanced $107,643 to

17   continue the marketing.

18   Q.    In other words, you are loaning the business that

19   amount of money?

20   A.    No, I'm loaning DeliverMed to keep doing its

21   activities in marketing.

22   Q.    I see.

23   A.    On behalf of the partners.

24   Q.    So you are loaning expenses for the marketing?

25   A.    Correct.

1   Q.       And with the expectation that who would pay you

2   back?

3   A.       Our business would pay me back.

4   Q.       The mail order business?

5   A.       Medicate Pharmacy Central, yes.

6   Q.       Then you go on to say, I'm feeling the heat from

7   the IRS for taxes on all the undistributed profits.

8   Please take care of.  At this point are you owed

9   undistributed income?

10  A.       Yes.

11  Q.       And what's going on with you tax-wise?  What are

12  you talking about here?  Explain it.

13  A.       Well, I cannot get information from 2006, 2007, as

14  to what our earnings are on the partnership of the mail

15  order.  I need some information on -- I need to file

16  taxes.  I haven't filed taxes for a long time, they're in

17  draft taxes.  And I'm getting very concerned because I

18  contacted the IRS, I have these undistributed profits, I

19  go through and I write them a letter explaining everything

20  that's going on and say, if I file anything with you, it's

21  got to be draft until then.  And they are responding

22  letters back constantly saying, you must file your taxes.

23  Q.       And this undistributed income, are you on an

24  accrual basis at this point?

25  A.       I'm on a cash basis, but I don't know how they're

1    reporting my situation to the IRS so I am getting

2    concerned.

3    Q.      And why are you unable to actually make the

4    filing?

5    A.      Well, I don't have any tax information from 2006

6    yet as to how Schaltenbrand and Schaltenbrand is reporting

7    the activities of the mail order pharmacy.  Is it going to

8    be down on a K-1?  Did they show the gross amount?  Did

9    they show the net amount received?  I don't know.

10   Q.      Are you requesting the information?

11   A.      I requested it several times from Senior, yes.

12   Q.      Larry Schaltenbrand Senior?

13   A.      Correct.

14   Q.      And did you ever receive a response?

15   A.      I received a response, yes.

16   Q.      What was the response?

17   A.      That's confidential.  You can't get that.

18   Q.      You can't get the information of the, of the

19   business that you're a partner in?

20   A.      Right.

21           THE COURT:  I have a question on this same line.

22   You said, please take care of -- and you are talking about

23   undistributed profits.  How much do you believe was owed

24   to you as undistributed profits as of the end of I guess

25   tax year 2006?

1           THE WITNESS:  At the end of 2006?

2           THE COURT:  I mean from -- do you have financial

3    reports or documents that showed how much you were owed?

4           THE WITNESS:  At this point, no.  A few months

5    after this, I did.

6           THE COURT:  Okay.

7    Q.     (BY MR. COX)  And in that few months later when

8    you did get some information, as you sit here today do you

9    know whether that was underreported to you or was

10   accurate?

11   A.     Well, I think it's been significantly

12   underreported.

13   Q.     And why do you think it's been underreported to

14   you at that time?

15   A.     Because during these proceeding we got a lot more

16   information as to the profitability of the business, and

17   we got a lot more information about distributions other

18   people were taking and personal expenses and all things

19   that would drive the -- and then there's been several

20   amended tax returns of the business and Michael filed

21   which showed in some instances greater profitability.  So

22   it's a lot less -- I mean, it's a lot more than I'm

23   stating.

24   Q.     So at this point you are trying to, you are trying

25   to get information so you can take care of this issue?

1    A.        Take care of the IRS issue, yes.

2    Q.        Did Mr. Schaltenbrand Senior indicate to you why

3    he thought information about the business you're a part of

4    would be confidential from you?

5    A.        Yes.

6    Q.        What did he say?

7    A.        That also is confidential.

8    Q.        Okay.  Let's now turn to page 84.  This is

9    actually the next day.  This is your e-mail to Michael on

10   December the 4th.  Tell us what you are talking about

11   here.

12   A.        The loan amount which was on the books that they

13   owed me was 107,000.  I'm asking him for needing his help

14   in following through in getting the loan repaid, whether

15   it's by wire, whether it's by check.

16   Q.        And then what do you say about the IRS?

17   A.        Well, I need to square up with the IRS on the

18   first of -- the letter I believe said January 2nd or 3rd,

19   I had to have everything in.  So I said on the 1st that

20   I'm getting quite concerned, the IRS is due from -- is the

21   undistributed earnings.

22            THE COURT:  Here's where I'm having a problem.  If

23   the IRS knew that you had undistributed earnings, how come

24   you didn't know you had undistributed earnings?  I mean,

25   the exact amount?

1          THE WITNESS:  No, I -- they knew I had -- they

2     knew I had undistributed.  I knew I had undistributed.

3     They didn't know the amount.  They had a requested filing

4     of a taxes.  I can't file a final taxes until I get a K-1

5     or some information about how the business did.  Anything

6     I had filed short of that would be a false.

7          THE COURT:  So you weren't -- you were filing for

8     extensions or not filing?

9          THE WITNESS:  Extensions, extensions, then finally

10    they're saying, send us some information.  I'm saying I've

11    got some, but they don't have the calculations --

12         THE COURT:  Okay.  So you weren't filing tax

13    return extensions because you say you didn't have all the

14    records.

15         THE WITNESS:  Just to make sure I understood, you

16    said I'm not filing tax returns and extensions?

17         THE COURT:  No, you're not filing, you're not

18    filing -- you're filing extensions on the tax returns.

19         THE WITNESS:  Correct.

20         THE COURT:  Because you're telling the IRS you

21    don't have all the information.

22         THE WITNESS:  I do not have the proper information

23    to file accurate income taxes --

24         THE COURT:  I understand now.

25    Q.     (BY MR. COX)  Did you file some, at least one

1    year, an informational return, not a final return

2    just to --

3    A.        Several months ago I was contacted by the IRS.  I

4    took all the information I had of undistributed earnings.

5    I took all the draft I could of taxes.  I took a great

6    deal of lengthy letters, and I sent corporate books and

7    everything, I made a gigantic box up and sent it to them

8    and said, here is where I'm at.

9    Q.        That still hasn't been resolved?

10   A.        I have not filed a final tax return on anything

11   since 2006, I believe, or '05.  I can't recall, but it's

12   been a lot of years.

13   Q.        Going ahead here, you say, we are all set at the

14   bank.  What are you talking about there?

15   A.        Well, I just called Kip again.  I said, Kip,

16   you've got the guaranty from the bank, and we all signed

17   and just to make sure everybody had signed with the bank,

18   that they got their information they needed.

19   Q.        And so you are moving toward this change that

20   occurred on January 1st, 2008, where you will own, and

21   Joey and Mike will own, all of Medicate Central?

22   A.        Joey, myself and Mike, yes.

23   Q.        Right.  And was there a discussion among the three

24   of you to change at some point the actual formal structure

25   of Medicate Pharmacy Central, that is, break it away from

1    Medicate Pharmacy Inc.?

2    A.      That was our plan, yes.  We had several -- we had

3    a couple meetings actually with the State -- I had a

4    couple meetings and we had one conference call with the

5    State Medicaid folks about breaking the provider number up

6    between East St. Louis and also Washington Park so there

7    would be two provider numbers, and then getting a federal

8    tax ID number for each facility.

9    Q.      Did that ever actually happen?

10   A.      No.

11   Q.      Why didn't it happen?

12   A.      There was just constant delays, constant, couldn't

13   get information, not follow through.

14   Q.      Who was supposed to be handling the documentation,

15   the paperwork, that would have formally changed Medicate

16   Pharmacy Central into something else that all three of you

17   would own as shareholders?

18   A.      Initially, it was going to be Tom Cannady.  Then

19   it was, like I said, he had another lawyer working on it.

20   And finally I got very frustrated and I said I'm going to

21   have a lawyer start working on it.  We did drafts of

22   operating agreements, corporate organization agreements,

23   and they were sent out, or I got return e-mails saying,

24   we're reviewing it, we'll get back to you, so there was

25   delay, delay.

1    Q.      Well, who was getting these attorneys, Cannady and

2    perhaps somebody else to -- that's C-A-N-A-D-Y [sic], by

3    the way -- to prepare these documents and when was that

4    being done?

5    A.      It happened right after the first of 2008.  I was

6    given the name of Tom Cannady by Mike to call.  I called

7    him many times, left messages, and one time the

8    receptionist was kind enough to say that, he can't talk to

9    you about things that Mike's doing, and, he represents

10   Mike.

11          So then Mike -- I told Mike.  He said he'd take

12   care of it.  And then there was supposed to be another

13   attorney that did it.

14   Q.      And over what period of time is, are you waiting

15   for Mike to get his attorneys to create these documents

16   that are needed to carry out the agreement you have

17   reached?

18   A.      A year, 13 months, something like that, and

19   finally I said I'm taking control of this and getting this

20   done.  Everything was in process, everything was being

21   filed, and nothing was being filed and nothing was being

22   processed.

23   Q.      So for 12 to 13 months you are waiting -- or not

24   waiting but trying to get Mike's people to do this?

25   A.      I would characterize it as chasing people to do

1    it.

2    Q.       And they never did it?

3    A.       No.

4    Q.       And when -- did you talk with Mike and express to

5    him this problem, that you want to get this paperwork

6    completed?

7    A.       Yeah, and Joey was very concerned.  He even gave

8    me Social Security numbers of him and his wife and said he

9    wanted to break up his shares between him and his wife.

10   And he said -- we were all getting concerned but, you

11   know, we kept on going forward and kept on going under,

12   this was being taken care of and everybody was very busy

13   growing the business and it was just delays, delays,

14   delays.

15   Q.       So from January 1st forward, and we're going

16   through these 12 or 13 minutes [sic], are you operating

17   on --

18            THE COURT:  Are we now in 2009 then?

19            MR. COX:  Well, he's indicated that he was trying

20   to get them -- yeah, from January 1st, 2008, he was trying

21   to get them to finish the paperwork.

22   Q.       (BY MR. COX) And I was asking during that 12 to 13

23   months after January 1, 2008, were you working with the

24   understanding that there was an agreement that there would

25   be a corporation of Medicate Pharmacy Central that you

1    would own a percentage of?

2    A.        I was working under that assumption.  I was

3    working under that representation.  We were all working

4    under that representation that we are all owners of

5    Medicate Pharmacy Central.  Myself, Mike and Joe.

6    Q.        So you say you finally gave up and tried to get

7    your own attorney involved to take care of it; is that

8    right?

9    A.        Yes.

10   Q.        Who was that?

11   A.        Chris Kennedy.

12   Q.        And his name is spelled like the president, not

13   the other, like the Cannady.  This is K-E-N-N-E-D-Y.  Is

14   that correct?

15   A.        Correct.

16   Q.        And when, about when was that, would you say?

17   A.        Oh, we met in early February 2009 and I explained

18   where we were and laid out all the information that we

19   had.

20   Q.        So during the past year you have been waiting on

21   Mike to get it done, so now you, here we are in February

22   2009, you are talking steps to get that done.  What

23   happens?  Do you get that done?

24   A.        No.  What happened is we started to get into the

25   process and started putting together documents, and we

1    sent off the operating agreement, I believe it was a

2    shareholder's agreement.  And I can't remember all the

3    agreements that Chris produced.  And we forwarded them to

4    Mike, and Mike's responded e-mail is, I'm going to forward

5    these to my dad and brother and Tom Cannady and we're all

6    going to review them and give suggestions.  And we were

7    waiting on things, and didn't respond until probably

8    spring of 2009.

9    Q.      And then what happened?  What was the response?

10   A.      In May 2009 time frame, they said that they were

11   going to forward the documents to us and --

12   Q.      Who's "they"?

13   A.      Mike said he would forward the documents after he

14   got the comments from everybody else.  Everybody else

15   being his dad, his brother, and Tom Cannady.

16   Q.      Did you ever get the documents?

17   A.      Never got the documents or the comments.

18   Q.      Did you followup with him to try to get him to do

19   that?

20   A.      Oh, yeah.  Yes.

21   Q.      What did you do?

22   A.      Well, he responded back to saying our comments are

23   going to be coming but we really need to get this debt

24   straightened out, we got to get you on as a guarantor of

25   the debt and I'm calling the bank now to get you on the

1    debt guaranty.

2    Q.        So at this time the previous guaranty had gone

3    away or were you still guaranteeing the debt at that time?

4    A.        The way it's listed on the financial statements, I

5    did not know that he went and consolidated those two loans

6    to a new loan so we would have a different bank loan

7    number, which would have had to have been, redo the

8    guarantees.

9    Q.        Were you willing to sign a guaranty for this new

10   loan he had taken out?

11   A.        You mean the converted loan, if you will?

12   Q.        Yes, the converted loan.

13   A.        Sure.   Sure.

14   Q.        Did he ever present to you a loan guaranty

15   agreement for your signature?

16   A.        No.

17   Q.        Did you indicate to him that you would be willing

18   to do that?

19   A.        Yes.   We received a loan guaranty during discovery

20   that the bank had prepared but I didn't ever receive it,

21   and I would have been willing to sign it.

22   Q.        Did you know that he had taken the old debts and

23   converted them into or combined them into a different

24   debt?

25   A.        At what time frame?

1    Q.        Back in spring of 2009.

2    A.        No.   We didn't know until fall of 2010, probably.

3    Or winter of 2010 during discovery and we pulled, we got

4    loan documents from the bank.

5    Q.        All right.

6              THE COURT:  Is this a good time to take a break?

7              MR. COX:  It would be, Your Honor.

8              (Court recessed from 2:31 p.m. to 2:48 p.m.)

9              MR. COX:  Are we ready?

10             THE COURT:  Yes.

11   Q.        (BY MR. COX)  Okay.  Now let's turn to page 69 of

12   Exhibit 6.   Okay.  We're taking a look now at page 69 of

13   Exhibit 6.   And this is an e-mail that Mike writes to you.

14   You are familiar with this e-mail, I guess?

15   A.        Yes.

16   Q.        In this e-mail, and here we are November 20th,

17   2007, around the time of the loan guaranty.   And here he's

18   talking about, he wants to make sure you are on the same

19   page regarding the purchase of the stock in Medicate

20   Central Pharmacy.   What is he talking about here?

21   A.        He's talking about, he's looking back at the MEZ

22   deal to see if he wants to go forward with the purchase of

23   his shares.

24   Q.        So for the MEZ deal to work he would have to sell

25   some of his stock?

1    A.        Well, the whole purpose of the MEZ deal was to buy

2    out his interest in Central, which is what he desired.

3    Q.        So at this point is he wanting to sell his whole

4    interest or has he modified that?

5    A.        Now it's been modified.

6    Q.        And how has it been modified?

7    A.        He wants to sell half of his 50 percent, or 25

8    percent of the overall business.

9    Q.        One of the things I wanted to ask you about is in

10   the third sentence.  He says, additionally we calculated

11   the profitability of DeliverMed.  I guess that's the mail

12   order part; right?

13   A.        Yes.

14   Q.        And that of Medicate Pharmacy retail.  And then he

15   says, we withheld calculations for Odyssey and Hope

16   Hospice as well as Cambridge House.

17            What is Odyssey?

18   A.        I don't recall.  I'm sorry.  It was another one of

19   those either hospice or a nursing or assisted living

20   centers.

21   Q.        So in making his calculations, he's not including

22   any value of, a calculation for value, he's not including

23   the value of these three parts of it; is that correct?

24   A.        That's correct, yes.

25   Q.        Was it your understanding that the change in the

1    structure whereby you would become an owner of Medicate

2    Central would include those things?

3    A.        Yes.  It would include everything in the, that is

4    done inside the brick building in Washington Park, which

5    would be Odyssey, hospice, Cambridge, retail, mail order.

6    Q.        So, his valuation here which I think he sets forth

7    saying he needs $1.8 million for the pharmacy shares would

8    not include the value of those other components of

9    Central; is that correct?

10   A.        Other components of what?  I'm sorry.

11   Q.        Of Central.  It doesn't include Odyssey, Hope

12   Hospice or Cambridge in that valuation he's put on it.

13   A.        Correct.

14   Q.        And so at this point can you telling from reading

15   this document whether he is saying when he says, I need

16   1.8 million for the pharmacy shares, whether he's talking

17   about all of his shares or just a part of them?

18   A.        Well, since he wants to retain 25 percent, it

19   would, the way it reads it makes me understand that he

20   wants -- the 1.8 million is comprised of 25 percent of

21   overall business.

22   Q.        One of the things I wanted to ask you about is, we

23   talk in the first, he talks in the first sentence about

24   purchase of stock.  And he's talking here about selling

25   stock or shares of Medicate Central Pharmacy; is that

1    correct?

2    A.      Correct.

3    Q.      But going on down here, he says, in order for

4    there to be a purchase of stock -- he's referring to

5    shares of the business; right?

6    A.      Yes.

7    Q.      He says, he's continuing to I guess treat himself

8    as owning 50 percent of those shares of stock, and he

9    wants to sell 25 percent of his shares of stock in

10   Medicate Central.  Is that what he's saying?

11   A.      That's what I'm reading, yes.

12   Q.      And so he says he needs 1.8 million for the

13   pharmacy shares so, did you read this to mean that you own

14   40 percent of those shares at that time of that stock?

15   A.      Correct.

16   Q.      Does this document reflect your understanding of

17   the agreement that you had with Mike and Joey that each of

18   you would receive shares of stock in Medicate Central

19   according to these, according to these figures, these

20   percentages?

21   A.      Yes, we would own stock in Medicate Central

22   Pharmacy.

23   Q.      Now, are these the correct percentages or did you

24   agree on different percentages that would be if you owned

25   all, a portion of all of it?

1    A.      We agreed to different percentages.

2    Q.      And so your percentage wouldn't have been 40

3    percent, what would your percentage have been?

4    A.      Ultimately there was some changing around for the

5    first couple months but it settled at 35.9 percent.

6    Q.      Okay.  And so here he is referring to stock, I

7    guess, as pharmacy shares as part of it being, part of it

8    being owned by you; is that correct?

9    A.      Correct.

10   Q.      And then he goes on and asks for some additional

11   things here and so on.  Now, at this point in time is

12   DeliverMed Holdings still handling the marketing and

13   sales?

14   A.      Yes.

15   Q.      And Medicate Pharmacy is still handling the

16   prescriptions; right?

17   A.      Yes.

18   Q.      Okay.  Now, are the retail pharmacies still

19   operating at this time?

20   A.      Yes.

21   Q.      Okay.  When you saw this Exhibit 6, page 69, when

22   you saw this e-mail from him, how did you respond?

23   A.      Well, I was trying to figure out what he was

24   saying.  Was he saying that the 1.8 was 50 percent or was

25   the 1.8 twenty-five percent.

1    Q.      Okay.  Let's take a look at page 73 then.  And at

2    the bottom we see the remnants of his, of his previous

3    e-mail.  And what is your response here and when did you

4    make it?

5    A.      I made my response on November 23rd, Friday -- I'm

6    sorry, 2007.

7    Q.      Okay.  So just to be, just to be very, very clear,

8    this, this thing you are going through with him talking

9    about the value of his 25 percent of the shares of stock

10   is of Medicate Central, of the whole Medicate Central

11   business?  Is that what you are talking about?

12   A.      Yes.

13   Q.      Would the MEZ financing people have accepted

14   anything less than all of the Medicate Central business,

15   that is, including Odyssey, Cambridge, hospice, so on,

16   would they include all of it?

17   A.      All of it.

18   Q.      And so what do you say to him about this valuation

19   that he's, he's talking about?

20   A.      May I read it?

21   Q.      Please.

22   A.      Most of what you are saying is correct, however

23   the whole business is 3.6, then the 50 to 60 percent you

24   own is estimated to be 1.98 million and then 25 or 50

25   percent of your shares is valued at 990,000 sales price.

1    Warrants of, warrants of 10 percent are exercisable and

2    not issues.

3    Q.    What does that mean?

4    A.    What it means is, it's an option you can exercise

5    in the future.  His request was that he wanted to have the

6    right to purchase those back.  I couldn't imagine how

7    somebody would want to fund a deal and say, yes, I'll give

8    you right of first refusal.  They, they want to buy it for

9    the increased value of the business.  So it's really not

10   issued shares, it's an option to buy shares.

11   Q.    Okay.  So if we go to the top then, when does he

12   respond to you?

13   A.    That is Sunday, November 25th, 2007.

14   Q.    Okay.  And so you have said to him, look, if the

15   whole business is 3.6 million, then you have miscalculated

16   your 25 percent of your shares, which you are talking

17   about the shares of the stock is valued at 990,000.  And

18   so what does he say about that?

19   A.    He says, Mark, comma, I'll explain when we meet

20   but if you look at the financials for this year and the

21   next few years our -- number sign, meaning numbers -- are

22   going to continue to grow.  I'm not basing on what I want

23   for my 25 percent on past performance but on what it would

24   be worth if we continued at the status quo or increasing

25   our business as we are.  Looking at the current numbers my

1    50 percent is bringing netting approximately 600K --

2    meaning 600,000 -- this year.  And I'll continue to get

3    larger as we grow.  Basing a purchase of half of my shares

4    will cost three times that number, and I guess that means

5    three times the 600,000.

6    Q.    So that would add up to 1.8 million --

7    A.    I'm sorry.  I talked over you.  I apologize.  It

8    would add up to 1.8.  Correct.

9    Q.    Okay.

10   A.    I would be a fool to agree to any value of any of

11   my shares at less than that.  We can discuss it tomorrow

12   or Tuesday.  Also, the note changes my position with the

13   bank.

14   Q.    What is, what is he talking about?  What note?

15   A.    I don't know there.  I, I -- I'm not exactly sure.

16   Q.    Okay.  Go ahead.

17         THE COURT:  Hold on a second.  Wouldn't it be

18   talking about the note at Bank of O'Fallon, that the

19   guaranty was signed 11/19/07 by Mr. Swift?

20         THE WITNESS:  Correct.  But I don't know what he

21   means by change in my position with the bank.

22   Q.    (BY MR. COX)  Okay.  You know what note he's

23   talking about --

24   A.    Yes, I do.

25         THE COURT:  That's what -- I thought he said he

1    didn't know what note he was talking about.

2          THE WITNESS:  I apologize.

3          MR. COX:  That's fine.  We can clarify that,

4    Judge.  I appreciate it.

5    Q.     (BY MR. COX)  You know what note he's talking

6    about but you, you don't know what he means when it says

7    it changes my position with the bank.

8    A.     Yeah, from that point on it says the note changes

9    my the position with the bank.

10   Q.     Go on ahead.  Let's see if we can figure this out.

11   It says, they see it as I am still the responsibility

12   party for 2 to 3 million dollars, meaning he's on the

13   note, he's personally guaranteed it.

14   A.     He's a guarantor of the note.

15   Q.     And then it says, I then have a side agreement

16   unenforceable by the bank with you and Joe.  What does he

17   mean by that, do you mean?

18   A.     He assumes that guaranty note that Joe and I

19   signed is not enforceable by the bank.  But as you recall

20   from my previous testimony, the bank surely considered it

21   enforceable.

22   Q.     If we are going to use the Bank of O'Fallon and a

23   guaranty, the three of us will have to be put on the note.

24          Is he saying that he wants all of you to be

25   signators on the note in addition to being guarantors or

1    do you know what he's talking about there?

2    A.       I just know I'm a guarantor.  I don't know what he

3    meant by, all three of us on the note.  Because when

4    you're a guarantor you are on the note.

5    Q.       All right.  So, at this point in time, in November

6    of 2007, you have made an agreement with him that you are

7    going to get shares of stock in this business, in this

8    corporation, and that, he's talking about the selling of

9    part of his shares of 50 percent of that stock.  Is that

10   what's happening?

11   A.       He is actually readdressing the MEZ loan in

12   talking about what he thinks I would be a fool to sell for

13   anything less than that.

14   Q.       Right.  But what's he selling?

15   A.       Shares of Medicate Central.

16   Q.       And how did -- what amount of Medicate Central

17   does he see himself according to this e-mail as owning?

18   A.       50 percent.

19   Q.       Did you agree or disagree with his, with his

20   valuation that he's put on it here of 3.6 million as of

21   November 25, '07.  When you read this, did you agree or

22   disagree or have an opinion at that time about it?

23   A.       I -- he's selling the stock.  It's his valuation

24   of what he wants for the stock.  He set the value so

25   that's his choice.

1    Q.      Going back to page 69, as to this valuation, does

2    it appear here in the top of page 69, the second sentence,

3    that he has reviewed the financials with his brother and

4    father?

5    A.      Yes.

6    Q.      And, and by financials what did you understand

7    he's talking about here?

8    A.      The financial statements of Medicate Central

9    Pharmacy.

10   Q.      Was there only one set of financial statements,

11   those prepared by Schaltenbrand and Schaltenbrand?

12   A.      At this time I only knew of the one that existed.

13   Q.      Okay.  And so in other words there's not some

14   other auditing firm or CPA firm or somebody else creating

15   financial statements, Schaltenbrand and Schaltenbrand was

16   all there was?

17   A.      Correct.

18   Q.      And did he, does he indicate whether his father

19   and his brother agree with this value he's put on it?

20   A.      He is saying, my father -- my brother and father,

21   and then he says, we, meaning collectively, brother,

22   father and him, agree that the valuation of the business

23   is $3.6 million.

24   Q.      I wanted to ask you about the new percentages.

25   Who came up with those?  Did you come up with the change

1    in the percentages?

2    A.        No, Mike came up with those after meeting with his

3    brother and his dad, Schaltenbrand and Schaltenbrand.

4             THE COURT:  What were the new percentages?

5             MR. COX:  I'm going to show you right now.  I have

6    it.

7             THE COURT:  Sorry to interrupt, and I'm

8    interrupting both of you, but when I got a question in my

9    head, if I don't ask it, I forget it.

10            MR. COX:  I'm happy for you to.  And you don't

11   have to have permission to ask it.  Ask away.

12   Q.        (BY MR. COX)  No, I appreciate the questions and

13   this is the answer to that one.

14   A.        Courtney, can you tell me what page this is?

15   Q.        This is page 95 of Exhibit 6, and here we are

16   January the 16th of '08.  Mike is writing to you and is he

17   telling you anything here about the percentages?  And the

18   thing I wanted to ask you about is, first of all, he has

19   some percentages in the first sentence.  Would you read

20   that sentence and explain it to us?

21   A.        It says, Mark, comma, I have discussed the

22   percentages with Larry and dad, they seem to work out with

23   16 percent retail, 79 percent mail order, and 5 percent

24   hospice and Cambridge House.

25   Q.        Now what does that mean?  What's he talking about

1    there?

2    A.        It's talking about the percentages of sales.

3    Q.        Okay.  So he's indicating 16 percent of the sales

4    of the whole Medicate Central Pharmacy?  Is that what we

5    are talking about?

6    A.        Yes, I'm sorry, Medicate Central.  Let me

7    paraphrase it.  Of the whole Medicate Central, 79 percent

8    of the revenue is mail order; 16 percent is retail; 5

9    percent for hospice and Cambridge House.

10   Q.        Okay.  Now, then he goes on to say, the

11   percentages for separation of my 100 percent of 16 percent

12   of retail and 50 percent of 79 percent mail order becomes

13   55.85 percent, yours becomes 35.32 percent, and Joe's are

14   8.83 percent.

15            So are those that I just read, the 55, 35, and 8,

16   the number percentages that are going to be applied to

17   this shares of this, of the entity Medicate Central which

18   is being created?

19   A.        Yes.  The 55, the 35, the 8, yes.

20   Q.        And then he goes on to talk about, Joe and I are

21   discussing swapping percentages, Joe has in Respiratory

22   for DeliverMed, if that's okay with you.

23            And eventually were these percentages that we see

24   here changed as a result of some swapping that was going

25   on with Joe and with Mike?

1    A.    Yes.

2    Q.    And so what are the final percentages that we end

3    up with after everything is finished?

4    A.    Mine is 35.9 percent.  Mike's was like 51.1

5    percent.  And Joe was the remainder to equal 100 percent.

6    Q.    Okay.  Now, these changes in percentage that we

7    have talked about here, when did that actually take

8    effect?

9    A.    January 1st, 2008.

10    Q.    Now even though the -- so even though the

11    paperwork was, wasn't completed, the business actually

12    changed the way it operated at that time and operated as

13    though the paperwork had been completed?

14    A.    Correct.

15    Q.    Now let's take a look at page 102.  At this point,

16    what's the date?

17    A.    I'm sorry but there's a couple e-mails here.

18    Q.    Okay.  Let's start with the bottom one.  Let me

19    get that out for you.  Now the bottom one is dated what?

20    A.    May 28th, Wednesday, 2008.

21    Q.    Okay.  And you are writing to Mike and Joe?

22    A.    From Mark Swift to Mike and Joe Siddle.  And it

23    has two "Joe Siddle@" because Joe had two different

24    e-mails.

25    Q.    Okay.  And what are you talking about here?

1    A.        Well, we just did this, I think I described

2    earlier this very large marketing that started March 10th

3    and was running through the end of May.  And I had talked

4    about if we wanted to continue it, what it was going to

5    cost, and the other, we needed some financing with them,

6    some funds.

7    Q.        So -- see, you're telling them how much you need

8    for marketing expense?

9    A.        If we wanted to continue that program we were on.

10   Q.        Now, I wanted to ask you about the next part.  It

11   says, the good news is, we have closed on Neuman --

12   N-E-U-M-A-N -- and Associates.  What is that?

13   A.        Neuman and Associates is a series of homes

14   throughout Chicago where mentally challenged adults who

15   are wards of the State live in group homes.  And there was

16   a pharmacy by the name of Sutcliff Pharmacy which was

17   currently servicing 645 to 800 patients, and had a

18   relationship with the people there and they had some

19   issues, not big ones, but they were looking for somebody

20   to cover the whole area by mail order would work because

21   some of the houses they had fell outside the area of

22   Sutcliff's ability to deliver.  And I told them we could

23   mail the drugs up to the homes and they could be

24   distributed there.

25   Q.        So how did this, how did the mail order business

1    or let's call it at this point, we would call it Medicate

2    Central, how did Medicate Central get this business?

3    A.        I -- from me.  I have known the people at Neuman

4    for five years, six years, at that point in time.

5    Q.        So you developed this business?

6    A.        Yeah.

7    Q.        And brought it to the Medicate Central?

8    A.        correct.

9    Q.        And so it's -- you indicate here, you are going to

10   transfer 645 to 800 patients over the months of June and

11   July here I guess in 2008, and so what would you estimate

12   that be in terms of additional revenue to the business?

13   A.        Can I use a calculator?

14   Q.        Okay.

15   A.        Is that okay?  Because I can -- I know how to do

16   the -- sorry, but off the top of my head I do not know.

17   Q.        Okay, no problem.

18   A.        I'm going to use the 800 number just for -- or

19   let's use like a 725, which is sort of a midpoint.  And

20   Neuman does not have a lot of script for patients, they

21   only have about three prescriptions per patient, and at

22   the 5495 which we bill per patient, that's $119000 a

23   month, for 12 months, it's $1.4 million in revenue.

24   Q.        Per year?

25   A.        Per year.  Additional revenue.

1    Q.      Okay.  And then you go on to say at the end there,

2    I will be in Washington Park next week, working with

3    restatement of financial statements.

4            What are you talking about?

5    A.      We were trying to calculate the, for the accruals

6    for the previous years, getting those off the books, and

7    expenditures, so we made some accruals in 2007 that had to

8    be taken off the books and that's the restatement, we had

9    to do a little accounting work, some accruals and some due

10   tos and due froms between the companies were, had to be

11   offset it.

12   Q.      At this point who are you working with on that?

13   A.      Larry.

14   Q.      Junior?

15   A.      Or, I'm sorry, Larry Junior, yes.

16   Q.      Okay.  So by this time you are getting information

17   from him?

18   A.      Yes.

19   Q.      Now, going to the one above it, let's take a look

20   at this.  This is from you to Mike.  The next day.  But if

21   we look underneath that we see an e-mail from Mike; is

22   that correct?

23   A.      Yes.

24   Q.      And what is Mike telling you in this e-mail?

25   A.      It says, Mark, comma, there are no funds available

1    for marketing at this time.  We exhausted all funds in the

2    line of credit and borrow an additional line of 150,000 to

3    make McKesson payment.  We also owe HD Smith 100,000 from

4    last week.  I'm awaiting a call from Kip -- meaning Kip

5    Atkins at the Bank of O'Fallon -- to see if we can add

6    funds to our present line.  I have not heard from him

7    since I last called him when we were all together.  I am

8    sure it is not the news we want to hear.  I will continue

9    to call him today.

10   Q.      Well, this sounds pretty grim here.  Did you have

11   any idea at this point before you received this e-mail

12   that the, that not only was the business out of money but

13   he's talking about having to go borrow more money from the

14   bank?

15   A.      I didn't know prior it to this e-mail, no, I

16   didn't know what the, the amount owed to the different

17   people were -- was.

18   Q.      And, and at this time is, is he still taking his

19   distributions, Mike?

20   A.      Yes.

21   Q.      Let's go up to the one above it.

22   A.      By the one above, are you referring to the May 29,

23   Thursday?

24   Q.      I am.  This is -- well, let's first begin with the

25   one just above what he wrote.  Let's take that one.

1    A.        That is also dated May 29th, 2008, Thursday.  Let

2    me just say, it's 12:18 p.m.  It's from myself to Mike.

3    Q.        Now how do you respond to this report from Mike

4    that you -- the company needs to borrow more money?

5    A.        It says, let's see what cash we have -- let's see

6    what cash we have, we have payables due Thursday.  I don't

7    want to shut down of call center.  We have to patch work

8    the cash until the tax refunds received.

9    Q.        What are you saying to him?

10    A.        Well, at this point in time Mike went into the

11    business and took out several hundred thousand dollars to

12    pay his personal taxes in April 15, 2008, which severely

13    choked our cash flow.  And after it was mailed, after the

14    checks were sent out, I said, wait a minute, you've got

15    accruals here, you are an accrual accountant, you can make

16    adjustments on your, on your taxes, probably accrue

17    things, and you will not owe that much taxes.  And you

18    have overpaid your taxes and taken the company's money.

19    Q.        So what do you mean, I don't want to shut down of

20    the call center.

21    A.        It takes a long time to get a call center going

22    where they call patients and you have what they refer to

23    as partials, where you may have like 80 percent of the

24    information, they may have to call the patient to get the

25    other 20, and you have this like rolling ball of work in

1    progress going on.  And as they get completed they start

2    bringing them to us.  If you shut down the call center and

3    say, we're not going to pay you, we don't want to do any

4    more work, all the stuff that's in progress you have paid

5    for you have just lost because, by the time you restart

6    it, those people are not interested or have gone their own

7    way.

8    Q.    So we look now at the top, is Mike's response to

9    you, it looks like the same day, not too long after that.

10   And how does he respond to you about this?

11   A.    He says, I know we don't want to shut down the

12   call center and try restarting it.  I have called and left

13   yet another call for Kip.  My hope is he will call with

14   another option of additional line of credit and we can

15   proceed.  I just -- I think he said, I just missed your

16   last call and I'm on another phone.  I will call you when

17   I get off.

18   Q.    Okay.  Let's now turn to page 107.  Let's look at

19   the bottom e-mail first on page 107 of Exhibit 6.  You're

20   writing here to Joe; is that right?

21   A.    Correct.

22   Q.    I first want to ask you about the subject.  You

23   call it DeliverMed 3.  What is that?

24   A.    We classified each marking campaign into different

25   DeliverMeds:  DeliverMed 1, DeliverMed 2, DeliverMed 3,

1    and they were by a certain time frame.  And then we'd keep

2    track of those patients in the system by that name,

3    DeliverMed 1, 2 or 3.  We used the information for various

4    reasons.  The biggest reason was, how long had DeliverMed

5    1, meaning the first marketing we did, was still with us

6    today.  And how long had DeliverMed 2 is still, et cetera.

7    Q.      When you say a marketing campaign, what is a

8    marketing campaign?

9    A.      We talked about it earlier where we take down and

10   we determine we want, say we all sit around the table,

11   Joe, Mike and I and say we're going to try to get 1500 new

12   patients.  And we work back in the formula and say, it's

13   going to take so many mailing, so much call, so much the

14   combination of two, and figure that whole process out.

15   And that whole process we run for a period of time and

16   then that's called a campaign.

17   Q.      And who determines the period of time?

18   A.      Well, the period of time is determined by the

19   number of patients that we all agree to want to try and

20   obtain.

21   Q.      For example, roughly speaking, DeliverMed 1

22   campaign was about how long?

23   A.      Oh, I'm -- several months.

24   Q.      Okay.

25   A.      DeliverMed 2 was several months.  DeliverMed 3 was

1    just a short time.   That's that real aggressive campaign

2    we did from March 10 to May, end of May of 2008.

3    Q.      So what are you saying to Joe here about the

4    DeliverMed 3 campaign?

5    A.      We had binders at the, which went by campaigns

6    showing what DeliverMed spent on each of those, show

7    receipts, show some marketing analysis of each one, and we

8    had them in binders 1, 2 and 3.   And we wanted to review

9    DeliverMed 3's to see what was accomplished because our

10    cost of obtaining patients as time went on was getting

11    more and more expensive because there's less and less

12    patients who want to sign up to our service so it takes a

13    lot more effort, a lot more money, to get them.

14    Q.      So going down now to the last sentence of that, it

15    says, I feel like Oliver Twist.   What is -- could you read

16    that for us?

17    A.      Okay.   Let's start at the beginning.   It says,

18    it's the principle and sloppy way the financing has

19    occurred, parentheses, the taxes being a prime example,

20    parentheses.   I feel like Oliver Twist when it comes to

21    disbursements.   There's always confusion and

22    misunderstanding.   I just cannot be that complex.   And to

23    think I'm supposed to believe this means I must be

24    perceived as a fool.

25    Q.      What are you talking about here, Mark?

1    A.        In Dickens' classic book Oliver Twist, the little

2    boy goes up with his bowl and says, may I have some more

3    please, sir?  And I felt like I was having to do that all

4    the time to get my distribution.

5    Q.        When you say there's always confusion and

6    misunderstanding, what are you talking about?

7    A.        Well again, Mike would only be in there Fridays,

8    and sometimes I would be down there Tuesday through

9    Thursday, and Mike was going to sign the distribution

10   checks, he was going to do it, he left, went to the lake

11   house, was out at the golf course or something of that

12   nature.  And I would call Joe and say, what's going on?

13   Well, Mike thought we were going to do that on Monday.

14   Or, we're confused as to where that goes.

15           And he said, well, and where does Mike -- we're

16   not sure where Mike is.  We can't find him.  And Mike's --

17   Mike's got to execute that.  And there was always a

18   confusion.  There was always a reason why we weren't

19   getting -- you know, we were out of money but we took out

20   hundreds of thousands to pay personal taxes.  There was

21   always confusion and it always seemed like it's a very

22   complex issue when it's a rather simple issue.

23   Q.        And then you go on to say, and to think I'm

24   supposed to believe this.  What is "this"?

25   A.        Believe that it really is that confusing, that

1    complex, to issue distribution checks.

2    Q.      And what do you mean by, this means I must be

3    perceived as a fool?

4    A.      If anybody expects a logical person to agree that

5    it's complex and it's involved and it's really, there's

6    always an excuse, then they're treating you like a fool.

7    Q.      Well, let's go up to the top then and we see

8    Joey's response.  And how does he respond to you?

9    A.      Nobody thinks you are a fool.  Mike and I believe

10   in you and we are where we are at because of you.  Nobody

11   has questioned your marketing funds, I'm just trying to

12   show you the trust and respect we have for you.  The

13   problem might be I don't communicate to Mike when you are

14   upset.  I don't communicate to Mike our conversations to

15   him.  So he doesn't know how you feel.  Mike has never

16   questioned the market funds.  I am the one asking you.

17   Mike comes in once a week, answer as his e-mails, returns

18   calls and leaves.  He leaves the marketing and operations

19   to you and me.  All the times the three of us are

20   together, we cannot communicate through our feelings with

21   distributions craziness.

22   Q.      What did you understand this to mean, this

23   distribution craziness?

24   A.      Just what I described earlier, Mike's not here,

25   Mike's at the golf course, we can't do this, oh, there was

1    some money we had to use for something else, oh, he had to

2    pay all of his taxes so there's nothing left for us.    That

3    craziness.

4    Q.      And his description here of what he talks about

5    Mike only coming in once a week and so on, was that

6    consistent with what you, yourself, observed?

7    A.      What I observed, yes, he was -- he was regularly

8    there for about two or three hours every Friday, but

9    that's about the only time.

10   Q.      Well, let's now move forward to the next month.

11   We're working our way up now to July the 12th, 2008, and

12   we're going to look at a page 114.   You are writing to

13   Mike on Saturday July the 12th.   And what are you telling

14   Mike here?

15   A.      You're talking about the bottom e-mail; correct?

16   Q.      I am.

17   A.      This is when I learned about, that all those

18   patients were lost that we had done on that aggressive

19   marketing campaign.   And I -- the subject is a meeting.

20   And I said, we have had a significant revenue leak.   Joe

21   asked for help.   John Tollefson and I will concentrate the

22   next few weeks on this topic.   I would like to meet with

23   you on Wednesday to go through the accreditation, the

24   revenue leak, and the tax refund status.   Also the status

25   of marketing.   I covered all these issues with Joe this

past week.  I would like him to stay at the pharmacy while

we meet.  With limited time Joe has before vacation, we

need every moment of his time working with John.   Thanks.

Q.      Let's talk about this for just a minute.  When you

talk about a revenue leak, what are you talking about?

A.      Lost patients.

Q.      Okay.  In other words, you lose patients, sales go

down.

A.      Correct.

Q.      And you are talking about Joe asked for help.  Is

that where he asked for John Tollefson to come help?

A.      Yes.

Q.      All right.  And then you indicate, John Tollefson

and I will be concentrating for the next few weeks on this

topic.  Did you and John Tollefson work together to remedy

this problem?

A.      Yes.  I was stating that because Joe was going to

go off to Africa and I just couldn't have John walk into a

pharmacy where people don't really know him and say, start

doing this.  So I had to come down there and go through

what I knew before he -- just to help him out.  And Joe

helped quite a bit for like the 24 hours before he took

off to Africa and left the project for Joe and I -- I'm

sorry, for John and I.

Q.      Okay.  Now then you go on to say, I would like to

1    meet with you, meaning Mike, on Wednesday, to go through

2    the accreditation, revenue leak and tax refund status.

3         Let's talk first about accreditation.  What were

4    you going to talk to Mike about in terms of accreditation?

5    A.     At that time Medicaid was requiring accreditation

6    of pharmacies for various reasons but probably the main

7    one that affected us was to be able to build Part B -- as

8    in boy -- for diabetic supplies.  You had to be an

9    accredited pharmacy.  Very similar to accreditation, if

10   like people are familiar with joint accreditation of

11   hospitals, it was now moving down to the retail pharmacy

12   area.  So we were in the process of doing all of the

13   documentation, getting all the binders together and

14   everything for accreditation.

15   Q.     So DeliverMed is bringing in through these various

16   campaigns additional patients but on the other end they're

17   leaking out, they're being lost, is that what you are

18   talking about with the leak?

19   A.     Yes, they were leaking faster than we could fill.

20   Q.     And in addition you have large distributions and

21   that are affecting the, what's available to pay bills in

22   the business; is that correct?

23   A.     Correct.

24   Q.     So Mike then responds there at the top, what do

25   you mean significant revenue leak?

1              Was he not aware that this problem existed?

2    A.       Well, when we were in Las Vegas, we being Joe and

3    I, we had called him several times --

4    Q.       When was that?

5    A.       Just before this.

6    Q.       Okay.

7    A.       Like several days.  Like we probably even came

8    back maybe that day or so.  And I kept on, we would e-mail

9    Mike a couple times, say we have a revenue leak issue,

10   call us.  We didn't get a response.  So I crafted this

11   e-mail up as another way to try and find him and

12   communicate with him what was going on.

13   Q.       Okay.  We're going to now turn over to page 120 of

14   Exhibit 6.  This is an e-mail from Mike to you dated

15   September 30, 2008.  And now he says, Mark, I have

16   reviewed your expenses.  What expenses are those?

17   A.       Travel expenses.  Expenses for phone lines I had,

18   cellular expenses.  In this case, some bonus payments that

19   we made out to the folks, things of that nature.  And they

20   were all assembled and I submitted an expense report for

21   reimbursement.

22   Q.       For your --

23   A.       Personally.

24   Q.       For the business expenses you are having?

25   A.       That I incurred.

1    Q.      There was a question here about a 900-dollar cash

2    payment bonus.  What was that?

3    A.      We had -- one of the things to try and shore up

4    the damage of the lost revenue leaks was we had certain

5    goals, how many patients we retained, how many -- there

6    was a variety of variables, I can't remember them all

7    right now, how many patients we got executed that week so

8    we wouldn't have a backlog, and we developed all these

9    targets.  And if everybody hit their goal as a group, they

10   each got, I can't think, I think it was 25 or $50,

11   something of that nature.  And they each got a 50-dollar

12   bonus and we -- I set the barbecue up outside and I

13   barbecued lunch.  It was an employee program.

14   Q.      I see.  And here he's questioning you on items

15   like $12 and $218, $500.  And at the same time what is he

16   taking out of the business in terms of distributions?

17   A.      Well, a standard distribution for his child

18   support and alimony.  You know, a lot of personal expenses

19   were to be found later.

20   Q.      On the credit cards?

21   A.      Credit cards and direct ones for country clubs,

22   thinks of that nature.

23   Q.      I see.  Now let's take a look at Exhibit 96.  We

24   have looked at this before.

25          MR. COX:  Exhibit 96.

1          THE COURT:  Oh, Exhibit 96?

2          MR. COX:  Yes.

3     Q.     (BY MR. COX)  Mark, who prepared this?

4     A.     I did.

5     Q.     And what did you prepare it from?

6     A.     Well, each column probably has some other source

7     of production.

8     Q.     Well, let's take a look at it.  The first column,

9     the distributions, where did you get these figures?

10    A.     The submitted tax return schedule.  I think it's

11    M-2.

12    Q.     So these are off the tax returns for Mike or for

13    the business?

14    A.     For Mike.

15    Q.     Okay.  So you went to his personal tax returns.  I

16    see in 2011 there's a zero for distribution.

17    A.     Correct.

18    Q.     Why is that?

19    A.     At the time we did not get -- we requested for the

20    2011, we just recently got that.

21    Q.     Okay.  So that would have to be added in?

22    A.     Sure.

23    Q.     Okay.  And what did his distributions add up --

24    according to the tax returns for your review?

25    A.     Without the 2011?

1    Q.      Yes.

2    A.      Approximately 3.3 million.

3    Q.      So those were distributions he received from the

4    mail order business and after 2008 from the Medicate

5    Pharmacy Central business that you were partners in; is

6    that correct?

7    A.      This was off the taxes.  I don't know how he

8    grouped it, but that's what he received as distribution

9    off the taxes.

10   Q.      And going to the second column, that's for W-2

11   salary.  Where did you get those figures?

12   A.      From SDIC, Southern Data Illinois Corporation, who

13   does the payroll.  We subpoenaed the payroll records for

14   Michael Schaltenbrand and came up with those numbers.

15   Q.      And what's the total salary Michael's received on

16   W-2?

17   A.      Approximately 567,000.

18   Q.      And then in the third column we have his salary

19   for non W-2.  What do you mean by that?

20   A.      The thousand dollars a week that he took.

21   Q.      So the thousand-dollar salary that I talked with

22   him about in his testimony, the thousand dollars per week,

23   that was not paid on a W-2?

24   A.      Correct.

25   Q.      Just like yours wasn't paid on a W-2?

1    A.       Correct.

2    Q.       If so, did you -- where, where did you say you got

3    all that information?

4    A.       Well, the general ledgers would show that.  2011,

5    we didn't get until later, and he bumped it up to $1500 a

6    week.

7    Q.       So, for 2011 it increased from a thousand a week

8    to 1500 a week?

9    A.       Correct.

10   Q.       All right.  And so you added all that up, not

11   counting 2011, and what would you get?

12   A.       312,000.

13   Q.       So we would have to add to that, you're the

14   accountant, 52,000 and --

15   A.       About 75,000, just call it.

16   Q.       About 75,000, okay.  Whatever 1500 times 52 is.

17   A.       About 78,000.

18   Q.       I had a good English teacher, I'm not so sure

19   about the math.

20            And let's see, let's go to company paid certainly

21   expenses.  Where did you get these numbers?

22   A.       During discovery and subpoenaed we got the various

23   credit card statements for Mike Schaltenbrand for the

24   different business, and the business of being Chase and

25   Bank of America and, et cetera, and just went through and

1    picked out some of the amounts that I could trace to the

2    general ledger.

3    Q.    And do you have confidence that this is all of

4    them?

5    A.    Oh, no, I do not have confidence.  I don't even

6    know what percent -- this could be a fraction or it could

7    be a third or a half, but it's way, it's way below 100

8    percent.

9    Q.    And so according to these figures what's the total

10   from 2005 through 2011 that Mr. Schaltenbrand has, has

11   received from this business?

12   A.    I'm sorry, since -- for the credit card or the

13   total?

14   Q.    For the total.

15   A.    Just to round it, about 4.5 million.

16   Q.    In a business like this, if you withdraw that much

17   money from the business for either expenses, salary, or

18   distribution, what effect would that have on the need for

19   the company to borrow money to keep expenses paid?

20   A.    It can only come from two sources, and that is

21   profits or from loans.

22   Q.    All right.

23   A.    I mean, it can come from a third source but we

24   would never had an example, that would be additional

25   contributing capital where somebody is putting capital

1    into the business.  We never had an example of that.

2    Q.    So would this kind of withdrawal cause you to have

3    to borrow more money?

4    A.    Yes.

5    Q.    And before we leave 2008, let's look at

6    Plaintiff's Exhibit 23, please.

7        MR. STINE:  Did you say 28, Courtney?

8        MR. COX:  23.

9        MR. STINE:  23, okay.

10   Q.    (BY MR. COX)  Okay, we're looking at Exhibit 23.

11   This is dated October 13th, 2008.  Please explain to the

12   judge the background of this document and how it came to

13   be created, if you know.

14   A.    I do.  I have a handicapped son.  And one of the

15   things I'm going to have to do is to get a house and turn

16   it into like a group house which is the best way you know

17   that your son will be taken care of.  And you'd hire a

18   resident to stay there and then they'd have three bedrooms

19   and three other people of his type that -- what I mean by

20   his type, I mean his skill level.

21        And there was a particular home and it was a very

22   complex, unusual story that -- it was right across from

23   the community center and that doesn't happen very often.

24   It was the perfect size home.  And it had a very telling

25   tale of where the bank was repossessing it and then they

1    closed it and then they didn't want it, and it was falling

2    through all these things.  And they had the most unusual

3    offer to people if they wanted to buy it.  You could bid

4    on a phone auction, but you had to send proof of cash

5    abilities and business or things of that nature.  And you

6    need to be registered to be one of the on-phone bidders.

7         And this is in October of 2008.  One night after

8    work Joe Siddle asked me to go to a movie with him, I

9    think it was the Batman movie, he wanted to see the Batman

10   movie.  So we went to the Batman movie that evening.  And

11   I had been calling and leaving messages and texting Mike

12   during the day saying, I gotta get some verification

13   what's owed me because I want to enter this bidding

14   process.

15        And Mike was kind enough to leave his home and

16   meet me at a bar, a sports type bar right across from the

17   movie theatre, it had a sports theme to it, and so I could

18   explain to him what I was doing.  And he said, well go see

19   Larry and Larry will put together your verification of

20   your earnings and things so that you can use it to state

21   your value to get in this bidding process.

22   Q.      And is that Larry Junior?

23   A.      That is Larry Junior, yes.

24   Q.      So at that point you didn't have the numbers you

25   needed to fill in the blanks, in other words?

1    A.      No, I did not have the numbers that tied to their

2    financial records and that's what I was trying to get

3    here.

4    Q.      Okay.  And so he said it was okay to talk to Larry

5    Junior?

6    A.      Yes.  And he set it up for me.  He was very kind

7    that way.  He set it up for me, told -- he either called

8    Larry or told me go to Larry about 2:00 in the afternoon

9    tomorrow.  So I did.

10   Q.      When you went there did you meet with Larry

11   Junior?

12   A.      Yes, I did.

13   Q.      And was he willing to meet with you?

14   A.      Oh, yes.

15   Q.      And now were -- did the two of you sit down

16   together and, and come up with this?

17   A.      I, I mentioned to him what I was trying to do.

18   And he had examples of confirm or verification letters

19   that he had used in the past, in other words, that opening

20   paragraph or two.

21   Q.      Okay.

22   A.      And so we used his example.  We created that and

23   then we had a bunch of blank lines.  And he -- I gotta

24   thank him very much.  He sat at the table, he brought out

25   all the files and stacked them up and we sat there

1    together back and forth.   And he was picking the numbers

2    off the statements, telling me to write them down, and I

3    wrote some down, he wrote some down on, let's call it a

4    work paper.   And he executed this and another one for me

5    so that I could use it for the bidding process.

6    Q.      Looking down at 2008, it says, earnings not

7    distributed N/A.   Why is that N/A?

8    A.      Well, the change of the relationship in 2008.

9    What we did is drew a line in the sand and said, okay, all

10   2005, '06 and '07, we're going to have to make up those

11   past distributions.   2008, we're all going to get a pro

12   rata basis of distribution as you would in a sub S chapter

13   corporation type where one person takes out a dollar, the

14   other people have to take out the matching.

15          So going 2008, we all tried to balance all the

16   time to make sure that we were all in, in proportionate.

17   Q.      All right.   Now do you, yourself, know whether

18   these numbers are accurate or were you relying on Larry

19   Junior to provide with you this information?

20   A.      I relied on Larry Junior.   He had so many work

21   papers and so many schedules.   He had done some work on

22   this.

23   Q.      Okay.   And we see here undistributed income, and

24   we talked a little about that.   And that means income you

25   haven't -- you have earned but not received yet?

1    A.      Correct.

2    Q.      All right.  Did having undistributed income affect

3    you in your taxes?

4    A.      Yes.

5    Q.      In what way?

6    A.      Well, several ways.  The whole tax filing

7    situation, that I still cannot file a final taxes.  I have

8    filed some drafts but with explanations.

9          And it has affected me greatly because of my

10   inability to file taxes has affected my daughters'

11   education, both of them in.  Because they're both NCAA

12   rowers, and the NCAA requires that you submit your tax

13   information so that they can monitor that, if a person

14   gets a grant, that it's not a way of getting around the

15   NCAA scholarship rules.

16         Then you have to submit your tax information to

17   the universities.  For my oldest daughter, that's Columbia

18   University in New York City.  And a younger daughter,

19   that's University of Wisconsin.  And I have not been able

20   to do this and it's been a nightmare.  It's affected my

21   daughters' financial education and we are coming up on a

22   time when it's going to affect it again, because I have to

23   have the Columbia filed on Cinco de Mayo, on May 5th.  And

24   the Big 10 requires their filing on June 5th --

25   Q.      And part of what you are asking -- I'm sorry.

1    And part of what you are asking the Court in this is to be

2    able to get that tax information so you can complete your

3    tax filings; is that correct?

4    A.      Correct.  Because for like one instance in 2007,

5    they sent a 1099 -- they being the Schaltenbrands -- sent

6    a 1099 to the IRS saying I received I think it was

7    $627,000, which was a calculation of how much they thought

8    I should be paid, when I wasn't paid that amount.

9    Q.      Okay.

10   A.      And that caused even more IRS problems and more

11   NCAA and more PEL grant problems.

12           MR. COX:  Your Honor, this is Exhibit 80.  It's a

13   new exhibit.

14           MR. STINE:  What was the number?

15           MR. COX:  80.

16           THE COURT:  We're going to take a 10-minute break.

17           THE CLERK:  All rise.

18           (Court recessed at 3:52 p.m. to 4:00 p.m.)

19           MR. COX:  Moving Exhibit 23.  Exhibit 23.

20           MR.  STINE:  Which one is that?

21           MR. COX:  That's Larry Junior's verification.  Has

22   that been admitted yet?

23           THE CLERK:  No.

24           MR. COX:  We'd move admission of that document.

25           MR. STINE:  No objections.

```
1              THE COURT:  That will be admitted.

2              MR. COX:  And Exhibit 96, which is distribution,

3      salaries, and so on, that Mark testified he compiled.

4              THE COURT:  That will be admitted.

5              MR. STINE:  Judge -- do I get a chance to object?

6              THE COURT:  No, doesn't matter.

7              (Off the record discussion.)

8              (Court recessed at 4:02 p.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                    <u>REPORTER'S CERTIFICATE</u>

2          I, Christine A. Simpson, Registered Merit Reporter

3   and Certified Realtime Reporter in and for the United

4   States District Court for the Southern District of

5   Illinois, do hereby certify that I was present at and

6   reported in machine shorthand the proceedings in the

7   above-mentioned court; and that the foregoing transcript

8   is a true, correct, and complete transcript of the

9   electronic recording.

10         I further certify that I am not an attorney for,

11  nor employed by, nor related to any of the parties or

12  attorneys in this action, nor financially interested in

13  the action.

14         I further certify that this transcript contains

15  pages 741-1000 and that this reporter takes no

16  responsibility for missing or damaged pages of this

17  transcript when same transcript is copied by any party

18  other than this reporter.

19         IN WITNESS WHEREOF, I have hereunto set my hand at

20  Benton, Illinois, this 28th day of April, 2012.

21

22              *s/Christine A. Simpson, RMR, CRR*

23         _____

24         Christine A. Simpson, RMR, CRR

25